## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

CARL HIGBIE, JOSEPH HARRIS, and )
MICHAEL VOTRUBA, )
                                  )
Plaintiffs, )
                                  )  Civil Action No. <u>1:24-cv-174</u> (GTS/CFH)
v. )
                                  )
STEVEN G. JAMES, in his Official )
Capacity as Superintendent of the )
New York State Police, SHERIFF KYLE )
BORGAULT, in his Official Capacity as the )
Sheriff of Rensselaer County, New York, )
SHERIFF DONALD J. KRAPF, in his )
Official Capacity as the Sheriff of Columbia )
County, New York, and JOHN DOES 1-10, )
                                  )
Defendants. )
_____ )

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

COME NOW Plaintiffs Carl Higbie, Joseph Harris, and Michael Votruba, ("Plaintiffs"),

by and through undersigned counsel, and allege as follows:

1.      This case involves a challenge to New York's wholesale refusal to allow those who

are not State residents to exercise their right to "public carry" while in the State of New York.

2.      In *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 33 (2022), the Supreme

Court unambiguously held that the Second Amendment "guarantees … a right to 'bear' arms in

public for self-defense."  In *District of Columbia v. Heller*, 554 U.S. 570, 581 (2008), the Court

explained that this right "is exercised individually and belongs to all Americans."

3.      In direct contravention of those clear holdings, New York provides no avenue for

"all Americans," who are not residents of New York, to "bear arms" in public.

1

4.    First, New York does not recognize or grant reciprocity to any concealed carry permit issued by any other state.  Whereas someone from Massachusetts can drive into New York based on a Massachusetts driver's license, the same Massachusetts citizen cannot carry a firearm into New York based on a Massachusetts concealed carry license.

5.    Second, New York does not allow non-New York residents who do not own property in New York even to apply for a New York firearm permit, instead allowing only New York residents (and some individuals who satisfy various exceptions not relevant here) to apply.

6.    Third, because New York does not permit a person *even to possess* most firearms[1] without a permit, the inability of nonresidents to obtain a New York permit means they cannot even "keep … arms," even within a private domicile or on private property.  And because New York does not permit the "open carry" of firearms, there is no way for non-residents to "bear arms" in public without a permit or reciprocity.

7.    Thus, for the 94 percent of Americans who are not residents of New York, the "right to keep and bear arms" in public simply does not exist within the State.  No other provision of the Bill of Rights works this way.  *See Heller*, 554 U.S. at 634 (rejecting Justice Breyer's opinion that the Second Amendment should be interpreted differently when "limited to an urban area," explaining that "[w]e know of no other enumerated constitutional right [that] has been subjected to [such an] approach").  In *Bruen*, the Supreme Court criticized as intolerable an argument that "would in effect exempt cities from the Second Amendment and would eviscerate the general right

---

[1] New York requires some form of license, subject to in-state residency or employment requirements, for handguns and semi-automatic rifles.   N.Y. Penal Law § 400.00(3)(a). Accordingly, bolt-action rifles and shotguns ("long guns") appear not to require licensure to possess.  However, this is no consolation for Plaintiffs, who seek to carry *handguns* for self-defense in public, because long guns are unwieldy, impractical, and indeed impossible to carry inconspicuously for such a purpose.  *See Heller*, 554 U.S. at 629 ("Whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense....").

to publicly carry arms for self-defense. *Bruen*, 597 U.S. at 31. Yet for nonresidents of New York, *the entire state* is practically exempted from the Second Amendment.

8.      But "[t]hat notion hangs on a cramped view of a citizen's federal constitutional right to keep and bear arms, which is a right a citizen enjoys everywhere in the country." *Rhode v. Bonta*, 2024 U.S. Dist. LEXIS 17052, at *43 (S.D. Cal. Jan. 30, 2024).

9.      Unsurprisingly, New York's patently unconstitutional scheme represents an extreme outlier among the 50 states, as Plaintiffs are not aware of *any state* that similarly has *no mechanism* for nonresidents to keep *or* bear arms – by denying nonresidents the ability to apply for permits, by refusing to recognize or grant reciprocity to the out-of-state permits held by nonresidents, and by conditioning mere possession of virtually all firearms on the issuance of an unobtainable permit. In contrast, although Connecticut, for example, refuses to recognize other states' carry licenses, Connecticut allows nonresidents to apply for Connecticut Pistol Permits, should they wish to carry firearms in Connecticut, provided they already have a license to carry from another state. *See* Conn. G.S. § 29-28(f). Even California and Hawaii, which do not issue permits to nonresidents, still permit nonresident visitors to transport firearms within the state. *See* Cal. Penal Code § 25610; H.R.S. § 134-3.

10.      As one court recently concluded, "[a] law-abiding resident of [one state] who is exercising his Constitutional right should not become a felon by exercising that right while he is traveling thorough [another state] merely because he has not obtained a [that state's] license to carry…. This Court can think of no other constitutional right which a person loses simply by traveling beyond his home state's border into another state continuing to exercise that right and instantaneously becomes a felon…." *Commonwealth v. Donnell*, No. 2211CR2835, 2023 Mass. Super. LEXIS 666, at *8 (Aug. 3, 2023).

## I.   **PARTIES**

11.     Plaintiff Carl Higbie is a natural person and a citizen of the United States and of the State of Connecticut.  Mr. Higbie resides in Fairfield County, Connecticut.

12.     Plaintiffs Joseph Harris and Michael Votruba are natural persons and citizens of the United States and of the Commonwealth of Massachusetts.  Mr. Harris resides in Worcester County, Massachusetts, while Mr. Votruba resides in Berkshire County, Massachusetts.

13.     Mr. Higbie is a law-abiding person, a gun owner, and currently possesses a Connecticut State Pistol Permit, which permits him to bear arms in public in Connecticut (and across most of the country).

14.     Mr. Harris and Mr. Votruba are law-abiding persons, gun owners, and currently possess unrestricted Massachusetts Licenses to Carry firearms, which permit them to bear arms in public in Massachusetts (and across most of the country).

