**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| CARL HIGBIE, JOSEPH HARRIS, and MICHAEL VOTRUBA, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 1:24-cv-00174-MAD-TWD |
| STEVEN G. JAMES, in his Official Capacity as Superintendent of the New York State Police, SHERIFF KYLE BOURGAULT, in his Official Capacity as the Sheriff of Rensselaer County, New York, SHERIFF DONALD J. KRAPF, in his Official Capacity as the Sheriff of Columbia County, New York, and JOHN DOES 1-10, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

<u>**MEMORANDUM OF AUTHORITIES IN SUPPORT OF PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**</u>

## TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .iv

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

LEGAL STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

I.     PLAINTIFFS HAVE STANDING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

    A.  Plaintiffs Have Suffered Injuries-in-Fact Which Are Traceable to Defendants'
        Conduct and Redressable by the Relief They Seek from This Court . . . . . . . . . . . . . 5

        1.  All Plaintiffs Attempted to Apply for New York Pistol/Revolver Licenses . . . . . .6

        2.  Defendants Prevented Plaintiffs from Applying for Licenses, and Confirmed
            that There Is No Mechanism for Out-of-State Individuals to Apply for a
            New York Pistol/Revolver License . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

    B.  Intervening Changes to New York's Licensing Forms Do Not Moot Plaintiffs'
        Request for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

    C.  Plaintiffs Were Denied Their Second Amendment Rights Irrespective of Whether
        Such Denial Stems from the Statute Itself or Defendants' Customs, Practices,
        or Policies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

II.    DENIAL OF NONRESIDENT CITIZENS' RIGHTS TO PUBLIC CARRY
      VIOLATES THE SECOND AND FOURTEENTH AMENDMENTS . . . . . . . . . . .17

    A.  New York's Residency Requirement Violates the Second Amendment's Plain
        Text Without Further Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    B.  New York's Residency Requirement Violates *Heller* Without Further Analysis . . . . 18

    C.  New York's Residency Requirement Violates *Bruen* Without Further Analysis . . . . 19

    D.  The Second Amendment Presumptively Protects Plaintiffs' Desired Course of
        Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    E.  There Is No Historical Tradition of Prohibiting Nonresidents from Possessing
        Handguns in Public . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    F.  The Historical Tradition Supports Plaintiffs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

ii

III.  NEW YORK MUST GIVE FULL FAITH AND CREDIT TO NONRESIDENTS'
      LICENSES TO EXERCISE AN ENUMERATED RIGHT . . . . . . . . . . . . . . . . . . . . 22

IV.   LICENSING DISCRIMINATION AGAINST NONRESIDENT CITIZENS
      VIOLATES THE PRIVILEGES AND IMMUNITIES CLAUSE . . . . . . . . . . . . . . 23

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# TABLE OF AUTHORITIES

***Page***

## Constitutional Provisions

Article IV, Section 1 ........................................................................................ 1, 22

Article IV, Section 2 ........................................................................................ 2, 23

Second Amendment ......................................................................................... passim

## Statutes

18 U.S.C. § 926A ............................................................................................. 22

1831 Ind. Acts 192, § 58 (1831 Indiana) ........................................................ 21

1841 Ala. Acts 148, Of Miscellaneous Offences, chap. 7, § 4 (1841 Alabama) ......................... 21

1878 Miss. Laws 175, An Act to Prevent the Carrying of Concealed Weapons and for

    Other Purposes, § 1 (1878 Mississippi) .................................................. 21

28 U.S.C. § 1739 ............................................................................................. 22

Act of Jan. 14, 1820, chap. 23 (1820 Indiana) ............................................... 21

An Act to Prevent Persons in This Commonwealth from Wearing Concealed Arms,

    Except in Certain Cases (1813) § 1 (1813 Kentucky) ............................... 21

Cal. Penal Code § 25610 .................................................................................. 4

Conn. Gen. Stat. § 29-28(f) ............................................................................. 4

Haw. Rev. Stat. § 134-3 ................................................................................... 4

N.Y. Exec. Law § 223 ...................................................................................... 12

N.Y. Penal Law § 400.00(3)(a) ....................................................................... passim

Revised Statutes of Arkansas (1837) Division VIII, chap. 44, art. I, § 13 ..................... 21

## Cases

*Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024) ......................................... passim

*Bach v. Pataki*, 408 F.3d 75 (2d Cir. 2005) ................................................... passim

*Cal. Rifle & Pistol Ass'n v. L.A. Cnty. Sheriff's Dep't*, 2024 U.S. Dist. LEXIS 221863 (C.D. Cal.

    Aug. 20, 2024) ......................................................................................... 20

*Commonwealth v. Donnell*, 2023 Mass. Super. LEXIS 666 (Aug. 3, 2023) ............................. 20

*County of Sacramento v. Lewis*, 523 U.S. 833 (1998) ................................... 22

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ..................................... passim

*Fed. Defs. of N.Y., Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118 (2d Cir. 2020) .................. 11

*Fox v. Bd. of Trs. of State Univ.*, 764 F. Supp. 747 (N.D.N.Y. 1991) .......................................... 15

*In re L.*, 2016 N.Y. Misc. LEXIS 3674 (Kings Cnty. Fam. Ct. Oct. 6, 2016) ........................ 1, 23

*Matter of Benedetti*, 2024 NY Slip Op 24151, ¶ 4 (Sup. Ct.) ...................................................... 16

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ..................................................... 1, 17, 23

*Mhany Mgmt., Inc. v. County of Nassau*, 819 F.3d 581 (2d Cir. 2016) ...................................... 15

*Milwaukee County v. M. E. White Co.*, 296 U.S. 268 (1935) .......................................................... 1

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) ................................................ passim

*Osterweil v. Bartlett*, 21 N.Y.3d 580 (2013) .............................................................................. 16

*Osterweil v. Bartlett*, 706 F.3d 139 (2d Cir. 2013) ................................................................... 15

*Osterweil v. Bartlett*, 738 F.3d 520 (2d Cir. 2013) ................................................................... 16

*Paul v. Virginia*, 75 U.S. 168, 180 (1869) ................................................................................... 2

*People v. Fong*, 901 N.Y.S.2d 909 (Nassau Cnty. Dist. Ct. 2009) ........................................ 2, 23

*People v. Telfair*, 207 N.Y.S.3d 439 (2023) .............................................................................. 15

*Rosales v. LaValley*, 2014 U.S. Dist. LEXIS 33532 (N.D.N.Y. Jan. 21, 2024) ........................ 11

*Saenz v. Roe*, 526 U.S. 489 (1999) .......................................................................................... 2, 23

*Suarez v. Paris*, 2024 U.S. Dist. LEXIS 130327 (M.D. Pa. July 24, 2024) ............................... 21

*Toomer v. Witsell*, 334 U.S. 385 (1948) .................................................................................. 2, 23

*United States v. Bedi*, 15 F.4th 222 (2d Cir. 2021) ..................................................................... 5

*United States v. Quinones*, 313 F.3d 49 (2d Cir. 2002) ............................................................... 5

*United States v. Rahimi*, 602 U.S. 680 (2024) .................................................................... 17, 18

*United States v. Rangel-Portillo*, 586 F.3d 376 (5th Cir. 2009) .............................................. 25

*Uzuegbunam v. Preczewski*, 592 U.S. 279 (2021) ..................................................................... 15

*Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19 (2d Cir. 2012) .................................................. 5

*Wilson v. Hawaii*, 2024 U.S. LEXIS 4884 (Dec. 9, 2024) ........................................................... 6

**Other Authorities**

"Record[]", II Dictionary of the English Language (Samuel Johnson 1755) .............................. 22

Antonin Scalia & Bryan A. Garner, <u>Reading Law: The Interpretation of Legal Texts</u> 93 (2012) 16

*Arm*, Merriam-Webster.com ...................................................................................................... 18

*Bear*, BLACK'S LAW DICTIONARY, (11th ed. 2019) ..................................................................... 18

*Emergency Rule – Concealed Carry License Rules for Non New York Residents*, <u>NYC Rules</u>
   (Aug. 6, 2024) ................................................................................................... 11, 14

*New York State Pistol/Semi-Automatic Rifle License Application*, <u>Onondaga Cnty. Sheriff's Off.</u>
(Mar. 1, 2023) ................................................................................................................. 15

*Pistol/Revolver License Application Semi-Automatic Rifle License Application*, <u>State of N.Y.</u>
(Nov. 2024) ................................................................................................................... 10

*QuickFacts: New York*, <u>U.S. Census Bureau</u> .......................................................................... 2

**Rules**

Fed. R. Civ. P. 56(a) ............................................................................................................. 5

Fed. R. Civ. P. 30(b)(6)……………………………………………………………………..12

# INTRODUCTION

A United States citizen entering New York does not leave federal constitutional rights at the border, as if entering a foreign land. Indeed, the Supreme Court has repeated time and again that "incorporated Bill of Rights protections 'are all to be enforced against the States under the Fourteenth Amendment....'" *McDonald v. City of Chicago*, 561 U.S. 742, 765 (2010). The Second Amendment is no exception, as "[t]he constitutional right to bear arms in public for self-defense is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 70 (2022). Thus, because "the Second Amendment right is exercised individually and belongs to *all Americans*" and "not an unspecified subset" of New Yorkers, *District of Columbia v. Heller*, 554 U.S. 570, 581, 580 (2008) (emphasis added), *all Americans* enjoy the right to keep and bear arms within New York irrespective of residency, property ownership, or employment.

The Constitution unsurprisingly codifies this basic precept – that U.S. citizens have the same federal rights from state to state – with several degrees of redundancy. First, the Second Amendment's "unqualified command" forbids infringement of nonresident American citizens' rights to keep and bear arms, a textual mandate confirmed by historical practice. *Bruen*, 597 U.S. at 17. Second, the Article IV, Section 1 Full Faith and Credit Clause "alter[ed] the status of the several states as independent foreign sovereignties," requiring that "a remedy upon a just obligation might be demanded as of right, irrespective of the state of its origin." *Milwaukee County v. M. E. White Co.*, 296 U.S. 268, 277 (1935). Thus, a state must recognize a sister state's record evincing eligibility to exercise a federal constitutional right, like a license to public carry.[1] And

---

[1] *See also In re L.*, 2016 N.Y. Misc. LEXIS 3674, at *12 (Kings Cnty. Fam. Ct. Oct. 6, 2016) ("[E]ach state must recognize a … marriage that was validly performed in any other state.");

1

third, the Article IV, Section 2 Privileges and Immunities Clause "removes 'from the citizens of each State the disabilities of alienage in the other States,'" *Saenz v. Roe*, 526 U.S. 489, 501 (1999), prohibiting states from practicing "severe discrimination" against nonresidents. *Toomer v. Witsell*, 334 U.S. 385, 399 (1948). To allow otherwise would mean "the Republic would … constitute[] little more than a league of States; it would not … constitute[] the Union which now exists," governed by the same federal Constitution. *Paul v. Virginia*, 75 U.S. 168, 180 (1869).

In direct contravention of these precepts, New York has long denied nonresident visitors their Second Amendment rights to publicly carry handguns for self-defense, providing no avenue for these individuals – some 94 percent of the U.S. population[2] – to obtain a New York Pistol/Revolver License in order to lawfully carry within the state. Indeed, as a general matter, New York does not permit a person *even to possess* most firearms[3] without a license. And in order to obtain a license, New York law provides that "[a]pplications *shall* be made and renewed, in the case of a license to carry or possess a pistol or revolver, … in the city or county, as the case may be, where the applicant *resides*, is *principally employed* or has his or her *principal place of business* as merchant or storekeeper...." N.Y. Penal Law § 400.00(3)(a) (emphases added).[4] Thus, for the

---

*People v. Fong*, 901 N.Y.S.2d 909, 909 (Nassau Cnty. Dist. Ct. 2009) ("New York State must, and does, give full faith and credit to Illinois' issuance of driver's licenses....").

[2] *See QuickFacts: New York*, U.S. Census Bureau, https://tinyurl.com/n9k7ahht (last visited Jan. 24, 2025).

[3] New York requires some form of license for handguns and semi-automatic rifles. N.Y. Penal Law § 400.00(3)(a). Accordingly, bolt-action rifles and shotguns ("long guns") appear not to require licensure to possess. However, this is no consolation for Plaintiffs, who seek to carry *handguns* for self-defense in public, because long guns are unwieldy, impractical, and indeed impossible to carry inconspicuously for such a purpose. *See Heller*, 554 U.S. at 629 ("Whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense...."); *see also id.* ("It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed.").

[4] The parties dispute whether the statute imposes a mandatory eligibility requirement or an optional venue guideline for submission of applications. However, the end result is the same – Defendants have deprived Plaintiffs of their Second Amendment rights, regardless of whether that deprivation

supermajority of the American population not meeting these residency or employment prerequisites, their license applications cannot even clear the starting gate.

And to make matters worse, New York refuses to recognize – *i.e.*, grant "reciprocity" to – any sister state's license to carry, thereby funneling all those who wish to carry a firearm in New York into the State's own exclusionary licensing scheme. Accordingly, being unable to even apply to obtain a New York license in the first place, those who do not reside or work in New York cannot rely on their out-of-state licenses and cannot obtain a New York license, rendering them entirely unable to "bear arms" in New York. This is true regardless of how many sister-state licenses one holds, how rigorous those licensing requirements are, and how law-abiding, well-trained, or familiar with firearms one is.

Thus, for the 94 percent of Americans who are not residents of New York, the "right to keep and bear arms" in public is not just "a second-class right," but rather "eviscerate[d]" entirely. *Bruen*, 597 U.S. at 70, 31. No court would tolerate such treatment of any other provision of the Bill of Rights, and the Second Amendment is no exception. Indeed, the Supreme Court already rejected an argument that "would in effect exempt cities from the Second Amendment...." *Bruen*, 597 U.S. at 31. Yet for nonresidents of New York, *the entire state* is practically exempted from the Second Amendment, irrespective of their status as American citizens enjoying full constitutional protection from coast to coast.