15.     If allowed to apply for a New York carry permit, Mr. Higbie, Mr. Harris, and Mr. Votruba would do so.  However, they are prohibited even from applying because they do not live, are not principally employed, and do not own property in New York.  Were they allowed to apply for New York permits, Mr. Higbie, Mr. Harris, and Mr. Votruba would meet the eligibility standards required as, but for the prohibition on their applying by virtue of their out-of-state residency, they otherwise are eligible to possess and carry firearms in the State of New York.

16.     Similarly, if allowed to use their Massachusetts and Connecticut permits to carry firearms within New York, Plaintiffs would do so, but cannot due to operation of New York law.

17.     Plaintiffs Higbie, Harris, and Votruba are the kind of persons discussed by the Supreme Court in its recent opinion in *Bruen* – that is, they are typical, law-abiding citizens with ordinary self-defense needs, who cannot be dispossessed of their right to bear arms in public for

self-defense in the State of New York simply because they do not live, are not principally employed, and do not own property in New York.

18.     Defendant Steven G. James is sued in his official capacity as the Superintendent of the New York State Police.  As Superintendent, he exercises, delegates, or supervises all the powers and duties of the New York Division of State Police, which is responsible for executing and enforcing New York's laws and regulations governing the carrying of firearms in public including, *inter alia*, prescribing the form for Pistol/Revolver License Applications.  As the Superintendent of the New York State Police, Mr. James is the entity/individual tasked with implementing procedures for the licensing scheme and process.  *See* N.Y. Penal Law § 400.00(3)(a) ("Blank applications shall, except in the city of New York, be approved as to form by the superintendent of state police."); (4)(a) (appeals process and promulgating rules for same); (5)(a) (receiving duplicate copies of permit applications); (7) (approving the form of license); (10)(b) (recertification of licenses upon expiration in certain counties).  Moreover, Defendant James is tasked with enforcing New York firearm laws, including arresting unlicensed residents *and* nonresidents who carry firearms unlawfully within the state.  Defendant James may be served at the New York State Police, Building 22, 1220 Washington Avenue, Albany, NY 12226.

19.     Defendant Sheriff Kyle Bourgault is the official responsible for accepting Pistol/Revolver License Applications within Rensselaer County, New York.  Prior to taking office, Sheriff Bourgault was the Deputy listed as the point of contact for the county's Pistol/Revolver License Applications process.[2]  The application instructions explain that, for the required character references, relatives may not be used, that "[a]ll references must live in the Capital District," and that references from outside "New York State are not acceptable."  *Id.*  Sheriff Bourgault is the

---

[2] http://tinyurl.com/bdzdh3pt.

Sheriff of the County where Plaintiff Votruba typically visits when he often drives to Grafton to visit his friend, and thus Rensselaer County is the primary county in which Plaintiff Votruba desires to keep and bear arms.  However, Defendant Bourgault does not accept and will not process Pistol/Revolver License Applications from out-of-state applicants like Plaintiff Votruba. Defendant Bourgault can be served at the Rensselaer County Sheriff's Office, 4000 Main Street, Troy, NY 12180.

20.     Defendant Sheriff Donald J. Krapf is the official responsible for accepting Pistol/Revolver License Applications within Columbia County, New York, and charges a $25 fee to process the application.[3]  The Sheriff's website states that "APPLICANTS MUST BE A LEGAL RESIDENT OF COLUMBIA COUNTY for a period of not less than six (6) months prior to applying...."  *Id.*  Likewise, all four "character references" required for an application "MUST reside in Columbia County...."  *Id.*  Defendant Krapf is the Sheriff of the County that both Plaintiff Votruba and Plaintiff Harris (1) drive through to cross into New York from Massachusetts, and (2) where Plaintiff Votruba visits when entering New York for shopping and other activities.  Further, Plaintiff Votruba lives within 400 yards of the Massachusetts Pittsfield State Forest, which is directly across the border from Columbia County, New York.  As explained below, Plaintiff Votruba routinely carries his firearm while hiking in Pittsfield State Forest, and in that area, there are no obvious boundaries separating Massachusetts from New York.  Plaintiff Votruba thus desires to obtain a New York permit to carry a firearm.  However, Defendant Krapf does not accept out-of-state permit applications.  Defendant Krapf can be served at the Columbia County Sheriff's Office, 85 Industrial Tract, Hudson, NY 12534.

---

[3] http://tinyurl.com/24mk3wh7.

21.     The Sheriff Defendants are included as defendants herein because they are the individuals responsible for accepting the permit applications in the areas visited by Plaintiffs, because their offices would be the ones to respond to a call to arrest Plaintiffs for carrying a handgun without a permit, and because the Second Circuit has held that "[l]icensing [for public carry] is a … principally local process that begins with the submission of a signed and verified application to a local licensing officer." *Bach v. Pataki*, 408 F.3d 75, 79 (2d Cir. 2005).

22.     As nonresidents of New York without property or principal employment in the State, Plaintiffs are ineligible to apply for New York permits, and thus under state law, there is no officer "with[] authority to review" their applications.  Defendants Bourgault and Krapf are sued because they are the individuals who would be most likely to accept Plaintiffs' applications, were Plaintiffs allowed by state law to apply for permits, and were Defendants allowed by state law to accept and process Pistol/Revolver License Applications.

23.     Defendants John Does 1-10 are individuals whose identities are currently unknown to Plaintiffs, and are therefore sued under fictitious names.  To the extent John Does 1-10 are discovered, Plaintiffs pray to amend this Complaint to show the true names of the Defendants at the appropriate time.

24.     This lawsuit challenges New York's firearm licensing scheme in two ways.

25.     First, New York's complete refusal to allow nonresident individuals the ability to apply for a permit to possess or carry firearms in public for self-defense violates the Second and Fourteenth Amendments, along with the privileges and immunities of state citizenship by allowing New Yorkers to exercise enumerated rights that are denied to (but are held by) all other Americans.