Unsurprisingly, New York's patently unconstitutional scheme represents an anomaly among the 50 states, as *no other state's* licensing scheme appears to operate like New York's. For

---

flows from their enforcement of the statute itself, or instead from Defendants' own customs, practices, and policies in administering New York's licensing scheme. Thus, for the sake of clarity, when Plaintiffs refer to "New York" law or N.Y. Penal Law § 400.00(3)(a) throughout this Memorandum, Plaintiffs alternatively mean Defendants' customs, practices, and policies of denying them nonresident licensure.

example, although Connecticut similarly refuses to recognize sister states' carry licenses, Connecticut allows nonresidents to apply for Connecticut Pistol Permits, provided they already have a license to carry from another state.  *See* Conn. Gen. Stat. § 29-28(f).  And even notoriously anti-gun California and Hawaii, which do not issue permits to nonresidents, still permit visitors to transport and possess firearms within the state.  *See* Cal. Penal Code § 25610; Haw. Rev. Stat. § 134-3.  New York thus is an outlier even among outliers.

Plaintiffs Carl Higbie, Joseph Harris, and Michael Votruba are residents of bordering sister states who regularly visit New York, each of whom attempted to apply for a New York Pistol/Revolver License.  But consistent with New York law, each was informed that, by virtue of his failure to satisfy the application prerequisites listed in N.Y. Penal Law § 400.00(3)(a), local licensing authorities would be unable to accept his application to carry a handgun within New York.  Harris and Votruba were informed that New York would not honor their sister-state carry licenses, regardless of jurisdiction of issuance.  As the Superintendent of the New York State Police ("NYSP"), Defendant Steven G. James is responsible for enforcing New York's firearm laws and for promulgating the New York Pistol/Revolver License application form, Form PPB-3, which required provision of a New York driver's license number at the time Plaintiffs attempted to apply.  Defendants Kyle Bourgault and Donald J. Krapf are the respective Sheriffs of Rensselaer and Columbia Counties in upstate New York, the officials responsible for accepting New York Pistol/Revolver License applications in those counties.  Their offices informed Plaintiffs that they would not accept Plaintiffs' license applications, and that New York law does not recognize Plaintiffs' sister-state carry licenses.

Plaintiffs filed suit on February 5, 2024.  Following completion of mandatory mediation and discovery, Plaintiffs submit this Motion for Summary Judgment to vindicate their rights.

## LEGAL STANDARD

"Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 30 (2d Cir. 2012); *see* Fed. R. Civ. P. 56(a). The "constitutionality of a criminal statute," and indeed the textual and historical analysis required by *Bruen*, 597 U.S. 1, present "pure question[s] of law." *United States v. Quinones*, 313 F.3d 49, 59 (2d Cir. 2002). Likewise, the "interpretation of a statute is a question of law...." *United States v. Bedi*, 15 F.4th 222, 225-26 (2d Cir. 2021).

## ARGUMENT

## I.    PLAINTIFFS HAVE STANDING.

### A. Plaintiffs Have Suffered Injuries-in-Fact Which Are Traceable to Defendants' Conduct and Redressable by the Relief They Seek from This Court.

Because "Article III courts have power to decide only 'Cases' or 'Controversies,'" a plaintiff must "allege such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Antonyuk v. James*, 120 F.4th 941, 976 (2d Cir. 2024) (petition for certiorari filed January 22, 2025). To that end, "[t]o establish Article III standing, a plaintiff must have '(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Id.* As the Second Circuit recently held, those who are "prevented from obtaining" and indeed even so much as "*deterred from seeking* … a concealed carry license" necessarily have standing to challenge their "consequent inability to exercise … Second Amendment rights...." *Id.* at 977 (emphasis added). Moreover, the "interest in carrying a firearm surely" is "cognizable," and a "plaintiff suffers an injury-in-fact if the defendant's allegedly unlawful conduct impairs that interest, even if it does so

by deterring the plaintiff," and such "injury is traceable to the defendants' enforcement of [licensing] provisions," including the "refusal to process applications...." *Id.* Of course, such "injury is redressable by" a favorable judicial decision when a plaintiff "would apply if the requirements were stricken." *Id.*

Finally, when a "plaintiff's injury … stems from his personal ineligibility for a license, the plaintiff must prove up that premise either by applying for a license or by making a substantial showing of futility." *Id.* at 979. And as to futility, the Second Circuit already has held that those informed that they are "statutorily ineligible for a carry license" because they are "neither a New York resident nor worker" have "nothing to gain thereafter by completing and filing an application." *Bach v. Pataki*, 408 F.3d 75, 82-83 (2d Cir. 2005). Accordingly, courts "will not require such a futile gesture as a prerequisite for adjudication in federal court." *Id.* at 83; *Antonyuk*, 120 F.4th at 979 ("application was futile where applicant 'was statutorily ineligible for [the] carry license'"); *see also Wilson v. Hawaii*, 2024 U.S. LEXIS 4884, at *1 (Dec. 9, 2024) (Thomas, J., respecting denial of certiorari) ("Americans need not engage in empty formalities before they can invoke their constitutional rights...."). Plaintiffs more than satisfy the Article III standing requirement to challenge New York's refusal to recognize their Second Amendment rights.

      1.  **All Plaintiffs Attempted to Apply for New York Pistol/Revolver Licenses.**

**Joseph Harris.** Plaintiff Harris is an adult male citizen of the Commonwealth of Massachusetts, a citizen of the United States, a law-abiding person, and has no disqualification under state or federal law which would prohibit him from possessing a firearm. Declaration of Joseph Harris ("Harris Declaration") ¶¶1, 3, ECF No. 1-1; Deposition of Joseph Harris ("Harris Deposition") at 15:18-21, 47:19-52:24, Exhibit 1. Harris is licensed to carry a firearm in Massachusetts, where he maintains an "unrestricted" license to carry. Harris Declaration ¶3;

Harris Deposition at 24:14-22. Harris also has several other valid, "nonresident" licenses issued by various states. Harris Declaration ¶3; Harris Deposition at 21:17-25 (Maine, Rhode Island, Connecticut, Texas, Florida, Utah, Pennsylvania). Harris frequently visits family in New York and desires to carry a handgun for self-defense. Harris Declaration ¶15; Harris Deposition at 20:12-20, 43:12-14 ("I want to be on the right side of the law when exercising my Second Amendment Rights."). Harris does not reside or own property in New York, nor is he employed in New York. Harris Declaration ¶¶5-6; Harris Deposition at 16:12-18, 55:10-12, 17:12-19:14.

Seeking to obtain a New York Pistol/Revolver License in December 2023, Harris called the NYSP and spoke with Sergeant Michael Brennan regarding his eligibility as a nonresident. Sergeant Brennan informed Harris that the only nonresidents who could apply for a New York permit are individuals who either are principally employed in New York or own property in New York.[5] Harris Declaration ¶¶4-6; Harris Deposition at 54:19-55:16; *see also* Deposition of Sergeant Michael Brennan ("Brennan Deposition") at 17:2-5, Exhibit 2. Sergeant Brennan also informed Harris that New York would not recognize his Massachusetts License to Carry Firearms. Harris Declaration ¶7; Harris Deposition at 55:13-16. Seeking further confirmation of his ineligibility to apply, Harris then called the Pistol Clerk at the Sheriff's Office of Rensselaer County, a county he traverses while visiting New York. The Pistol Clerk informed Harris that, in order to apply in Rensselaer County, he needed to live within the county and hold a New York Driver's License, and that New York would not recognize his Massachusetts license. Harris Declaration ¶¶8-10; Harris Deposition at 57:23-58:22; Deposition of Sheriff Bourgault

---

[5] *But see* Bourgault Declaration, *infra*, at 23:5-7 ("How about if they just own land?" "That does not qualify, as far as I know."). This property-ownership exception, although commonly cited by other licensing officials, is something of an atextualism, as the statute only enumerates *residency*, employment, and place of business. *See* N.Y. Penal Law § 400.00(3)(a).