26.     Second, New York does not honor the permit of any other state, a scheme that is plainly unconstitutional under *Bruen*, and which violates the constitutional requirement that New York grant Full Faith and Credit to the concealed carry permits issued by other states.

## II.    JURISDICTION AND VENUE

27.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 1651, 2201, 2202 and 42 U.S.C. §§ 1983 and 1988.

28.     Venue lies in this Court pursuant to 28 U.S.C. § 1391.

## III.    STATEMENT OF FACTS

### a. The Second Amendment.

29.     The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

30.     In its landmark 2008 decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court rejected the nearly uniform opinions reached by the courts of appeals, which for years had claimed that the Second Amendment protects only a communal right of a state to maintain an organized militia. *Id.* at 581. Setting the record straight, the *Heller* Court explained that the Second Amendment recognizes, enumerates, and guarantees to *individuals* the preexisting right to keep and carry arms for self-defense and defense of others in the event of a violent confrontation. *Id.* at 592; *see also Antonyuk v. Chiumento*, 2023 U.S. App. LEXIS 32492, at *30-33 (2d Cir. Dec. 8, 2023) (discussing *Heller*).

31.     Then, in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Court explained that the Second Amendment is fully applicable to the states through operation of the Fourteenth

Amendment. *Id.* at 791; *see also Antonyuk*, 2023 U.S. App. LEXIS 32492, at *33-34 (discussing *McDonald*).

32.     Next, in *Caetano v. Massachusetts*, 577 U.S. 411 (2016), the Court reaffirmed its conclusion in *Heller* that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding," and that this "Second Amendment right is fully applicable to the States." *Id.* at 411, 416.

33.     And as the Supreme Court explained in *Bruen*, the Second and Fourteenth Amendments together guarantee individual Americans not only the right to "keep" firearms in their homes, but also the right to "bear arms," meaning "to carry a handgun for self-defense outside the home," free from infringement by either federal or state governments. *Bruen*, 597 U.S. at 10.

34.     Importantly, in addition to clearly recognizing the right of "'law-abiding, responsible citizens' … to public carry" (*id.* at 38 n.9), *Bruen* also rejected outright the methodology previously used within this Circuit and other circuits to judge Second Amendment challenges. *Antonyuk*, 2023 U.S. App. LEXIS 32492, at *36 (acknowledging abrogation of Second Circuit precedent and the prior two-step methodology).

35.     Prior to *Bruen*, the Second Circuit had adopted a two-part test for analyzing Second Amendment cases: "First, we 'determine whether the challenged legislation impinges upon conduct protected by the Second Amendment,' and second, if we 'conclude[] that the statute[] impinge[s] upon Second Amendment rights, we must next determine and apply the appropriate level of scrutiny.'" *N.Y. State Rifle & Pistol Ass'n v. City of New York*, 883 F.3d 45, 55 (2d Cir. 2018); *see also Bruen*, 597 U.S. at 19 n.4 (collecting cases using two-part test).

36.     Rejecting this widespread atextual, "judge-empowering" (*Bruen*, 597 U.S. at 22) interest-balancing approach, *Bruen* directed (again) the federal courts to first principles:  to assess the text of the Second Amendment, as informed by the historical tradition.  *Bruen*, 597 U.S. at 19.

37.     First, the Supreme Court "decline[d] to adopt that two-part approach" used in this and other circuits, reiterating that, "[i]n keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 17.

38.     Second, the Supreme Court held that "[t]o justify [a] regulation, the government may not simply posit that the regulation promotes an important interest.  Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.  Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'"  *Bruen*, 597 U.S. at 17; *see also Antonyuk*, 2023 U.S. App. LEXIS 32492, at *37 (discussing *Bruen* and its requirement that "the government must affirmatively prove that its firearms regulation is part of the historical tradition").

39.     Third, in reviewing the historical evidence, the *Bruen* Court cabined review of relevant history to a narrow time period, because "not all history is created equal," focusing on the period around the ratification of the Second Amendment, and *perhaps* the Fourteenth Amendment, but only to the extent that it "mere[ly] confirm[s]" a Founding-era tradition.  *Bruen*, 597 U.S. at 37.  Indeed, the Court noted that "post-ratification" interpretations "cannot overcome or alter that text," and "we have generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights

was adopted in 1791." *Id.* at 36, 37; *see also Bruen*, 597 U.S. 37-60 (discussing the lack of relevant historical prohibitions on concealed carry in public).

40.     In other words, according to the Second Amendment's text, and as elucidated by the Court in *Bruen*, if a member of "the people" wishes to "keep" or "bear" a protected "arm," then the ability to do so "shall not be infringed."  Period.  There are no "ifs, ands, or buts," and it does not matter (even a little bit) how important, significant, compelling, or overriding the government's justification for or interest in infringing the right.  It does not matter whether a government restriction "minimally" versus "severely" burdens (infringes) the Second Amendment.  There are no relevant statistical studies to be consulted.  There are no sociological arguments to be considered.  The ubiquitous problems of crime or the density of population do not affect the equation.  The only appropriate inquiry then, according to *Bruen*, is what the "public understanding of the right to keep and bear arms" was during the ratification of the Second Amendment in 1791.  *Bruen*, 597 U.S. at 36-38.

41.     Lest there be any doubt, the Supreme Court has also instructed as to the scope of the protected persons, arms, and activities covered by the Second Amendment.

42.     First, *Heller* explained that, "in all six other provisions of the Constitution that mention 'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset."  *Heller*, 554 U.S. at 580.  *Heller* cited to *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990), which held that "'[T]he people' … refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community."  *Id.*; *Heller*, 554 U.S. at 581 (Second Amendment "is exercised individually and belongs to all Americans.").

11

43.    Second, *Heller* turned to the "substance of the right: 'to keep and bear Arms.'" *Heller*, 554 U.S. at 581.  The Court explained that "'[k]eep arms'" was simply a common way of referring to possessing arms, for militiamen *and everyone else*."  *Id.* at 583.  Next, the Court instructed that the "natural meaning" of "bear arms" was "wear, bear, or carry … upon the person or in the clothing or in a pocket, for the purpose … of being armed and ready for offensive or defensive action in a case of conflict with another person."  *Id.* at 584.  And "[a]t the time of the founding, as now, to 'bear' meant to 'carry.'"  *Id.*  *Bruen* was more explicit, explaining that the "definition of 'bear' naturally encompasses public carry."  *Bruen*, 597 U.S. at 32.