("Bourgault Deposition") at 20-21, Exhibit 3. Harris then contacted the Sheriff's Office of Columbia County, another county he traverses during New York visits, which likewise informed him that New York does not issue permits to nonresidents unless they own property in New York. Harris Declaration ¶¶11-13; Harris Deposition at 56:4-57:22; Deposition of Sheriff Krapf ("Krapf Deposition") at 16:4-7, Exhibit 4. The Columbia County Sheriff's Office also explained to Harris that New York would not recognize his Massachusetts license. Harris Declaration ¶13; Harris Deposition at 56:11-12; Krapf Deposition at 17:22-23.

**Michael Votruba.** Plaintiff Votruba is an adult male citizen of the Commonwealth of Massachusetts, a citizen of the United States, a law-abiding person, and has no disqualification under state or federal law which would prohibit him from possessing a firearm. Declaration of Michael Votruba ("Votruba Declaration") ¶¶1, 3, ECF No. 1-3; Deposition of Michael Votruba [sic] ("Votruba Deposition") at 15:4-11, 19:10-20:20, 33:9-20, 41:23-45:17, Exhibit 5. Votruba maintains an "unrestricted" Massachusetts license to carry. Votruba Declaration ¶3; Votruba Deposition at 20:21-24, 32:22-24. Votruba lives next to the Massachusetts Pittsfield State Forest, which shares a border with New York. Votruba Declaration ¶4; Votruba Deposition at 34:13-17. As an avid hiker, Votruba routinely visits this forest and carries his firearm while there. However, because the border between the Pittsfield State Forest and New York is unmarked, Votruba risks carrying his firearm into New York inadvertently and therefore desires the legal protection of a New York or New York-recognized license to avoid criminal liability. Votruba Declaration ¶¶5-6; Votruba Deposition at 34:7-18, 48:23-49:10.[6] Moreover, Votruba routinely visits New York to purchase fuel in New Lebanon and visit friends in Columbia and Rensselaer Counties. Votruba

---

[6] *See Antonyuk*, 120 F.4th at 1019 (Second Circuit "doubt[ing] that there is historical support for the regulation of firearms in wilderness parks, forests, and reserves.").

Declaration ¶¶7-10; Votruba Deposition at 34:21-24, 36:13-19.  While visiting New York, Votruba desires to carry a handgun for self-defense.  Votruba Declaration ¶¶13, 17; Votruba Deposition at 28:7-10.  Votruba does not reside or own property in New York, nor is he employed in New York. Votruba Declaration ¶¶13, 17; Votruba Deposition at 28:7-10.

Seeking to obtain a New York Pistol/Revolver License in December 2023, Votruba called the NYSP three times to inquire about his eligibility as a nonresident, but he could never get through to a live person.  Votruba Declaration ¶13; Votruba Deposition at 38:21-39:12.  Votruba then called the Rensselaer County Sheriff's Office and left a message for then-Deputy Kyle Bourgault.  Defendant Bourgault returned the call on December 18, 2023, informing Votruba that New York does not issue licenses to nonresidents unless they work in New York.  Votruba Declaration ¶¶14-15; Votruba Deposition at 36:20-37:22; Bourgault Deposition at 20-21.

**Carl Higbie.**  Plaintiff Higbie is an adult male citizen of the State of Connecticut, a citizen of the United States, a law-abiding person, and has no disqualification under state or federal law which would prohibit him from possessing a firearm.  Declaration of Carl Higbie ("Higbie Declaration") ¶¶1, 3, ECF No. 1-2; Deposition of Carlton Higbie IV ("Higbie Deposition") at 14:4-11, 33:20-36:16, 37:13-40:15, Exhibit 6.  A former Navy SEAL, Higbie has extensive weapons training across a variety of platforms.  Higbie Declaration ¶¶4-5, 8; Higbie Deposition at 22:21-22, 59:20-24.  Higbie has carried firearms openly and concealed, in numerous countries and on several continents, including in secured locations, government buildings, United States embassies, and even during domestic commercial air travel within the United States.  Higbie Declaration ¶6; Higbie Deposition at 59:20-24.  Higbie has an unrestricted license to carry firearms issued by Connecticut.  Higbie Declaration ¶3; Higbie Deposition at 41:9-14.  Higbie routinely carries a

firearm in public for self-defense when in Connecticut and desires to do the same when he visits New York.  Higbie Declaration ¶15; Higbie Deposition at 61:7-8, 62:6-7.

Higbie frequently visits northern New York to shop, visit friends, and participate in recreational activities.  Higbie Declaration ¶¶11-12, 14; Higbie Deposition at 24:23-25.  Higbie does not reside or own property in New York.  Higbie Declaration ¶¶1, 14; Higbie Deposition at 14:4-11.  Higbie hosts a television show on Newsmax, a cable channel, from Manhattan.  Higbie Deposition at 14:12-23.  Even so, Higbie has been unable to apply for a New York Pistol/Revolver License, having been turned away by licensing authorities in Manhattan (irrespective of him being present in Manhattan for a few hours each day during the week) in addition to Dutchess, Rensselaer, Putnam, and Westchester Counties.  *Id.* at 23:4-9, 24:17-29:2; *see also id.* at 23:24-24:5 ("I inquired in police stations in all the counties I mentioned.  And all of them turned me away on the spot, … you don't live here, you don't work here, you don't come through here and you're not a New York State resident.").  And as for New York City, the City's separate application stood in the way.[7]  Following the Supreme Court's *Bruen* decision in 2022, Higbie contacted the New York City Police Department ("NYPD") regarding his license eligibility and informed NYPD that he "worked" in New York City. Higbie Deposition at 29:3-24.  But rather than encourage an application from Higbie, the NYPD licensing official informed him that he "can't proceed" because he would have to provide a New York driver's license number in order to apply.  *Id.* at 29:17-20; *see also id.* at 30:23-31:2 (online application "requires a New York State driver's license which does not allow me to proceed until I have that....").

---

[7] Defendant James's Form PPB-3 makes clear that "[n]o license issued as a result of this application is valid in the City of New York."  *Pistol/Revolver License Application Semi-Automatic Rifle License Application*, State of N.Y. (Nov. 2024), https://tinyurl.com/5n9b4fhj. New York City maintains a separate licensing scheme from that which Defendants administer in upstate New York.

Only recently, *after* Plaintiffs filed this litigation, did New York City voluntarily remove this residency requirement via "emergency rule."[8]  Thus, at all times leading up to this litigation and through early August 2024, Higbie was prevented from applying for a license in New York City, and Defendants precluded him from applying for a license in upstate counties by virtue of his nonresidency.[9]  As Higbie stated, if he could apply for an upstate New York permit, he would do so, and he likewise would carry if New York recognized his Connecticut license.  Higbie Declaration ¶15; Higbie Deposition at 52:10-24.  Likewise, Higbie specifically enquired about a permit from Dutchess County because he frequents that area.  Higbie Deposition at 24-25.

### 2. Defendants Prevented Plaintiffs from Applying for Licenses, and Confirmed that There Is No Mechanism for Out-of-State Individuals to Apply for a New York Pistol/Revolver License.