44.    Third, with respect to the term "arms," the Court explained that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding."  *Heller*, 554 U.S. at 582.  Indeed, the "arms" protected by the Second Amendment include "weapons of offence, or armour of defence…. '[A]rms' [are] 'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.'"  *Id.* at 581.

45.    The *Bruen* Court also acknowledged the inherent risk in *all* permitting schemes, noting that, "because any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees <u>deny ordinary citizens their right to public carry</u>."  *Bruen*, 597 U.S. at 38 n.9 (emphasis added).

46.    Because New York law operates to entirely deprive nonresidents of Second Amendment rights, this Court's intervention is necessary to make it clear to New York that it is not free to thumb its nose at the text of the Second Amendment, the opinions of the Supreme Court, and that the Second Amendment is neither a "constitutional orphan" nor a "second-class right."

*Silvester v. Becerra*, 583 U.S. 1139, 1149 (2018) (Thomas, J., dissenting from denial of certiorari);

*McDonald*, 561 U.S. at 780; *Bruen*, 597 U.S. at 70.

### b. New York's Permitting Scheme.

47.     As the Second Circuit explains, "New York requires a carry license for the concealed and open carrying of firearms.  *See* N.Y. Penal Law §§ 265.01, 265.02, 400.00(2)(d)-(f).  This general approach to the concealed and open carrying of firearms is distinct from that of some other States, which have laws specifically addressing the carrying of concealed firearms." *Bach v. Pataki*, 408 F.3d 75, 79 n.6 (2d Cir. 2005).[4]

48.     New York thus represents an extreme outlier among the states, first by refusing to allow nonresidents to apply for New York firearm permits (at least 27 states do not even require a permit to carry a concealed firearm in public, while the vast majority that do require permits will issue permits to out-of-state residents, as does Connecticut, discussed *supra*, and most states that require a permit for concealed carry still allow open carry without a permit)[5] and, second, by not accepting or recognizing the permits issued by any other states (virtually all states recognize at least some permits issued by other states).

49.     New York law requires that "[a]pplications shall be made and renewed, in the case of a license to carry or possess a pistol or revolver … to the licensing officer in the city or county, as the case may be, where the applicant resides, is principally employed or has his or her principal place of business as merchant or storekeeper...."  N.Y. Penal Law § 400.00(3)(a).

50.     Thus, for an out-of-state individual who does not "reside[]," "is [not] principally employed," or does not "ha[ve] his or her principal place of business as merchant or storekeeper"

---

[4] Plaintiffs do not concede the constitutionality of *any* permitting scheme, requiring them to obtain government preclearance or permission to exercise an enumerated constitutional right.
[5] http://tinyurl.com/28axkx44.

in New York, such individual cannot even apply for a permit to exercise the right to public carry (or, for that matter, to even possess most firearms within New York at all).

51.    As the Second Circuit explained:

[a]s a nonresident without New York State employment, Bach is not eligible for a New York firearms license. The State Police informed Bach that "no exemption exists which would enable [him] to possess a handgun in New York State" and that "there are no provisions for the issuance of a carry permit, temporary or otherwise, to anyone not a permanent resident of New York State nor does New York State recognize pistol permits issued by other states."

*Bach v. Pataki*, 408 F.3d 75, 77 (2d Cir. 2005); *see also id.* at 81 ("The only nonresidents eligible for a license are local workers, who may apply to the licensing officer in the city or county of their principal employment or principal place of business."); *id.* at 82-83 ("the State Police informed Bach that he was statutorily ineligible for a carry license. Bach had nothing to gain thereafter by completing and filing an application.").

52.    The Second Circuit further stated that "[i]mposing a filing requirement would force Bach to complete an application for which he is statutorily ineligible and to file it with an officer without authority to review it. 'We will not require such a futile gesture as a prerequisite for adjudication in federal court.' … Bach's claims are thus justiciable." *Bach*, 408 F.3d at 83.

53.    And in *Antonyuk v. Chiumento*, 2023 U.S. App. LEXIS 32492, at *65 (2d Cir. Dec. 8, 2023), the Second Circuit recently cited to *Bach* approvingly for the futility exception when an applicant "was statutorily ineligible for [the] carry license."

54.    Because "challenging a rule that limits *eligibility* for a license is different from challenging a component of the application process itself," *Antonyuk*, 2023 U.S. App. LEXIS 32492, at *63-64, Plaintiffs are not required to attempt to apply for a permit in New York because the "application for the permit would [be] futile." *Bach*, 408 F.3d at 77, 83.  Indeed, Plaintiffs are not even able to submit an application.

14

55.     But even though the Second Circuit already explained why, under New York law, Plaintiffs cannot keep and bear arms within the state, and even though Second Circuit law does not require Plaintiffs to attempt to apply for a license for which they are "statutorily ineligible," Plaintiffs nevertheless have taken steps and have sought to obtain New York permits (*see infra*). Unsurprisingly, those attempts have been rebuffed.  Plaintiffs Votruba and Harris have been told by individuals both within the New York State Police, and also with the offices of the Sheriff Defendants, that they are flatly ineligible to apply for a permit, and that their home state's permits are not honored within New York.  *See* Exhibits 1, 2, and 3.

56.     In addition to its holdings about the futility of applying for a license when statutorily ineligible, *Bach* also upheld (prior to *Heller* or *Bruen*) the New York regime at issue in this case, whereby "New York State [has] no provisions for the issuance of a carry permit … nor does New York State recognize pistol permits issued by other states."  *Id.* at 77.  In reaching that conclusion, *Bach* erroneously concluded that "the Second Amendment is not a source of individual rights" (*id.* at 77), and also held wrongly that "the Second Amendment's 'right to keep and bear arms' imposes a limitation on only federal, not state, legislative efforts...."  *Id.* at 84.