**Steven G. James.**  Defendant Steven G. James is the current Superintendent of the NYSP. As Superintendent, he exercises, delegates, or supervises all the powers and duties of the New York Division of State Police, which is responsible for executing and enforcing New York's laws and regulations governing the carrying of firearms in public including, *inter alia*, prescribing the form for Pistol/Revolver License Applications.  As the Superintendent of the NYSP, Defendant James is the entity/individual tasked with implementing procedures for the licensing scheme and process.  *See* N.Y. Penal Law §§ 400.00(3)(a) ("Blank applications shall, except in the city of New York, be approved as to form by the superintendent of state police."), (4)(a) (appeals process and promulgating rules for same), (5)(a) (receiving duplicate copies of permit applications), (7)

---

[8] *Emergency Rule – Concealed Carry License Rules for Non New York Residents*, <u>NYC Rules</u> (Aug. 6, 2024), https://tinyurl.com/mr45xzej.

[9] Of course, " we evaluate 'whether the party invoking jurisdiction had the requisite stake in the outcome *when the suit was filed*.'"  *Fed. Defs. of N.Y., Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 126 (2d Cir. 2020); *see also Rosales v. LaValley*, 2014 U.S. Dist. LEXIS 33532, at *8 (N.D.N.Y. Jan. 21, 2024) (same).

(approving the form of license), (10)(b) (recertification of licenses upon expiration in certain counties). Moreover, Defendant James is tasked with enforcing New York firearm laws, including arresting unlicensed residents *and* nonresidents who carry firearms unlawfully within the state. *See* N.Y. Exec. Law § 223. *See also* Response to Request for Admission 5, Defendant Steven G. James' Answers to Plaintiffs' Request for Admissions, Exhibit 7 ("New York State does not acknowledge pistol permits issued by other states to permit lawful possession or carry of pistols in New York State.").

**Michael Deyo, Esq.** Michael Deyo, General Counsel for the NYSP, was designated as the Fed. R. Civ. P. 30(b)(6) witness for the NYSP. Mr. Deyo testified at his September 2024 deposition that Defendant James has the authority to amend the New York Pistol/Revolver License application Form PPB-3 to remove the requirement of a "New York driver's license."[10] Deposition of Michael Deyo, Esq. ("Deyo Deposition") at 28:17-29:2, Exhibit 8. Mr. Deyo also testified that the NYSP recently changed its policy when answering questions from callers seeking information on nonresident permits. He testified that the "guidelines direct [NYSP officials] to say that neither residency nor employment within the state are an eligibility requirement for obtaining a firearm license" and that the policy had changed "this month." *Id.* at 35:14-36:5.

**Sergeant Michael Brennan.** Sergeant Michael Brennan, assigned to the "pistol permit bureau" with the NYSP, testified that he has spoken with individuals who call the NYSP about nonresident pistol licensure. Brennan Deposition at 15:18-22. Sergeant Brennan testified that "if you don't live in New York, … or work in New York, there would be no mechanism for you to apply" for a license. *Id.* at 16:9-12; *see also id.* at 24:9-12 (same); *id.* at 43:13-18 ("[W]e're all

---

[10] As discussed later, Defendant James did in fact amend Form PPB-3 to remove the requirement for a New York driver's license.

trained through the on-the-job training sort of policy and program. Our responses would be the same...."). Finally, Sergeant Brennan confirmed that New York does not have reciprocity with any other state's license to carry. *Id.* at 32:16-18.

**Sheriff Donald J. Krapf.** Columbia County Sheriff Donald J. Krapf testified that he oversees the acceptance of pistol license applications in Columbia County, but that his office does not accept applications for pistol licenses from nonresidents. Krapf Deposition at 13:7-16, 16:5-7. Sheriff Krapf testified that applicants "need to be a resident of the county" or "have their primary place of employment in that jurisdiction," and that New York "[d]oes not accept permits from out of state." *Id.* at 16:18-22, 18:14-16. In fact, Sheriff Krapf did not recall his county ever having accepted an application from a nonresident. *Id.* at 17:2-7. However, Sheriff Krapf testified that, if New York law changed or this Court issued an order allowing nonresidents to apply, he would "absolutely" accept those applications. *Id.* at 24:13-19. Sheriff Krapf also testified that his office requires that character references "must reside in Columbia County," a policy that "preceded [his] term in office," which would pose difficulties for nonresident applicants, and exceeds what the statute requires. *Id.* at 29:8-30:12. Finally, Sheriff Krapf testified that "[a]pplicants must be a legal resident of Columbia County for at least six months," another policy that "predated [his] term" and exceeds the statute but nevertheless remains in effect. *Id.* at 33:8-11.

**Sheriff Kyle Bourgault.** Rensselaer County Sheriff Kyle Bourgault testified that "Rensselaer County does not accept applications from out-of-state residents" and the required character references "must be within the Capital District" and "known to somebody for five years," with "[n]o references to be accepted outside of New York State...." Bourgault Deposition at 20:25-

21:2, 16:5-7, 23:25-24:2, 16:5-7.[11]  Sheriff Bourgault testified that his office's role is to accept applications and conduct background checks, and that the "judges have always been the ones that issue pistol permits."  *Id.* at 18:9-13.  Although unable to confirm precisely with whom he had spoken over the phone, Sheriff Bourgault recalled that he had spoken about nonresident licensure with an individual that "is very similar to the complaint that was received" and who had asked about reciprocity with Massachusetts.  *Id.* at 20:2-6, 21:3-5.  Sheriff Bourgault confirmed that he told that person that Rensselaer County does not accept nonresident applications, and that a Massachusetts license would not be recognized in New York.  *Id.* at 20:24-21:9.  Finally, Sheriff Bourgault confirmed that, were he allowed to accept nonresident license applications, he "certainly" would do so.  *Id.* at 25:23-26:3.

### B.  Intervening Changes to New York's Licensing Forms Do Not Moot Plaintiffs' Request for Relief.

After Plaintiffs filed suit, but following no change in the underlying statute, New York City voluntarily opened its pistol license application to nonresidents via "emergency order" dated August 6, 2024.  *See* I(A)(1)(c), *supra*.  Then, in September 2024, and likewise with no change to the underlying statute, the NYSP voluntarily updated its guidelines for call-center staff, instructing them to inform nonresident callers that "neither residency nor employment within the state are an eligibility requirement for obtaining a firearm license."  Deyo Deposition at 35:20-23.  Finally, in November 2024, Defendant James quietly updated New York Pistol/Revolver License application Form PPB-3 to drop the requirement of a New York driver's license, an action which he remains

---

[11] *But see* Deyo Deposition at 47:2-9 ("[T]here's no residency requirement for character references in the New York Penal Law 400, is there?"  "No."); *see also id.* at 47:20-48:8 ("Are they allowed to add residency requirements...?"  "There's nothing in the penal law that would grant that authority specifically.").

free to reverse at any time.[12]  These recent actions bear all the hallmarks of voluntary cessation and they therefore fail to deprive this Court of jurisdiction to hear Plaintiffs' case.  *See Mhany Mgmt., Inc. v. County of Nassau*, 819 F.3d 581, 603 (2d Cir. 2016).  Accordingly, it is a defendant's burden to "demonstrate that (1) there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation."  *Id.*  Moreover, "even 'nominal damages' will save a case from mootness...."  *Fox v. Bd. of Trs. of State Univ.*, 764 F. Supp. 747, 756 (N.D.N.Y. 1991); *Uzuegbunam v. Preczewski*, 592 U.S. 279, 283 (2021) ( "an award of nominal damages by itself can redress a past injury").  Finally, non-party New York City's voluntary rule change likewise is of no moment to any Plaintiff for the reasons discussed in I(A)(1)(c), *supra*.