57.     Of course, these holdings have been explicitly overruled since at least 2008, as *Heller* confirmed the Second Amendment is an individual right, *McDonald* incorporated that right against the states, and *Bruen* explained that the right extends to public carry outside the home.  *Cf. Bach*, 408 F.3d at 84 ("we hold that the Second Amendment's 'right to keep and bear arms' imposes a limitation on only federal, not state, legislative efforts."), *with Bruen*, 597 U.S. at 38 n.9.

58.     In other words, *Bach*'s Second Amendment holdings are no longer good law.

59. Alternatively, to the extent this Court finds *Bach* has not been overruled for that proposition, then Plaintiffs bring this lawsuit to correct the law.

60. Because Plaintiffs are members of "the people" who wish to "keep and bear" protected "arms" in public, *Bruen* requires that New York demonstrate that a broad and enduring historical tradition existed, at the time of the Founding, completely disarming citizens who merely happened to be residents of another state. *See Commonwealth v. Donnell*, No. 2211CR2835, 2023 Mass. Super. LEXIS 666, at *5 (Aug. 3, 2023) (finding "no historical precedent limiting the reach of one's exercise to a federal constitutional right to only within that resident's states borders.").

61. No such tradition has ever existed, and thus the challenged statutes infringe rights that "shall not be infringed" and must be struck down.

### c. Plaintiff Carl Higbie

62. Plaintiff Carl Higbie is an adult male citizen of the State of Connecticut, residing in Fairfield County, Connecticut. He is a citizen of the United States, is a law-abiding person, and has no disqualification under state or federal law which would prohibit him from possessing a firearm. *See* Declaration of Carl Higbie, Exhibit 1.

63. Mr. Higbie served in the U.S. Navy from 2005 to 2012, as a Navy SEAL, during which time he was deployed to Iraq twice. During that time, he held top secret security clearances. *See also Bach*, 408 F.3d at 76 (recounting that the plaintiff there was a "model citizen" and "veteran Navy SEAL" with "top secret security clearance"). *Id*. at ¶4.

64. As a SEAL, Mr. Higbie received extensive weapons training, across a variety of weapons platforms, including the handguns that are issue in this case. During his service, Mr. Higbie carried firearms, open and concealed, in numerous countries across several continents, including in secured locations, government buildings, United States embassies, and even during

domestic commercial air travel within the United States.  Although having been entrusted to carry all manner of weaponry virtually anywhere in the world, New York now prohibits Mr. Higbie from carrying an ordinary handgun even when hiking in remote and sparsely populated wilderness areas. *Id*. at ¶¶5, 6.

65.     As part of his years of extensive training, Mr. Higbie participated in close-quarters combat training involving shoot-no-shoot situations, which required participants to judge a variety of circumstances and make split-second decisions about the appropriate use of force (including de-escalation). *Id*. at ¶8.

66.     This training has proven effective even at home.  Soon after Mr. Higbie returned from his first deployment, he awoke to his home being broken into by six individuals.  Although armed, and although lethal force certainly would have been justified, Mr. Higbie was able to defend his home and stop the threat without firing a shot or taking a life.  *Id*. at ¶¶9, 10.

67.     Mr. Higbie maintains an unrestricted license to carry firearms issued by Connecticut.  *Id*. at ¶3.

68.     Mr. Higbie lives approximately three miles from the New York border. *Id*. at ¶11.

69.     Mr. Higbie routinely shops, eats, engages in recreation, and visits friends across the border in New York State, including in Westchester County, but cannot lawfully carry a firearm while doing so.  *Id*.

70.     Additionally, Mr. Higbie owns a hunting property in Connecticut that is close to the border of Dutchess County, New York.  During trips to that property, Mr. Higbie also often enters New York for various purposes, but cannot lawfully carry firearms while he is there. *Id*. at ¶12.

71.    Although often finding himself in New York, Mr. Higbie does not satisfy any of the exemptions to be able to apply for a permit in New York, and therefore, his Second Amendment rights are infringed by New York's refusal to allow him to even apply for a permit. *Id.* at ¶14.

72.    As he is unable to lawfully carry in New York, while traveling from Connecticut to New York, Mr. Higbie is required to disarm himself, even in his home state, as he is unable to carry a firearm in New York and there is no way he can even keep a handgun locked in his vehicle while shopping, seeing a movie, eating dinner, etc.  *Id.* at ¶12.

73.    Despite all of Mr. Higbie's training and intimate familiarity with firearms, because he is a "law-abiding citizen[] with ordinary self-defense needs," New York refuses to allow him to carry a handgun, denying him the ability to exercise his Second Amendment rights that apply everywhere "in public" – even in New York.

### d. Plaintiff Joseph Harris

74.    Plaintiff Joseph Harris is an adult male citizen of the Commonwealth of Massachusetts, residing in Worcester County.  He is a citizen of the United States, is a law-abiding person, and has no disqualification under state or federal law which would prohibit him from possessing a firearm.  *See* Declaration of Joseph Harris, Exhibit 2.

75.    Mr. Harris is licensed to carry a firearm in Massachusetts and maintains a Massachusetts nonrestricted license to carry.  Additionally, Mr. Harris also maintains a Texas Handgun License.

76.    On December 4, 2023, Mr. Harris contacted the New York State Police at 1-855-529-4867 (1-855-LAW-GUNS) at 1:27 PM EST and spoke to Sergeant Brennan. *Id.* at ¶4.

77.    Mr. Harris explained that he is a Massachusetts resident, and expressed his intent and desire to apply for a New York license to carry.  *Id.* at ¶5.

78.     However, Mr. Harris was told that the only nonresidents who can apply for a New York permit are individuals who either are principally employed in New York or own property in New York.  *Id.* at ¶6.  Mr. Harris meets neither criterion.

79.     Mr. Harris then asked if his Massachusetts permit granted him any rights to carry a firearm in New York via reciprocity, and Sergeant Brennan told him that it did not.  *Id.* at 7.