## C.  Plaintiffs Were Denied Their Second Amendment Rights Irrespective of Whether Such Denial Stems from the Statute Itself or Defendants' Customs, Practices, or Policies.

The Second Circuit already has interpreted N.Y. Penal Law § 400.00(3)(a) to preclude nonresident license eligibility.  *See Bach*, 408 F.3d at 77 ("[A]s a nonresident without New York State employment, Bach is not eligible for a New York firearms license."); *see also* Krapf Deposition at 21:18-22:6 ("How is it that … both you and Sheriff Bourgault, are under the impression that New York does not allow out-of-state residents to apply for permits?"  "Based off the criteria and the wording of Penal Law 400, Sub 3.").  Even so, some have questioned this conclusion.[13]  *See, e.g.*, *People v. Telfair*, 207 N.Y.S.3d 439, 447 (2023) (Rivera, J., concurring)

---

[12] *See, e.g.*, *New York State Pistol/Semi-Automatic Rifle License Application*, Onondaga Cnty. Sheriff's Off. (Mar. 1, 2023), https://perma.cc/KLS2-FSYY; *cf. Pistol/Revolver License Application Semi-Automatic Rifle License Application*, *supra* note 7 (changing this field to "Driver's License # (or Non-Driver ID)," omitting "NY" in November 2024).

[13] Much of this post-*Bach* confusion stems from a subsequent lawsuit brought by a denied applicant who owned only a part-time vacation residence in New York and therefore was not domiciled there.  *See Osterweil v. Bartlett*, 706 F.3d 139, 140 (2d Cir. 2013).  The Second Circuit certified

("Whether New York prohibits nonresidents from obtaining a gun license is an open question...."); *see also* Deyo Deposition at 25:7-9 ("Based upon the law, there's nothing that would prevent them from applying in any county."); *but see* Deyo Deposition at 45:21-25 ("I could see a reasonable interpretation based upon the four corners of what Penal Law 400, Subdivision 3 says to have that understanding.").

Plaintiffs submit that the statute's mandatory language controls: "Applications *shall* be made … where the applicant resides...."  N.Y. Penal Law § 400.00(3)(a) (emphasis added).  If an applicant cannot meet the statute's requirements, they fail the statutory mandate that "[a]pplications shall be made" in the prescribed manner, and there is no other manner provided in which they may apply.[14]  Indeed, "[n]othing is to be added to what the text states or reasonably implies.... That is, a matter not covered is to be treated as not covered."  Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 93 (2012).  But as noted *supra*, even if the statute did *not* operate to bar nonresident Plaintiffs from applying for licenses, *Defendants have*, and they remain liable under Section 1983.  *See* 42 U.S.C. § 1983 (emphasis added) (reaching officials acting "under color of any statute, ordinance, *regulation, custom, or usage*").

---

the question of whether an "applicant who owns a part-time residence in New York but makes his permanent domicile elsewhere [is] eligible for a New York handgun license in the city or county where his part-time residence is located" to the New York Court of Appeals.  *Id.* at 145.  The New York Court of Appeals held that the statute "does not preclude an individual who owns a part-time *residence* in New York but makes his permanent domicile in another state from applying for a New York handgun license, [and] we have no occasion to decide whether a contrary law would be unconstitutional*."  Osterweil v. Bartlett*, 21 N.Y.3d 580, 587 (2013) (emphasis added); *see also Osterweil v. Bartlett*, 738 F.3d 520, 521 (2d Cir. 2013) (adopting answer to question).  *Osterweil* therefore is distinguishable because it contemplated at least *some* form of residence within New York.  Here, Plaintiffs have none whatsoever.

[14] *See Matter of Benedetti*, 2024 NY Slip Op 24151, ¶ 4 (Sup. Ct.) ("under § 400.00 (3) (a), a licensing officer has the ability to grant a license to an applicant only if the applicant lives or performs his work in the county where the officer is venued. Unfortunately, the applicant neither lives nor works in Albany County. Therefore, since the court lacks jurisdiction to entertain the application, it must sua sponte dismiss the matter for lack of jurisdiction.").

## II.    DENIAL OF NONRESIDENT CITIZENS' RIGHTS TO PUBLIC CARRY VIOLATES THE SECOND AND FOURTEENTH AMENDMENTS.

The Second Amendment to the U.S. Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. This absolutist language contains no qualification or limitation constraining who may exercise the right, which arms may be owned and carried, how they may be acquired, where the right may be exercised, or for what purposes, and it applies with equal force against federal and state action by operation of the Fourteenth Amendment. *McDonald*, 561 U.S. at 765. Accordingly, the right presumptively belongs to "all Americans," presumptively protects "all instruments that constitute bearable arms," presumptively extends to all locations, and presumptively covers all "lawful purposes." *Heller*, 554 U.S. at 581, 582, 624; *Bruen*, 597 U.S. at 32 ("Th[e] definition of 'bear' naturally encompasses public carry.").[15] Indeed, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct" and a challenged firearm regulation is presumed unconstitutional. *Bruen*, 597 U.S. at 24. To that end, courts must "assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding" via examination of the Founding-era[16] "principles that underpin our regulatory tradition." *Id.* at 26; *United States v. Rahimi*, 602 U.S. 680, 692 (2024). And "[o]nly" if the government "justif[ies] its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation …

---

[15] *Bach*'s Second Amendment holding no longer controls, being a pre-*Heller*, pre-*McDonald* decision which held that the Second Amendment "imposes a limitation on only federal, not state, legislative efforts." *Bach*, 408 F.3d at 84.

[16] The Second Circuit has held that "the prevailing understanding of the right to bear arms in 1868 and 1791 are both focal points of our analysis." *Antonyuk*, 120 F.4th at 972. Plaintiffs dispute the validity of this analytical approach. *See* Compl. ¶39. Even so, "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry." *Bruen*, 597 U.S. at 38.

may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Bruen*, 597 U.S. at 24.

### A. New York's Residency Requirement Violates the Second Amendment's Plain Text Without Further Analysis.

At the outset, *Bruen*'s Second Amendment historical test applies when it is necessary to ascertain the original meaning of one or more of the Second Amendment's terms. *See Bruen*, 597 U.S. at 25 ("Members of this Court 'loo[k] to history for guidance.'"). Properly understood, if a firearm regulation simply bans the keeping or bearing of arms, such prohibition flatly contravenes the text, and no further analysis is necessary. *See Rahimi*, 602 U.S. at 711 (Gorsuch, J., concurring) ("[d]iscerning what the original meaning of the Constitution requires"). Here, Plaintiffs clearly are "people," weapons such as handguns clearly are "Arms," and to carry such a weapon clearly means to "bear" it. *See Arm*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/arm (last visited Jan. 6, 2025); *Bear*, BLACK'S LAW DICTIONARY, (11th ed. 2019). New York's total prohibition of Plaintiffs' arms bearing therefore is at odds with the plain text itself, and no amount of historical analysis can "overcome or alter that text." *Bruen*, 597 U.S. at 36; *see also id.* ("[T]o the extent later history contradicts what the text says, the text controls.").