80.     Mr. Harris then called the Rensselaer County Pistol Permit Clerk at (518) 270-4171 and left a message.  His call was returned by the "Pistol Permit Clerk" on December 20, 2023, who did not provide his name.  The Pistol Permit Clerk advised Mr. Harris that Mr. Harris needed a New York driver's license, and needed to live in Rensselaer County to be able to apply for a pistol permit.  *Id.* at ¶¶8-9.

81.     Mr. Harris was also advised that his Massachusetts License to Carry was not granted any reciprocity in New York, meaning he could not carry a concealed handgun in New York on his Massachusetts permit.  *Id.* at ¶10.

82.     Mr. Harris also contacted the Columbia County Sheriff's Office, and received a return phone call on December 20, 2023.  A lady by the name of "Stephanie" asked Mr. Harris if he owned property in Columbia County, for which he answered in the negative.  *Id.* at ¶11. Stephanie advised that Mr. Harris needed to own property in Columbia County in order to apply for a pistol permit in New York, because New York does not issue out-of-state permits unless that person owns property in the state.  Mr. Harris also inquired about his Massachusetts License to Carry and was told it was not recognized in New York.  *Id.* at ¶12.

83.     There is no avenue for Mr. Harris to apply for and to receive a permit to carry a firearm in New York because he does not reside in, is not principally employed in, and does not own property in New York.

84. Mr. Harris has family in New York that he frequently visits. Mr. Harris desires to carry his firearm in New York when he visits his family, and would do so but for state law which denies him the ability to apply for or receive a New York permit. Similarly, New York does not recognize Mr. Harris' Massachusetts license to carry or his Texas handgun license. If Mr. Harris were able to apply for a New York permit, he would do so, and if he were not statutorily ineligible to apply simply for being a nonresident, he would be issued a permit and would be able to carry his firearm when he visits New York.

85. Additionally, New York's infringement of Mr. Harris' Second Amendment rights affects him in Massachusetts as well. For instance, when Mr. Harris drives to see his family in New York, Mr. Harris must disarm himself prior to him leaving his house, and thus even while in Massachusetts, he cannot exercise Second Amendment rights while in transit to New York.

**e. Plaintiff Michael Votruba.**

86. Plaintiff Michael Votruba is an adult male citizen of the Commonwealth of Massachusetts, residing in Pittsfield, in Berkshire County. He is a citizen of the United States, is a law-abiding person, and has no disqualification under state or federal law which would prohibit him from possessing a firearm. *See* Declaration of Michael Votruba, Exhibit 3.

87. Mr. Votruba has maintained an active and unrestricted Massachusetts license to carry since 2018.

88. Although living in Massachusetts, the backyard to Mr. Votruba's home is approximately 400 yards from the Massachusetts Pittsfield State Forest, which is connected to the State of New York.

89. Mr. Votruba routinely carries his firearm when he is hiking in Pittsfield State Forest. However, if he walks too far in the forest while carrying his firearm in Massachusetts, he

can instantly become a criminal were he to accidentally cross over into New York without a permit. Unsurprisingly, though, there are no markings visible in the woods to let one know if or when he is close to crossing over in the state of New York. *See* Exhibit 3, ¶¶5, 6. *See Commonwealth v. Donnell*, at *9 (rejecting a situation where "a law abiding New Hampshire resident exercising his constitutional right to carry while shopping at the Pheasant Tree Mall in Nashua, New Hampshire would become a felon when he shops in a [different] section … at that Mall, which happens to be in Tyngsborough, Massachusetts.").

90.     New York's refusal to let Mr. Votruba obtain a permit to bear arms, even in heavily wooded wilderness areas, stands in direct contrast to the Second Circuit's recently expressed "doubt that there is historical support for the regulation of firearms in wilderness parks, forests, and reserves." *Antonyuk*, 2023 U.S. App. LEXIS 32492, at *171.

91.     New York's refusal to permit Mr. Votruba to apply for a permit or to allow him to carry his firearm in New York also infringes his ability to carry his firearm in Massachusetts, even though he is licensed to carry in Massachusetts. Due to New York's onerous regime, Mr. Votruba is often unable carry his firearm with him when he is hiking in the Massachusetts state forest, so as to avoid inadvertently violating the law by accidentally crossing into New York. As such, New York's infringement follows him to his home state.

92.     Additionally, Mr. Votruba routinely visits New York by car. For instance, Mr. Votruba purchases gasoline from a New Lebanon, New York (Columbia County) gas station, Stewarts, as it is the "closest non-ethanol gas station" for all his small-engine power equipment. *Id*. at ¶8.

93.    Yet when driving to do something as simple and mundane as filling up on gas, Mr. Votruba cannot carry his firearm, even on the drive in Massachusetts where he is licensed, because he will eventually cross over into New York where he cannot legally carry.

94.    Mr. Votruba also routinely drives his vehicle to visit a friend in Grafton, in Rensselaer County, New York. *Id*. at ¶10.

95.    When traveling to and through New York, Mr. Votruba is forced to disarm himself, as he reasonably fears being arrested and/or prosecuted for carrying a firearm without a New York permit.   In fact, in late November, 2023, Mr. Votruba was stopped by law enforcement in Rensselaer County and given a warning for speeding.  Given the amount of contact Mr. Votruba has with the State of New York, it is foreseeable that additional law enforcement contact will occur.  *Id*. at ¶12.

96.    In order to find out how he could apply for a permit, Mr. Votruba called NYSP to ask about a nonresident New York permit, but he could never get through to a live person.  *Id*. at ¶13.

97.    He then called the Rensselaer County Sheriff's Office on December 14, 2023, and left a message for Deputy Kyle Bourgault.  On December 18, 2023, Deputy Bourgault returned his call and told him that the county does not issue permits to out of state residents, even though Mr. Votruba "live[s] so close to New York [he] can probably taste it."  *Id*. at ¶15.

98.    As such, Mr. Votruba cannot even apply for a permit in New York to exercise his Second Amendment rights.  Likewise, Mr. Votruba's Massachusetts license to carry is not honored in New York, and thus he cannot carry under that license when visiting New York. *Id*. at ¶16.