### B. New York's Residency Requirement Violates *Heller* Without Further Analysis.

Binding precedent also renders any textual and historical analysis unnecessary. *Heller* already has done the legwork, holding that "the Second Amendment right is exercised individually and belongs to all Americans," and that "handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." *Heller*, 554 U.S. at 581, 629. As described *supra*, N.Y. Penal Law § 400.00(3)(a) operates to deprive a supermajority of Americans their rights to use handguns, and it therefore violates *Heller*'s analysis and holdings.

**C.  New York's Residency Requirement Violates *Bruen* Without Further Analysis.**

Additionally, *Bruen* held that "the Second Amendment guarantees an 'individual right to possess and carry weapons in case of confrontation,' … and confrontation can surely take place outside the home," thereby repudiating an argument that "would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense...."  *Bruen*, 597 U.S. at 33, 31.  Indeed, there is "no historical basis for New York to effectively declare the island of Manhattan" off-limits to firearms.  *Id.* at 31.  As described *supra*, N.Y. Penal Law § 400.00(3)(a) operates to place the entirety of New York off-limits to firearms for some 94 percent of Americans, and it therefore facially violates *Bruen*'s analysis and holdings, too.  The Second Amendment does not tolerate means-testing by way of a residency requirement.

**D.  The Second Amendment Presumptively Protects Plaintiffs' Desired Course of Conduct.**

Should this Court proceed to a *Bruen* historical analysis, it will find that Plaintiffs' presumptive protection already was litigated in *Heller* and *Bruen*.  Indeed, "[i]t is undisputed that … ordinary, law-abiding, adult citizens" like Plaintiffs "are part of 'the people' whom the Second Amendment protects."  *Bruen*, 597 U.S. at 31-32; *see* I(A)(1), *supra*.  "Nor does any party dispute that handguns are weapons 'in common use' today for self-defense."  *Bruen*, 597 U.S. at 32; *see* I(A)(1), *supra*.  And with respect to Plaintiffs' desire to publicly carry, "[t]he Second Amendment's plain text … presumptively guarantees … a right to 'bear' arms in public for self-defense."  *Bruen*, 597 U.S. at 33; *see* I(A)(1), *supra*.  Accordingly, N.Y. Penal Law § 400.00(3)(a)'s residency, employment, and business requirements are *presumed unconstitutional* unless and until Defendants "justify [their] regulation by demonstrating that" entirely prohibiting a supermajority of Americans from bearing arms "is consistent with the Nation's historical tradition…."  *Bruen*, 597 U.S. at 24.  Defendants cannot, as a number of courts already have found.

**E. There Is No Historical Tradition of Prohibiting Nonresidents from Possessing Handguns in Public.**

Recently, the Superior Court of Massachusetts had occasion to decide the constitutionality of a Massachusetts licensing law as applied to a New Hampshire resident in possession of an unlicensed firearm. In *Commonwealth v. Donnell*, 2023 Mass. Super. LEXIS 666 (Aug. 3, 2023), the court held the statute unconstitutional as applied, observing that "[t]he Commonwealth point[ed] to no historical precedent limiting the reach of one's exercise to a federal constitutional right to only within that resident's states borders." *Id.* at *5. Moreover, the court could "think of no other constitutional right which a person loses simply by traveling beyond his home state's border into another state continuing to exercise that right and instantaneously becomes a felon subject to mandatory minimum sentence of incarceration." *Id.* at *8-9.

Likewise, the U.S. District Court for the Central District of California recently issued a preliminary injunction against a California law "allow[ing] only Californians to apply for CCW licenses." *Cal. Rifle & Pistol Ass'n v. L.A. Cnty. Sheriff's Dep't*, 2024 U.S. Dist. LEXIS 221863, at *49 (C.D. Cal. Aug. 20, 2024).[17] Concluding that "entirely barr[ing]" nonresidents from public carry violates the Second Amendment, the court observed that "[t]he only historical analogues offered by the State … are the 20th century laws in Georgia, Oregon, and West Virginia." *Id.*; *see Bruen*, 597 U.S. at 66 n.28 ("20th-century evidence … does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence."); *see also Antonyuk*, 120 F.4th at

---

[17] An Order implementing the preliminary injunction was entered on January 22, 2025 (*see* 2:23-cv-10169-SPG-ADS, Document 81) ("Residents of states and US territories besides California, who are: members of [Organizational Plaintiffs], and; b. who are not otherwise prohibited from possessing firearms under federal or California law, upon proof of such membership, are entitled under this Order to apply for a California concealed handgun license…").

989 n.41 ("Twentieth-century evidence is not as probative as nineteenth-century evidence because it is less proximate to the ratification of the Fourteenth Amendment.").

Finally, the U.S. District Court for the Middle District of Pennsylvania recently granted summary judgment in favor of plaintiffs challenging a law banning the unlicensed possession of firearms in vehicles, holding that, "[u]nder *Bruen* and its progeny, Pennsylvanians must be permitted to freely transport firearms for their constitutional rights to have potency … [T]he court cannot countenance an interpretation whereby those protections extend only as far as an individual can travel by foot." *Suarez v. Paris*, 2024 U.S. Dist. LEXIS 130327, at *31-32 (M.D. Pa. July 24, 2024).  All told, a growing consensus of courts has concluded what text and history plainly show – nonresidents cannot be dispossessed of their Second Amendment rights.

### F.  The Historical Tradition Supports Plaintiffs.

Not only is there no historical tradition (Founding era or otherwise) to support New York's refusal to allow nonresidents to carry firearms in New York, but in fact the opposite is true.  From the 1600s to the modern day, laws proliferated that *exempted* nonresident visitors – or "travelers" – from local carry restrictions.[18]  *See, e.g.*, *Bruen*, 597 U.S. at 47-48 (citing a 1686 East New Jersey law that protected "strangers" from local pistol restrictions); An Act to Prevent Persons in This Commonwealth from Wearing Concealed Arms, Except in Certain Cases (1813) § 1 (1813 Kentucky); Revised Statutes of Arkansas (1837) Division VIII, chap. 44, art. I, § 13; Act of Jan. 14, 1820, chap. 23 (1820 Indiana); 1831 Ind. Acts 192, § 58 (1831 Indiana); 1841 Ala. Acts 148, Of Miscellaneous Offences, chap. 7, § 4 (1841 Alabama); 1878 Miss. Laws 175, An Act to Prevent the Carrying of Concealed Weapons and for Other Purposes, § 1 (1878 Mississippi); *see also* 18

---

[18] It should be noted that these bans normally applied to *concealed* weapons only, while allowing the open and unconcealed carry of pistols, residence of the firearm carrier notwithstanding.

U.S.C. § 926A (1986 federal protection).[19]  Likewise, part of Plaintiff Votruba's course of conduct, hiking through the wilderness with a firearm, has occurred from before this country was founded. There certainly is no historical tradition banning an American from carrying a firearm while walking around in the woods.