99.    Mr. Votruba, when at home in Massachusetts, routinely carries his firearm when in public, as is his Second Amendment right.  If Mr. Votruba were allowed to apply for a New York

permit, he would do so and, if he were not statutorily ineligible to apply simply for being a nonresident, he would be issued a permit, and would be able to carry his firearm when he visits New York. *Id.* at ¶17.

100.    Plaintiffs Higbie, Harris, and Votruba do not have residency in New York, are not principally employed in New York, and do not own property in New York.  Thus, they are ineligible to apply for a New York permit to carry or even possess a firearm, solely due to their status as nonresidents.

### f.    The Full Faith and Credit Clause.

101.    The Full Faith and Credit Clause of the U.S. Constitution provides that "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof."  U.S. Const. art. IV, §

102.    New York's refusal to grant reciprocity to any out-of-state permits violates the full faith and credit New York must give to the permits of other states.

103.    New York's statutory scheme, which refuses to accept, honor, or acknowledge permit issued to the citizens of other states, like Plaintiffs, violates this constitutional provision.

104.    To receive a Massachusetts' License to Carry, an individual must be qualified under Mass. Ann. Laws ch. 140, § 131, including among other things, being over twenty-one years of age, not an illegal alien, not subject to outstanding arrest warrants, not a fugitive from justice, not dishonorably discharged from the armed forces, and not have exhibited or engaged in behavior that suggests that, if issued a license, the applicant or licensee may create a risk to public safety or a risk of danger to self or others.

105.   Finally, an applicant must take a firearms safety course approved by Massachusetts. Mass. Ann. Laws ch. 140, § 131P.

106.   A true and correct copy of the Massachusetts's permit application can be found at https://www.mass.gov/doc/resident-firearms-license-application/download.

107.   As to Connecticut, Conn. Gen. Stat. § 29-28 allows for the licensing of public carry of firearms for those who, among other things, successfully complete a firearms safety course; not be a prohibited person (including felonies or certain misdemeanors); not be subject to a restraining order involving the use, attempted use, or threatened used of physical force against another person; not be subject to a firearm seizure order; not be federally prohibited under 18 U.S.C. §§ 922(g)(2), (4) or (9); not be present unlawfully or illegal in the United States; and cannot be under twenty-one years of age.

108.   In issuing a permit to carry firearms, Massachusetts and Connecticut have made the determinations that the Plaintiffs here are not prohibited from exercising their Second Amendment right to public carry of a firearm.

109.   Indeed, Massachusetts and Connecticut have among the most stringent criteria in the nation with respect to the issuance of carry permits.

110.   Thus, Plaintiffs have shown that they fall squarely within the class of people that courts have held to be among the most law abiding in society.  *See Wolford v. Lopez*, 2023 U.S. Dist. LEXIS 138190, at *91 (D. Haw. Aug. 8, 2023) ("Although it is possible post-*Bruen* that more conceal carry permits are eventually issued in Hawai'i, that alone does not negate Plaintiffs' position that the vast majority of conceal carry permit holders are law-abiding.").

111.   Likewise, if Plaintiffs were New York residents, they would meet all criteria to be issued a New York permit.

112.     New York must give Plaintiffs' out of state permits full faith and credit as a record

of a public act certifying Plaintiffs' eligibility to carry a firearm.  *See Commonwealth v. Donnell*,

at *4-5 (rejecting the argument that "Massachusetts is not obligated to recognize an out of state

resident right to carry a firearm under the Full Faith and Credit clause" because, prior to *Bruen*,

the right to carry was merely considered a privilege, not a right).

**COUNT I**
**U.S. CONST. AMEND. II**
**RIGHT TO KEEP AND BEAR ARMS**
**42 U.S.C. § 1983 AGAINST DEFENDANTS**

113.     The foregoing allegations are repeated and realleged as if fully set forth herein.

114.     New York's refusal to allow nonresidents to keep and bear arms violates Plaintiffs'

Second Amendment rights that "shall not be infringed."

115.     Plaintiffs are members of "the people" who desire to "bear" a quintessential

protected "arm" (a handgun) in public.

116.     Under *Bruen*, "when the Second Amendment's plain text covers an individual's

conduct, the Constitution presumptively protects that conduct. To justify its regulation, the

government may not simply posit that the regulation promotes an important interest.  Rather, the

government must demonstrate that the regulation is consistent with this Nation's historical

tradition of firearm regulation." *Bruen*, 597 U.S. at 17.

117.     Thus, the burden is on New York to prove, based on Founding-era historical

tradition, that its refusal to permit 94 percent of Americans to keep or bear arms in New York

somehow comports with the original public understanding of the Second Amendment.

118.     However, there is no historical analogue for requiring individuals to apply for a

permit prior to carrying a firearm in public (much less even possessing or "keep[ing]" a firearm),

and certainly no historical analogue for limiting carry solely to those residents of a particular state.

25

119.     Thus, N.Y. Penal Law § 400.00(3)(a) violates the Second Amendment and conflicts with *Bruen*'s clear teachings.

120.     As such, Defendants' laws, customs, practices, and policies, reducing the Second Amendment's protection of the right to "keep and bear arms" to an inkblot, damage Plaintiffs in violation of 42 U.S.C. § 1983.

121.     By infringing the Second Amendment right to bear arms in public in these ways, the New York laws and regulations discussed in the foregoing allegations violate the Second Amendment, which apply to Defendants by operation of the Fourteenth Amendment, both facially and as applied to Plaintiffs, and are therefore invalid.

**COUNT II**
**U.S. CONST. ART. IV, § 2**
**PRIVILEGES AND IMMUNITIES CLAUSE**
**42 U.S.C. § 1983 AGAINST DEFENDANTS**

122.     The foregoing allegations are repeated and realleged as if fully set forth herein.

123.     The Privileges and Immunities Clause of Article IV, § 2 of the United States Constitution provides that "the Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several states."  This Constitutional provision removes "from the citizens of each State the disabilities of alienage in the other States."  *Saenz v. Roe*, 526 U.S. 489 (1999) (quoting *Paul v. Virginia*, 8 Wall. 168, 180 (1868)).  The Privileges and Immunities Clause bars discrimination against citizens of other states based on their status as a citizen of another state. *Toomer v. Witsell*, 334 U.S. 385 (1948).