### III.    NEW YORK MUST GIVE FULL FAITH AND CREDIT TO NONRESIDENTS' LICENSES TO EXERCISE AN ENUMERATED RIGHT.

The Full Faith and Credit Clause of the U.S. Constitution provides that "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State.  And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof."  U.S. Const. art. IV, § 1.[20]

New York must give Plaintiffs' out-of-state licenses full faith and credit as a record of a public act certifying Plaintiffs' eligibility to carry a firearm.  Indeed, just as it does today, to "Record[]" was originally understood to mean "[t]o register any thing so that its memory may not be lost."  II Dictionary of the English Language (Samuel Johnson 1755).  Because Plaintiffs' out-of-state carry licenses may be used in the courts of their home states to prove eligibility to exercise their Second Amendment rights, so too must New York honor these records for this purpose.  *See* 28 U.S.C. § 1739 ("All nonjudicial records .... or copies thereof, so authenticated, shall have the same full faith and credit in every court and office within the United States and its Territories and Possessions as they have by law or usage in the courts or offices of the State, Territory, or

---

[19] *See* attached Appendix of Historical Laws, Exhibit 9.

[20] Because Second Amendment precedents have seen more development than the precedents supporting the arguments that follow, the canon of constitutional avoidance counsels that this Court first should decide the case on Second Amendment grounds and proceed to Plaintiffs' other constitutional claims only if it were to disagree with Plaintiffs on the former.  *See County of Sacramento v. Lewis*, 523 U.S. 833, 859 (1998) (Stevens, J., concurring in the judgment) (noting "the policy of avoiding the unnecessary adjudication of constitutional questions," especially when a question may be "both difficult and unresolved").

Possession from which they are taken."). The Full Faith and Credit Clause already protects all manner of unenumerated rights and even privileges. *See, e.g.*, *In re L.*, 2016 N.Y. Misc. LEXIS 3674, at \*12 (Kings Cnty. Fam. Ct. Oct. 6, 2016) ("[E]ach state must recognize a … marriage that was validly performed in any other state."); *Fong*, 901 N.Y.S.2d at 909 ("New York State must, and does, give full faith and credit to Illinois' issuance of driver's licenses...."). Records evincing eligibility to exercise a constitutionally enumerated right should be treated no differently.

## IV.   LICENSING DISCRIMINATION AGAINST NONRESIDENT CITIZENS VIOLATES THE PRIVILEGES AND IMMUNITIES CLAUSE.

The Privileges and Immunities Clause provides that "the Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several states." U.S. Const. art. IV, § 2. "At the time of Reconstruction, the terms 'privileges' and 'immunities' had an established meaning as synonyms for 'rights.' The two words, standing alone or paired together, were used interchangeably with the words 'rights,' 'liberties,' and 'freedoms,' and had been since the time of Blackstone." *McDonald*, 561 U.S. at 813 (Thomas, J., concurring in the judgment). Because this clause "removes 'from the citizens of each State the disabilities of alienage in the other States,'" *Saenz* 526 U.S. at 501, and therefore prohibits "severe discrimination" against nonresidents, *Toomer*, 334 U.S. at 399, New York cannot discriminate against nonresidents seeking to exercise their enumerated right to bear arms.

The Second Circuit previously assumed, "without deciding, that entitlement to a New York carry license is a privilege under Article IV." *Bach*, 408 F.3d at 91. Indeed, that decision was reached before the Second Amendment was determined to guarantee an individual right, and before the Supreme Court clarified that the right extends to "all Americans" bearing arms outside the home. The Second Circuit also acknowledged that "[t]here is no question that New York discriminates against nonresidents in providing handgun licenses under Article 400." *Bach*, 408

F.3d at 91.  However, the Second Circuit nevertheless rejected *Bach*'s Privileges and Immunities claim, a decision which is no longer good law.  Relying on New York's "considerable discretion" in licensing matters and the "power to *sua sponte* revoke or cancel a license", "which may be exercised at 'any time'", the Second Circuit held that the Privileges and Immunities clause was no bar to New York's discrimination, because New York had a "monitoring interest … in continually obtaining relevant behavioral information" from permit holders and that licensing officers have "the discretion to revoke licenses upon displays of 'poor judgment'" *Id.* at 79–80, 91.  But again, this holding is no longer tenable under *Bruen*, which rejected the notion that a person's Second Amendment rights are subject to "licensing officials['] discretion to deny licenses based on a perceived lack of need or suitability."  *Bruen*, 597 U.S. at 13.  While *Bach* noted that "other States are not bound to impose a discretionary revocation system like New York's," 408 F.3d at 92, after *Bruen*, no state is permitted to create such a "discretionary … system."  *See id.* at n.33 (contrasting Virginia's system of "specific enumerated grounds for disqualification" with New York's "vest[ing] [of] extraordinary discretion in licensing officers.").  Indeed, *Bruen* explicitly rejected this characteristic of "may issue" licensing regimes, contrasting them with licensing schemes that "contain only 'narrow, objective, and definite standards' guiding licensing officials … rather than requiring the 'appraisal of facts, the exercise of judgment, and the formation of an opinion.'" *Bruen*, 597 U.S. at 38 n.9.

Moreover, whereas the plaintiff in *Bach* held a permit from Virginia, which has a relatively permissive licensing regime, Plaintiffs here hold permits from Massachusetts and Connecticut, states with some of the most restrictive licensing regimes in the country.  Thus, *Bach* had no cause to "determine whether a plaintiff from a State employing a system substantially similar to New York's would be able to" succeed on a Privileges and Immunities claim.  *Bach*, 408 F.3d at 92

n.33. *Bach* therefore serves as no bar to Plaintiffs' Privileges and Immunities claim and, in fact, appears to invite it, and the Supreme Court's nondiscrimination precedents make it clear that N.Y. Penal Law § 400.00(3)(a)'s treatment of nonresidents is untenable.

## CONCLUSION

As the Fifth Circuit observed in a Fourth Amendment case, "[i]ndividuals do not shed their constitutional rights with the click of a seatbelt." *United States v. Rangel-Portillo*, 586 F.3d 376, 381 (5th Cir. 2009). Constitutional rights likewise do not end at the New York state line, and this Court should confirm that, for the 94 percent of Americans living outside of New York's borders, "[t]he constitutional right to bear arms in public for self-defense is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *Bruen*, 597 U.S. at 70. To that end, Plaintiffs request entry of declaratory and injunctive relief holding N.Y. Penal Law § 400.00(3)(a)'s residency, employment, and business prerequisites unconstitutional.

Respectfully submitted this the 24th day of January, 2025.


*/s/ Stephen D. Stamboulieh*                           Robert J. Olson
Stephen D. Stamboulieh                                 William J. Olson, PC
Stamboulieh Law, PLLC                                  370 Maple Avenue West, Suite 4
P.O. Box 428                                           Vienna, VA 22180
Olive Branch, MS 38654                                 (703) 356-5070 (T)
(601) 852-3440 (T)                                     (703) 356-5085 (F)
stephen@sdslaw.us                                      rob@wjopc.com
NDNY Bar Roll# 520383                                  NDNY Bar Roll# 703779
*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I, Stephen D. Stamboulieh, hereby certify that I have caused to be filed a true and correct copy of the foregoing document or pleading with the Court's ECF system, which generated a notice and delivered a copy of the same to all counsel of record.


Dated: January 24, 2025.

/s/ *Stephen D. Stamboulieh*
Counsel for Plaintiffs

26