124.     Separately from Plaintiffs' Second Amendment claim, the United States Supreme Court has consistently held that regulations and classifications that impose a penalty or an impermissible burden on the right to travel violate the Equal Protection Clause of the Fourteenth

Amendment, unless absolutely necessary to promote a compelling government interest. *Saenz v. Roe*, 526 U.S. 489 (1999); *Shapiro v. Thompson*, 394 U.S. 618 (1969).

125.   Accordingly, New York's policy of denying out-of-state residents the ability to lawfully exercise their constitutionally protected right to be armed in public for self-defense inhibits the free interstate passage of citizens and violates equal protection doctrines by treating Americans differently merely on account of their state of residency.

126.   The Second Circuit previously assumed, "without deciding, that entitlement to a New York carry license is a privilege under Article IV." *Bach v. Pataki*, 408 F.3d 75, 91 (2d Cir. 2005).  Indeed, that decision was reached before the Second Amendment was determined to protect an individual right, and before the Supreme Court clarified that the right extends to "all Americans" bearing arms outside the home.

127.   The Second Circuit also acknowledged that "[t]here is no question that New York discriminates against nonresidents in providing handgun licenses under Article 400." *Id.*

128.   However, the Second Circuit's nevertheless rejected *Bach*'s Privileges and Immunities claim, a decision which is no longer good law.

129.   Relying on New York's "considerable discretion" (*id.* at 79) in licensing matters and the "power to *sua sponte* revoke or cancel a license" (*id.* at 80), "which may be exercised at 'any time'" (*id.*), the Second Circuit held that the Privileges and Immunities clause was no bar to New York's discrimination, because New York had a "monitoring interest … in continually obtaining relevant behavioral information" from permit holders (*id.* at 91) and that licensing officers have "the discretion to revoke licenses upon displays of 'poor judgment[.]'" *Id.*

130.   This holding is no longer tenable under *Bruen*, which rejected the notion that a person's Second Amendment rights were subject to "licensing officials['] discretion to deny

licenses based on a perceived lack of need or suitability." *Bruen*, 597 U.S. at 13.  While *Bach* noted that "other States are not bound to impose a discretionary revocation system like New York's (408 F.3d at 92), after *Bruen*, no state is permitted to create such a "discretionary … system."  *See id.* at n.33 (contrasting Virginia's system of "specific enumerated grounds for disqualification" with New York's "vest[ing] [of] extraordinary discretion in licensing officers.").  Indeed, *Bruen* explicitly rejected this characteristic of "may issue" licensing regimes, contrasting them with licensing schemes that "contain only 'narrow, objective, and definite standards' guiding licensing officials … rather than requiring the 'appraisal of facts, the exercise of judgment, and the formation of an opinion.'"  *Bruen*, 597 U.S. at 38 n.9.

131.    Moreover, whereas the plaintiff in *Bach* held a permit from Virginia, which has a relatively permissive licensing regime, Plaintiffs here hold permits from Massachusetts and Connecticut, States with some of the most restrictive licensing regimes in the country.  Thus, *Bach* had no cause to "determine whether a plaintiff from a State employing a system substantially similar to New York's would be able to" succeed on a Privileges and Immunities claim.  *Bach*, 408 F.3d at 92 n.33.

132.    In short, *Bach*'s holding that nonresident gun owners "'constitute a peculiar source of the evil at which the statute is aimed'" (*id.* at 94) cannot be squared with *Bruen*'s holding that the Second Amendment protects a broad right to "bear arms" that applies to "all Americans," especially "ordinary, law-abiding, adult citizens" like Plaintiffs.  *Bruen*, 597 U.S. at 70, 31.

133.    In other words, *Bruen* entirely undermines the basis for *Bach*'s holding rejecting the Privileges and Immunities claim.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs request that judgment be entered in their favor and against Defendants as follows:

1.      An order declaring that the challenged sections of N.Y. Penal Law § 400.00 are unenforceable, unconstitutional, and violate the Second and Fourteenth Amendments to the United States Constitution;

2.      An order declaring that New York's failure to accept applications or issue firearm permits to out of state residents violates the Privileges and Immunities Clause;

3.      An order declaring that New York must honor permits to carry firearms issued by other states, regardless of whether the permit holder is a resident of New York;

4.      An order declaring that New York must permit residents of other states to apply for and be issued permits to carry firearms in New York;

5.      An order permanently enjoining all Defendants and all other officers, agents, servants, employees, and persons under the authority of the State, from enforcing all laws prohibiting concealed carry if the person accused of that crime has an otherwise-valid permit to carry issued by any state, and is not otherwise prohibited from possessing or carrying firearms;

6.      An order permanently enjoining all Defendants and all other officers, agents, servants, employees, and persons under the authority of the State, from refusing to accept applications from, and refusing to issue permits, to otherwise eligible persons who are not residents of the State of New York;

7.      Nominal damages;

8.      Costs of suit, including attorney fees and costs pursuant to 42 U.S.C. § 1988; and

9.      Such other further relief as is necessary to effectuate the Court's judgment or that the Court otherwise deems just and appropriate.

Dated:  February 5, 2024.

Respectfully submitted,

*/s/ Stephen D. Stamboulieh*          Robert J. Olson
Stephen D. Stamboulieh          William J. Olson, PC
Stamboulieh Law, PLLC          370 Maple Ave. West, Suite 4
P.O. Box 428          Vienna, VA 22180-5615
Olive Branch, MS  38654          703-356-5070 (T)
601-852-3440          703-356-5085 (F)
stephen@sdslaw.us          wjo@mindspring.com
NDNY Bar Roll# 520383          NDNY Bar Roll# 703779