UNITED STATES DISTRICT COURT
NORTHERN DISCTRICT OF NEW YORK

---

CARL HIGBIE, JOSEPH HARRIS, and
MICHAEL VOTRUBA,

*Plaintiffs*,

-against-

STEVEN G. JAMES, in his official capacity as Superintendent of the New York State Police, KYLE BOURGAULT, in his official capacity as Sheriff of Rensselaer County, New York, DONALD J. KRAPF, in his official capacity as Sheriff of Columbia County, New York, and JOHN DOES 1-10,

*Defendants*.

---

**DECLARATION OF JAMES M. THOMPSON**

24-CV-174

MAD/TWD

James M. Thompson hereby declares as follows, pursuant to 28 U.S.C. § 1746:

1. I am a member of the Bar of the State of New York and am admitted to practice in this District. I serve as Special Counsel for Second Amendment Litigation in the office of Letitia James, the New York State Attorney General. With my co-counsel Matthew J. Gallagher, I represent Defendant Steven G. James in his official capacity as Superintendent of the New York State Police.

2. I submit this Declaration in support of Superintendent James' opposition to Plaintiffs' Motion for Summary Judgment, ECF No. 39, and in support of the Superintendent's Cross-Motion for Summary Judgment. This declaration is submitted for the limited purpose of putting before the Court certain historical documents supporting assertions in the accompanying memorandum of law.

3. Unless otherwise stated, the facts and circumstances set forth in this declaration

are based upon my own personal knowledge, review of documents and information in the legal file relating to this action, research on online databases (particularly the HeinOnline database of historical laws), and conversations with experts.

4. Attached as Exhibit 1 is an excerpt from the 1894 publication of the Colonial Laws of New York from the Year 1664 to the Revolution, containing a prohibition on selling guns, gunpowder, and ammunition to Native Americans or "any person Inhabiting out of this Government," absent permission from the Governor.

5. Attached as Exhibit 2 is an excerpt of the 1897 publication of the Charter to William Penn, and Laws of the Province of Pennsylvania, containing a prohibition on selling guns, gunpowder, and ammunition to Native Americans or "any person Inhabitting out of this Government," absent permission from the Governor.

6. Attached as Exhibit 3 is an excerpt from the 1850 publication of the Public Records of the Colony of Connecticut, containing a prohibition on selling guns, gunpowder, and ammunition to Native Americans or outsiders, without license from a court or two magistrates.

7. Attached as Exhibit 4 is an excerpt from the 1672 publication of The General Laws And Liberties of the Massachusetts Colony, containing a prohibition on selling guns, gunpowder, and ammunition to Native Americans or outsiders.

8. Attached as Exhibit 5 is an except from the Acts, Resolutions and Memorials of the Fifteenth Legislative Assembly of the Territory of Arizona, containing a law stating that "Persons traveling may be permitted to carry arms within settlements or towns of the Territory for one-half hour after arriving in such settlements or town, and while going out of such towns or settlements."

9. Attached as Exhibit 6 is an excerpt from Volume II of A Digest of the Laws of

Texas, containing "An Act to Regulate the Keeping and Bearing of Deadly Weapons."

10. Attached as Exhibit 7 is an excerpt from the 1887 Acts of the Legislative Assembly of the Territory of New Mexico, containing "An Act to prohibit the unlawful carrying and use of deadly weapons."

11. Attached as Exhibit 8 is an excerpt from the July 22, 1865 edition of The Los Angeles Tri-Weekly News, containing an ordinance prohibiting certain weapons within the city and containing an exception for "persons actually traveling, and immediately passing through Los Angeles city."

12. Attached as Exhibit 9 is a copy of an October 4, 1880 ordinance enacting a system for pistol permits available only to residents of the City of Brooklyn and "[a]ny non-resident, who does business in the City of Brooklyn, and has occasion to carry a pistol while in said city," as reprinted in the October 26, 1880 edition of the Brooklyn Daily Eagle.

13. Attached as Exhibit 10 is an excerpt from the Ordinances of the Mayor, Aldermen and Commonalty of the City of New York In Force January 1, 1881, prohibiting the carrying of pistols and providing for the issuance of permits to persons who "apply to the officer in command at the station-house of the precinct where he resides" or to "[a]ny non-resident who does business in the city of New York, and has occasion to carry a pistol while in said city," who could apply "in the same manner as is required by residents of said city."

14. Attached as Exhibit 11 is an excerpt from a 1910 edition of the Municipal Code of the City of Albany, N.Y., containing "An ordinance regulating the carrying of loaded firearms in the City of Albany," which provided for issuance of permits only to "[a]ny nonresident who does business in the city of Albany, and has occasion to carry a loaded pistol, revolver, or firearm while in the said city," who could "make application for permission to do so, to the

Commissioner of Public Safety, in the same manner as is required of residents of said city . . ."

15. Attached as Exhibit 12 is an excerpt from a 1905 copy of the Municipal Ordinances of the City of Troy, containing "An Ordinance Regulating the Carrying of Loaded Firearms and other Dangerous Weapons in the City of Troy," allowing for issuance of handgun permits, with "[a]ny non-resident who does business in the City of Troy and has occasion to carry a loaded pistol, revolver, or firearm while in the said city" being able to "make application for permission to do so, to the commissioner of public safety, in the same manner as is required of residents of said city . . ."

16. Attached as Exhibit 13 is an excerpt from The General Ordinances of the City of Milwaukee up to January 1, 1896, containing an ordinance prohibiting the carrying of certain deadly weapons, but allowing for the chief of police to issue permits in appropriate circumstances to "any person residing within the city of Milwaukee . . ."

17. Attached as Exhibit 14 is an excerpt from the 1872 Revised Ordinances of the City of Omaha, containing a prohibition on the carrying of concealed weapons, with an exception for "well known and worthy citizens, or persons of good repute, who may carry arms for their own protection in going to or from their place or places of business, if such business be lawful."

18. Attached as Exhibit 15 is an excerpt from the 1914 edition of Park's Annotated Code of the State of Georgia, requiring that persons seeking a firearm license must apply to "the ordinary of the respective counties in which the party resides."

19. Attached as Exhibit 16 is an excerpt from the 1913 General Laws of Oregon, including a law forbidding the sale of a pistol to anyone who has not obtained "a permit" signed by a judicial official "of the county wherein such person resides."

20. Attached as Exhibit 17 is an excerpt from the 1921 Laws of Missouri, including a law requiring persons wishing to buy or sell a concealable firearm to obtain a permit "issued by the circuit clerk of the county in which the applicant for a permit resides in this state."

21. Attached as Exhibit 18 is an excerpt from the 1925 Acts of the Legislature of West Virginia, including a law requiring that a person applying for a firearm permit "has been a *bona fide* resident of this state for at least one year next prior to the date of such application, and of the county sixty days next prior thereto."

22. I declare under penalty of perjury that to the best of my knowledge the foregoing is true and correct.

Dated: Washington, DC
February 14, 2025

James M. Thompson

# EXHIBIT 1

# THE

# COLONIAL LAWS

OF

# NEW YORK

FROM THE

## YEAR 1664 TO THE REVOLUTION,

INCLUDING THE

CHARTERS TO THE DUKE OF YORK, THE COMMISSIONS AND INSTRUCTIONS TO COLONIAL GOVERNORS, THE DUKE'S LAWS, THE LAWS OF THE DONGAN AND LEISLER ASSEMBLIES, THE CHARTERS OF ALBANY AND NEW YORK AND THE ACTS OF THE COLONIAL LEGISLATURES FROM 1691 TO 1775 INCLUSIVE.

## VOLUME I.

TRANSMITTED TO THE LEGISLATURE BY THE COMMISSIONERS OF STATUTORY REVISION, PURSUANT TO CHAPTER 125 OF THE LAWS OF 1891.

ALBANY:
JAMES B. LYON, STATE PRINTER.
1894.

REPRODUCTION BY PERMISSION OF
THE BUFFALO & ERIE COUNTY PUBLIC LIBRARY
BUFFALO, NEW YORK

REPRODUCTION BY PERMISSION OF
THE BUFFALO & ERIE COUNTY PUBLIC LIBRARY
BUFFALO, NEW YORK

theire Voyage or Journey, And also all Strangers, Lodgers or other Persons may freely Continue in such Houses, when theire Lawfull Occations and business doth require, Provided there be no disorder amongst them.

Every Person so Licenced for the Entertainment of strangers with their Horses, shall provide one or more Enclosure for Summer Hay and Provender for winter with convenient stable roome, And attendance; upon Penalty of two Shillings Sixpence for every days default, and double Damage to the party thereby wronged.

No Licenced Person shall unreasonably exact upon his Guest for any sort of entertainment, and no man shall be compelled to pay above eight pence a Meale, with small Beer only unless the Guest shall make other agreement with the person so lycenced.

No Licence shall be granted by any two Justices in Sessions for above the terme of one year, but every person so Licenced before the expiration of the said Terme shall and are hereby enjoyned to repair to the sessions of that Jurisdiction for renewing their Several Licenses for which they shall pay to the Clarke of the Sessions two Shillings Six pence, or else they shall forfeit five pounds as unlicenced persons.

All Offences committed against this law, shall be determined by the Constable with two or more of the Overseers, who are impowered to Collect and receive the Severall fines or distrayne in Case of non-payment rendring accompt thereof as is else where required.

## INDIANS.

No Purchase of lands from Indians After the first day of March, 1664, shall be Esteemed a good Title without leave first had and obtained from the Governour and after leave so obtained, The Purchasers shall bring the Sachem and right owner of such Lands before the Governoure to acknowledge satisfaction and payment for the said Lands whereupon they shall have a grant from the Governoure And the Purchase so made and prosecuted is to be entered upon record in the Office & from that time to be valid to all intents and purposes.

All injuryes done to the Indians of what nature whatsoever shall upon their Complaint and proofe thereof in any Court have speedy redress gratis, against any Christian in as full and Ample manner, (with reasonable allowance for damage), as if the Case had been betwixt Christian & Christian.

No person shall sell, give or Barter directly or indirectly any Gun or Guns, Powder, Bullet, shott, Lead nor any Vessel of Burthen, or Row Boate Canooes only excepted Without Licence first had and obtained under the Governours hand and Seal, to

REPRODUCTION BY PERMISSION OF
THE BUFFALO & ERIE COUNTY PUBLIC LIBRARY
BUFFALO, NEW YORK

any Indian whatsoever, nor to any person Inhabiting out of this Goverment, nor shall amend or repair any Gun belonging to any Indian, nor shall Sell any armour or weapons, upon penalty of ten pounds for every Gun, Armour, weapon, Vessell, or Boat, so Sould given or Bartered, five pounds for every pound of powder, and forty Shillings for every pound of Shott or Lead and proportionably for any greater or lesser quantity.

No Person Shall from and after the first day of September 1665 Directly or Indirectly Trade with the Indians for any sort of furrs without Licence first had from the Governoure which Licence is to be renewed every year at the Governours pleasure, or remained if he shall find just Exception.

No Person whatsoever from henceforth shall Sell, Truck, Barter, give or deliver any Strong Liquores to any Indian directly or indirectly, whatsoever known by the name of Rum, Strong waters, Wine Brandy Spirrits or any other Strong Liquore under any other Name whatsoever; Under the Penalty of forty Shillings for one pint and Soo proportionately for greater or lesser quantities so Sould, Bartered, given or delivered as aforesaid, One third part of this penalty to be to the informer, Provided always that it is and shall be Lawfull by way of reliefe and Charity to any Indian in Case of sudden extremity sickness faintness or weariness to sell or give to such Indian or Indians the quantity of two drames and no more of any such Strong Liquors as are aforementioned Provided also that the Governoure by Licence may Authorize any person or persons to sell any or all Such Strong Liquores to Indians upon Security taken from the person Licenced for his or theire good behaviour.

In all Places within this Goverment the English and all others shall keep their Cattle from destroying the Indians Corne in any ground where they have right to plant and if any of theire Corne be destroyed for want of fencing the Towne shall make Satisfaction, and shall have power amongst themselves to lay the Charge where the Occation of the Damage did arise.

Provided that the Indians shall make proofe the Cattle of such a Town farme or Person did the Damage And for the Indians Encouragement towards the fencing in theire Corn fields, such Townes farmers or Persons where Cattle may annoy them that way shall Direct, Assist and help them in felling of trees riving and Sharpening Rayles and holing of Poasts; allowing one English man to three or more Indians and shall also draw the fencing into place for them, and allow one man a day or two towards the setting up of the same, And either sell or lend them Tooles to finish it Provided that such Indians shall



REPRODUCTION BY PERMISSION OF
THE BUFFALO & ERIE COUNTY PUBLIC LIBRARY
BUFFALO, NEW YORK

fence their Cornefields or Ground att their own Charge, And if any Indians shall refuse to fence their Corne Grounds (being tendred help as aforesaid,) in the presents and hearing of Sufficient witnesses They shall keep of all Cattle or loose their Damage.

And if any harme be done at any time by the Indians unto the English in theire Cattle, The Gouvernour or Deputy Governour with two of the Councell, or any Court of Sessions or Assises may order Satisfaction according to Law and Justice.

No Indian whatsoever shall at any time be Suffered to Powaw or performe outward worship to the Devil in any Towne within this Goverment.

### JURORS AND JURYES.

That the Clarke of the Sessions sh all in Convenient time before the Sitting of the Court give a Certificate to the Sheriffe or under Sheriff of what and how many Causes are entered for their hearing the next Sessions to the end the Sheriff or under Sheriff may (and are hereby required) Immediately to Issue forth warrants to the Constable of the Severall Townes of the Jurisdiction of the Court or Jurymen proportionable to the Causes with regard to the equality of the number from each Town and according to the warrant The Constable shall warn so many of the Overseers to attend as Jurymen and return their names to the under Sheriff, And if such Number of Jury men so required, prove not Sufficient for Carrying on the business with dispatch to the Sessions The Justices may require the Sheriffe or under Sheriffe, to Supply their number with so many able and discreet men as shall either attend the Court upon other occations, or shall happen to be Inhabitants of the Towne where the Court shall be held.

All Juryes so Chosen shall be Empanelled and Sworn truly to try between party and party and shall find the matter of fact, with the Damages and Costs according to the Evidence; where upon the Justices in the absence of other Superior Officers, shall pronounce the sentence directing the Jury in point of Law, and if there bee matter of apparent equity upon the forfeiture of an Obligation, breach of Covenant without damage or the like, the Bench shall determine such matters of equity.

Every Juryman shall be allowed three Shillings Six pence per Diem for the Charges of their Attendance out of the fees and profits arising in each Court where they do Service, or by the Country if those fall Short.

No Jury shall exceed the number of Seaven nor be under Six unless in Special Causes upon Life and Death, The Justices shall thinke fitt to Appoint twelve.

REPRODUCTION BY PERMISSION OF
THE BUFFALO & ERIE COUNTY PUBLIC LIBRARY
BUFFALO, NEW YORK

# EXHIBIT 2

# CHARTER

TO

# WILLIAM PENN,

AND

# LAWS OF THE PROVINCE OF PENNSYLVANIA,

PASSED BETWEEN THE YEARS 1682 AND 1700,

PRECEDED BY DUKE OF YORK'S LAWS IN FORCE FROM THE YEAR 1676 TO THE YEAR 1682, WITH AN

# APPENDIX

CONTAINING LAWS RELATING TO THE ORGANIZATION OF THE PROVINCIAL COURTS AND HISTORICAL MATTER.

---

PUBLISHED UNDER THE DIRECTION OF
JOHN BLAIR LINN,
*Secretary of the Commonwealth.*

---

COMPILED AND EDITED BY
STAUGHTON GEORGE, BENJAMIN M. NEAD,
THOMAS McCAMANT.

HARRISBURG:
LANE S. HART, STATE PRINTER.
1879.

Reproduction by Permission of Buffalo & Erie County Public Library Buffalo, NY




OBVERSE. REVERSE.

*Great Seal of the Province of Pennsylvania,*
*(reduced one-half.)*

Reproduction by Permission of Buffalo & Erie County Public Library Buffalo, NY

# DUKE OF YORKE'S

# BOOK OF LAWS.

INTRODUCED SEPTEMBER 22, 1676.

Reproduction by Permission of Buffalo & Erie County Public Library Buffalo, NY



*House of York.*

Reproduction by Permission of Buffalo & Erie County Public Library Buffalo, NY

# *LAWES

*Establisht by the Authority of his Majesties Letters patents, granted to his Royall Highnes James Duke of Yorke and Albany; Bearing Date the 12th Day of March in the Sixteenth year of the Raigne of our Soveraigne Lord Kinge Charles the Second.*

*Digested into one Volume for the publicke use of the Territoryes in America under the Goverment of his Royall Highnesse.*

*Collected out of the Severall Laws now in force in his Majesties American Colonyes and Plantations.*

*Published March the 1st Anno Domini 1664 at a General meeting at Hemsted upon Longe Island by virtue of a Commission from his Royall Highness James Duke of Yorke and Albany given to*

*Colonell Richard Nicolls Deputy Governeur, bearing date the Second day of Aprill 1664.*

**Absence.**

IF any Justice or high Constable shall bee absent from the Sessions held within that Riding he shall pay for every Dayes absence ten pounds and every petty Constable for each default shall pay five pounds Provided that it shall be Lawful for the Justices upon the Bench to discharge any Constable from his Appearance if they shall think fitt. **Absence from sessions, how punished.**

**Actions.**

That all actions of Debts Accompts Slanders and Actions of the Case concerning Debts and Accompts shall be tryed within that Jurisdiction where the Cause of action Doth arise. **Trial of actions.**

All actions of Debt or Trespasse under the value of five pounds between Neighbours shall be put to Arbitration of two indifferent persons of the Neighbourhood to be nominated by the Constable of the place; And if either or both parties shall refuse (upon any pretence,) their Arbitration: Then the next Justice of the peace upon notice therof by the Constable shall choose three other indifferent persons; who are to meet at the Dissenters charge from the first Arbi- **Arbitrations.**

*See Appendix for ordinance introducing these laws on the Delaware.

Reproduction by Permission of Buffalo & Erie County Public Library Buffalo, NY

to be kept, shall for every such neglect forfeit Tenne Shillings and every person found Drunk in or about any of their houses shall forfeit two shillings Six pence, And for being the Author or accessary of the breach of the Peace and discorders or for Tipling at unseasonable hours shall forfeit ten Shillings and for want of payment or in case they be Servants and neglect their Masters occations They shall be sent to the Stocks one hour at the least, It shall be lawfull notwithstanding for all Licenced Persons to Entertain Land Travellers or Seafareing men in the night season when they Come on shore or from their Journey for theire necessary refreshment or towards theire preparation for theire Voyage or Journey, And also all Strangers, Lodgers or other Persons may freely Continue in such Houses, when theire Lawfull Occations and business doth require, Provided there be no disorder amongst them.

Punishment for drunkenness on premises, breaches of peace, &c.

Every person so Licensed for the Entertainment of strangers with their Horses, shall provide one or more Enclosure for Summer Hay and Provender for winter with convenient stable roome And attendance; upon Penalty of two Shillings Sixpence for every days default, and double Damage to the party thereby wronged.

To be provided with stabling.

No Licensed Person shall unreasonably exact upon his Guest for any sort of entertainment, and no man shall be compelled to pay above eight pence a Meale, with small Beer only unless the Guest shall make other agreement with the person so lycenced.

Extortionate charges, prohibited.

Price of meals.

No Licence shall be granted by any two Justices in Sessions for above the terme of one year, but every person so Licenced before the expiration of the said Terme shall and are hereby enjoyned to repair to the sessions of that Jurisdiction for renewing their Several Licences for which they shall pay to the Clark of the Sessions two Shillings Six pence, or else they shall forfeit five pounds as unlicenced persons.

Term of licenses.

Renewal of same.

All Offences committed against this law, shall be determined by the Constable with two or more of the Overseers, who are impowered to Collect and receive the Severall fines or distrayne in Case of non payment rendring accompt thereof as is else where required.

How offenses to be determined.

**Indians.**

No Purchase of lands from Indians After the first day of March 1664 shall be Esteemed a good Title without leave first had and obtained from the Governour and after leave so obtained, The Purchasers shall bring the Sachem and right owner of such Lands before the Governoure to acknowledge satisfaction and payment for the said Lands whereupon they shall have a grant from the Governoure And the Purchase so made and prosecuted is to be entered upon record in the Office & from that time to be valid to all intents and purposes.

Purchase of lands from Indians.

All Injuryes done to the Indians of what nature whatsoever; shall upon their Complaint and proofe thereof in any Court have speedy redress gratis, against any Christian in

Redress of injuries.

Reproduction by Permission of Buffalo & Erie County Public Library Buffalo, NY

Case 1:24-cv-00174-MAD-TWD Document 42-2 Filed 02/14/25 Page 19 of 127



as full and Ample manner, (with reasonable allowance for damage) as if the Case had been betwixt Christian and Christian.

Furnishing Indians with guns, &c., without license, prohibited.

No Person shall sell give or Barter directly or indirectly any Gun or Guns Powder, Bullet, shott, Lead nor any Vessel of Burthen, or Row Boate Canooes only excepted Without Licence first had and obtained under the Governours hand and Seal, to any Indian whatsoever, nor to any person Inhabitting out of this Government nor shall amend or repair any Gun belonging to any Indian, nor shall Sell any armour or weapons, upon penalty of ten pounds for every Gun, Armour, weapon, Vessell, or Boat, so Sould given or Bartered, five pounds for every pound of powder, and forty Shillings for every pound of Shott or Lead and proportionably for any greater or lesser quantity.

Also, trading for furs.

No Person Shall from and after the first day of September 1665 Directly or Indirectly Trade with the Indians for any sort of furrs without Licence first had from the Governoure which Licence is to be renewed every year at the Governours pleasure, remained if he shall find just Exception.

Furnishing liquor.

No Person whatsoever from henceforth shall Sell, Truck, Barter, give or deliver any Strong Liquores to any Indian directly or indirectly, whatsoever known by the name of Rum Strong waters, wine Brandy Spirrits or any other Strong Liquore under any other Name whatsoever; Under the Penalty of forty Shillings for one pint and So proportionably for greater or lesser quantities so Sould, Bartered, given or dilivered as aforesaid, One third part of this penalty to be to the informer, Provided always that it is and shall be Lawfull by way of reliefe and Charity to any Indian in Case of sudden extremity sickness faintness or weariness to sell or give to such Indian or Indians the quantity of two drames and no more of any such Strong Liquors as are aforementioned Provided also that the Governoure by Licence may Authorize any person or persons to sell any or all Such Strong Liquores to Indians upon Security taken from the person Licenced for his or theire good behaviour.

Cattle prohibited from destroying Indians' corn fields.

In all Places within this Goverment the English and all others shall keep their Cattle from destroying the Indians Corne in any ground where they have right to plant and if any of theire Corne be destroyed for want of fencing the Towne shall make Satisfaction, and shall have power amongst themselves to lay the Charge where the Occation of the Damage did arise.

Satisfaction for damages.

Provided that the Indians shall make proofe the Cattle of such a Town farme or Person did the Damage And for the Indians Encouragement towards the fencing in theire Corn fields, such Townes farmers or Persons where Cattle may annoy them that way shall Direct, Assist and help them in felling of trees riving and sharpening Rayles and holing of Poasts; allowing one English man to three or more Indians and shall also draw the fencing into place for them, and allow one man a day or two towards the setting up of the same, And either sell or lend them Tooles to finish it Provided that such Indians shall fence their Cornefields or

To be assisted in fencing their fields.

Reproduction by Permission of Buffalo & Erie County Public Library Buffalo, NY

Ground att their own Charge, And if any Indians shall refuse to fence their Corne Grounds (being tendred help as aforesaid,) in the presents and hearing of Sufficient witnesses They shall keep of all Cattle or loose their Damage.

And if any harme be done at any time by the Indians unto the English in theire Cattle, The Gouernoure or Deputy Governour with two of the Councell, or any Court of Sessions or Assises may order Satisfaction according to Law and Justice. Satisfaction for injuries to cattle by Indians.

No Indian whatsoever shall at any time be Suffered to Powaw or performe outward worship to the Devil in any Towne within this Goverment. Powwowing, prohibited.

**Jurores and Juryes.**

That the Clark of the Sessions shall in Convenient time before the Sitting of the Court give a Certificate to the Sheriffe or under Sheriff of what and how many Causes are entered for their hearing the next Sessions to the end the Sheriff or under Sheriff may (and are hereby required) Immediately to Issue forth warrants to the Constable of the Severall Townes of the Jurisdiction of the Court for Jurymen proportionable to the Causes with regard to the equality of the number from each Town and according to the warrant The Constable shall warn so many of the Overseers to attend as Jurymen and return their names to the under Sheriff, And if such Number of Jury men so required, prove not Sufficient for Carrying on the business with dispatch to the Sessions The Justices may require the Sheriffe or under Sheriffe, to Supply their number with so many able and discreet men as shall either attend the Court upon other occations, or shall happen to be Inhabitants of the Towne where the Court shall be held. Summoning of jurors.

All Juryes so Chosen shall be Empanelled and Sworn truly to try between party and party and shall find the matter of fact, with the Damages and Costs according to the Evidence; where upon the Justices in the absence of other Superior Officers, shall pronounce the sentance directing the Jury in point of Law, and if there bee matter of apparent equity upon the forfeiture of an Obligation, breach of Covenant without damage or the like, the Bench shall determine such matters of equity. To be sworn. And directed in points of law. Bench to determine matters of equity.

Every Juryman shall be allowed three Shillings Six pence per Diem for the Charges of their Attendance out of the fees and profits arising in each Court where they do Service, or by the Country if those fall Short. Compensation.

No Jury shall exceed the number of Seaven nor be under Six unless in Special Causes upon Life and Death, The Justices shall thinke fitt to Appoint twelve. Number.

In all Cases wherein the Law is obscure, so as the Jury cannot be Sattisfied therein. They have Liberty to present a special verdict (viz) If the Law be so in such a point, We find for the plaintiffe but if the Law be otherwise, We find for the Defendant, In which Case the determination doth properly belong to the Court, And all Juryes shall have liberty in matter of fact, if they cannot finde the maine Issue, Special verdicts. Liberty in matters of fact.

C

Reproduction by Permission of Buffalo & Erie County Public Library Buffalo, NY

# EXHIBIT 3

24-cv-00174-MAD-TWD Document 42-2 Filed 02/14/25 Page 2

556
C112

THE

# PUBLIC RECORDS

OF THE

# COLONY OF CONNECTICUT,

PRIOR TO THE UNION WITH NEW HAVEN COLONY,

MAY, 1665;

TRANSCRIBED AND PUBLISHED, (IN ACCORDANCE WITH A RESOLUTION OF THE GENERAL ASSEMBLY,) UNDER THE SUPERVISION OF THE SECRETARY OF STATE,

WITH OCCASIONAL NOTES, AND AN APPENDIX;




By J. HAMMOND TRUMBULL,

COR. SEC. CONN. HIST. SOCIETY; COR. MEMB. N. YORK HIST. SOCIETY, ETC.

HARTFORD:
BROWN & PARSONS.
1850.

Digitized by Google

*At a General Assembly of the State of Connecticut, holden at Hartford, in said State, on the first Wednesday of May, in the year of our Lord, one thousand eight hundred and forty-nine:*

*Resolved,* That the Secretary of State be authorized to purchase for the use of the State, two hundred and fifty copies of a publication of the Public Records of the Colony of Connecticut, prior to the union with New Haven colony, under the Charter of 1662. *Provided,* that such publication shall be made with the approval, and under the supervision of the Secretary, and shall be authenticated by his official certificate as a true and literal copy of the original record; *and provided also,* that the expense of the same shall not exceed two dollars per copy; and that the literal copy of the original record, above specified, be deposited with the Secretary of State, for the use of the State.

*Resolved,* That the copies so purchased be distributed by the Secretary, as follows; one copy to the town clerk of each town in this State, to be preserved in his office, for the use of the town; one copy to the Governor and to each of the State Officers of this State; one copy to the Governor of each of the several states and territories, of the United States; one copy to the library of Congress; and the remainder of said two hundred and fifty copies, to be deposited in the office of the Secretary of State, subject to the disposal of the General Assembly.

PRESS OF
CASE, TIFFANY & CO.,
HARTFORD, CONN.

Digitized by Google

24-cv-00174-MAD-TWD Document 42-2 Filed 02/14/25 Page 2



For the better furnisheing the Riuer wth Cordage towards the rigging of Shipps, It is Ordered, that what hempseed any prson hath wthin these libertyes, that they shall ether sowe yt themselves, or sell yt to some others wthin the Riuer that may sowe the same.

The late Rate graunted, of 50*l.* is to be made vp a 100*l.* and to be prportioned vppon the three Townes according to the former Rate, wch may be paid in sum̄er Wheat at 4*s.* 4*d.* the bushl, Rye at 3*s.* vi*d*, Pease at 3*s.* vi*d*, Indean at 2*s.* viij*d.* pruided yt be Marchantable Corne, and the Constables of ech Towne are Ordered to receaue no other but at such vnder Rate as they shall esteeme yt at, or in wampū at 6 a penny.

The former Order of Indean at 2*s.* vi*d.* the bushl is repealed, and the seurall sorts of Corne before mentioned are made payable, vppon the pryses herein specified, for any labour or hyer of men or cattle, hereafter to be done.

The size of Pipestaues is to be 4 foote vi inches in length, the breadth and thicknes according to the former Order.

It is Ordered, that noe man wthin this Jurisdiction shall directly or indirectly amend, repaire, or cause to be amended or repaired, any gun, smale or greate, belonging to any Indean, nor shall endeuor the same, nor shall sell or giue to any Indean, directly or indirectly, any such gun or gunpowder, or shott, or lead, or mould, or millitary weapons, or armor, nor shall make any arrowe heads, vppon payne of ten pownd fyne for euery offence at lest, nor sell nor barter any guns, powder, bullitts or lead, wherby this Order might be evaded, to any prson inhabiting out of this Jurisdiction, wthout lycence of this or the prticuler Court, or som two Magistrats, vppon payne of ten pownd for every gun, fiue pownd for eury pownd of powder, 40*s.* for euery pownd of bullitts or lead, and so prportionably for any greater or lesser quantity.

Mr. Whiteing & Capten Mason are desiered to take Order to demaund the Tribuit due frō Long Iland and the Indeans vppon the mayne, and wt they can receaue may be accoumpted towards that wch is due to thē frō the Country. Mr. Whiteing is contente to accepte of the Corne at Mohegen, and to dischardge the prises of the two cloathes, pruided he be abated by

Digitized by Google

# EXHIBIT 4

# THE GENERAL LAWS And LIBERTIES of the MASSACHUSETS COLONY:

*Revised & Re-printed.*

By Order of the General Court Holden at *Boston*, *May* 15th. 1672.

*Edward Rawson Secr.*

---

*Whosoever therefore resisteth the Power, resisteth the Ordinance of God and they that resist receive to themselves Damnation.* Rom. 13. 2.

---

CAMBRIDGE

*Printed by Samuel Green, for John Usher of Boston.*

1672.


SIGILLVM : GVB : ET : SOCIET : DE : MATTACHVSETS : BAY : IN : NOVA : ANGLIA

# THE GENERALL LAWS OF THE MASSACHUSETS COLONY,

REVISED AND PUBLISHED, BY ORDER OF THE GENERAL COURT

in *October* 1658.

*Forasmuch as the free fruition of such Liberties, Immunities, Priviledges, as Humanity, Civility and Christianity call for, as due to every Man in his Place and Proportion, without Impeachment and Infringement, hath ever been, and ever will be, the Tranquility and Stability of Churches and Common-wealth, and the denyall or deprival thereof, the disturbance, if not ruine of both.* The Civil priviledges of the Inhabitants of this Colony.

It is therefore Ordered by this Court and the Authority thereof, That no mans life shall be taken away, no mans Honour or good Name shall be stained, no mans person shall be arrested, restrained, banished, dismembred, nor any wayes punished; no man shall be deprived of his wife or children, no mans goods or estate shall be taken away from him, nor any wayes indamaged, under colour of Law, or countenance of Authority, unless it be by virtue or equity of some express Law of the Country warranting the same, established by a General Court, and sufficiently published; or in case of the defect of a Law, in any particular case, by the word of God. And in Capital Cases, or in Cases concerning dismembring, or banishment, according to that word, to be judged by the Generall Court. [1641.]

## *Ability. Age.*

IT is Ordered by this Court and the Authority thereof; That the age for passing away Lands, or such kinde of Hereditaments, or for giving of Votes, Verdicts or Sentences in any civil Courts or causes, shall be one and twenty years, but in chusing Guardians, fourteen years. And all persons of the age of one and twenty years, as aforesaid, and of understanding and memory, whether excommunicate, condemned, or other, shall have full power and liberty, to make their Wills and Testaments, and other lawfull Alienations of their Lands and Estates. [1641. 47.]

Age of discretion.

Liberty to dispose Estate.

Case 1:24-cv-00174-MAD-TWD Document 42-2 Filed 02/14/25 Page 29 of 127



## *IMPRISONMENT.*

Who Baylable:

IT is Ordered and by this Court Declared, That no Mans Perſon ſhall be Reſtrained or Impriſoned by any Authority whatſoever, before the Law hath Sentenced him thereto, if he can put in ſufficient Security, Baile or Mainprize, for his appearance and good Behaviour in the mean time, unleſs it be in Crimes Capital, and Contempt in open Court, and in ſuch Caſes where ſuch expreſs Act of Court doth allow it. [*1641.*]

## *INDIANS.*

*A.52. p.16.*

FOR *ſetling the Indians Title to Lands in this Juriſdiction;*
It is Declared and Ordered by this Court and Authority thereof, That what Lands any of the Indians in this Juriſdiction have poſſeſſed and improved, by ſubduing the ſame, they have juſt right unto, according to that in *Gen. 1.28. & chap. 9. 1. & Pſal. 115. 16.*

Indians Title to Land.

*And for the farther incouragement of the hopeful work amongſt them, for the Civilizing, and helping them forward to Chriſtianity; If any of the Indians ſhall be brought to Civility, and ſhall come among the Engliſh to Inhabit, in any of their Plantations, and ſhall there live Civilly and Orderly;*
That ſuch Indians ſhall have Allotments amongſt the Engliſh, according to the Cuſtome of the Engliſh in like caſe.

Civil Indians to have Land granted them.

Further it is Ordered, that if upon good experience, there ſhall be a competent number of the Indians brought on to Civility, ſo as to be capable of a Townſhip, upon their requeſt to the General Court, they ſhall have graunt of Lands undiſpoſed of, for a Plantation as the Engliſh have.

Indians not to be diſpoſſeſſed

And further it is Ordered by this Court, that if any Plantation or Perſon of the Engliſh, ſhall offer injuriouſly to put any of the Indians from their Planting grounds, or Fiſhing-places, upon their complaint and proof thereof, they ſhall have relief in any of the Courts of Juſtice amongſt the Engliſh, as the Engliſh have.

And further it is Ordered by this Court and the Authority thereof, and be it hereby Enacted, That all the Tract of Land within this Juriſdiction, whether already granted to any Engliſh Plantations or Perſons, or to be granted by this Court (not being under the qualification of Right to the Indians) is, and ſhall be accounted the juſt Right of ſuch Engliſh as already have, or hereafter ſhall have Graunt of Lands from this Court, and the Authority thereof; from that of *Geneſis 1. 28.* and the Invitation of the Indians.

*L. 1. p.38*

2. And it is Ordered, That no Perſon whatſoever, ſhall henceforth buy

Case 1:24-cv-00174-MAD-TWD Document 42-2 Filed 02/14/25 Page 30 of 127



buy Land of any Indian without Licenfe firft had and obtained of the General Court, and if any offend herein, fuch Land fo bought fhall be forfeited to the Country. None to buy Land of Indians

Nor fhall any perfon, fell, give or Barter, directly or indirectly, any Gun or Guns, Powder, Bullets, Shot, Lead to any Indian whatfoever, or to any perfon Inhabiting out of this Jurifdiction: Nor fhall any amend or repair any Gun belonging to any Indian, nor fhall fell any Armour or Weapons, upon penalty of *ten pounds* for every Gun, Armour or Weapons fo fold, given or Bartered, *five pounds* for every pound of Powder, *forty fhillings* for every pound of Shot or Lead, and proportionably for any greater or leffer quantity. [*1633. 37.*] no arms or ammunition to be traded with the indians.

FOR *Explanation of the Law*, tit. *Indians*;

This Court doth Declare the Prohibition there expreft, Referring to the purchafe of Indian Land without Licence from this Court, is to be underftood, as well Graunts for tearm of years as for ever, and that under the fame penalty, as in the faid Law is expreft. [*1665.*]

3. *Whereas the* French *and* Dutch *and other forreign Nations do ordinarily Trade Guns, Powder, Shot, &c. with Indians, to our great prejudice and ftrengthening and animating the Indians againft us, And the aforefaid* French, Dutch *&c. do prohibit all Trade with the Indians within their refpective Jurifdictions, under penalty of Confifcation, &c.* *L.2.p.15.*

It is therefore Ordered; That it fhall not be lawful for any *Frenchman, Dutch-man*, or any perfon of any other Forreign Nation whatfoever, or any *Englifh* dwelling amongft them, or under them, or any of them, to Trade with any *Indian* or *Indians* within the Limits of our Jurifdiction, directly or indirectly by themfelves or others, under penalty of Confifcation of all fuch Goods and Veffels as fhall be found fo Trading, or the due value thereof, upon juft proof of any Goods or Veffels, fo Trading or Traded. Forreigners prohibited Trade with our Indians

And it fhall be lawful for any perfon or perfons, Inhabiting within this Jurifdiction, to make feizure of any fuch Goods or Veffels Trading with the *Indians*; one half whereof fhall be for the proper ufe and benifit of the party feizing, and the other half to the Country.

4. *And becaufe the Trade of Furrs with the Indians in this Jurifdiction, doth properly belong to this Common-wealth, and not unto particular perfons;* *A.57.p.22.*

It is therefore Ordered, That henceforth no Perfon or Perfons, directly or indirectly, fhall Trade with the Indians for any fort of Peltry, excepting only fuch as are Authorized by this Court, or by fuch Committee as this Court fhall appoint from time to time, under the penalty of *one Hundred pounds* fine for every offence, *ten pound* whereof fhall be to the Informer, the reft to the Country. None to Trade furrs with Indians without licenfe under penalty of 100 li.

5. *Whereas feveral Orders for the preventing of Drunkennefs amongft the Indians have been made, yet notwithftanding there is little or no reformation: For the prevention thereof, and the frequent effects thereof, Murder and other outrages amongft them;* *A.52.p.23.*

This Court doth Order, that no perfon of what quality or condition

# EXHIBIT 5

# ACTS,

## RESOLUTIONS AND MEMORIALS

OF THE

## FIFTEENTH

# LEGISLATIVE ASSEMBLY

OF THE

## TERRITORY OF ARIZONA.

UNIV. OF MICH. LAW LIBRARY.

27588

SESSION BEGUN ON THE TWENTY-FIRST DAY
OF JANUARY, A. D. 1889.

PRESCOTT:
OFFICE OF THE COURIER.
1889

Generated on 2021-06-15 19:27 GMT / https://hdl.handle.net/2027/mdp.35112203976339
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

1:24-cv-00174-MAD-TWD Document 42-2 Filed 02/14/25 Page 33 of



SEC. 3 This Act shall be in force and effect from and after its passage.

Approved March 18, 1889.

---

No. 13. AN ACT

Defining and Punishing Certain Offenses Against the Public Peace.

*Be it Enacted by the Legislative Assembly of the Territory of Arizona:*

SECTION 1. If any person within any settlement, town, village or city within this Territory shall carry on or about his person, saddle, or in his saddlebags, any pistol, dirk, dagger, slung shot, sword-cane, spear, brass knuckles, bowie knife, or any other kind of knife manufactured or sold for purposes of offense or defense, he shall be punished by a fine of not less than twenty-five nor more than one hundred dollars; and in addition thereto, shall forfeit to the County in which he is convicted, the weapon or weapons so carried.

SEC. 2. The preceding article shall not apply to a person in actual service as a militiaman, nor as a peace officer or policeman, or person summoned to his aid, nor to a revenue or other civil officer engaged in the discharge of official duty, nor to the carrying of arms on ones own premises or place of business, nor to persons traveling, nor to one who has reasonable ground for fearing an unlawful attack upon his person, and the danger is so imminent and threatening as not to admit of the arrest of the party about to make such attack upon legal process.

SEC. 3. If any person shall go into any church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into a ball room, social party or social gathering, or to any election precinct on the day or days of any election, where any portion of the people of this Territory are collected to vote at any election, or to any other place where people may be assembled to muster or to perform any other public duty, or to any other public assembly, and shall have or carry about his person a pistol or

Generated on 2021-06-15 19:28 GMT / https://hdl.handle.net/2027/mdp.35112203976339 / Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google Original from UNIVERSITY OF MICHIGAN

1:24-cv-00174-MAD-TWD Document 42-2 Filed 02/14/25 Page 34 o



other firearm, dirk, dagger, slung shot, sword-cane, spear, brass knuckles, bowie knife, or any other kind of a knife manufactured and sold for the purposes of offense or defense, he shall be punished by a fine not less than fifty nor more than five hundred dollars, and shall forfeit to the County the weapon or weapons so found on his person.

SEC. 4. The preceding article shall not apply to peace officers, or other persons authorized or permitted by law to carry arms at the places therein designated.

SEC. 5. Any person violating any of the provisions of Articles 1 and 3, may be arrested without warrant by any peace officer and carried before the nearest Justice of the Peace for trial; and any peace officer who shall fail or refuse to arrest such person on his own knowledge, or upon information from some credible person, shall be punished by a fine not exceeding three hundred dollars.

SEC. 6. Persons traveling may be permitted to carry arms within settlements or towns of the Territory for one-half hour after arriving in such settlements or town, and while going out of such towns or settlements; and Sheriffs and Constables of the various Counties of this Territory and their lawfully appointed deputies may carry weapons in the legal discharge of the duties of their respective offices.

SEC. 7. It shall be the duty of the keeper of each and every hotel, boarding house and drinking saloon, to keep posted up in a conspicuous place in his bar room, or reception room if there be no bar in the house, a plain notice to travelers to divest themselves of their weapons in accordance with Section 9 of this Act, and the Sheriffs of the various Counties shall notify the keepers of hotels, boarding houses and drinking saloons in their respective Counties of their duties under this law, and if after such notification any keeper of a hotel, boarding house or drinking saloon, shall fail to keep notices posted as required by this Act, he shall, on conviction thereof before a Justice of the Peace, be fined in the sum of five dollars to go to the County Treasury.

SEC. 8. All Acts or parts of Acts in conflict with this Act are hereby repealed.

SEC. 9. This Act shall take effect upon the first day of April, 1889.

Approved March 18, 1889.

Generated on 2021-06-15 19:28 GMT / https://hdl.handle.net/2027/mdp.35112203976339
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from UNIVERSITY OF MICHIGAN

# EXHIBIT 6

Texas. Laws, statutes, etc. Digests

# A DIGEST

OF THE

# LAWS OF TEXAS:

## CONTAINING THE LAWS IN FORCE,

AND

# THE REPEALED LAWS

## ON WHICH RIGHTS REST,

FROM 1864 TO 1872,

## CAREFULLY ANNOTATED.

BY GEORGE W. PASCHAL,

*OF AUSTIN, TEXAS,*

LATE REPORTER OF THE SUPREME COURT OF TEXAS, AUTHOR OF PASCHAL'S ANNOTATED CONSTITUTION, PASCHAL'S DIGEST OF DECISIONS, ETC., ETC.

Third Edition—Volume II.

8

WASHINGTON, D. C.:

W. H. & O. H. MORRISON,

LAW BOOKSELLERS AND PUBLISHERS.

1873.

Generated on 2021-06-15 18:51 GMT / https://hdl.handle.net/2027/hvd.hl3e66
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
HARVARD UNIVERSITY

Case 1:24-cv-00174-MAD-TWD Document 42-2 Filed 02/14/25 Page 37 of 127



days' imprisonment.

jail nor less than one day nor more than ten days, or both, in the discretion of the court or jury before whom the trial is had.

12 Aug., 1870; took effect 12 Oct., 1870. Vol. 21, part 1, p. 63.

### AN ACT REGULATING THE RIGHT TO KEEP AND BEAR ARMS.

Persons not to bear arms at public assemblies. Social intercourse and elections not to be made dangerous.

Art. 6512.

Kinds of weapons prohibited.

Fine $50 to $500. Notes, 111, 167.

Scalp-lifting country excepted.

Armed officials.

ART. 6511. [1] If any person shall go into any church or religious assembly, any school-room or other place where persons are assembled for educational, literary, or scientific purposes, or into a ball room, social party, or other social gathering, composed of ladies and gentlemen, or to any election precinct on the day or days of any election, where any portion of the people of this state are collected to vote at any election, or to any other place where people may be assembled to muster or to perform any other public duty, or any other public assembly, and shall have about his person a bowie-knife, dirk, or butcher-knife, or firearms, whether known as a six-shooter, gun, or pistol of any kind, such person so offending shall be deemed guilty of a misdemeanor, and on conviction thereof shall be fined in a sum not less than fifty or more than five hundred dollars, at the discretion of the court or jury trying the same: *Provided*, That nothing contained in this section shall apply to locations subject to Indian depredations: *And provided further*, That this act shall not apply to any person or persons whose duty it is to bear arms on such occasions in discharge of duties imposed by law.

12 April, 1871; took effect 12 June, 1871. Vol. 21, part 2, p. 25.

### AN ACT TO REGULATE THE KEEPING AND BEARING OF DEADLY WEAPONS.

Carrying arms a misdemeanor, punishable by fine and forfeiture, unless, &c. Patriots and militiamen excepted. Art. 6511.

Fine $25 to $100 for first offense.

Imprisonment for second offense. Notes 111, 167.

People at home and officials excepted.

Legislators not "civil officers."

ART. 6512. [1] Any person carrying on or about his person, saddle, or in his saddle-bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purpose of offense or defense, unless he has reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing; or unless having or carrying the same on or about his person for the lawful defense of the state, as a militiaman in actual service, or as a peace officer or policeman, shall be guilty of a misdemeanor, and, on conviction thereof, shall, for the first offense, be punished by fine of not less than twenty-five nor more than one hundred dollars, and shall forfeit to the county the weapon or weapons so found on or about his person; and for every subsequent offense may, in addition to such fine and forfeiture, be imprisoned in the county jail for a term not exceeding sixty days; and in every case of fine under this section the fines imposed and collected shall go into the treasury of the county in which they may have been imposed: *Provided*, That this section shall not be so construed as to prohibit any person from keeping or bearing arms on his or her own premises, or at his or her own place of business, nor to prohibit sheriffs or other revenue officers, and other civil officers, from keeping or bearing arms while engaged in the discharge of their official duties, nor to prohibit persons traveling in the state from keeping or carrying arms with their baggage: *Provided further*, That members of the legislature shall not be included under the term "civil officers" as used in this act.

Art. 6512. Justification must be immedi-

ART. 6513. [2] Any person charged under the first section of this act, who may offer to prove, by way of defense, that he was

Generated on 2021-06-15 18:52 GMT / https://hdl.handle.net/2027/hvd.hl3e66
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google
Digitized by Google
Original from HARVARD UNIVERSITY

Case 1:24-cv-00174-MAD-TWD Document 42-2 Filed 02/14/25 Page 38 of 127



in danger of an attack on his person, or unlawful interference with his property, shall be required to show that such danger was immediate and pressing, and was of such a nature as to alarm a person of ordinary courage; and that the weapon so carried was borne openly and not concealed beneath the clothing; and if it shall appear that this danger had its origin in a difficulty first commenced by the accused, it shall not be considered as a legal defense.

ate and pressing danger;

and weapon not concealed.

Impending danger.

ART. 6514. [3] If any person shall go into any church or religious assembly, any school-room, or other place where persons are assembled for amusement, or for educational or scientific purposes, or into any circus, show, or public exhibition of any kind, or into a ball-room, social party, or social gathering, or to any election precinct on the day or days of any election, where any portion of the people of this state are collected to vote at any election, or to any other place where people may be assembled to muster, or to perform any other public duty, (except as may be required or permitted by law,) or to any other public assembly, and shall have or carry about his person a pistol, or other firearm, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured and sold for the purposes of offense and defense, unless an officer of the peace, he shall be guilty of a misdemeanor, and, on conviction thereof, shall, for the first offense, be punished by a fine of not less than fifty, nor more than five hundred dollars, and shall forfeit to the county the weapon or weapons so found on his person; and for every subsequent offense may, in addition to such fine and forfeiture, be imprisoned in the county jail for a term of not more than ninety days.

Attending public meetings armed an offense to be punished in like manner.

Society protected and attempted civilization.

Character of arms prohibited.

Fine $50 to $100 for first offense, and imprisonment for perseverance.

ART. 6515. [4] This act shall not apply to nor be enforced in any county of the state which may be designated in a proclamation of the governor as a frontier county, and liable to incursions of hostile Indians.

Governor may exempt frontier counties by proclamation.

ART. 6516. [5] All fines collected under the provisions of this act shall be paid into the treasury of the county, and appropriated exclusively to the keeping in repair and maintenance of public roads, and all weapons forfeited to the county under the provisions of this act shall be sold as may be prescribed by the county court, and the proceeds appropriated to the same purpose.

Art. 6517. All fines under this act must be paid into county treasury.

ART. 6517. [6] It shall be the duty of all sheriffs, constables, marshals, and their deputies, and all policemen and other peace officers, to arrest any person violating the first or third sections of this act, and to take such person immediately before a justice of the peace of the county where the offense is committed, or before a mayor or recorder of the town or city in which the offense is committed, who shall investigate and try the case without delay. On all such trials the accused shall have the right of a trial by jury, and of appeal to the district court; but, in case of appeal, the accused shall be required to give bond, with two or more good and sufficient sureties, in a sum of not less than one hundred, nor more than two hundred dollars, if convicted under the first section, and in a sum of not less than two hundred, nor more than one thousand dollars, if convicted under the third section of this act; said bond to be payable to the state of Texas, and approved by the magistrate, and conditioned that the defendant will abide the judgment of the district court that may be rendered

Peace officers to arrest offenders, &c.

Jury trial and appeal allowed. Appeal bond.

Payable to State.

Generated on 2021-06-15 18:52 GMT / https://hdl.handle.net/2027/hvd.hl3e66
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google
Original from HARVARD UNIVERSITY

Forfeiture. in the case; and in case of forfeiture the proceedings thereon shall be as is or may be prescribed by law in similar cases; and all moneys collected on any bond or judgment upon the same, shall be paid over and appropriated as provided in the fifth section of this act.

Art. 6516.

Art. 6517. Officer failing to arrest to be discharged. Arts. 6512, 6514.

ART. 6518. [7] Any officer named in the sixth section of this act who shall refuse or fail to arrest any person whom he is required to arrest by said section on his own information, or where knowledge is conveyed to him of any violation of the first or third sections of this act, shall be dismissed from his office on conviction in the district court, on indictment or information, or by such other proceedings or tribunal as may be provided by law, and, in addition, shall be fined in any sum not exceeding five hundred dollars, at the discretion of the court or jury.

And fined not more than $500.

District courts to have concurrent jurisdiction.

ART. 6519. [8] The district courts shall have concurrent jurisdiction under this act, and it is hereby made the duty of the several judges of the district courts of this state to give this act especially in charge to the grand juries of their respective counties.

Governor to publish the act.

ART. 6520. [9] It is hereby made the duty of the governor to publish this act throughout the state; and this act shall take effect and be in force from and after the expiration of sixty days after its passage.

## TITLE XIII.—OF OFFENSES AGAINST PUBLIC POLICY AND ECONOMY.

Arts. 2035–2038.

### CHAPTER I.—ILLEGAL BANKING AND PASSING SPURIOUS MONEY.

### AN ACT CONCERNING PRIVATE CORPORATIONS.

2 Dec., 1871; took effect from passage. Vol. 21, part 3, p. 82. Officers to publish semi-annual returns; punishment for failure. Arts. 5932–6011.

ART. 6521. [79] Every such corporation shall semi-annually, in the months of July and January, publish in one or more newspapers in the county where such corporation shall have its place of business, a statement, verified by the oath of its president or secretary, setting forth its actual financial condition, and the amount of its property and liabilities, under a penalty of five hundred dollars to the state, to be recovered by indictment against the president, cashier, or directors, and shall also deposit a copy of said statement, verified as aforesaid, in the office of the secretary of state.

How recovered.

Arts. 2043.

### CHAPTER III.—OF SELLING TO INDIANS.

31 Aug., 1866. Art. 6317 for caption. Selling liquor to Indians.

ART. 6522. [408] If any person shall give or barter, or cause to be sold, given, or bartered, any ardent spirits, or any spirituous or intoxicating liquors, or firearms, or ammunition, to any Indian of the wild or unfriendly tribes, he shall be fined not less than ten nor more than one hundred dollars. Justices of the peace and mayors shall have jurisdiction under this article.

Who may punish.

### CHAPTER IV.—GAMING.

11 May, 1871; took effect from passage. Vol. 21, part 3, p. 84. Arts. 2046, 2054.

### AN ACT TO AMEND AN ACT ENTITLED "AN ACT TO ADOPT AND ESTABLISH A PENAL CODE FOR THE STATE OF TEXAS," APPROVED AUGUST 26, A. D. 1856, AND TO REPEAL AN ACT ENTITLED "AN ACT TO AMEND ARTICLES 412 AND 418 OF AN ACT TO ADOPT AND ESTABLISH A PENAL CODE FOR THE STATE OF TEXAS," APPROVED DECEMBER 16, A. D. 1863.

Keeping a gaming table or bank punished.

ART. 6523. [412] If any person shall keep or exhibit, for the purpose of gaming, any gaming table or bank, of any name or

Generated on 2021-06-15 18:53 GMT / https://hdl.handle.net/2027/hvd.hl3e66
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google
Original from HARVARD UNIVERSITY

# EXHIBIT 7

PUBLIC PROPERTY.—Any Public Officer in possession of this Book will deliver it to his successor.

1887

# ACTS

—OF THE—

# LEGISLATIVE ASSEMBLY,

—OF THE —

# TERRITORY OF NEW MEXICO,

TWENTY-SEVENTH SESSION.

Convened at the Capitol, at the City of Santa Fe, on Monday, the 27th Day of December, 1886, and Adjourned on Thursday, the 24th Day of February, 1887.




LAS VEGAS, NEW MEXICO:
J. A. CARRUTH. PRINTER, BINDER AND BLANK BOOK MANUFACTURER.
1887.

Case 1:24-cv-00174-MAD-TWD Document 42-2 Filed 02/14/25 Page 42 of 1



in the third degree shall be punished by imprisonment for not less than three nor more than twenty-one years, in the territorial penitentiary.

SEC. 5. It is the true intent of this act to repeal said sections 687, 688, 689, 695, 699, 700, 702 and 703, referred to in the first section of this act, only so far as the same apply to offenses committed after the passage of this act, but the said sections are to be held and remain in force and apply to all acts done and offenses committed prior to the passage of this act, and all pending prosecutions and those hereafter instituted for acts done prior to the passage of this act shall be commenced and carried on and punishment be had under the said sections 687, 688, 689, 695, 699, 700, 702 and 703, which said sections are hereby continued in force only for that purpose. Intent of repeal.

SEC. 6. This act shall be in force from and after its passage.

Approved February 24, 1887.

---

# CHAPTER XXX.

## CRIMES-WEAPONS.

---

AN ACT to prohibit the unlawful carrying and use of deadly weapons.

---

*Be it enacted by the Legislative Assembly of the Territory of New Mexico:*

SECTION 1. That any person who shall hereafter carry a deadly weapon, either concealed or otherwise, on or about the settlements of this territory, except it be in his or her residence, or on his or her landed estate, and in the lawful defense of his or her person, family or property, the same being then and there threatened with danger, or except such carrying be done by legal authority, upon conviction thereof shall be punished by a fine of not less than fifty dollars, nor more than three hundred, or by imprisonment not less than sixty days, nor more than six months, or by both such fine and imprisonment, in the discretion of the court or jury trying the same. Carrying any deadly weapon.

Threatening any person.

SEC. 2. Any person who shall draw a deadly weapon on another, or who shall handle a deadly weapon in a threatening manner, at or towards another, in any part of this territory, except it be in the lawful defense of himself, his family or his property, or under legal authority, upon conviction thereof, shall be fined in any sum not less than one hundred dollars, nor more than five hundred dollars, or by imprisonment at hard labor in the county jail or territorial penitentiary not less than three months nor more than eighteen months, or by both such fine and imprisonment, in the discretion of the court or jury trying the same.

Assault with deadly weapon.

SEC. 3. Any person who shall unlawfully assault or strike at another with a deadly weapon, upon conviction thereof shall be punished by a fine not exceeding one thousand dollars, or by imprisonment at hard labor in the county jail or territorial penitentiary, not exceeding three years, in the discretion of the court or jury trying the same.

Flourishing deadly weapon.

SEC. 4. Any person who shall unlawfully draw, flourish or discharge a rifle, gun or pistol within the limits of any settlement in this territory, or within any saloon, store, public hall, dance hall or hotel, in this territory, except the same be done by lawful authority, or in the lawful defense of himself, his family or his property, upon conviction thereof shall be punished by a fine of not more than one thousand dollars, or by imprisonment for a term of not more than three years, or by both such fine and imprisonment, in the discretion of the court or jury trying the same. The word "settlement," as used in this act, shall be construed to mean any point within three hundred yards of any inhabited house, in the territory of New Mexico.

Insulting person while armed.

SEC. 5. Any person being armed with a deadly weapon, who shall, by words, or in any other manner, insult or assault another, upon conviction thereof, shall be punished by a fine of not less than one hundred dollars, nor more than three hundred dollars, or by imprisonment at hard labor in the county jail or territorial penitentiary for not less than three months, nor more than one year, or by both such fine and imprisonment, in the discretion of the court or jury trying the same.

Jurisdiction of offenses.

SEC. 6. Justices of the peace, as well as the district courts shall have concurrent jurisdiction of all offenses committed under the first section of this act; but of offenses committed under the remaining sections hereof, justices of the peace shall not have jurisdiction except as committing magistrates, and it is made the duty of the justices of the peace of the several counties of the territory before whom any person is brought or arraigned for the violation of any

of the above sections, other than section one of this act, if reasonable grounds exist to believe such person guilty, to bind such person over in a good and sufficient bond to the district court of such county, and in default of such bond to commit to jail as in other felonies.

What accused must prove.

SEC. 7. It shall not be necessary, in the trial of any cause arising under the provisions of this act to prove that the person charged was not, at the time of violating the said provisions, in the lawful defense of himself, his family or property, or acting by lawful authority, but the accused must prove that he was, at such time, within the exception claimed.

Deadly weapon, definition of.

SEC. 8. Deadly weapons, within the meaning of this act, shall be construed to mean all kinds and classes of pistols, whether the same be a revolver, repeater, derringer, or any kind or class of pistol or gun; any and all kinds of daggers, bowie knives, poniards, butcher knives, dirk knives, and all such weapons with which dangerous cuts can be given, or with which dangerous thrusts can be inflicted, including sword canes, and any kind of sharp pointed canes; as also slung shots, bludgeons or any other deadly weapons with which dangerous wounds can be inflicted.

Travelers may carry arms.

SEC. 9. Persons traveling may carry arms for their own protection while actually prosecuting their journey and may pass through settlements on their road without disarming; but if such travelers shall stop at any settlement for a longer time than fifteen minutes they shall remove all arms from their person or persons, and not resume the same until upon eve of departure.

Officers may carry arms when.

SEC. 10. Sheriffs and constables of the various counties, and marshals and police of cities and towns, in this territory, and their lawfully appointed deputies, may carry weapons, in the legal discharge of the duties of their respective offices, when the same may be necessary, but it shall be for the court or the jury to decide from the evidence whether such carrying of weapons was necessary or not, and for an improper carrying or using deadly weapons by an officer, he shall be punished as other persons are punished, for the violation of the preceding sections of this act.

Duty of hotel and saloon keepers, &c.

SEC. 11. Every keeper of hotel, boarding house, bar room, drinking saloon or place where liquor is sold, or dance hall, in this territory, shall keep conspicuously posted up a copy of this act, in both the English and Spanish languages, and it is hereby made the duty of every such keeper of a hotel, boarding house, bar room, drinking saloon or place where liquor is sold, or dance hall, or the person in charge of the same, who shall become cognizant of any violations

of the provisions of this act, in, upon or about their premises, to immediately and at once direct the attention of such violator to the provisions of this act, and upon a failure of such keeper of a hotel, boarding house, bar room, drinking saloon, or place where liquor is sold, or dance hall, or the person in charge thereof, to so do, he or they shall be liable to pay a fine of not less than $5, nor more than $50.

Duty of judges.

SEC. 12. It shall be the duty of the judges of the several district courts of this territory, at the charging of the grand jury of the several counties, to direct the attention of the said grand juries to the provisions of this act, and require that they make diligent inquiry as to any violation of the same.

Duty of county commissioners.

SEC. 13. The boards of county commissioners of the several counties of this territory are hereby directed and required to have printed in both English and Spanish a sufficient number of copies of this act for the use of and to be furnished to all persons applying for the same; and it is made the duty of the several sheriffs and collectors of said counties to furnish to each person with a license a copy of this act, in both English and Spanish.

SEC. 14. All fines and penalties accruing from the violation of the provisions of this act shall be paid into the county treasury of the county in which such violation occurs to the credit and for the benefit of the school fund of said county.

SEC. 15. This act shall have full force and effect from and after the first day of March, 1887.

Approved February 18, 1887.

# EXHIBIT 8

# The Los Angeles Tri-Weekly News.

**VOL. XIII.** LOS ANGELES, SATURDAY, JULY 22, 1865. **NO. 12.**



## Los Angeles News.

PUBLISHED EVERY

**Tuesday, Thursday and Saturday,**

AT THE

NEWS BUILDING,

One door from the corner of Los Angeles and Commercial sts.

**CONWAY & WAITE,**

Editors and Proprietors.

C. R. CONWAY. ALONZO WAITE.

TERMS OF SUBSCRIPTION.

| | |
|---|---|
| One Year, in advance | $5 00 |
| Six Months | 3 00 |
| Three Months | 2 00 |

RATES OF ADVERTISING.

| | |
|---|---|
| 1 square,(10 lines or less,) first insertion | $2 00 |
| Each subsequent insertion | 1 00 |

L. P. FISHER, No. 175½ Washington st., is Agent for the NEWS, in the city of San Francisco. All orders left with him will be promptly attended to


JUDGE WM. SHARKEY, PROVISIONAL GOVERNOR OF MISSISSIPPI.—The *Times*, of Cincinnati, publishes the following statement of an extraordinary and revolting case, which was passed on in the Mississippi Courts by Judge Sharkey some years ago:

A planter was afflicted with a loathsome disease. So offensive were his ulcers that he was deserted by his white friends, and while thus afflicted and forsaken, a girl whom he owned as a slave kindly and patiently waited upon him, dressed his ulcers, cleansed his person, and watched over him until he eventually recovered. With gratitude and affection to his benefactor, he took her to Cincinnati, Ohio, executed to her a deed of manumission, had it recorded, returned to Mississippi, and there married her in legal form. They lived together affectionately for many years, reared a family of children, and as he lay upon his death-bed, by will divided his property between his wife and children. His brothers hearing of his death, came forward and demanded the property. The widow and children were indignant at the demand. They, too, were seized, and the validity of the marriage was tried before Judge Sharkey, of that State, who decided that the whole matter was a fraud upon the law of slavery—that the property belonged to the collateral heirs.—His widow was sold by the surviving brothers, the children were bid off at public auction, and both mother and children now toil in chains or sleep in servile graves.

And this infamous wretch President Johnson has appointed Provisional Governor of Mississippi. His removal should be demanded at once—a wretch who pollutes the earth.

The *coup d'oil* of the petroleum district in Pennsylvania is thought to be finer than anything in Grease or the Mediterranean *isles*.

Italy and the Pope have concluded an arrangement on the Episcopal question. The Bishops are to return, and the Pope will immediately fill the vacancies.

The ancient cooks carried their arts to the most whimsical perfection. They were able to serve up a whole pig, boiled on one side and roasted on the other.

Biddy, while on a begging expedition, was asked by a lady if she had any children. "Yes, mum," replied Biddy, with great readiness, "I'm the mother of an orphan."

The cheerful live longest in life, and after it, in our regards. Cheerfulness is the offshot of goodness. It is a sanitary principle as well to the body as the mind, and it is to both the cause and effect of health.

A Boy whose general appearance betokened the want of a father's care, being asked what his father followed for a living, replied, "He's a Methodist by trade, but he don't work at it any longer."

What Sheridan said of wine may be applied to joking, be sure to enjoy is that which you crack at another person's expense.

EXTRAVAGANT SALARIES OF SOME OF OUR OFFICE-HOLDERS.—The Stockton *Independent* of July 11th says:

There is scarcely a county of the State, in or out of the mines that is not by far too dearly governed. Just look at it! An able-bodied laboring man or mechanic, by working every day in the year, after paying his moderate expenses, can hardly lay up $400 or $500. Not one in ten reaches the lowest of these figures.

A merchant whose investment does not exceed $15,000, is glad to clear $2,500 a year. Not one farmer in fifty, with an investment not exceeding $10,000, and employing from four to eight hands, realizes as much as $2,000 per year. Yet, in the face of this general low ebb of trade and wages, there are mountain counties whose lists of taxable property, real and personal, do not exceed two and a quarter million dollars each, where the Sheriff realizes as high as $8,000 or $10,000 per year, the Clerk nearly as much, besides heavy pay for one or two deputies; the District Attorney from $3,000 to $5,000, the County Judge nearly as much, though not employed a quarter of his time, with multiplied officers of lower grade, either feed or salaried, in which the pay is proportionately heavy. We actually pay our common laborers here less than the same labor commands in Massachusetts or Illinois, and our farmers and mechanics can make no more here than there. But our County Clerks, Sheriffs, Recorders, and lowest Judges of Courts of record receive twice as much as New England and Western Governors of States, Supreme Judges or members of Congress.

This may be sound political economy, but we don't see it. The laborer is worthy of his hire as well as the public official, and the wages of one ought not to be out of all proportion to the wages of the other, unless we wish to establish an official aristocracy on the one hand and a plebeianism of honest labor on the other. The interior papers are derelict in duty in not advocating and pushing a general reform in the matter. It is difficult to over-estimate the services of genius or a very high order of intellect; but these are qualities seldom found in official stations in this part of the world. The very lowest of demagogic arts are by far more characteristic; and that the poor mountain counties are so severly taxed to pamper the miserable brood is there own fault. Cut down their wages to a half or a third of their present rates, and honester, more capable men, less purchasable, and less tempted and disposed to purchase others, because divested of the power, will fill official stations, devoting their whole attention to duty and business rather than as now to political wire-pulling and office-grabbing.

ANNE AS A MAN'S NAME.—Anne is, or was, common as a man's name among the French. The celebrated warrior, the Constable Anne de Montmorenci, flourished in the time of Francis I., of France, and was killed at age of seventy-four years, at the battle of St. Denis, November 10th, 1567. Although he bore a feminine name, he was anything but a woman in temper or disposition. He was a rough, brave, cruel soldier and general.

A young man was fined the other day twenty dollars for kissing a pretty girl when she didn't want him to. It often costs ten times as much when they do want him to.

"I shall be at home next Sunday," the young lady remarked, as she followed to the door her beau, who seemed to be wavering in his attachment. "So shall I," was the brute's reply.

Virtue springs from industry rather than religion. We care not how pious a man is; let him "loaf" for a week, and he will feel the devil in him bigger than a woodchuck.

A great flood in the district of Berthier and Sorel, in Canada, recently swept away houses, barns, and stock, and drove the inhabitants into the tall trees. Many lives were lost.

HEALTH BROKEN DOWN can be restored by that great remedy and purifier of the vital fluids, Le Doyen's Sarsaparilla, Iodine Alterative. The doctors use it in preference to all other purifiers for scrofula, rheumatism, eruptions, sores, and general life and constitutional medicine. Crane & Brigham, Agents.


TO THE UNFORTUNATE.

NEW REMEDIES! NEW REMEDIES!

**Dr. Gibbon's Dispensary,**

(Established in 1854.)

17 Kearney street, near Commercial, San Francisco.

EXPOSURE OF QUACKERY.



For the treatment of Sexual and Seminal Diseases, such as gonorrhea, gleet, stricture, syphylis in all its forms; seminal weakness, impotency, etc. Skin diseases [of years standing] and Ulcerated Legs, successfully treated.

DR. GIBBON has the pleasure of announcing that he has returned to this State, after an absence of one year, during which time he has visited all the principal hospitals of Europe—among them those of Dublin, London and Paris. The following celebrated hospitals of London are among those visited by the Doctor: Guy's, High street, Borough; St. Bartholemew's, Smithfield; St. Luke's, Old street; St. Mary's, Camb Place, Pad.;—Lock, Harrow road; University, Gower street; Westminster, Broad Sanctuary; Charing Cross, Agar street, Strand; London, Whitechapel road; Royal Free, Gray's Inn road;—King's College, Portugal street.

DR. GIBBON has also visited Drs. Acton of London; Parker of Birmingham, England, and Ricord of Paris, who are considered the best physicians and surgeons in the world, and whose authority is acknowledged to be the highest in the treatment of Sexual Diseases. DR. GIBBON has obtained from them their new mode of treatment, which cannot be surpassed. DR GIBBON has spared neither time nor money in seeking out new remedies, and has returned with increased facilities for the alleviation of human suffering.

**Horrible Diseases.**

How many thousands of persons, both male and female, are there who are suffering out a miserable existence from the effects of secret indulgences, or from virus absorbed into the system. Look at their pallid, emaciated and disfigured faces and their broken down constitutions, disqualifying them for the happiness of marriage or the enjoyment of life.—In this horrid situation thousands suffer until death closes the scene. Let parents, guardians and friends attend to those who are suffering with any of these horrible, life-destroying maladies—see that they are cared for and cured before it be too late. Send them immediately to DR. GIBBON, a physician who has made private diseases his especial study for years, and who is certain to cure the most inveterate cases without mercury or any injurious drugs. It is important to those who are afflicted, or to those who are interested in the welfare of their friends, to be careful of the many pretended Doctors who infest all cities, publishing their skill in curing all diseases in a few days, imposing upon the public by using the names of eminent physicians in Europe and other places. Be therefore careful and make enquiry, or you may fall into the hands of those charlatans.

**Seminal Weakness.**

Seminal Weakness, the consequence of self-abuse. This solitary vice or depraved sexual indulgence is practised by the youth of both sexes to an almost unlimited extent, producing with unerring certainty the following train of morbid symptoms, unless combatted by scientific medical measures, viz: sallow countenance, dark spots under the eyes, pain in the head, ringing in the ears, noise like the rustling of leaves and rattling of chariots, uneasiness about the loins, weakness of the limbs, confused vision, blunt intellect, loss of confidence, diffidence in approaching strangers, a dislike to form new acquaintances, a disposition to shun society, loss of memory, hectic flushes, pimples and various eruptions about the face, furred tongue, fetid breath, coughs, consumption, night sweats, monomania and frequent insanity. If relief be not obtained should apply immediately either in person or by letter, and have a cure effected by this new and scientific mode of treating this complaint, which never fails of effecting a quick and radical cure. Dr. G. will give $100 to any person who will prove satisfactorily to him that he was cured by either of the San Francisco quacks.

DR. GIBBON is responsible and will give to each patient a written instrument binding himself to effect a radical and permanent cure or make no charge.

Persons at a distance may be *Cured at Home* by addressing a letter to Dr. Gibbon, stating case, symptoms, length of time the disease has continued, and have medicine promptly forwarded, free from damage and curiosity, to any part of the country, with full and plain directions for use for ten dollars, sent in a registered letter, or through Wells, Fargo & Co.

Address DR. J. F. GIBBON, 617 Kearney st., near Commercial, San Francisco, Post Office Box No. 252.

**Prevention better than Cure.**

The newly invented Patent French Safe, a sure prevention against diseases and pregnancy. Sent by mail—price $2.

Address Dr. J. F. GIBBON, 617 Kearney st., corner of Commercial, San Francisco. Post Office Box 252. jy1-3m



**Business Cards.**

**C. DUCOMMUN,**
**WATCHMAKER,**
and Dealer in
**JEWELRY, STATIONERY, HARDWARE,**
Mining Tools,
**Rope and Cordage, Colt's Pistols,**
Arms of all Kind, and Ammunition,
WALLPAPER, WILLOWWARE
Paints, Oils, (Coal Oil,)
FINE HAVANA CIGARS & TOBACCO,
And General Merchandize, at very
my10 Low Prices.

**I. W. HELLMAN,**
(Successor to A. Portugal,)
**Corner of Main and Commercial sts.,**
DEALER IN
**Dry Goods, Clothing, Hats,**
**Caps, Trimmings, Ribbons, &c.,**
**BOOTS AND SHOES.**
**GENTLEMENS' FURNISHING GOODS.**
A fine assortment of
**LADIES' BONNETS & HATS,**
Together with a
WELL SELECTED STOCK
of the
**Finest Dress Goods,**
ever brought to this market.

I am now opening my new stock, received per the last steamer, and which will be replenished on the arrival of each and every vessel in our harbor.

I would solicit a call from all old patrons and those wishing to

**OBTAIN THE BEST,**

before purchasing elsewhere.

*CALL AND SEE FOR YOURSELVES.*

**It is no trouble to show goods.**

Having purchased my stock at reduced rates, I will sell at the

**LOWEST CASH PRICES!**

Particular attention paid to orders from the country.

Having transferred by sale my stock and old stand, I would recommend all my former patrons to give Mr. Hellman a call.

A. PORTUGAL.

Los Angeles, April 15, 1865.


No. 704.

**NOTICE.**

**Of the discontinuance of the Southern Land District, (office at Los Angeles) in the State of California.**

NOTICE IS HEREBY GIVEN, that pursuant to the provisions of the 5th section of the act of Congress, approved 30th May, 1862, entitled "An Act to reduce the expenses of the survey and sale of the public lands in the United States," the President of the United States has directed the discontinuance of the Los Angeles Land District, (office at Los Angeles) in the State of California, and that the vacant lands therein be made subject to sale and entry at San Francisco, in said State.

Lands remaining unsold and unappropriated by law, and heretofore subject to sale and entry at Los Angeles, will cease to be subject to entry at said office from this date; and the Land Officers at San Francisco will give future public notice of the day on which they will be prepared to receive applications for entries of any such lands at their office.

Given under my hand at the City of Washington, this twenty-sixth day of April, A. D. 1865.

By order of the President.

J. M. EDMUNDS,
Commissioner of the General Land Office.
ju10-6w


**Notice to Wool Growers.**

THE undersigned will pay the

**Highest Market Price for WOOL.**

We will also make LIBERAL ADVANCES to parties who wish to ship their wool to San Francisco.

**Wool Sacks at San Francisco Cost!**

S. LAZARD & CO.,
Corner Bell's Row.
Los Angeles, July 23, 1864. 1y

AMYGDALINE.—For sale at Welch & Wellweber's drug store. *



**Business Cards.**

**Dr. A. B. HAYWARD,**
OFFICE
Between S. Hellman & Co's. store, and P. Banning's Office.
TEMPLE'S BLOCK, MAIN STREET,
LOS ANGELES.
RESIDENCE—White Cottage, north side Alise street, near Alameda. fe1

**Dr. R. T. HAYES,**
PHYSICIAN AND SURGEON,
TENDERS his professional services to the citizens of Los Angeles and vicinity. Office, Apothecaries' Hall, near the Post Office. Residence, McLaren house, Fort street. noy27-'61

**WM. B. OSBURN,**
PHYSICIAN AND SURGEON,
-OFFICE-
At Junge's Drug Store, Main street.
feb28

**W. G. STILL,**
NOTARY PUBLIC,
AND
COMMISSIONER OF DEEDS
for the Territory of Arizona.
ALL legal documents neatly drawn up, in English and Spanish. Will attend to the collection of notes and accounts. Jan. 1, 1864.
Office at the Post Office, Los Angeles.

**G. J. CLARKE,**
NOTARY PUBLIC,
(Appointed by Governor Low,)
-OFFICE-
At the Post Office, Main street.
ja21

**O. MORGAN,**
NOTARY PUBLIC,
Appointed by Gov. Low.
—OFFICE—
At the Post Office,
dec30 LOS ANGELES.

**BANNING & CO.,**
FORWARDING AND COMMISSION
AGENTS.
**Wilmington and Los Angeles.**
July 1, 1865.

**TOMLINSON & CO..**
Forwarding & Commission
MERCHANTS
LOS ANGELES AND SAN PEDRO,
January 1, 1865.

**WM. M. BUFFUM,**
Successor to Geo. Thacher & Co.,
Wholesale and Retail Dealer in
**WINES AND LIQUORS**
SYRUPS, BITTERS, CORDIALS,
ALE, PORTER AND CIGARS,
MAIN STREET.
Los Angeles, April 3, 1864.


**Democratic Primary Election Notice.**

A primary election for delegates to a Democratic County Convention, for Los Angeles County, to be held at the Court House in the city of Los Angeles, on Saturday, July 29th, 1865, at 10 o'clock A. M., will be held at the several precincts of the County on Saturday, July 22d, 1865, from the hour of 10 A. M, to 5 P. M,

The places of voting, Inspector, and number of delegates to be chosen, are as follows:

Anaheim—At the house of Langenberger; A. Langenberger Inspector. One delegate.

El Monte—House of John Hopper; John Hopper, Inspector. Four delegates.

La Ballona—House of Macedonia Aguilar; M, Aguilar Inspector. Two delegates.

Los Nietos—House of J. H. Coleman; J. H. Coleman, Inspector. Two delegates.

Old Mission—House of Ynocencia Reyez; H. Hathaway, Inspector. One delegate.

Santa Ana—House of J. Burruell; Carlos Dominguez, Inspector; one delegate

San Fernando—House of Felis; Jose Ygnacio del Valle, Inspector; one delegate.

San Gabriel—Store of Nathan Tuch; E. M. Jones, Inspector; two delegates.

San Juan—Store of Wolf McLaughlin; Louis Wolf, Inspector; one delegate

San Jose—Store of R. Vejar; R. Vejar, Inspector; two delegates.

Soledad—House of Joel H, Turner; J. H. Turner, Inspector; one delegate.

Tehachepay—House of John M. Brite; John M. Brite, Inspector; two delegates.

Tejon—House of Saml. A Bishop; S. A. Bishop Inspector. One delegate.

Azusa—House of Juan Tate; N. Beardslee, Inspector. One delegate.

Los Angeles—Montgomery Saloon; Inspector, D. Marchesesault. Eight delegates.

Wilmington—One delegate.

Per order of the Democratic County Committee of Los Angeles County.

*A. B. CHAPMAN*, Secretary.


**Los Angeles Lodge No, 35, I. O. O. F,**

REGULAR MEETINGS of the above Lodge, are held in their Hall, Temple's new block, every *WEDNESDAY EVENING*, at 8 o'clock.

jy13 EUGENE MEYER, R. S.

# Los Angeles News.

**SATURDAY, JULY 22, 1865.**


## UNION TICKET.

For Senator—J. S. MALLARD.
For Assembly—M. A. FORSTER, O. MORGAN,
For Sheriff—H. C. WILEY.
For County Clerk—JUAN M. SEPULVEDA.
For Treasurer—F. W. KOLL.
For Assessor—R. G. SURDAM.
For District Attorney—R. SACKETT.
For Public Administrator—T. H. BURDICK
For Coroner—S. ARBUCKLE.
For Superintendent of Public Instruction—ELIAS BIRDSALL.
For Supervisors—John Fischer, John Jones, W. Kalisher, Julian Chavis, Francisco Ygneoa.

THE NOMINATING CONVENTION. — The County Union Convention, for the nomination of State Senator, Assemblymen, and candidates to fill the county offices, met at the County Court House, on Thursday, at the appointed time; opening with a grand farce it continued water-logged, and tail-tied for the whole day without arriving at a permanent organization. The "Banningites" taking possession of the temporary organization, and the committee on credentials finding the Banning interest in the minority, re-vamped their report, by which act they threw the precincts of Santa Catalina Island and Anaheim into contest, for the same reason that they might have thrown out every other precinct in the county—merely because the Banning delegates were defeated. This may be said of every precinct in the county, except Wilmington and Los Angeles; the latter, however, cannot be claimed for Mr. Banning upon the Union vote. Capt. Swazey—an army officer, and of course not a citizen of this county, and not eligible to be a delegate—was appointed chairman of the committee on credentials; Col. Curtis in lobby, engineering matters to the utmost The whole, when summed up, shows one of the boldest attempts to break up the Union organization here, which was ever sprung upon a political party. Mr. Banning must be the next Senator whether the Union party want him or not. All the military officers and shoddyites throughout California, Arizona and New Mexico—all those who are interested in the gigantic swindles upon the Government, which are soon to be inaugurated in Arizona, in connection with the removal of the Capital of the above named Territory, from Prescott to Tucson, the corruption incident upon the establishment of a large military force in the vicinity of the Pima Villages, need the services of Mr. B.; they must be secured whether the Union party support the measure or not. Mr. Banning's absence from the county, at present, has some connection, no doubt, with the schemes now on foot, as we have ascertained, upon reliable authority, that B. desires the location of the Capital above mentioned, to be at the Maricopa Wells, or at the Pimas, or at some other point adjacent to Tucson, where a town site can be procured. The Union party have thus far, in the canvass, disapproved the above movements, and measures; it will continue to disapprove of all chicanery, fraud and corruption of the character which has been so unjustly thrust upon it by the nomination of Mr. Banning—to force Union men to vote for him when he does not "fill the bill." The convention water-logged on a motion to adopt the report of the committee on credentials, which unfairly disfranchised the anti-Banning side of the question, the latter having a clear working majority.—About sun-set—not yet having affected a permanent organization—W. F. Swazey was called to preside by the temporary chairman, S. Haley, and the nomination of the Banning ticket was made in about ten minutes by a *viva voce* vote, none but their own men voting, when they adjourned *sine die*; eleven votes being the highest number cast for any of their candidates, out of twenty-three legally represented precincts. After the Banning delegates left the room—and, whose conduct and exit was equivalent to "bolting" outright—the convention took up the business in regular order and proceeded to nominate a full and regular ticket. The enactments of the day, in detail would fill a quarto volume; it furnished the most ridiculous and disgusting farce ever perpetrated upon a people; it has bursted up and will defeat the Union party in this county; for all of which Mr. Banning is held directly responsible. His managers unblushingly boast of the amount of money squandered and used to carry the primary election, as well as the price paid for proxies; they still boast that money will and shall carry him through to the Senate chamber. If the proceedings of Thursday is a sample of the corruption adopted by Senator Conness, and Gov. Low, under which to ride into position, when the contest is over they will have learned a lesson; that dictation, fraud and corruption is not the best policy; a lesson which will leave Gov. Low at home, and one that will last Conness through his present term in the U. S. Senate, and *leave him at home the next.*

CONNESS AND LOW IN EL DORADO.—The *Union* says it is now proposed, by the Conness men here, to run a ticket with men pledged to the support of Governor Low, and it is well understood that every man must go for whomsoever Conness may tell them to. It is against such dictation as this that we protest, a dictation that robs the people of their dearest rights, and makes it a tool of the scheming and ambitious men that form and belong to the Conness party. Mr. Conness is the Senator at Washington, let us strengthen his hands then in discharging his duties, but when he passes beyond the limit of his duty, plays the ward politician, and demeans his office, let us drive him back to his place; this is what the people are called on to do to-morrow.

Yes, that is our hand exactly. We are opposed to public men dictating to the people. We have been slow to believe Mr. Conness desired to dictate to the Union party who they should have for United States Senator, but we are in doubt no longer. Recent events in this county have demonstrated the fact that Conness and Low were determined to force the election of men bound to their interests. It was openly boasted here that the money used so freely in buying men on the day of the primary election, and buying proxies afterwards, came from up-country. Conness and Low, it would seem, had no confidence in any other Union man here but Banning, to run for the State Senate. Mr. Sackett, who was recently appointed Postmaster of this city, was threatened with decapitation if he did not go for Banning. He scorned to be bought. Dictation was also resorted to with other Union men—to their shame be it said, some yielded and did as they were ordered. But John Conness cannot dictate to the mass of the true and tried Union men of this county whom they shall nominate for legislative or other positions—they are men of sufficient capacity, intelligence and independence to choose for themselves—they desire and will brook no interference from Conness, Low, or any of their satellites. Governor Low has not money enough to buy the Union party of this county—it is not for sale. For a long time we have backed John Conness, believing that the attacks made on him, charging him with desiring to control and dictate to the Union men of this State, were malicious, gotten up by his enemies to destroy him, but things that have transpired here within the last few weeks have tended to enlighten us—we go the "only sober Senator" no longer. We predict that Low will not be U. S. Senator, though he has sought to buy the position.

The following telegram was received here, from San Francisco, on the evening of the 19th inst:

WASHINGTON, July 19.—*via* San Francisco, 19th.—All the conspirators sentenced to be hanged to-day were executed. The arrangements for the execution were perfect; General Hancock was present throughout the proceedings. Payne made a statement on behalf of Mrs. Suratt exonerating her from culpability, and that all the other prisoners subscribed to an affidavit impeaching testimony of important witnesses against her.

The names of those hanged were Mrs. Suratt, Payne, Alserrott and Harrold. Dr. Mudd and O'Laughlin, were sentenced to penitentiary for life, and Spangler for five years hard labor.

ON THE WAY.—Maj. M. B. Duffield, U. S. Marshal for Arizona, arrived here by the steamer Pacific, on her last trip, on his way to Tucson. He left here this morning.—The Major has rather disturbed the plans of Gov. Goodwin, and the rest of the Copperhead horde of Government appointees, in their attempt deceive and swindle the Government.

DELEGATES.—The following named gentlemen were elected, yesterday, delegates to the Union State Convention: Wm. M. Stockton, H. C. Wiley, C. R. Johnson and R. Sackett.

HEAVY PENALTY.—We direct attention to the ordinance to be found in another column, prohibiting the carrying of deadly weapons, under a penalty of one hundred dollars.

FARE EAST.—On the 18th instant, the Pacific Mail steamship Golden City sailed for Panama, carrying passengers as follows: First cabin, outside rooms, $225;—do., inside, $200; second cabin, $190; steerage, $80.

YREKA, July 16.—A letter has reached here stating that the Indians killed two men at Surprise Valley, cutting up their bodies and hanging the pieces around on the bushes.

It is stated that a French war steamer has taken possession, in the name of the French Government, of Maldens Island, lying in latitude 8 13 S. long., 154 59 W.—The island is estimated to contain 500,000 tons of guano.

A dispatch from Salt Lake, July 16th, says: The last stage from Virginia City, Montana, was attacked by "road agents" (robbers.) Four passengers were killed, and the stage robbed of $75,000 in treasure.

Walter Murray has been nominated as the Union Senator, from Santa Barbara and San Luis Obispo counties.

Chas. E. Huse is the Union nominee for the Assembly from Santa Barbara county.

It is said that ex-Governor Wright of Indiana will be tendered the Mission to Berlin.

## NEW ADVERTISEMENTS.

### The Mayor and Common Council of Los Angeles City do ordain as follows:

SEC. 1.—In future, no persons, except peace officers and persons actually traveling, and immediately passing through Los Angeles city, shall wear or carry any dirk, pistol, sword in a cane, slung shot, or other dangerous or deadly weapons, concealed or otherwise, within the corporate limits of said city, under a penalty of not more than one hundred dollars fine, and imprisonment at the discretion of the Mayor, not exceeding ten days.

SEC. 2.—It is hereby made the duty of each police officer of this city when any stranger shall come within said corporate limits wearing or carrying weapons, to as soon as possible give them information and warning of this Ordinance, and in case they refuse or decline to obey such warning, by depositing their weapons in a place of safety, to complain of them immediately, under the first section of this Ordinance.

SEC. 3.—This Ordinance shall go into effect immediately after its passage.

Passed July 17th, A. D. 1865.
W. H. PERRY, Pres. C. C.
Approved this 17th day July, 1865.
JOSE MASCAREL, Mayor.

### Revised Ordinance, City of Los Angeles; Article 5:

SEC. 2.—No person or persons shall fire any pistol, gun or rifle, or other description of fire arms, or discharge any air gun whatever in any street within the fire limits of the city, under a penalty of five dollars for the first offence; ten dollars for the second offence; and, for the third offence not more than fifty dollars, and imprisonment at the discretion of the Mayor, not exceeding ten days.

### El Mayor y el Consejo Municipal de la Ciudad de Los Angeles ordenan lo que sigue:

Seccion 1a.—En lo futuro, ninguna persona o personas, excepto los oficiales de policia, y los transeuntes que sin parar atraviesan la ciudad, podran llevar o cargar daga o puñal, pistola, espada dentro de un baston, bola de plomo con puño, o cualquiera otra arma peligrosa o mortifera, oculta o de cualquiera otro modo, dentro de los limites de dicha ciudad, bajo la pena de una multa de no mas de Cien Pesos, y un encarcelamiento a la discrecion del Mayor, que no exceda de diez dias.

Seccion 2a.—Por la presente sera el deber de todo oficial de policia de esta ciudad, cuando cualquiera forastero venga dentro de los limites de ella llevando o cargando armas, darles aviso y conocimiento de la presente ordenanza, tan pronto como les sea posible, y en caso de que se rehusen o dejen de obedecer a la amonestacion, depositando sus armas en un lugar de seguridad, hacer inmediatamente una queja, conforme a la primera seccion de esta ordenanza.

Seccion 3a.—Esta ordenanza se llevara a debido efecto inmediatamente despues de su publicacion.

Decretado hoy dia 17 de Julio, de 1865.
W. H. PERRY, Pres. del C. M.
Aprobado hoy dia 17 de Julio de 1865.
JOSE MASCAREL, Mayor.

*ORDENANZA REVISADA;*
Ciudad de Los Angeles, Art. 5º,

Seccion 2a.—Ninguna persona o personas podran disparar alguna pistola, escopeta o rifle, o cualquiera otra arma de fuego, o cualquiera escopeta de viento, en ninguna de las calles de la ciudad, bajo la pena de cinco pesos por la primera ofensa; diez pesos por la segunda, y por la tercera no mas de cincuenta pesos y un encarcelamiento a la discrecion del Mayor, que no exceda de diez dias.

### SUMMONS.

STATE OF CALIFORNIA, San Bernardino county, District Court of the First Judicial District of said State. The People of the State of California, to William D. Huntington, greeting: You are hereby summoned to appear and answer the complaint of Caroline Huntington, filed against you, within ten days from the service of this summons, if served on you in this county; within twenty days if served on you in this district and out of this county, and within forty days if served on you out of this district, in an action commenced on the 19th day of June, A. D. 1865, in said court, wherein plaintiff prays that the marriage heretofore existing between her and you may be dissolved, and the plaintiff divorced from you, and you are hereby notified that if you fail to answer said complaint, as herein required, plaintiff will cause your default to be entered and apply to the court for such relief as is prayed for in said complaint.

[SEAL.] Witness my hand, and the seal of said District Court of the First Judicial District in and for the county of San Bernardino, this 19th day of June, A. D. 1865.
A. F. McKENNEY, District Clerk.
CLARK & ROLFE, Attorneys for Plaintiff.
[Int. Rev. 5 cts. canceled.] jy15-3m

### Fruit! Fruit!

HAVING purchased the fine and well-known orchard of W. M. Stockton, at San Gabriel Mission, I now offer for sale

### ALL VARIETIES OF FRUIT!

OF EXCELLENT QUALITY,

in their season. Orders from a distance promptly attended to, at the lowest market rates.

JOHN L. SLAUGHTER.
San Gabriel, July 1, 1865.

# U. S. 7-30 LOAN!

BY AUTHORITY OF THE SECRETARY of the Treasury, the undersigned has assumed the General Subscription Agency for the sale of United States Treasury Notes, bearing seven and three-tenths per cent. interest, per annum, known as the

### SEVEN-THIRTY LOAN.

These Notes are issued under date June 15th, 1865, and are payable three years from that time, in currency, or are convertible, at the option of the holder, into

**U. S. 5-20 Six per cent.**

## Gold Bearing Bonds.

These bonds are now worth a premium of nine per cent., including gold interest from November, which makes the actual profit on the 7-30 loan at current rates, including interest, about ten per cent. per annum, besides its EXEMPTION FROM STATE AND MUNICIPAL TAXATION, WHICH ADDS FROM ONE TO THREE PER CENT. MORE, according to the rate levied on other property. The interest is payable in currency, semi-annually, by coupons attached to each note, which may be cut off and sold to any bank or banker.

The interest amounts to

| | | | | |
|---|---|---|---|---|
| One cent | per day | on a | $50 | note. |
| Two cents | " | " | $100 | " |
| Ten | " | " | $500 | " |
| 20 | " | " | $1,000 | " |
| $1 | " | " | $5,000 | " |

Notes of all the denominations named will be promptly furnished upon receipt of subscriptions. This is

### THE ONLY LOAN IN MARKET

now offered by the Government, and it is confidently expected that its superior advantages will make it the

### GREAT POPULAR LOAN of the PEOPLE

Less than $300,000,000 of the loan authorized by the last Congress, are now on the market.

This amount, at the rate at which it is being absorbed, will all be subscribed for within four months, when the notes will undoubtedly command a premium, as has uniformly been the case on closing the subscriptions to other Loans.

In order that citizens of every town and section of the country may be afforded facilities for taking the loan, the National Bank, State Banks, and Private Bankers throughout the country have generally agreed to receive subscriptions at par. Subscribers will select their own agents, in whom they have confidence, and who only are to be responsible for the delivery of the notes for which they receive orders.

JAY COOKE,
Subscription Agent, Philadelphia.
March 25, 1865. my9-3m

### ADDENDUM.

PER OVERLAND TELEGRAPH:
PHILADELPHIA, May 17th, 1865.

2d Series all sold. Commenced on 3d Series. Two Hundred and Thirty Millions (230,000,000) precisely like other two Series, except dated 15th July, and Government reserves the right to pay six per cent. in gold instead of 7-30 currency.

JAY COOKE,
Subscription Agent, Philadelphia.

### Sale of Real Estate in Partition.

WHEREAS, a decree was duly made and entered by the Hon. District Court of the First Judicial District, at a regular term of said Court, held at the town and county of Santa Barbara, on the tenth day of June, A. D. 1865, in a certain cause in equity then therein pending, between Maria de Jesus Olivera de Cota and Francisco Cota, plaintiffs, vs. John Temple, et als., defendants, adjudging and decreeing among other things, that all and singular, the following described lands and premises situated in the county of Santa Barbara, State of California, be sold by and under the direction of the undersigned, Referees, appointed by decree of said Court for that purpose, to wit:

All that certain tract of land or rancho, called and known as the rancho of "Santa Rosa," granted by the Government of Mexico, in the year 1839, to Francisco Cota, deceased, and finally confirmed by U. S. Board of Land Commissioners, to heirs of said Francisco Cota, deceased, containing three and one-half square leagues, and bounded on the north by the rancho of Santa Rita and the rancho of Los Alamos; and on the west by the rancho called Lompoc and the Santa Ynez river; on the south by the rancho of San Julian, and on the east by the ranchos of Las Cruces and San Carlos de Jonata. Now, notice is hereby given, that the undersigned will sell all and singular said lands and premises, with the hereditaments and appurtenances, in front of the court house door, in the town and county of Santa Barbara,

**On MONDAY, the twenty-first day of August, A. D. 1865,**

at 10 o'clock A. M., to the highest bidder for cash, in U. S. gold coin. Terms of sale, twenty per cent. of purchase money to be paid at time of sale, and remainder on approval of sale by said court.

The above is a first-class grazing farm, with an abundance of water and timber, wood, &c., a large part of the same excellent agricultural land. It contains very valuable and extensive deposits of asphaltum, and is, in the opinion of competent experts, in a favorable locality for petroleum.

HENRY CARNES,
F. A. THOMPSON,
S. R. I. STURGEON,
Referees.
Santa Barbara, June 28, 1865. jy1-20d.

### "PHOENIX" TRIUMPHANT!

The old bird "rises from his ashes" flaps his golden wings, and scatters the dust of "INDEMNITY" in

**U. S. GOLDCOIN!**

with justice to all mankind.

THE

## PHŒNIX INSURANCE COMPANY

**HARTFORD, CONN.**

with the modest capital of

**$600,000 PAID UP,**

AND

**$925,000 Cash Assets,**

securely invested according to sworn

FINANCIAL STATEMENT,

published to the world every six months, offers to the public

**FIRST CLASS INDEMNITY,**

against loss by fire. The best is always the cheapest.

**Insure with the Phœnix of Hartford.**

Examine your goods before purchasing.

**Losses always paid Promptly**

At points where they occur!

Home Office, Hartford, Conn.; Branch Offices, Cincinnati, O., and San Francisco, Cal. RESIDENT AGENTS in all of the principal towns of the United States, who are authorized to

**ISSUE POLICIES**

without reference to other offices.

S. E. BRIGGS,
Resident Phœnix Agent,
**LOS ANGELES.**
☞ OFFICE—At Wells, Fargo & Co's.
mh25

### SADDLERY AND HARNESS!

E. H. WORKMAN. W. H. WORKMAN.

**WORKMAN & BRO.,**

Successors to

**S. C. FOY & BRO.,**

Los Angeles street, Los Angeles.

Keep constantly on hand a complete assortment of everything appertaining to the

**SADDLERY AND HARNESS BUSINESS.**

Particular attention paid to orders of all kinds. Repairing done with neatness and dispatch. my20

### SIMON LEVY,

Wholesale dealer in

**HAVANA CIGARS,**

AND ALL OTHER BRANDS,

which will be sold at San Francisco prices.
☞ My stock will be temporarily opened at the Lafayette Hotel.
Los Angeles, April 18th, 1865.

### FOR SALE.

**PURE SPANISH MERINO RAMS,**



Bred by the subscriber, from imported pure Spanish Merino Ewes, and sired by thorough-bred pure Spanish Merino Rams, selected and imported from the celebrated stock of

**Mr. Hammond of Vermont.**

Giving his personal attention to the careful breeding of pure blooded Sheep, and having none other on the ranch, the subscriber is enabled to guarantee with certainty every ram to be

**Strictly Pure Spanish Merino.**

Purchasers select in the order of buying.

**Price of yearlings, Fifteen Dollars**

THOMAS B. DIBBLEE.
Rancho Santa Anita, Los Angeles. m2-3m

☞ Los Angeles Pioneer Oil Company.—Location of works at Los Angeles, Los Angeles county, State of California.—Notice: There is delinquent upon the following described stock, on account of assessment levied on the 12th of June, 1865, the several amounts set opposite the names of the respective shareholders as follows:

| | No. Certif. | No. Shs. | Amount. |
|---|---|---|---|
| J. E. Addison | not issued | 200 | $200 00 |
| J. F. Curtis | do | 200 | 200 00 |
| A. J. Coffee | do | 200 | 200 00 |
| R. W. Heath | do | 200 | 200 00 |
| F. A. Morgan | do | 200 | 200 00 |

And in accordance with law and an order of the Board of Trustees, made on the 12th day of June, 1865, so many shares of each parcel of said stock as may be necessary will be sold at the office of the company, No. 5, Temple's Block, Main street, Los Angeles, on MONDAY, July 31st, 1865, at 2 o'clock P. M. of said day, to pay said delinquent assessment thereon, together with costs of advertising and expenses of the sale.

P. DOWNEY, Secretary.
Office at No. 5, Temple's Block, Main street, Los Angeles.
Los Angeles, July 15th, 1865. jy15td

### NOTICE TO CREDITORS.

**Estate of William Klein, deceased.**

NOTICE IS HEREBY GIVEN, to the creditors of, and all persons having claims against William Klein, deceased, to present the same, with the necessary vouchers, to the undersigned, in Los Angeles city, within ten months from the first publication of this notice.

Los Angeles City, July 14th, 1865.
DANIEL SCHIECK.
LOUIS LICHTENBERGER,
jy15-5w1aw

# NEW ADVERTISEMENTS.

## The Mayor and Common Council of Los Angeles City do ordain as follows:

Sec. 1.—In future, no persons, except peace officers and persons actually traveling, and immediately passing through Los Angeles city, shall wear or carry any dirk, pistol, sword in a cane, slung shot, or other dangerous or deadly weapons, concealed or otherwise, within the corporate limits of said city, under a penalty of not more than one hundred dollars fine, and imprisonment at the discretion of the Mayor, not exceeding ten days.

Sec. 2.—It is hereby made the duty of each police officer of this city when any stranger shall come within said corporate limits wearing or carrying weapons, to as soon as possible give them information and warning of this Ordinance, and in case they refuse or decline to obey such warning, by depositing their weapons in a place of safety, to complain of them immediately, under the first section of this Ordinance.

Sec. 3.—This Ordinance shall go into effect immediately after its passage.

Passed July 17th, A. D. 1865.

W. H. PERRY, Pres. C. C.

Approved this 17th day July, 1865.

JOSE MASCAREL, Mayor.

---

## Revised Ordinance, City of Los Angeles; Article 5:

Sec. 2.—No person or persons shall fire any pistol, gun or rifle, or other description of fire arms, or discharge any air gun whatever in any street within the fire limits of the city, under a penalty of five dollars for the first offence; ten dollars for the second offence; and for the third offence not more than fifty dollars, and imprisonment at the discretion of the Mayor, not exceeding ten days.

# EXHIBIT 9

# THE BROOKLYN DAILY EAGLE.

VOL. 41.—NO. 298. BROOKLYN, TUESDAY, OCTOBER 26, 1880. THREE CENTS.


## DEMOCRATS.

### Meetings in Brooklyn Last Night.

#### The Constitutional Union Association. Kings County War Veterans—Addresses by Demas Barnes, General McMahon and Others—Defining the Issues.

The Constitutional Union Association held a meeting last evening in the Olympic Theatre, which was filled with an attentive audience. Mr. Thomas E. Pearsall presided and introduced as speakers Mr. M. L. Towns and Colonel Daniel J. O'Leary.

MR. TOWNS' ADDRESS.

Mr. Towns said that the cloud which a fortnight ago lowered on the horizon had been dispelled by the rays of Democratic truth and the heavens were all propitious. Those of least courage, who a few days ago wore long faces and gloomy countenances, fearing the worst, though determined to do their best, were now enthusiastic and full of hope. They remembered that it was not until the third day that Hancock at Gettysburg achieved victory and rescued the nation [loud applause], and this remembrance fostered the faith and hope that the glad news would resound through the country on the third day of November next that Hancock had led the ranks of the Democracy through the ballot box to civil liberty, and scattered the enemies of free institutions and a united nation. [Applause.] Then would they be assured of constitutional liberty and the perpetuation of those glorious institutions which their fathers established in blood. At the beginning of this campaign the Republicans came before the people with

THE OLD SECTIONAL CRY

about the South and the rebel claims and the danger which would be incurred by placing the Government in the hands of Toombs and Jeff. Davis and the rebel brigadiers. On that basis the campaign in Vermont and Maine was conducted, but when the vote of the free people of the Pine Tree State was recorded the bloody shirt was furled, and those who had waved it were indicted by the people for indecent exposure and compelled to hide their heads in shame. Blaine was routed and betook himself to Philadelphia. There he assumed the doleful Quaker garb, and reflecting, as a sadder and a wiser man, upon the error of his party, proclaimed a new issue. Then the country was astonished to hear that the Republican party, which had fostered monopolies, moneyed institutions and big corporations, had suddenly awakened to the fact that the workingman, whom they had hitherto despised, was a factor in society and needed protection, and that they were his only friends. They began with war claims and sectional issues and by stirring up bad blood betwixt North and South, and by parading Garfield from Ohio to Fifth avenue, and by enlisting the respectability of the country on their side—meaning capitalists and those who run large corporations; but finding this would not do, they put on a philanthropic face and gave a sympathetic leer, and announced themselves as the friends of the workingman. [Laughter.] This was nothing but

A GARB OF HYPOCRISY.

[Applause.] Had not all the corporations and large capitalists of the country been protected by the Republican party from the very first, not only by national but by State legislation? Under the Republican party had not wages declined? Who was accountable for the panic of 1873, when the wages of the working man were reduced to the lowest possible basis? Amid all the prosperity of later years the workingman had reaped no benefit. His hours of labor were no shorter, his wages no greater, his children and himself no better fed or clad, and his tenement dwelling unimproved and uncheapened. Protection was granted to the capitalist exclusively, none to the laborer; so that while everything which the manufacturer brought into the market was to be protected, the only thing which the workingman had in the market—his labor— was to have no protection. [Applause.] There was to be no tariff on immigration, but even the Chinese barbarians were to be brought hither in ship loads, to work for thirty cents a day and drive the American citizen to the wall. [Applause.] Mr. Towns referred to the celebrated Chinese letter of Mr. Garfield, and challenged anyone to offer any reasonable argument against its genuineness. Mr. Towns thought it very appropriate that the Republican party, which arrogated to itself the claim of having given prosperity to the country and overlooked the operations of Divine Providence, should have for its advocate a man like Bob Ingersoll, who believed in no God. The speaker concluded by expressing his firm conviction that the Democratic party would give the next President to the United States. Mr. Towns raised his audience to a high pitch of enthusiasm which never cooled to its close.

*After a few words by Colonel Daniel J. O'Leary, the meeting dispersed.*

#### Sixth Ward Hancock and English Club—Addresses by S. B. Halliday, Demas Barnes and James D. Bell.

The Sixth Ward Hancock and English Campaign Club held a meeting last evening at its headquarters on Court street opposite Butler. There was a large attendance, and previous to the meeting there was a profuse display of fireworks. The platform was neatly decorated, and portraits of the candidates were conspicuously displayed. The president and vice president of the club were prevented from attending by a meeting of the Central Campaign Club which required their presence, and in their absence Mr. R. J. Lalor, presided. After a few preliminary remarks, Mr. Lalor introduced as the first speaker of the evening

MR. S. B. HALLIDAY,

who discussed the issues of the campaign and assured his hearers that the interests of the nation would be sacredly secure in the hands of General Hancock, the man whose executive ability and steadfastness to the right has never once faltered. The election of Hancock would mean unity of the heart and hand, friendliness between the sections, and universal amity between workingmen throughout the length and breadth of the land. Mr. Halliday concluded by saying:

The services of General Hancock are on record in the annals of his country, and when future generations ponder the story of his life it will arouse within them a desire to emulate so bright an example, while the profound wisdom of his acts and utterances on the Constitutional principles of civil liberty will make him rank as one of the most patriotic and intelligent of statesmen. Mr. Halliday referred to the record of Mr. English, the candidate for Vice President on the Democratic side, and then concluded as follows: The duty we have to perform is now before us. It is clear. With earnestness, with enthusiasm, and with all the energy that lies within us, we must now work and watch for the election of our candidates. All the machinery that a desperate and corrupt party can invent will be brought into play in this contest, but if the Democracy stand shoulder to shoulder they will march in triumph over this army of office holders and corruption. [Loud applause.]

Mr. Lalor introduced as the next speaker

MR. DEMAS BARNES,

who received a cordial greeting. Mr. Barnes, after the applause had subsided, spoke as follows: I am not unmindful of the compliment which has been paid me by your association, in asking me, on several occasions, to address a meeting; but circumstances have prevented my doing so, and at this time, when the president comes to me and asks if he may announce me to my neighbors and friends, I said "No, not to-night." But, gentlemen, with the courtesy for which he is distinguished, the chairman has seen fit to introduce me. [Applause.] Now, I am always happy to meet my neighbors and friends, and particularly upon occasions of this kind, but I must say to you that I did not come here to-night to say one single

of which I speak were relieved of the payment of $5,000,000, and the tide gates for a depreciation of the currency were also let loose. Trace any of the workings of this party and we find ourselves going back to the same place. When I find this enthusiasm, these fireworks, these manifestations of delight, they remind me of an anecdote I heard some time ago, regarding the trial by jury, of a negro accused of stealing a pig, and, in this connection, it will be well to bear in mind the declaration made by Republicans to the effect that the success of the Democracy would be the ruin of the country. Sam, who was charged with stealing the pig, employed Mr. Johnson to defend him, and the jurors, like Sam, were colored. The first witness swore that he saw Sam steal the pig. Turning to his client, Mr. Johnson said, "Sam, this won't do. How do you account for this?" "Never mind," said Sam, "go on with the trial." The next witness swore that he saw Sam kill the pig. "Why," said Mr. Johnson, hastily turning toward his client, "you are almost certain to be convicted." "Never mind," repeated Sam, "go on with the trial." The jury retired and in a few minutes brought in a verdict of not guilty. When Sam left the court room he explained to Mr. Johnson the cause of the verdict in his favor, doing so in these words, "The jury had some of the bacon." This question of bacon runs through the country altogether too much, and if we have anything to do in purifying the sentiment of our politics, it is particularly upon that one point. If I were going to make a speech I think I should want to elaborate on this question. The issues are so many, with reference to the tariff, to our finances, to the Southern matter, and with regard to the destroyed commerce of the country, that it would take longer time than I can devote to-night, but there is one question on which I will slightly touch. If you cross the ocean, to whom do you pay your freight and passage money? You pay it to foreigners. Is this the kind of prosperity that a party in power for twenty years could have given us, with plain, practical sense? We are certainly great in many respects, but we are cramped by the legislation from Washington. In many things, gentlemen, if I were able to regulate affairs, there would be a change. We would not only be prosperous in the present degree, but in a degree far greater. We have the artisan school and the political capital, but we have not brains at Washington sufficiently good to grapple with the question as to whether it befits us to send our material abroad in foreign ships. England loads her ships and sails them wherever she chooses, but the American is excluded from foreign markets by what I call false legislation at Washington, and by a party that has been in power for twenty years. These are vital questions. They are interesting because they are practical. Mr. Chairman, I am much obliged for this opportunity of saying a word. I will not detain the audience longer, for I see that you have other speakers, but will bid you good evening. [Loud applause.]

The third speaker was

MR. JAMES D. BELL,

of this city. He said a great deal had been heard this campaign about the protection that Republicans intended to give to labor. There had been six years of Democratic domination in the House of Representatives. In 1874 numerous tariff projects were introduced into Congress, all of which were quietly ignored by the Democrats, who proposed to let the tariff question settle itself. It had the power to alter the tariff and it did not do it. Did that look as if the Democrats were to make any great change if in power in the time to come? The Democrats, it was fair to presume, would not change the tariff. As a matter of fact, the tariff was not an issue in this campaign, but was only raised as a cry against the Democrats, to offset the general enthusiasm for General Hancock. Rev. Mr. Beecher pronounced himself a free trader, and yet announced his intention to vote for General Garfield. If the tariff were at issue would it be likely that Mr. Beecher would make any such assertion? The speaker thought not. Erastus Corning was a protectionist, but he had no fear that the Democratic party would, by carrying its policy, be opposed to the best interests of the people of the whole country. Leaving the tariff question, Mr. Bell referred to the so called solid South, and closed his address by a review of the records of the candidates, and an appeal to work hard until election day in favor of the maintenance of Democratic principles and good government. [Applause.]

It was announced that the Moran Brothers had subscribed $10 toward club expenses, and then the meeting adjourned.

#### Kings County War Veterans—Addresses by Colonel Coler and General McMahon.

The Kings County Hancock War Veterans' Association held a meeting last night at the Democratic General Committee Rooms, corner of Court and Remsen streets, with Vice President John Lynch in the chair. There was a slim attendance, owing to a misunderstanding as to the place of meeting.

Colonel Coler, formerly of Illinois, was the first speaker. He was a soldier, he said, in the Mexican War, and in the late unpleasantness, when he lived in Illinois. He related a number of interesting reminiscences of Lincoln and Douglas, with whom he was well acquainted. Douglas he characterized as a noble, loyal Democrat. The speaker said that when he was at the head of the Central Committee in Illinois Douglas was sent for to come to that State. Douglas consulted with Lincoln, who advised him to go, and this was the last time Lincoln and Douglas ever met. The speaker cited this to show that the leading man in the Democratic party in that day was loyal to the Union and in favor of the suppressing of the rebellion. A large part of the regiments that went out from Illinois were Democrats. The majority of the Republicans who were boasting to-day that that party put down the rebellion, never fought themselves. This late Chinese letter showed the nature of the animal we were fighting. The speaker did not see Garfield write it, but it was like him and it was like the party. [Applause.] The speaker had no doubt that Mr. Garfield wrote the letter.

GENERAL MARTIN T. MCMAHON

was next introduced. He said that the time was short and little ought to be said while much ought to be done. The only issue to be considered was the perpetuity of the republic. The canvass of the Republican party had been often changed during the past few months. The first of their claims was that the Republican party put down the rebellion. If every Republican voter of that day went to war, as they all did not, where did the other 1,400,000 come from? Next came the terrible accusation against General Hancock, charging him with the murder of Mrs. Surratt, but when they learned the facts they abandoned that position. Again, they fell back on the proposition that the country was prosperous, and therefore needed no change—taking to themselves all the glory and the prosperity of the nation. They conspired to cheat Almighty God out of the credit of making the grass grow and the crops to ripen. Lastly they carried the day in Indiana. The speaker was in Indiana at the election. The Democrats were lulled to sleep by the victory in Maine, and the Republicans won the day on a false issue—the tariff. The tariff question was not an issue in the canvass. By mutual consent, this question had been thrown out as a party question. The understanding in Congress at the last and the previous Congress was that the tariff was not to be an issue in the canvass. When the election in Indiana had been decided the Democratic party awoke to a sense of its position and set right the much mooted question. Tariff for revenue only meant protective tariff. A great part of the tariff was unjust—for instance the tariff on wood pulp. In such matters the Democratic party sought to have the tariff modified, so as to make it in the interest of the people rather than of the favored few.

GARFIELD'S CHINESE LETTER.

Like a Divine interposition in the campaign came the famous Chinese letter of Garfield. This dispelled the illusion with which the Republican party was covering itself—that of a protector of American labor. It had been denied, and in every single denial that had been issued there was a quibble, and in some instances a direct falsehood. Not a single man familiar with Mr. Garfield's handwriting but pronounced the letter genuine. The speaker considered the evidence for and against the letter and thought, without doubt, that Garfield had written it. If Garfield was an unimpeached witness, the speaker would accept his denial as final. But, unfortunately, such was not the case. He had been proven by a committee composed of his own political friends, to be a perjurer. This was not the verdict of a partisan committee. Secondly, came the fact that no one had a greater interest in denying that letter than Mr. Garfield. He had over and over expressed similar sentiments to his intimate friends. This letter came directly

poor fellow's money or his political scalp. [Laughter.] He next touched upon the Chinese letter. The Republicans say it was the most wicked forgery ever devised. Strange that a man in public life as long as Garfield should be under the necessity of not only denying the genuineness of the letter, but of hunting up proof that it was a forgery. Although the speaker had sat only three years in the Assembly, it would not be necessary for him to deny a forged letter to-morrow, no matter how cleverly counterfeited, as he would only have to point to his record, if the substance of the letter had even come up in any shape before the Legislature. The Chinese labor question came up in Congress several times while Garfield was a member of the House, and his actions were in full accord with the spirit of the letter. The speaker quoted from the Congressional Record, and remarked that the Republicans would scarcely dare to say that the book was a forgery. [Laughter and applause.] So you see the man who forged the handwriting must have gone down deep into Garfield's heart, for the sentiments expressed were unquestionably his. Garfield's denial should also be considered in the light of his record for veracity, as given by the *Tribune*, *Times* and *Harper's Weekly*.

After the singing of an effective campaign song the meeting came to a close.

#### Long Island Political Notes.

Last evening there was a Republican rally at Comac, and an address by Hon. E. A. Carpenter.

This evening, the Democrats of Northport will be addressed by the Hon. James Wadsworth and Judge Armstrong.

The Republicans of St. James held an enthusiastic meeting, and it is said the largest ever convened there, on Friday evening. They were addressed by Wilmot D. Smith and District Attorney Petty.

Last Friday evening there was a grand Democratic demonstration at Babylon. Over fifteen hundred people were present, some seven hundred being visitors from Huntington and Port Jefferson.

The Republican County Committee of Suffolk has sent out a circular levying an assessment of three per cent. of the gross yearly receipts of each officeholder. Several postmasters have refused to pay it.

The Hell Gate pilotage question is the pivotal issue in Suffolk County, and both candidates for the Assembly have pledged their influence for the repeal of the law.

Colonel Fleming, of Jamaica, President of the Hancock Club, has gone into the western part of the State to do service on the stump. He is an effective campaign orator.

The Democratic campaign is badly managed in Queens County. Last evening two such eloquent gentlemen as Major Quincy and Mr. Hollahan had an audience of about one hundred people in Jamaica.

On Friday evening the Republicans of Huntington had twelve hundred people at their meeting, and addresses were made by Mr. N. G. Carman, of Babylon, and Mr. Whittridge, of New York, President of the Independent Republican Association.

Though late in the campaign, the Democrats of Smithtown have organized a campaign club, with the following officers: President, George W. Hallock; Vice President, H. D. Norenus; Treasurer, W. Smith; Secretary, A. E. Hallock.

Stephen B. French, one of the New York Police Commissioners, is now on a tour through Suffolk County, putting the Republicans in line for a grand struggle for victory next Tuesday. Mr. French belongs in Sag Harbor. He was formerly Treasurer of Suffolk County, and once the Republican candidate for Congressman. He is particularly interested in the election of Mr. Carpenter to the Assembly.

## THE ELECTION.

### Orders for the Direction of the Police.

The following important general orders have been issued to the various police captains by Superintendent Campbell. The captains have been notified that the provisions of the orders will be rigidly enforced:

OFFICE OF THE SUPERINTENDENT OF POLICE,
CITY OF BROOKLYN, MUNICIPAL BUILDING,
BROOKLYN, October 26, 1880.

GENERAL ORDERS, No. 206—The following orders are hereby promulgated for the information and direction of the Police Department, while on duty at the polls on Tuesday, the 2nd day of November, 1880:

I. You will take special precaution for the preservation of the public peace, and order the whole force under your command on duty at thirty minutes before sunrise, excepting those detailed by the Superintendent of Police for that day; you will frequently visit the several polling places in your precinct, and carefully supervise and instruct your officers in the performance of their duties; you will detail the most competent Sergeants to take charge of the telegraphic instruments during the day, and until the close of the canvass; you will promptly transmit information to the Central Office of all disturbances and arrests that may occur during that day.

II. You will be held responsible for the prompt and safe transmission, before sunrise, of the prescribed number of ballot boxes to each election district in your precinct; and that said boxes are properly labeled and inspected; and that they contain no ballots before the polls are duly opened; and that they are properly placed in one continuous row, with the glass sides facing to the front; and that the provisions of Section 23 of the Election law are fully complied with.

III. A sufficient space must be kept clear of all persons in front of the buildings where the polls are located to enable all citizens to approach the polls without interruption. Citizens will be formed in one line in the order of their arrival at the polls, preparatory to depositing their votes. The police must take orders from the Inspectors and Canvassers of Election, and they must accept of the co-operation and co-operate with the Deputy United States Marshals and U. S. Supervisors of Election for the preservation of the peace and protection of citizens. They shall arrest and convey to the nearest station house all disturbers of the public peace and violators of the Election law.

IV. The police force must remember that they are not the agents of any political candidate, faction or party, and that manifestation of interest or conduct to the advantage or prejudice of any candidate, faction or party, by any member of the Department, will be followed by immediate dismissal therefrom.

V. Inasmuch as the right to challenge is the inherent right of all voters, therefore all challengers must be protected in the discharge of that duty, whenever and wherever they may desire to exercise it. And you will allow citizens to be present at the canvassing of the votes, but under no circumstances will the citizens be permitted to interfere with the canvassers in the discharge of their duty.

VI. The enforcement of the law prohibiting the sale, or exposure for sale, of any intoxicating liquors of any description, and the closing of all drinking saloons within the prescribed distance from the polls, and of section 26 of the Election law of 1872, is strictly enjoined. The slightest evasion of duty in this respect will be followed by severe penalties.

VII. It is to be hoped that the conduct of the police (on not only this very important occasion, but at all times) will be such as to deserve the confidence and respect of all good citizens. Their attention is directed to sections 13, 14, 23, 24 and 26 of the Election law of 1872. They will report to their respective captains the names of all canvassers who may refuse or neglect to canvass the votes, as provided by law, and instructions of the Board of Elections, to wit:

First, electoral; second, State judiciary; third, Congress; fourth, Assembly; fifth, county officers; sixth, city officers; seventh, ward officers; eighth, Constitutional amendments.

VIII. You will be held strictly responsible for the faithful execution of the letter and spirit of this order, and a prompt compliance with the provisions of the Election laws, and of the following general orders.

By order of the Commissioner.

P. CAMPBELL, Superintendent of Police.

To Captain———, ———,

# PISTOLS—CARRYING OF.

## ORDINANCE TO REGULATE THE CARRYING OF PISTOLS.

The Common Council of the City of Brooklyn do ordain as follows:

SECTION 1. Every person, except those authorized by law to make arrests, and persons to whom permits shall have been issued, as hereinafter provided, who shall have in his possession, within the City of Brooklyn a pistol of any description, concealed on his person, shall be punished, on conviction, by a fine not exceeding ten dollars, or, in default of payment of such fine, by imprisonment not exceeding *ten days*.

Sec. 2. Any person twenty one years of age and over, except as provided in Section 1 of this ordinance, who has occasion to carry a pistol for his protection, may apply to the officer in command of the station house of the precinct where he resides, and such officer, if satisfied that the applicant is a proper and law abiding person, shall give said person a recommendation to the Superintendent of Police, or, in the absence of the superintendent, to the inspector in command at the central office, who may issue a permit, if approved by the Commissioner of Police and Excise, to the said person, allowing him to carry a pistol of any description.

Sec. 3. Any non-resident, who does business in the City of Brooklyn, and has occasion to carry a pistol while in said city, must make application for permission to do so to the officer in command of the station house of the precinct in which he does business, in the same manner as is required by residents of said city, and shall be subject to the same conditions and restrictions.

Sec. 4. The Commissioner of Police and Excise is hereby authorized and empowered, for reasons appearing to be satisfactory to him, to annul or revoke any permit given under this ordinance. All persons to whom such permission shall be given are hereby declared to be individually responsible for their own acts or the consequences that may arise from the use of pistols carried under the permission to be obtained, as provided in this ordinance.

Sec. 5. If, at the time of the arrest of any person, a pistol of any description shall be found concealed on the person so arrested, without the necessary permit to carry the same, the officer making the arrest shall state such fact to the police magistrate before whom the prisoner is brought, and shall make a separate complaint (in addition to the complaint under which the arrest is made) against such prisoner for violation of this ordinance.

Adopted in Common Council, October 4, 1880.

Ten days had elapsed on the 19th day of October, without the same being approved or disapproved by the Mayor.

D. MCNAMARA, City Clerk.

CITY CLERK'S OFFICE, Brooklyn, October 25, 1880.

I do hereby certify that the foregoing is a true copy of the original ordinance on file in this office, and of the whole of said original.

*oc25 10t* *D. MCNAMARA, City Clerk.*

# EXHIBIT 10

New York (City:

# ORDINANCES

OF THE

# Mayor, Aldermen and Commonalty

OF THE

# CITY OF NEW YORK,

IN FORCE JANUARY 1, 1881;

REVISED BY

ELLIOTT F. [itch] SHEPARD AND EBENEZER B. SHAFER,

COMMISSIONERS APPOINTED FOR THAT PURPOSE.

ADOPTED BY THE COMMON COUNCIL AND PUBLISHED BY THEIR AUTHORITY.

NEW YORK:
MARTIN B. BROWN, PRINTER AND STATIONER,
Nos. 49 AND 51 PARK PLACE.

1881.

Generated on 2021-06-14 18:27 GMT / https://hdl.handle.net/2027/njp.32101067734473
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
PRINCETON UNIVERSITY

**Surplus.** SEC. 260. The surplus money, if any, arising from any such sale, after deducting the amount of the loan, the interest then due on the same, and the expenses of the advertisement and sale, shall be paid over by the pawnbroker, loanbroker, or keeper of a loan office, to the person who would be entitled to redeem the pledge in case no such sale had taken place.

**Regulations** SEC. 261. No pawnbroker, loanbroker or keeper of a loan office shall make any loan on the separate or divided part or parts of any one article or thing, and which article or thing shall have been offered entire or collectively to him or her by way of pawn or pledge.

**Ibid.** SEC. 262. No pawnbroker, loanbroker, or keeper of a loan office, shall, under any pretense whatever, purchase or buy any second-hand furniture, metals or clothes, or any other article or thing whatever, offered to him or her as a pawn or pledge.

**Penalties.** SEC. 263. Every pawnbroker, loanbroker, or keeper of a loan office, who shall violate or neglect or refuse to comply with any or either of the provisions of sections of this article shall, for every such offense, forfeit and pay the sum of one hundred dollars.

## ARTICLE XXVII.

### *Carrying of Pistols.*

**Concealed weapons.** SEC. 264. Every person, except judges of the federal, state and city courts, and officers of the general, state and municipal governments, authorized by law to make arrests, and persons to whom permits shall have been issued, as hereinafter provided, who shall have in his

Generated on 2021-06-14 18:27 GMT / https://hdl.handle.net/2027/njp.32101067734473
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google Original from PRINCETON UNIVERSITY

e 1:24-cv-00174-MAD-TWD Document 42-2 Filed 02/14/25 Page 56 of



possession within the city of New York a pistol of any description concealed on his person, or not carried openly, shall be deemed guilty of a misdemeanor, and shall be punished, on conviction, by a fine not exceeding ten dollars, or, in default of payment of such fine, by imprisonment not exceeding ten days.

Permits to carry pistols

SEC. 265. Any person, except as provided in this article, who has occasion to carry a pistol for his protection, may apply to the officer in command at the station-house of the precinct where he resides, and such officer, if satisfied that the applicant is a proper and law-abiding person, shall give said person a recommendation to the superintendent of police, or the inspector in command at the central office in the absence of the superintendent, who shall issue a permit to the said person, allowing him to carry a pistol of any description. Any non-resident who does business in the city of New York, and has occasion to carry a pistol while in said city, must make application for permission to do so to the officer in command of the station-house of the police precinct in which he so does business, in the same manner as is required by residents of said city, and shall be subject to the same conditions and restrictions.

Complaint for carrying concealed weapons.

SEC. 266. If, at the time of the arrest, a pistol of any description shall be found concealed on the person of, or not carried openly by any one arrested, the officer making the arrest shall state such fact to the police magistrate before whom the prisoner is brought, and shall make a separate complaint against such prisoner for violation of the provisions of this article.

Generated on 2021-06-14 18:50 GMT / https://hdl.handle.net/2027/njp.32101067734473
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google
Original from PRINCETON UNIVERSITY

e 1:24-cv-00174-MAD-TWD Document 42-2 Filed 02/14/25 Page 57 of



Revocation of permission to carry pistols.

SEC. 267. The commissioners of police of the police department of the city of New York are hereby authorized and empowered, for reasons appearing to be satisfactory to them, by a vote of a majority of a quorum of said commissioners on ayes and noes, to annul or revoke any permission given under this article. All persons to whom such permission shall be given are hereby declared to be individually responsible for their own acts, or the consequences that may arise from the use of pistols carried under the permission to be obtained as provided in this article.

## ARTICLE XXVIII.

*Snow-ploughs and Sweeping-machines by Railroad Companies and others in the City of New York.*

Snow-ploughs.

SEC. 268. It shall not be lawful for any or either of the street or horse-car railroads or stage companies, proprietors or corporations, within the limits of the city of New York, or their officers, agents or servants, to cause or allow any snow-plough, sweeping-machine or other similar instrument to pass over the tracks or lines occupied or used by them within the said limits, unless by the express permission in that behalf to be granted to them by the mayor.

Sweeping-machines.

Fines.

SEC. 269. Any of the said companies, proprietors or corporations who shall violate the provisions of the above section, shall be punished by a fine not exceeding one hundred dollars for each offense, and the officers, agents or servants of such companies, proprietors or corporations who shall violate the said provisions

Generated on 2021-06-14 18:49 GMT / https://hdl.handle.net/2027/njp.32101067734473
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from PRINCETON UNIVERSITY

# EXHIBIT 11

# MUNICIPAL CODE

OF THE

## CITY OF ALBANY, N. Y.

CONTAINING

**The Dongan Charter, Second Class Cities' Law, The Unrepealed Portions of the Former City Charters, General and Special State Laws**

APPLICABLE TO

## THE CITY OF ALBANY

AND

## THE GENERAL CITY ORDINANCES

---

COMPLETE TO SEPTEMBER, 1910

---

Compiled and Arranged by Franklin M. Danaher and Charles H. Mills, under the Direction of

ARTHUR L. ANDREWS

*Corporation Counsel*

ALBANY, N. Y.

1910

PRESS OF
THE BRANDOW PRINTING COMPANY
ALBANY, N. Y.

Generated on 2021-06-15 14:21 GMT / https://hdl.handle.net/2027/hvd.li2h26
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
HARVARD UNIVERSITY

ments for the period of five years from the date of the contract of sale, and for the performance of all other conditions in said contract contained. The amount of such bond and the sufficiency of the sureties to be approved by the Mayor, and its form and manner of execution by the Corporation Counsel or his assistant.

§ 6. All moneys received by the City Treasurer from such sales shall be credited by him as for moneys received for redemption of lands purchased by the city for non-payment of taxes, water rents and assessments.

§ 7. This ordinance shall take effect immediately.

---

## CHAPTER 72

### An ordinance regulating the carrying of loaded firearms in the City of Albany

Passed March 6, 1905.

*The City of Albany, in Common Council convened, ordains as follows:*

Section 1. Any person, other than a peace officer, who shall in any public street, highway, or place within the city of Albany, have or carry concealed upon his person any loaded pistol, revolver, or other firearm, without theretofore having been authorized as hereinafter provided to carry the same, shall be guilty of a misdemeanor, punishable by a fine not exceeding one hundred and fifty dollars, or by imprisonment in a penitentiary or county jail for not more than one hundred and fifty days, or by both.

§ 2. Any person, except as provided in this ordinance, who has occasion to carry a loaded revolver, pistol, or firearm for his protection, may apply to the Commissioner of Public Safety— and such officer, if satisfied that the applicant is a proper and law-abiding person, shall give the said person a permit allowing him to carry such loaded firearms for such period of time as he may deem proper. Any nonresident who does business in the city of Albany, and has occasion to carry a loaded pistol, revolver, or firearm while in the said city, must make application for permission to do so, to the Commissioner of Public Safety, in the same manner as is required of residents of said city, and shall be subject to the same conditions and restrictions.

§ 3. If, at the time of arrest, a loaded pistol, revolver, or firearm of any description shall be found concealed on the person of

Generated on 2021-06-15 14:21 GMT / https://hdl.handle.net/2027/hvd.li2h26
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google Original from HARVARD UNIVERSITY

se 1:24-cv-00174-MAD-TWD Document 42-2 Filed 02/14/25 Page 61 of 1



the one arrested, the officer making the arrest shall state such fact to the magistrate before whom the prisoner is brought, and shall make a separate complaint against such prisoner, for violation of the provisions of this ordinance.

§ 4. The Commissioner of Public Safety is hereby authorized and empowered, for reason appearing to be satisfactory to him, to annul, or revoke any permission given under this ordinance. Every person to whom a permit shall be granted as above provided, shall pay therefor, the sum of two dollars and fifty cents; which shall be applied in aid of the Police Pension Fund; and a return in detail, shall be made monthly by the Commissioner of Public Safety, to the Comptroller of the City, of the amount so received and credited. All persons to whom such permission shall be granted are hereby declared to be individually responsible for their own acts, or the consequences that may arise from the use of loaded pistols, revolvers, or firearms, carried under the permission obtained as provided in this ordinance.

§ 5. All ordinances or parts of ordinances of the city of Albany, inconsistent with the provisions of this ordinance are hereby repealed.

## CHAPTER 73

**An ordinance determining the number of members of the fire department and the classes or grades in which they shall be divided**

Section 1. The number of members of the Fire Department and the classes or grades in which they shall be divided is hereby determined as follows:

There shall be one chief, two permanent assistant chiefs, one clerk, one superintendent of fire alarm, one assistant superintendent of fire alarm, two operators, two linemen, one battery man, one superintendent of the hose and supply depot, one assistant superintendent of hose and supply depot, thirteen foremen, not to exceed thirteen assistant foremen, ten engineers of steamers, ten firemen of steamers, ten drivers of steamers, three tillermen, three drivers of trucks, sixty-four permanent hosemen and laddermen, two relief engineers, one relief fireman, one relief driver, one relief truckman, one call assistant engineer, not to exceed forty-five call hosemen and laddermen, one veterinary surgeon and one department physician.

Generated on 2021-06-15 14:22 GMT / https://hdl.handle.net/2027/hvd.li2h26
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google Original from HARVARD UNIVERSITY

# EXHIBIT 12

1:24-cv-00174-MAD-TWD Document 42-2 Filed 02/14/25 Page 63

# MUNICIPAL ORDINANCES

OF THE

# CITY OF TROY

1905

## RULES AND REGULATIONS

of the

## HEALTH DEPARTMENT

## RULES AND REGULATIONS

With Reference to the

## WATER WORKS

Generated on 2021-06-15 14:19 GMT / https://hdl.handle.net/2027/hvd.li21x4
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
HARVARD UNIVERSITY

1:24-cv-00174-MAD-TWD Document 42-2 Filed 02/14/25 Page 64 o



## AN ORDINANCE REGULATING THE CARRYING OF LOADED FIREARMS AND OTHER DANGEROUS WEAPONS IN THE CITY OF TROY.

Passed May 4, 1905.

*The City of Troy in Common Council convened, ordains as follows:*

SECTION 1. Any person, other than a peace officer, who shall in any public street, highway or place within the City of Troy, have or carry concealed upon his person any loaded pistol, revolver, or other firearm, or any slungshot, billy, sand-club, or a dagger, dirk, stilletto, or dangerous knife, without theretofore having been authorized as hereinafter provided to carry the same, shall be guilty of a misdemeanor, punishable by a fine not exceeding one hundred and fifty dollars or by imprisonment in a penitentiary or county jail for not more than one hundred and fifty days, or by both.

§ 2. Any person, except as provided in this ordinance, who has occasion to carry a loaded revolver, pistol or firearm for his protection, may apply to the commissioner of public safety—and such officer, if satisfied that the applicant is a proper and lawabiding person, shall give the said person a permit allowing him to carry such loaded firearm for such period of time as he may deem proper. Any non-resident who does business in the City of Troy, and has occasion to carry a loaded pistol, revolver, or firearm while in the said city, must make application for permission to do so, to the commissioner of public safety, in the same manner as is required of residents of said city, and shall be subject to the same conditions and restrictions.

§ 3. If, at the time of arrest, a loaded pistol, revolver, or firearm of any description or slungshot, billy, sand club, or a dagger, dirk, stilletto, or dangerous knife, shall be found concealed on the person of the one arrested, the

Generated on 2021-06-15 14:19 GMT / https://hdl.handle.net/2027/hvd.li21x4
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google Original from HARVARD UNIVERSITY

1:24-cv-00174-MAD-TWD Document 42-2 Filed 02/14/25 Page 65



officer making the arrest shall state such fact to the Magistrate before whom the prisoner is brought, and shall make a separate complaint against such prisoner, for violation of the provisions of this ordinance.

§ 4. The commissioner of public safety is hereby authorized and empowered, for reasons appearing to be satisfactory to him, to annul, or revoke any permission given under this ordinance. Every person to whom a permit shall be given as above provided, shall pay therefore, the sum of two dollars and fifty cents; which shall be applied in aid of the police pension fund; and a return in detail, shall be made monthly by the commissioner of public safety, to the comptroller of the city, of the amount so received and credited. All persons to whom such permission shall be granted are hereby declared to be individually responsible for their own acts or the consequences that may arise from the use of loaded pistols, revolvers, or firearms, carried under the permission obtained as provided in this ordinance.

§ 5. All ordinances or parts of ordinances of the City of Troy, inconsistent with the provisions of this ordinance are hereby repealed.

§ 6. This ordinance shall take effect immediately.

Generated on 2021-06-15 14:20 GMT / https://hdl.handle.net/2027/hvd.li21x4
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
HARVARD UNIVERSITY

# EXHIBIT 13

THE

# GENERAL ORDINANCES

OF THE

# CITY OF MILWAUKEE

UP TO JANUARY 1, 1896,

WITH

AMENDMENTS THERETO

AND AN

APPENDIX.

---

COMPILED AND CODIFIED BY

CHARLES H. HAMILTON,

CITY ATTORNEY.

PUBLISHED BY ORDER OF THE COMMON COUNCIL.

---

MILWAUKEE:
Edward Keogh, Printer, 386 and 388 Broadway.
1896.

Generated on 2021-06-14 18:00 GMT / https://hdl.handle.net/2027/nyp.33433014918449
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
NEW YORK PUBLIC LIBRARY

*Section 3.* The officers or employes of any of said markets shall perform such additional duties as may be imposed upon them by the common council and the commissioner of health of the city of Milwaukee.

Duties of officers and employes.

*Section 4.* Any person who shall resist, hinder or obstruct the officers or employes of any of said markets in the lawful discharge of any of the duties imposed upon them, shall, upon conviction thereof, be fined in any sum not exceeding twenty-five dollars.

Penalty for obstructing officers.

*Section 5.* It shall be unlawful for any person to sell or offer for sale fruits or berries within the city of Milwaukee, except by the barrel, bushel, or some aliquot part of a bushel, according to the table of dry measures, nor shall it be lawful to sell fruits or berries in packages, except every such package contain a barrel, a bushel or some aliquot part of a bushel, according to the table of dry measures, provided, that this section shall not apply to dry or preserved fruits and berries, or to the sale of fruits retailed at a fixed price per piece or number.

Sale of fruits and berries.

*Section 6.* All fruits and berries, fresh or dried, sold or offered for sale in the city of Milwaukee, in packages, shall be of equally good quality in every part of the package.

Quality in packages.

*Section 7.* It shall not be lawful for any person to sell except to retailers, between the hours of 6 o'clock in the morning and 12 o'clock at noon, in any street, sidewalk or alley, within two blocks of any of the markets established by this chapter, any vegetables or other articles, the sale of which is regulated by this chapter.

Hours for selling.

*Section 8.* Any person violating any of the provisions of sections 5, 6 and 7 in this chapter shall, upon conviction thereof, be fined not less than five nor more than twenty-five dollars.

Penalty.

## CHAPTER XX.

### MISDEMEANORS.

*Section 1.* All persons are prohibited from carrying or driving in any vehicle on or over any street, alley, sidewalk or public ground in the city of Milwaukee, any live calf, sheep, lamb, swine or other animal, or any bird, so tied or placed as to inflict torture thereto.

Cruelty to animals in vehicles.

Generated on 2021-06-14 18:01 GMT / https://hdl.handle.net/2027/nyp.33433014918449
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google
Original from NEW YORK PUBLIC LIBRARY

Case 1:24-cv-00174-MAD-TWD Document 42-2 Filed 02/14/25 Page 69 of 127



**Ball playing in streets, school grounds, etc., prohibited.**

*Section 21.* The throwing, catching or batting of baseballs in any of the streets, alleys, public school grounds or other public grounds is hereby prohibited.

**Leaving wells and cisterns open.**

*Section 22.* The occupants of any lot, part of lot or parcel of land in the city of Milwaukee occupied for residence or business purposes, are hereby prohibited from leaving open and not securely guarded any cistern, well or other dangerous excavation on such lot; and every owner of any lot, part of lot or parcel of land in said city, not occupied for residence or business purposes, is hereby in like manner prohibited from leaving open and not securely guarded any well, cistern or other dangerous excavation on such lot, part of lot or parcel of land; and every such occupant or owner who shall offend against the provisions of this section shall, upon conviction, be fined not less than five nor more than fifty dollars for each offense.

**Injuring trees, grass plats, etc., in public parks.**

*Section 23.* All persons are hereby prohibited from breaking or otherwise injuring any tree, shrub or plant, breaking, soiling or defacing any fountain, statue or other ornamental structure; treading, walking or riding upon any grass plat, or in any way injuring, soiling or defacing any public property in any public park, square, sidewalk or ground in the city of Milwaukee, whether the same shall be owned or held in trust by said city, or held in trust for the use of any ward of said city; any person violating any of the provisions of this section shall, upon conviction thereof, be fined not less than five nor more than fifty dollars.

**Leasing buildings for prostitution.**

*Section 24.* All persons are hereby prohibited from leasing or letting, either as landlord or agent of the landlord, tenant or agent of the tenant, or as landlord through any agent or sub-agent, any house, room or other premises in the city of Milwaukee, to be used for the purpose of prostitution or lewdness; any person violating any of the provisions of this section shall, upon conviction thereof, be fined not less than fifty nor more than five hundred dollars.

**Carrying dangerous weapons—Permit. Fee. Penalty.**

*Section 25.* It shall be unlawful for any person except policemen, regular or special, or any officer authorized to serve process, to carry or wear concealed about his person, any pistol or colt, slung-shot, cross-knuckles.

Generated on 2021-06-14 18:01 GMT / https://hdl.handle.net/2027/nyp.33433014918449
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google Original from NEW YORK PUBLIC LIBRARY

knuckles of lead, brass or other metal, or bowie-knife, dirk knife, or dirk or dagger, or any other dangerous or deadly weapon, within the limits of the city of Milwaukee; provided, however, that the chief of police of said city may upon any written application to him made, issue and give a written permit to any person residing within the city of Milwaukee, to carry within the said city a pistol or revolver when it is made to appear to said chief of police that it is necessary for the personal safety of such person or for the safety of his property or of the property with which he may be entrusted, to carry such weapon; and the holding of such permit by such person shall be a bar to prosecution under this ordinance. Said chief of police shall keep the names and residences of all persons to whom he may grant such permits, in a book to be kept for that purpose, and he shall have power to revoke such permit at any time.

Said chief of police shall, upon granting each and every such permit, collect from the person to whom the same is granted, the sum of three (3) dollars, and he shall pay all moneys so collected by him upon granting such permits, into the city treasury.

Any person who shall wear or carry any such pistol, slung-shot, cross-knuckles, knuckles of brass, lead or other metal, knife, dirk or dagger, or any other dangerous or deadly weapon, within the limits of the city of Milwaukee, contrary to the provisions of this chapter, shall be liable to a penalty of not less than ten nor more than one hundred dollars for each and every offense.

**Employes of Gas Company to wear badge.**

*Section 26.* All employes of the Gaslight company of the city of Milwaukee, under the superintendent of the said company, are hereby required upon all occasions when inspecting the meters of said Gaslight company in any dwelling house or other building in the city of Milwaukee, to wear badges or stars in a conspicuous place on the breast, which badges or stars shall be provided to said employes by said Milwaukee Gaslight company, and shall be subject to the approval of the city clerk of the city of Milwaukee.

**Not to inspect meters without wearing badge.**

*Section 27.* It shall be a misdemeanor for any such employe of the said Milwaukee Gaslight company, or any other person, to inspect or attempt to inspect or take away any gas meter of said company from any dwelling house

Generated on 2021-06-14 18:01 GMT / https://hdl.handle.net/2027/nyp.33433014918449
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google
Digitized by Google
Original from NEW YORK PUBLIC LIBRARY

# EXHIBIT 14

THE

# REVISED ORDINANCES

OF THE

# CITY OF OMAHA:

ALSO THE

## CITY CHARTER, FORMER CHARTERS OF THE CITY

AND

## AMENDMENTS THERETO:

TOGETHER WITH ALL

## STATE LAWS RELATING TO THE CITY:

ALSO

A LIST OF FORMER AND PRESENT CITY OFFICERS, THE RULES OF THE CITY COUNCIL, AND THE RULES AND REGULATIONS OF THE FIRE DEPARTMENT OF THE CITY.

PRINTED AND PUBLISHED BY AUTHORITY OF THE CITY COUNCIL, MARCH, 1872.

COMPILED, REVISED AND ARRANGED
BY JOHN P. BARTLETT,
EX-CITY SOLICITOR.

OMAHA, NEBRASKA:
OMAHA HERALD STEAM BOOK AND JOB PRINTING HOUSE.
1872.

Generated on 2021-06-15 18:58 GMT / https://hdl.handle.net/2027/uiug.30112098434225
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF ILLINOIS AT
URBANA-CHAMPAIGN

ase 1:24-cv-00174-MAD-TWD Document 42-2 Filed 02/14/25 Page 73 of 1



where such business is to be carried on, and shall not be assignable.

SEC. 2. Such person or firm shall keep a suitable book in which they shall enter at the time a list and description of each and every article left with them in pawn, with date of pawning; and such book, as well as all other books relating to his or their business as pawnbrokers, shall be at all times open to the inspection of the City Marshal or such officers as he may authorize, in writing, for that purpose. All articles of whatever kind or nature which have been received in pawn shall also be produced for inspection at any time when demanded by such officer. Each pawn ticket shall plainly set forth the per centage, and the amount loaned, and all charges of whatever kind or nature, necessary to be paid to redeem the effects so put in pawn.

SEC. 3. If any person or firm shall engage in the business of pawnbrokers without having a license as herein required, or shall violate any provision of this chapter, such person or persons, on conviction thereof, shall be fined not to exceed one hundred dollars.

---

## CHAPTER XXVIII.

### PEACE AND ORDER.

SEC. 1. Fighting—being intoxicated—using obscene language.
2. Indulging in indecent, disorderly or immodest acts.
3. Dress—not to be indecent.
4. Indecent or lewd pictures, books, or plays.
5. Discharging firearms or fireworks.
6. Carrying concealed weapons.
7. Disorderly houses prohibited.
8. Gaming.
9. Vagrants and swindlers.
10. Additional penalty.

SECTION 1. It shall be unlawful for any person to disturb

Generated on 2021-06-15 18:58 GMT / https://hdl.handle.net/2027/uiug.30112098434225
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google
Digitized by Google
Original from
UNIVERSITY OF ILLINOIS AT
URBANA-CHAMPAIGN

Case 1:24-cv-00174-MAD-TWD Document 42-2 Filed 02/14/25 Page 74 of 127



the good order and peace of the city of Omaha by making any loud or unusual noise; or by fighting or threatening to fight, by tumultuous threatenings, or offensive carriage, or by being intoxicated on the streets, or in an public place in said city, or in any private place without the consent of the owner, or by using any obscene or profane language in the streets or other public places to the annoyance of citizens.

SEC. 2. It shall be unlawful for any person or persons to indulge in any indecent or disorderly conduct, or any lewd or lascivious behavior in the streets or other public places in the city of Omaha, or to commit any indecent, immodest or filthy act within the limits of said city in the presence of any person, or in such a situation that persons passing might ordinarily see the same.

SEC. 3. It shall be unlawful for any person to appear in any public place in said city in a state of nudity, or in a dress not belonging to his or her sex, or in an indecent or lewd dress.

SEC. 4. It shall be unlawful for any person to exhibit, sell, or offer for sale, or to dispose of in any manner any indecent or lewd book, picture or other thing, or to exhibit any indecent, immoral, or lewd play or other representation within said city, and any person who shall violate any of the provisions of this section or of the preceding sections of this chapter, or who shall in any manner other than is herein specified, willfully or maliciously disturb the public peace of said city, shall, on conviction thereof, be fined in any sum not exceeding fifty dollars.

SEC. 5. If any person shall unnecessarily discharge any fire-arms, or shoot off any fire-crackers, or other fire-works, or shall light or throw any fire-ball or crackers, in said city, without permission of the Mayor, such person so doing, shall, on conviction thereof, be fined in any sum not exceeding twenty dollars. The City Council may by resolution suspend the operation of the above provision of this section, on the Fourth of July or any other day of public rejoicing.

SEC. 6. If any person shall carry any concealed weapon or weapons, or have concealed upon or about his or her person

Generated on 2021-06-15 18:58 GMT / https://hdl.handle.net/2027/uiug.30112098434225
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF ILLINOIS AT
URBANA-CHAMPAIGN

Case 1:24-cv-00174-MAD-TWD Document 42-2 Filed 02/14/25 Page 75 of 127



any revolver, pistol, slung shot, bowie knife, or other deadly weapon or instrument, such person shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be fined in any sum not exceeding twenty dollars. The foregoing provision shall not apply to officers whose duties require that they should carry arms, nor to well known and worthy citizens, or persons of good repute, who may carry arms for their own protection in going to or from their place or places of business, if such business be lawful.

SEC. 7. Any person or association of persons who shall permit in his, her, or their house, out-house, yard, or other premises under his, her, or their control, any gambling with cards, dice, or other implements or devices used in gambling, or who shall permit any loud or unusual noises therein, or shall suffer or permit any person or persons to fight or threaten to fight in such premises, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be fined in any sum not to exceed twenty dollars.

SEC. 8. Any person or persons who shall keep a house for the purpose of gambling therein, or who shall suffer or permit other persons to come there, or to frequent and come together there for the purpose of gaming, and every person who in any public place shall play for money or other valuable thing at cards, dice, or in any other manner, or shall bet at Faro, Keno, or any other game, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be fined in any sum not exceeding twenty dollars.

SEC. 9. Any and all persons who shall loiter about the city for the space of ten days, without having some known legal occupation or means of support, and all suspicious persons who can give no reasonable account of themselves, which said classes of persons are usually termed vagrants, and all watch stuffers, ball game players, and all other persons who shall practice any game, trick, or device with intent to swindle, may be arrested with or without warrant by the Marshal or any policeman of the city, and upon conviction of any act herein set forth shall be deemed guilty of a misdemeanor and shall be fined in any sum not to exceed fifty dollars.

Generated on 2021-06-15 18:58 GMT / https://hdl.handle.net/2027/uiug.30112098434225
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF ILLINOIS AT
URBANA-CHAMPAIGN

# EXHIBIT 15

PARK'S

# ANNOTATED CODE

OF

# THE STATE OF GEORGIA

## 1914

**Embracing the Code of 1910 and Amendments and Additions Thereto Made by the General Assembly in 1910, 1911, 1912, 1913, and 1914, Together with Complete Annotations from the Judicial Decisions Through Those Contained in the 139 Georgia Reports, 12 Georgia Appeals Reports, 212 Federal Reporter, and 230 United States Supreme Court Reports**

PUBLISHED BY AUTHORITY OF THE GENERAL ASSEMBLY

PREPARED BY
ORVILLE A. PARK

HARRY S. STROZIER
BASCOM S. DEAVER

CHARLES H. GARRETT
HARRY B. SKILLMAN

## Volume VI
## PENAL CODE

ATLANTA
THE HARRISON COMPANY
1915

§ 348. (§ 342.) **Carrying of deadly weapons at courts, etc.** Whoever shall carry about his person any dirk, bowie-knife, pistol or revolver, or any kind of deadly weapon, to or while at a court of justice or an election ground or precinct, or any place of public worship, or any other public gathering in this State, except militia muster grounds, shall be punished as for a misdemeanor. This section shall not apply to a sheriff, deputy sheriff, coroner, constable, marshal, policeman, or other arresting officer, or their posse, acting in the discharge of their official duties.

Acts 1870, p. 421. 1878-9, p. 64. 1895, p. 63. 1909, p. 90.

**Accessible place,** where accused carried deadly weapon to, knowing that public gathering would take place nearby, and he went to such place while the gathering was in progress and secured the weapon and carried it about his person into the gathering, he was guilty. 123/566 (3) (51 S. E. 636).

**After arriving** at public gathering, if one then comes into possession of pistol, he is not indictable under this section. 115/582 (41 S. E. 992).

**Barbecue** on the Fourth of July, where four hundred people assembled, is a "public gathering." 123/566 (2) (51 S. E. 636).

**Concealed weapon,** carrying of, different offense from that of carrying pistol to church. 4 App. 845 (62 S. E. 561).

**Constitutional,** section is. 53/472.

**Indictment** sufficient which alleges that the carrying was "to and at a court of justice, then in session, in and for the 426th district, Georgia militia." 53/472. Indictment charging carrying pistol to "mayor's court," sufficient where act creating court did not designate it by name but provided that mayor should preside. 100/264 (1) (28 S. E. 38). Indictment need not allege that accused did not belong to class excepted in statute. 116/847 (43 S. E. 256); 12 App. 81 (2) (76 S. E. 784).

**Mayor's court:** See **Indictment.**

**Place of public worship,** not necessarily a church, but any place where public worship is going on; indictment alleging carrying pistol to "place of public worship" and locating place by name, sufficient. 1 App. 313 (1, 2) (57 S. E. 999).

**Possession** of pistol obtained while at place of worship, not sustain charge of carrying pistol to such place. 119/805 (47 S. E. 175).

§ 348 (a). **Carrying pistols without license.** [It shall be unlawful for any person to have or carry about his person, in any county in the State of Georgia, any pistol or revolver without first taking out a license from the ordinary of the respective counties in which the party resides, before such person shall be at liberty to carry around with him on his person, or to have in his manual possession outside of his own home or place of business: Provided that nothing in this law shall be construed to alter, affect or amend any laws now in force in this State relative to the carrying of concealed weapons on or about one's person, and provided further, that this shall not apply to sheriffs, deputy sheriffs, marshals, or other arresting officers of this State or United States, who are now allowed, by law, to carry revolvers; nor to any of the militia of said State while in service or upon duty; nor to any students of military colleges or schools when they are in the discharge of their duty at such colleges.]

Acts 1910, p. 134.

**Constitutionality:** Sections 348 (a)-348 (d), not violative of provision of State Constitution as to right of the people to bear arms (§ 6378, Civil Code) (one dissenting). 137/1 (1) (72 S. E. 260); s. c., 9 App. 855 (72 S. E. 436); 10 App. 13 (72 S. E. 600), 23 (72 S. E. 510), 122 (72 S. E. 935), 128 (72 S. E. 927); see 13 App. 301, 302 (79 S. E. 94). Nor of similar provision of Federal Constitution (§ 6685, Civil Code). Id., 1 (2).

**Construction** of this statute should be reasonable. 12 App. 427 (1) (77 S. E. 371); 13 App. 301 (2) (79 S. E. 94).

**Cropper,** dwelling of landlord is not place of business of. 10 App. 451 (73 S. E. 551). See **Farm.**

**Evidence** to show possession of pistol may be circumstantial. 12 App. 84 (1) (76 S. E. 785).

**Examination** of pistol with a view to its purchase, permissible. Statute not violated where one who had pistol in his hand only for examination was temporarily called aside by some one wishing to speak to him. 12 App. 427 (2, 3) (77 S. E. 371).

**Farm:** Home and place of business of farmer are the house where he resides, and his farm. It is not a violation of the statute for a farm overseer to carry on the farm a pistol fully exposed to view, though he has no license. 12 App. 425 (76 S. E. 103, 991). Where farm laborer carried pistol between his employer's residence and the house occupied by himself and his wife, which was also upon the plantation, he was not guilty. 12 App. 479 (77 S. E. 653). Testimony showing that accused had pistol on a farm where he lived and worked, and which he owned in common with others, conviction unauthorized. 12 App. 483 (77 S. E. 653). See **Cropper.**

**Father** carrying pistol to his home, on taking it away from his son, to prevent the son from having it, was guilty. 11 App. 722 (75 S. E. 1135).

**Finding** pistol in road and carrying it to one's home for safe-keeping until called for by owner not violation of the section. 13 App. 301 (4) (79 S. E. 94).

**Indictment:** The second proviso of the section is not part of the definition of the offense and need not be negatived by the indictment. The exception in the proviso is matter of defense. 12 App. 81 (1) (76 S. E. 784), 363 (77 S. E. 188).

**Intention** as ingredient of the crime. 13 App. 301 (2) (79 S. E. 94).

**Ownership** of pistol is immaterial, except in so far as the circumstance of ownership may tend to illustrate the guilt or innocence of the defendant. 12 App. 706 (2) (78 S. E. 270).

**Prima facie case** is made out when the State proves that the accused carried a pistol on his person or had manual possession of a pistol not at his home or place of business, and burden is then upon accused to show that he had a license. 12 App. 81 (3) (76 S. E. 784), 84 (2) (76 S. E. 785), 557 (77 S. E. 829).

**Public road:** Possession of pistol by one on public road violates law. 10 App. 451 (73 S. E. 617).

**Purchase:** See **Examination.**

**Returning** pistol to owner who had left it at his house, that accused was, is no defense. 10 App. 451 (73 S. E. 617).

**Suddenly** acquiring possession of a pistol for purpose of defending one's self not a violation of the statute. 12 App. 84, 85 (76 S. E. 785); see 13 App. 140 (78 S. E. 866).

**Temporary,** that possession was, only, no defense. 10 App. 451 (73 S. E. 617). The terms of the statute involve the idea of a duration, for some appreciable time at least, of the possession of a pistol, and the kindred idea that this possession is with the intent of carrying the weapon to some other place. 12 App. 427 (77 S. E. 371).

§ 348 (b). **License, how obtained.** [The ordinary of the respective counties of this State in which the applicant resides may grant such license, either in term time or during vacation, upon the application of party or person desiring to apply for such license; provided applicant shall be at least eighteen years old or over, and shall give a bond payable to the Governor of

the State in the sum of one hundred dollars, conditioned upon the proper and legitimate use of said weapon with a surety approved by the ordinary of said county, and the ordinary granting the license shall keep a record of the name of the person taking out such license, the name of the maker of the fire-arm to be carried, and the caliber and number of the same.]

Acts 1910, pp. 134, 135.

**Minor** under 18 years of age cannot legally have pistol or revolver about the person, either with or without license. 10 App. 128 (72 S. E. 927). Policy of the State with reference to minors. Id.

§ 348 (c). **Fee for license.** [The person making such application and to whom such license is granted, shall pay to the ordinary for granting said license the sum of fifty cents, which license shall cover a period of three years from date of granting same.]

Acts 1910, pp. 134, 135.

§ 348 (d). **Punishment.** [Any person violating any of the provisions of the three preceding sections shall be punished as for a misdemeanor, as prescribed in section 1065 of this Code.]

Acts 1910, pp. 134, 135.

§ 349. (§ 343.) **Pointing weapon at another.** Any person who shall intentionally point or aim a gun or pistol, whether loaded or unloaded, at another, not in a sham battle by the military, and not in self-defense, or in defense of habitation, property, or person, or other instances standing upon like footing of reason and justice, shall be guilty of a misdemeanor.

Acts 1880-1, p. 151.

**Abusive language:** See **Opprobrious words.**

**Aiming weapon** at another is to point it intentionally. 6 App. 805 (2) (65 S. E. 812).

**Arresting officer** violates this section when pointing pistol is not in self-defense or defense of habitation, property, or person, and not done to accomplish arrest. 9 App. 227 (70 S. E. 969).

**Assault** with intent to murder by pointing gun may include offense of pointing and aiming gun. 6 App. 208 (64 S. E. 709). See **Intention.**

**Disorderly conduct** being charged in violation of city ordinance, no defense that pointing pistol at another was charged as one of the acts of disorderly conduct and that such action is a State offense not punishable by municipal court. 2 App. 731 (1) (59 S. E. 20).

**Evidence** showing that defendant pointed pistol at policeman warranted conviction, though it appeared that policeman struck defendant twice on the head before the pistol was pointed, it also appearing that defendant was getting the pistol out of his hip pocket before the policeman struck the first blow, and that he had the weapon in his hand before the second blow was struck. 10 App. 38 (3) (72 S. E. 520).

**Indictment** which failed to charge that pistol was intentionally pointed was fatally defective. 121/141 (48 S. E. 908). Intentional pointing need not be expressly charged if language used raises no other implication than that act was intentional. 6 App. 208 (64 S. E. 709). Indictment charging the pointing of a pistol at two named individuals is not supported by proof that the pistol was pointed at one of the individuals named and at a third

# EXHIBIT 16

STATE OF OREGON

CONSTITUTIONAL AMENDMENTS ADOPTED, AND LAWS ENACTED BY THE PEOPLE UPON INITIATIVE PETITION AND REFERENDUM AT THE GENERAL ELECTION NOVEMBER 5, 1912,

TOGETHER WITH THE

# GENERAL LAWS

AND

## Joint Resolutions and Memorials

ENACTED AND ADOPTED BY THE

TWENTY-SEVENTH REGULAR SESSION

OF THE

LEGISLATIVE ASSEMBLY

1913




SALEM, OREGON
WILLIS S. DUNIWAY, STATE PRINTER
1913

Sec. 1621. Upon appeal being taken, the clerk of the court where the notice of appeal is filed, must within 30 days thereafter, or such further time as such court, or the judge thereof may allow, transmit a certified copy of the notice of appeal, certificate of cause, if any, and judgment roll to the clerk of the Supreme Court.

Filed in the office of the Secretary of State February 26, 1913.

---

## CHAPTER 256.

### AN ACT

[S. B. 330.]

Forbidding the sale, barter, giving away, disposal of or display for sale of pocket pistols and revolvers, and fixing a penalty for the violation thereof.

*Be it enacted by the People of the State of Oregon:*

Section 1. It shall be unlawful for any person, firm or corporation to display for sale at retail any pocket pistol or revolver or to sell at retail, barter, give away or dispose of the same to any person whomsoever, excepting a policeman, member of the militia or peace officer of the State of Oregon, unless the purchaser or person attempting to procure the same shall have a permit for the purpose of procuring such pocket pistol or revolver signed by the municipal judge or city recorder of the city or county judge or a justice of the peace of the county wherein such person resides.

Section 2. *Provided,* that no judge, city recorder or justice of the peace shall issue such permit until said applicant has furnished him with an affidavit from at least two reputable freeholders as to the applicant's good moral character.

Section 3. All persons, firms or corporations engaged in the retail sale of pocket pistols or revolvers shall keep a record of the sale of such pocket pistols or revolvers by registering the name of the person or persons and the number of the pocket pistol or revolver and shall transmit same to the sheriff of the county in which purchase is made on the 1st and 15th day of each calendar month.

Section 4. Any person violating the provisions of this act shall be guilty of a misdemeanor.

Filed in the office of the Secretary of State February 26, 1913.

# EXHIBIT 17

# LAWS OF MISSOURI

PASSED AT THE SESSION OF THE

*Fifty-First General Assembly*

WHICH CONVENED AT THE

*City of Jefferson*

WEDNESDAY, JANUARY 5, 1921




MDCCCXX

(*By Authority*)

COMPILED BY

CHARLES U. BECKER,

SECRETARY OF STATE

*In compliance with section 7068*
*Revised Statutes, 1919.*

supervision of such training and appoint such assistants as may be necessary to administer said act, and fix their compensation; (4) to direct the disbursement and administer the use of all funds provided by the federal government and allotted for the vocational rehabilitation of such persons.

**Sec. 4. Shall formulate plan of co-operation.**—It shall be the duty of the state board for vocational education to formulate a plan of co-operation in carrying out the provisions of this act and of said act of congress, with Missouri workmen's compensation commission.

**Sec. 5. Authorized and empowered to receive gifts and donations—to be reported to the general assembly.**—The state board for vocational education is hereby authorized and empowered to receive such gifts and donations, either from public or private sources, as may be offered unconditionally or under such conditions related to the vocational rehabilitation of persons disabled in industry or otherwise and consistent with the provisions of this act. All moneys received as gifts or donations shall be deposited in the state treasury and shall constitute a permanent fund to be called the special fund for the vocational rehabilitation of disabled persons, to be used by the said board to defray the expenses of vocational rehabilitation in special cases, including the payment of necessary expenses of persons undergoing training. A full report of all gifts and donations offered and accepted, together with the names of the donors and the respective amounts contributed by each, and all disbursements therefrom shall be submitted biennially to the general assembly.

**Sec. 6. Emergency.**—On account of there being many persons in the state needing vocational rehabilitation, and that there are now federal funds available for this purpose an emergency exists within the meaning of the Constitution; therefore this act shall take effect and be in force from and after its passage and approval.

Approved April 7, 1921.

---

[H. B. 168.]

## WEAPONS, FIREARMS: Regulation of Sale and Possession.

AN ACT to provide for the public safety by requiring each pistol, revolver or other firearm of a size which may be concealed upon the person, to be stamped with the description of the same, and a record of all sales thereof to be kept by all dealers therein, and regulating the buying, selling, borrowing, loaning, giving away, trading, bartering, delivering or receiving of such weapons, and prescribing punishments for the violation thereof, and with an emergency clause.

SECTION
1. Pistol, revolver or firearms to be plainly marked.
2. Shall secure permit to acquire weapon.
3. Weapons must be stamped.
4. Manufacture not prohibited.

SECTION
5. Punishment for violation.
6. Validity of remaining sections not affected.
7. Emergency clause.

*Be it enacted by the General Assembly of the State of Missouri, as follows:*

**Section 1. Pistol, revolver or firearms to be plainly marked.** No wholesaler or dealer therein shall have in his possession for the purpose of sale, or shall sell, any pistol, revolver, or other firearm of a size which may be concealed upon the person, which does not have plainly and permanently stamped upon the metallic portion thereof, the trademark or name of the maker, the model and the serial factory number thereof, which number shall not be the same as that of any other such weapon of the same model made by the same maker, and the maker, and no wholesale or retail dealer therein shall have in his possession for the purpose of sale, or shall sell, any such weapon unless he keep a full and complete record of such description of such weapon, the name and address of the person from whom purchased and to whom sold, the date of such purchase or sale, and in the case of retailers the date of the permit and the name of the circuit clerk granting the same, which record shall be open to inspection at all times by any police officer or other peace officer of this state.

**Sec. 2. Shall secure permit to acquire weapon.**—No person, other than a manufacturer or wholesaler thereof to or from a wholesale or retail dealer therein, for the purposes of commerce, shall directly or indirectly buy, sell, borrow, loan, give away, trade, barter, deliver or receive, in this state, any pistol, revolver or other firearm of a size which may be concealed upon the person, unless the buyer, borrower or person receiving such weapon shall first obtain and deliver to, and the same be demanded and received by, the seller, loaner, or person delivering such weapon, within thirty days after the issuance thereof, a permit authorizing such person to acquire such weapon. Such permit shall be issued by the circuit clerk of the county in which the applicant for a permit resides in this state, if the sheriff be satisfied that the person applying for the same is of good moral character and of lawful age, and that the granting of the same will not endanger the public safety. The permit shall recite the date of the issuance thereof and that the same is invalid after thirty days after the said date, the name and address of the person to whom granted and of the person from whom such weapon is to be acquired, the nature of the transaction, and a full description of such weapon, and shall be countersigned by the person to whom granted in the presence of the circuit clerk. The circuit clerk shall receive therefor a fee of $0.50. If the permit be used, the person receiving the same shall return it to the circuit clerk within thirty days after its expiration, with a notation thereon showing the date and manner of the disposition of such weapon. The circuit clerk shall keep a record of all applications for such permits and his action thereon, and shall preserve all returned permits. No person shall in any manner transfer, alter or change any such permit or make a false notation thereon or obtain the same upon any false representation to the circuit clerk granting the same, or use or attempt to use a permit granted to another.

**Sec. 3. Weapons must be stamped.**—No person within this state shall lease, buy or in anywise procure the possession from any person, firm or corporation within or without the state, of any pistol, revolver or other firearm of a size which may be concealed upon the person, that is not stamped as required by section 1 of this act; and no person shall buy or otherwise acquire the possession of any such article unless he shall have first procured a written permit so to do from the circuit clerk of the county in which such person resides, in the manner as provided in section 2 of this act.

**Sec. 4. Manufacture not prohibited.**—Nothing herein contained shall be considered or construed as forbidding or making it unlawful for a dealer in or manufacturer of pistols, revolvers or other firearms of a size which may be concealed upon the person, located in this state, to ship into other states or foreign countries, any such articles whether stamped as required by this act or not so stamped.

**Sec. 5. Punishment for violation.**—Any person, its or his directors, officers, agents or servants, convicted of violating any of the provisions of this act, shall be punished by imprisonment in the penitentiary for not more than five years, or by imprisonment in the county jail not less than six months, or by a fine not less than fifty dollars nor more than five thousand dollars, or by both fine and imprisonment in the county jail.

**Sec. 6. Validity of remaining sections not affected.**—If any section, subsection, sentence, clause or phrase of this act is for any reason held to be unconstitutional, such decision shall not affect the validity of the remaining portions of this act. The general assembly hereby declared that it would have passed this act and each section, subsection, sentence, clause and phrase thereof, irrespective of the fact that any one or more of the same shall be declared unconstitutional.

**Sec. 7. Emergency clause.**—There being no adequate law governing the stamping, recording, sale and other disposition of weapons as described herein, creates an emergency within the meaning of the Constitution; therefore this act shall take effect and be in force from and after its approval.

Approved April 7, 1921.

# RESOLUTIONS.

[S. J. and C. R. No. 1.]

## PROPOSED CONSTITUTIONAL AMENDMENT RELATING TO QUALIFICATIONS OF VOTERS.

*Be it resolved by the Senate, the House of Representatives concurring therein:*

That at the general election, to be held in this state on the Tuesday following the first Monday in November, A. D. 1922, there shall be submitted to the qualified voters of Missouri, for adoption or refusal, an amendment to the Constitution of the state, repealing section 2 of article VIII of said Constitution of Missouri and enacting a new section in lieu thereof, to be known as section 2 of article VIII, as follows:

**Sec. 2.** Every citizen of the United States, possessing the following qualifications, shall be entitled to vote at all elections by the people:

First: Shall have resided in the state one year immediately preceding the election at which such citizen offers to vote.

Second: Shall have resided in the county, city or town where such citizen offers to vote at least sixty days immediately preceding the election.

The legislature is hereby authorized and directed to enact proper and suitable laws, providing the means and method by which any absent qualified elector may vote an absentee ballot at all elections by the people, whether such absent elector be within or without this state.

Approved March 28, 1921.

---

[S. J. and C. R. No. 2.]

## PROPOSED CONSTITUTIONAL AMENDMENT RELATING TO ENABLING WOMEN TO HOLD ANY OFFICE IN THE STATE.

JOINT AND CONCURRENT RESOLUTION submitting to the qualified voters of Missouri an amendment to the Constitution thereof so as to enable women to hold any office in this state.

*Be it resolved by the Senate, the House of Representatives concurring therein, as follows:*

That at the special election to be held in this state on August 2, 1921, there shall be submitted to the qualified voters of the state for adoption the following amendment to the Constitution thereof:

**Section 1.** No person shall be disqualified from holding office in this state on account of sex, and those provisions in the Constitution of Missouri requiring that persons, to be eligible for certain offices, must have been qualified voters for a certain

number of years, shall not apply to women who have the necessary qualifications of citizenship until after the nineteenth amendment to the Constitution of the United States shall have been in effect an equivalent number of years.

Approved March 11, 1921.

---

[S. J. and C. R. No. 9.]

## PROPOSED CONSTITUTIONAL AMENDMENTS RELATING TO BONUS FOR THOSE WHO SERVED HONORABLY IN THE MILITARY OR NAVAL FORCES OF THE UNITED STATES OF AMERICA: Authorizing the Issuing of Bonds or Other Evidence of Indebtedness for Fifteen Millions of Dollars.

JOINT AND CONCURRENT RESOLUTION submitting to the qualified voters of the state of Missouri an amendment to article IV, of the Constitution of the state of Missouri, authorizing the general assembly to contract a debt or liability on behalf of the state of Missouri and to issue bonds to an amount not exceeding $15,000,000.00 for the purpose of paying a bonus to bona fide residents of the state of Missouri, and to certain survivors of such residents, who served honorably in the military or naval forces of the United States of America at any time between the sixth day of April, nineteen hundred and seventeen, and the eleventh day of November, nineteen hundred and eighteen, and providing for the payment of such indebtedness.

*Be it resolved by the Senate, the House of Representatives concurring therein:*

That at the general election to be held on the Tuesday next following the first Monday in November, 1922, or at a special election to be called by the governor in his discretion prior to such general election, there shall be submitted to the electors of the state, for their approval or rejection, an amendment to the Constitution of the state of Missouri, adding to article IV thereof, between section 44a and section 45, a new section to be known as section 44b, to read as follows:

**Section 44b.** In addition to the exceptions made and created in sections 44 and 44a, the general assembly shall have power, for the purpose of paying to each bona fide resident of the state of Missouri who served honorably in the military or naval forces of the United States of America at any time between the sixth day of April, nineteen hundred and seventeen and the eleventh day of November, nineteen hundred and eighteen, a bonus of ten dollars for each and every month or major fraction of a month, that such resident was in active service, to contract or to authorize the contracting of a debt or liability on behalf of the state, and to issue bonds or other evidence of indebtedness thereof not exceeding, in the aggregate, fifteen millions of dollars; such bonds or other evidences of indebtedness to bear interest at a rate not exceeding five per cent per annum, payable semi-annually, and maturing not later than twenty years from the date they bear. The said bonds and the interest that will accrue thereon shall be paid out of a fund to be provided by the levy and collection of a direct annual tax upon all taxable prop-

erty in the state. It shall be the duty of the state auditor, annually, on or before the first day of July, to determine the rate of taxation necessary to raise the amount of money needed for that year to pay the principal and interest maturing in the next succeeding year, taking into consideration available funds, delinquencies and the cost of collection. The auditor shall annually certify the rate of taxation so determined to the clerk of the county court of each county and to the assessor or other officer in the city of St. Louis whose duty it may be to make up and certify the tax books wherein are extended the state taxes. It will be the duty of said clerks and the said assessor or other proper officer in the city of St. Louis to extend upon the tax books the taxes to be collected and certify the same to the collector of the revenue of their respective counties, and the city of St. Louis, who shall collect such taxes at the same time and in the same manner and by the same means as are now or may hereafter be provided by law for the collection of state and county taxes, and pay the same into the state treasury. The legislature shall enact such laws as may be necessary to carry into effect this amendment. The wife or husband, child, mother or father, in the order named and none other, of any deceased resident who served honorably in the military or naval forces, as provided in this section, shall be paid the sum or allowance that such deceased resident would be entitled to receive hereunder if such deceased resident had lived. Provided, that no one person entitled to receive the bonus herein provided shall receive an amount exceeding two hundred and fifty dollars; and, provided, that no person shall be entitled to receive the bonus herein provided, who being in the military or naval service of the United States of America subsequent to the sixth day of April, nineteen hundred and seventeen, refused on conscientious, political or other grounds to subject himself to military discipline or to render unqualified service; and provided further, that no person shall be entitled to receive the bonus herein provided who was not a bona fide resident of the state of Missouri at least during the twelve months prior to the sixth day of April, nineteen hundred and seventeen, or who has received a state bonus from any other state in the union.

Approved March 25, 1921.

---

[H. J. and C. R. No. 7.]

## PROPOSED CONSTITUTIONAL AMENDMENT RELATING TO PAY OF MEMBERS OF THE GENERAL ASSEMBLY AND EXPENSES OF COMMITTEE.

JOINT AND CONCURRENT RESOLUTION submitting to the qualified voters of the state of Missouri, a proposal to amend section 16 of article IV of the Constitution of Missouri, relating to "pay of members of the general assembly and expenses of committees."

*Be it resolved by the House of Representatives, the Senate concurring therein:*

That at the general election to be held on the first Tuesday, following the first Monday in November, 1922, the following

amendment to the Constitution of Missouri, relating to the compensation of members of the general assembly of the state of Missouri, shall be submitted to the qualified voters of said state, to wit:

**Section 1.** That section 16 of article 4 of the Constitution of Missouri, be and the same is hereby amended, by striking out the word "five" in the third line of said section, and inserting in lieu thereof the word "ten," and be further amended by striking out the word "seventy" in the fourth line of said section, and inserting in lieu thereof, the word "one hundred," and be further amended by striking out the word "five" in the seventh line of said section and inserting in lieu thereof the word "ten," so that said section 16 of article 4, aforesaid, when amended shall read as follows:

**Sec. 16. Pay of members and employees—expenses of committees.**—The members of the general assembly shall severally receive from the public treasury such compensation for their services as may, from time to time, be provided by law, not to exceed ten dollars per day for the first one hundred days of each session, and after that not to exceed one dollar per day for the remainder of the session, except the first session held under this Constitution, and during revising sessions, when they may receive ten dollars per day for one hundred and twenty days, and one dollar per day for the remainder of such session. In addition to per diem, the members shall be entitled to receive traveling expenses or mileage, for any regular and extra session not greater than now provided by law; but no member shall be entitled to traveling expenses or mileage for any extra session that may be called within one day after an adjournment of a regular session. Committees of either house, or joint committees of both houses, appointed to examine the institutions of the state, other than those at the seat of government, may receive their actual expenses, necessarily incurred while in the performance of such duty; the items of such expenses to be returned to the chairman of such committee, and by him certified to the state auditor, before the same, or any part thereof, can be paid. Each member may receive at each regular session an additional sum of thirty dollars, which shall be in full for all stationery used in his official capacity, and all postage, and all other incidental expenses and perquisites; and no allowance or emoluments, for any purpose whatever, shall be made to or received by the members, or any member of either house, or for their use, out of the contingent fund or otherwise, except as herein expressly provided; and no allowance or emolument, for any purpose whatever, shall ever be paid to any officer, agent, servant or employe of either house of the general assembly, or of any committee thereof, except such per diem as may be provided for by law, not to exceed five dollars.

Approved March 25, 1921.

[H. J. and C. R. No. 9.]

## PROPOSED CONSTITUTIONAL AMENDMENTS RELATING TO POWER OF GENERAL ASSEMBLY TO CONTRACT OR AUTHORIZE DEBT OR LIABILITY FOR PURPOSE OF CONSTRUCTING HARD SURFACED PUBLIC ROADS.

JOINT AND CONCURRENT RESOLUTION to amend section 44a of article IV of the Constitution of Missouri by inserting the words "and interest" between the words "principal" and "of" in line 19 of said section.

*Be it resolved by the House of Representatives, the Senate concurring therein:*

That at the general election to be held on the Tuesday next following the first Monday in November, 1922, or at a special election to be called by the governor in his discretion prior to such general election, there shall be submitted to the electors of the state, for their approval or rejection, an amendment to the Constitution of the state amending section 44a of article IV thereof by inserting between the words "principal" and "of," as the same appear in line 19 of said section 44a, the words, "and interest" so that said section 44a, when amended, will read as follows:

**Section 44a.** In addition to the exceptions made and created in section 44, the general assembly shall have the power from time to time, for the purpose of constructing hard surfaced public roads, in each county of the state, to contract or to authorize the contracting of a debt or liability on behalf of the state, and to issue bonds or other evidences of indebtedness thereof not exceeding, in the aggregate sixty millions of dollars, such bonds to bear interest at a rate not exceeding five per centum per annum, payable semi-annually, and maturing not later than thirty years from the date they bear. The said bonds and the interest that will accrue thereon shall be paid out of a fund to be provided by the levy and collection of a direct annual tax upon all taxable property in the state. Any motor vehicle registration fees or license fees or taxes, authorized by law, except the property tax thereon, less the cost and expense of collection and the cost of maintaining any state highway department or commission, authorized by law, shall after the issuance of such bonds, and so long as any bonds herein authorized are unpaid, be and stand appropriated without legislative action for and to the payment of the principal and interest of the said bonds, and shall be credited to a sinking fund to be provided for by law. It shall be the duty of the state auditor, annually, on or before the first day of July, to determine the rate of taxation necessary to raise the amount of money needed for that year to pay the principal and interest maturing in the next succeeding year, taking into consideration available funds, delinquencies and the cost of collection. The auditor shall annually certify the rate of taxation so determined to the clerk of the county court of each county and

Case 1:24-cv-00174-MAD-TWD Document 42-2 Filed 02/14/25 Page 94 of 127



to the assessor or other officer in the city of St. Louis whose duty it may be to make up and certify the tax books wherein are extended the state taxes. It will be the duty of said clerks and the said assessor or other proper officer in the city of St. Louis to extend upon the tax books the taxes to be collected and certify the same to the collector of the revenue of their respective counties, and the city of St. Louis, who shall collect such taxes at the same time and in the same manner and by the same means as are now or may hereafter be provided by law for the collection of state and county taxes, and pay the same into the state treasury. The legislature shall enact such laws as may be necessary to carry into effect this amendment.

Approved March 25, 1921.

---

[J. and C. R. No. 12.]

## PROPOSED CONSTITUTIONAL AMENDMENT SUBMITTING AN AMENDMENT TO ENABLE WOMEN TO HOLD ANY OFFICE IN THIS STATE.

JOINT AND CONCURRENT RESOLUTION submitting to the qualified voters of Missouri an amendment to the Constitution thereof so as to enable women to hold any office in this state.

*Be it resolved by the House of Representatives, the Senate concurring therein, as follows:*

That at the next general election, or at a special election called by the governor in his discretion, prior to such general election there shall be submitted to the qualified electors of this state for adoption, the following amendment to the Constitution of the state of Missouri:

**Section 1.** No person shall be disqualified from holding office in this state on account of sex, and those provisions in the Constitution of Missouri requiring that persons, to be eligible for certain offices, must have been qualified voters for a certain number of years, shall not apply to women who have the necessary qualifications of citizenship until after the nineteenth amendment to the Constitution of the United States shall have been in effect an equivalent number of years.

Approved March 25, 1921.

---

[H. J. and C. R. No. 14.]

## PROPOSED CONSTITUTIONAL AMENDMENT REQUIRING GENERAL ASSEMBLY TO PROVIDE FOR COLLECTION OF AN ANNUAL TAX, OR LICENSE FEE, ON MOTOR VEHICLES.

JOINT AND CONCURRENT RESOLUTION submitting to the qualified voters of the state of Missouri an amendment to article 4 of the Constitution of the state of Missouri requiring the general assembly to provide for the collection of an annual tax, or license fee, on motor vehicles and to establish such rate of tax or schedule of fees based upon the horsepower, weight or value of such motor vehicle, to be submitted to the voters

**of the next general election after the adoption of this resolution or at the discretion of the governor, at a special election to be called in the discretion of the governor prior thereto.**

*Be it resolved by the House of Representatives, the Senate concurring therein:*

That the general election to be held on the Tuesday next following the first Monday in November, 1922, or at a special election to be called in the discretion of the governor, there should be submitted to the voters an amendment to article 4 of the Constitution of the state of Missouri, a new section to be known as section 44b, to read as follows:

**Section 44b.** In addition to the exceptions made, granted and provided in section 44 of article 2 of the Constitution of Missouri, the general assembly of the state of Missouri may provide by a new law for the levy and collection of an annual license tax or fee upon all motor vehicles within the state and may establish the rate of such license tax or fee based upon the horsepower, weight and value of each motor vehicle.

Approved March 25, 1921.

# Amendments to the Constitution Adopted November 2, 1920.

(Published in accordance with the provisions of an act approved March 10, 1905.)

## Framing of Charters in Certain Cities.

That sections 16 and 17 of article IX of the Constitution of Missouri is hereby repealed and the following two sections enacted in lieu thereof:

**Section 16. Charter framed by large cities.**—Any city having a population of more than one hundred thousand inhabitants may frame and adopt a charter for its own government, consistent with and subject to the Constitution and laws of the state in the following manner: The legislative authorities of the city may provide, by ordinance, for submission to the voters the question: "Shall a commission be chosen to frame a charter?" If such ordinance becomes effective more than sixty days before the next election such question shall be submitted at such election and if not, then at the next general election thereafter, except as herein otherwise provided. Such question shall also be submitted, when requested, by a petition signed by 10 per cent of the qualified voters of such city, filed with the board of election commissioners or such board or officials as may be in charge of municipal elections in such city. If such petition prays for a special election and is signed by twenty per cent of the qualified voters of such city, a special election shall be held in such city not less than sixty days, nor more than ninety days, after the filing of such petition. The percentage of electors required to sign any petition provided for herein shall be based upon the total number of electors voting at the last preceding general municipal election. The petitions herein provided for shall be canvassed by the board of election commissioners or other officials having charge of municipal elections in such city, and its determination as to the sufficiency of such petitions shall be final. The question of whether or not a commission shall be chosen to frame a new charter and the names of electors or sets of names of electors of the city, who are candidates for the proposed commission, shall be printed on the same ballot, but no candidate, or list of candidates, shall bear the name, heading or label of any political party which has, prior to such election, had candidates for state or federal offices. Candidates for the proposed commission shall be nominated by petition signed by not less than two per cent of the qualified voters of such city, and filed with the board of election commissioners, or other

officials having charge of municipal elections in such city, at least thirty days prior to such election; provided that in no case shall the signatures of more than one thousand voters be required to nominate a candidate. If a majority of electors voting on the question of whether or not a charter commission shall be chosen to frame a charter, vote in the affirmative, then the thirteen candidates receiving the highest number of votes shall constitute such commission. Any charter so framed shall be submitted to the electors of the city and an election held at a time fixed by the charter commission but at least thirty days subsequent to the completion of the charter and not more than one year from the date of the election of such commission. Any part or parts of a charter so framed may be submitted to be voted upon separately. Any alternative section or article may be presented for the choice of the voters and may be voted on separately and accepted or rejected, separately, without prejudice to other articles or sections of the charter. If a charter is adopted at such election that section or article submitted in the alternative, which receives the greatest number of votes, shall be deemed adopted. If any such proposed charter be approved by a majority of the electors voting on the proposition of whether or not such charter shall be adopted, it shall become the charter of such city at the time fixed therein and shall supersede any existing charter and amendments thereof. Duplicate certificates shall be made, setting forth the charter adopted and its ratification, which shall be signed by the chief magistrate of the city, and authenticated by its corporate seal. One of such certified copies shall be deposited in the office of the secretary of state and the other, after being recorded in the records of the city, shall be deposited among the archives of the city and all courts shall take judicial notice thereof. The notice for any election provided for in this section shall be published for at least three weeks in at least one newspaper printed in such city, which newspaper shall have a bona fide sale or circulation in such city of at least two thousand copies of each issue, in which such notice is published, and which newspaper has been published continuously for fifty-two weeks next before the publication of such notice, such publication of such notice to be made at least once each week and on the same day of the week in each of said three weeks, and the last publication to be within two weeks of the date of such election.

**Sec. 17.** Amendments of any charter framed and adopted under the authority of section 16 of article IX of this Constitution may be submitted to the electors by a charter commission in the manner provided for the submission of a complete charter. Amendments may also be proposed by the legislative authority of the city or by a petition of not less than ten per cent of the qualified voters of the city, filed with the board of election commissioners, or officials having charge of municipal elections in such city, setting forth such proposed amendment. The legis-

lative authorities of the city shall at once provide, by ordinance, that any amendment so proposed shall be submitted to the electors at the next election held in the city not less than sixty days after its passage, or at a special election, if called for in the manner proposed for in section 16 of this article. Any proposed amendment submitted to the electors, and approved by a majority of those voting thereon, shall become a part of the city charter at the time and under the conditions fixed in such amendment; and sections or articles may be submitted in the alternative and determined in the same way as hereinbefore provided with reference to alternative sections or articles of a complete charter.

---

### Limit of Indebtedness; Counties, Cities, Civil Subdivisions.

That section 12 of article X of the Constitution of Missouri is hereby repealed and that the following new section is hereby adopted in lieu thereof:

**Section 12.** No county, city, town, township, school district or other political corporation or subdivision of the state shall be allowed to become indebted in any manner or for any purpose to an amount exceeding in any year the income and revenue provided for such year, without the consent of two-thirds of the voters thereof voting on such proposition, at an election to be held for that purpose; nor in cases requiring such assent shall any indebtedness be allowed to be incurred to an amount including existing indebtedness, in the aggregate exceeding five per centum on the value of the taxable property therein, to be ascertained by the assessment next before the last assessment for state and county purposes, previous to the incurring of such indebtedness, except that cities having a population of seventy-five thousand inhabitants or more may, with the assent of two-thirds of the voters thereof voting on such proposition at an election to be held for that purpose, incur an indebtedness not exceeding ten per centum on the value of the taxable property therein, to be ascertained by the assessment next before the last assessment for state and county purposes previous to the incurring of such indebtedness; such proposition may be submitted at any election, general or special; provided that, with such assent any county may be allowed to become indebted to a larger amount for the erection of court house or jail, or for the grading, construction, paving, or maintaining of paved, gravelled, macadamized or rock roads and necessary bridges and culverts therein; and provided further, that any county, city, town, township, school district or other political corporation or subdivision of the state, incurring any indebtedness requiring the assent of the voters as aforesaid, shall before or at the time of doing so, provide for the collection of an annual tax sufficient to pay the interest on such indebtedness as it falls due, and also to constitute a sinking fund for the payment of the principal thereof, within twenty years from the time of contracting the same: And provided further, that the corporate authori-

ties of the city of St. Louis are hereby authorized to issue interest-bearing bonds for said city in the amount of five million dollars, at a rate of interest not to exceed four per cent per annum, the principal payable within thirty years from the date of their issue, and the proceeds thereof shall be paid to the corporation organized for the celebration of the Louisiana purchase centennial in said city, to be used by said corporation for said celebration, holding a world's fair or exposition in said city. And said corporate authorities of St. Louis shall be repaid as large a proportionate amount of the aid given by them as shall be repaid to the stockholders of said corporation on the sum subscribed and paid by them, and any surplus remaining from the assets of said corporation after said stockholders and said city shall have been paid in full, shall be divided between said stockholders and said city in proportion to the aggregate amount of said stock so paid in and the amount so loaned by said city; and any amount so received by said city from said corporation shall be paid into the sinking fund of said city for the redemption of its outstanding bonds: Provided, that if, at the election for the adoption of this amendment to the Constitution, a majority of the votes cast within the limits of said city of St. Louis voting for and against this amendment shall be against its adoption, then no bonds shall be issued under this amendment; and provided further, that no such indebtedness so created shall be in any part thereof paid by the state or from any state revenue, tax or fund, but the same shall be paid by the city of St. Louis alone. Provided, that in the city of St. Louis the amount of bonds now aggregating $6,111,000, that being the amount assumed by said city in the scheme of separation from the county of St. Louis, and the sum of $5,808,000 heretofore prior to January 1, 1901, expended in the construction of waterworks for the city of St. Louis and any bonds which may be hereafter issued by said city in the construction and improvement of waterworks, the payment of the interest whereon and the principal whereof shall be provided from the revenues of said waterworks; that is to say, the amount of said bonds which shall be outstanding at the time shall not be included in the computation of the existing bonded indebtedness in determining the amount of bonds authorized to be issued by said city with the assent of two-thirds of the voters under the provisions of this article, but said city shall be authorized at any time to issue bonds, with the assent aforesaid, to an amount, including outstanding indebtedness, other than that above named, to the amount of ten per cent, of the value of the taxable property in said city, to be ascertained as above provided, and said city shall have power, with such assent of the voters, to issue bonds for the construction and improvement of waterworks, the interest whereon and the principal whereof shall be provided for from the income of said waterworks. Said city shall establish a sinking fund for the payment of the bonds so authorized according to the

times fixed for the maturity of the same. Provided, further, that any city which now has or may hereafter attain a population of seventy-five thousand or more inhabitants may acquire, by purchase, condemnation or construction, waterworks, gas works, electric light works, street railways, telegraph and telephone systems, heating plants, ice or refrigeration plants, or any other plant, system or public service institution, within or outside of the limits of such city, for the use of the city or its citizens, and for the purpose of paying therefor, in whole or in part, may issue public utilities bonds, which public utilities bonds shall not be included in the liabilities or indebtedness of the city limited by the prior provisions of this section; but the total amount of such public utilities bonds to be issued by such city shall not exceed twenty per centum of the value of the taxable property in said city, to be ascertained as above specified. The principal of said public utilities bonds shall not constitute an obligation of the city enforcible out of the funds raised by taxation. Such city may also issue its bonds, other than public utilities bonds, for the payment, in whole or in part, for such public utilities, and such bonds, other than public utilities bonds, shall constitute a direct obligation of the city, but the total amount of such bonds, other than public utilities bonds, shall not exceed in the aggregate ten per centum of the taxable property therein, as hereinbefore provided, but such bonds, other than public utilities bonds, shall require the assent of two-thirds of all the legal votes cast on that proposition. The ordinance authorizing the purchase, condemnation or construction of such public service plant or system shall provide what portion, if any, of the cost thereof shall be paid by issue of public utilities bonds, and what portion, if any, shall be paid by issue of general bonds of the city, other than public utilities bonds. The principal and the interest of such public utilities bonds shall be paid out of the earnings or sale of the utilities plant or system for the acquisition of which said issue was made, but the city may thereafter provide, by ordinance, for the payment in any year of any part of the interest or principal of said bonds due in that year, out of the general revenue of that year raised by general taxation. Such city shall have power to execute its mortgage or mortgages on any such utility, or any addition thereto, or extension thereof, to secure the payment of such public utilities bonds, and in case of default in the payment of such public utilities bonds, and the interest thereon or interest thereon, said bondholders, or their representatives, may appeal to any court of competent jurisdiction, sitting in the county or city in which such city is located, and said court may, in its discretion, if said default continue, appoint a receiver to take charge of such property, and such receiver shall operate said property pending such proceeding in such court, and until a final decree of foreclosure in such proceeding, and for a period of one year thereafter, during which period the city may, upon payment to the

bondholders of all indebtedness past due, and court costs, and receiver's obligations, retake said property, subject to its unmatured obligations. If said property is not thus retaken by the city in said period of redemption, said receiver shall deliver said property to such party, as the court in such action may order, and thereupon all liability of the city on said bonds shall cease and determine and its rights as owner of said utility or plant shall cease, and determine, and thereafter said utility or plant shall be operated by the party named in said order of courts, or his successors or assigns, in conformity with and subject to the provisions of the ordinance authorizing the acquisition or purchase or construction of said public utility or plant, and the issuance of bonds therefor; but such city shall not issue any such public utilities bonds without the assent of four-sevenths of the voters thereof, voting on that proposition, at an election to be held for that purpose, and such proposition may be submitted at a special election or at a general election, in either of which events if four-sevenths of all of the legal votes cast on such proposition are in favor of the issue of said bonds, the city shall have authority to issue the same. Such utility may be acquired by condemnation proceedings in the same manner that such city may acquire real estate for public purposes, or in such other manner as may be provided by law. Such city may, by a vote of the people in the manner herein provided, take up any public utilities bonds and issue its general bonds in lieu thereof, and may take up any general bonds issued on account of any public utility and issue public utilities bonds in lieu thereof, whenever there exists such debt-making power of the city as will authorize the issue of such new bonds, but no substitution shall be made without the consent of the holders of such bonds.

---

## Road Districts; Authorizing Special Tax Levy.

That article X of the Constitution of Missouri is hereby amended by adding thereto the following section, to be known as section 23, article X, Constitution of Missouri:

**Sec. 23.** In addition to the taxes now authorized to be levied for county purposes, under and by virtue of section 11 of article 10 of the Constitution of this state, and in addition to the special levy for road and bridge purposes authorized by section 22 of article 10 of the Constitution of this state, it shall be the duty of the county court of any county in this state, when authorized so to do by a majority of the qualified voters of any road district, general or special, voting thereon at an election held for such purpose to make a levy of not to exceed fifty cents on the one hundred dollars valuation on all property within such district, to be collected in the same manner as state and county taxes are collected, and placed to the credit of the road district authorizing such special levy. It shall be the duty of the county court, on petition of not less than ten qualified voters and tax-payers resid-

ing within any such road district, to submit the question of authorizing such special election to be held for that purpose, within twenty days after filing of such petition.

---

**Bonds for Road Building; Proposed Issue, $60,000,000.00.**

That article IV of the Constitution of Missouri is hereby amended, by adding a new section, between section 44 and section 45, to be known as section 44a:

**Sec. 44a.** In addition to the exceptions made and created in section 44, the general assembly shall have the power, from time to time, for the purpose of constructing hard surfaced public roads, in each county of the state, to contract or to authorize the contracting of a debt or liability on behalf of the state, and to issue bonds or other evidences of indebtedness thereof not exceeding, in the aggregate, sixty millions of dollars, such bonds to bear interest at a rate not exceeding five per centum per annum, payable semi-annually, and maturing not later than thirty years from the date they bear. The said bonds and the interest that will accrue thereon shall be paid out of a fund to be provided by the levy and collection of a direct annual tax upon all taxable property in the state. Any motor vehicle registration fees or license fees or taxes, authorized by law, except the property tax thereon, less the cost and expense of collection and the cost of maintaining any state highway department or commission, authorized by law, shall, after the issuance of such bonds, and so long as any bonds herein authorized are unpaid, be and stand appropriated without legislative action for and to the payment of the principal of the said bonds, and shall be credited to a sinking fund to be provided for by law. It shall be the duty of the state auditor, annually, on or before the first day of July, to determine the rate of taxation necessary to raise the amount of money needed for that year to pay the principal and interest maturing in the next succeeding year, taking into consideration available funds, delinquencies and the cost of collection. The auditor shall annually certify the rate of taxation so determined to the clerk of the county court of each county and to the assessor or other officer in the city of St. Louis whose duty it may be to make up and certify the tax books wherein are extended the state taxes. It will be the duty of said clerks and the said assessor or other proper officer in the city of St. Louis to extend upon the tax books the taxes to be collected and certify the same to the collector of the revenue of their respective counties, and the city of St. Louis, who shall collect such taxes at the same time and in the same manner and by the same means as are now or may hereafter be provided by law for the collection of state and county taxes, and pay the same into the state treasury. The legislature shall enact such laws as may be necessary to carry into effect this amendment.

**Cities: Waterworks, Electric Light and Ice Plants.**

That section 12a of article 10 of the Constitution of Missouri, be and the same is hereby amended by striking out the words and figures, "nor less than two thousand (2000) inhabitants," in the second line of said section 12a of article 10, and be further amended by striking out the words and figures, "five (5)" in line 6 of said section 12a of article 10, and inserting in lieu thereof the words and figures, "ten (10)," and that said section 12a of article 10, aforesaid, be further amended by inserting between the words "waterworks" and "electric," in the 8th line of said section 12a of article 10, aforesaid, the words "ice plants," so that said section 12a of article 10, aforesaid, when amended shall read as follows:

**Sec. 12a. Certain cities allowed to incur additional indebtedness for waterworks, ice plants and light plants.**—Any city in this state, containing not more than thirty thousand (30,000) inhabitants, may, with the assent of two-thirds ($\frac{2}{3}$) of the voters thereof voting at an election held for that purpose, be allowed to become indebted in a larger amount than specified in section 12 of article 10 of the Constitution of this state, not exceeding an additional ten (10) per centum on the value of the taxable property therein, for the purpose of purchasing or constructing waterworks, ice plants, electric or other light plants, to be owned exclusively by the city so purchasing or constructing the same: Provided, that any such city incurring any such indebtedness requiring the assent of the voters, as aforesaid, shall have power to provide for, and before or at the time of incurring such indebtedness shall provide for the collection of an annual tax, in addition to the other taxes provided for by this Constitution, sufficient to pay the interest on such indebtedness as it falls due, and also to constitute a sinking fund for the payment of the principal thereof within twenty (20) years from the time of contracting the same, any provisions in this Constitution to the contrary notwithstanding.

---

**Pensions for Blind; Levy of Tax.**

That article IV, section 47, be and the same is hereby amended by adding after the words "Provided further, that nothing in this Constitution contained shall be construed as prohibiting the general assembly from granting, or authorizing the granting of, pensions to the deserving blind, as may be provided and regulated by law," as the same occurs in lines fifteen and sixteen of said section, the following words, "Provided further, that the general assembly of the state of Missouri shall cause an annual tax of not less than one-half of one cent nor more than three cents on the one hundred dollars' valuation of the taxable property of the state to be levied for the purpose of providing a fund to be devoted in the manner provided by law to the pensioning of the deserving blind. If any balance shall exist in such fund after the deserving blind have been pensioned, then the same, or so much

thereof as may be necessary, may be used for the support of the commission for the blind. And if there shall be a balance in said fund after the blind have been pensioned and the commission for the blind has received adequate support, then the same shall be transferred to the public school fund. Said tax shall be levied and collected annually in the same manner as other state taxes are levied and collected, and such fund shall be subject to appropriation for above purposes by the general assembly."

---

**Soldiers' Settlement Fund; Bond Issue, $1,000,000.00.**

That article IV, section 44, Constitution of Missouri is amended by addition of the following provisions to be known as subdivision 4, article IV, section 44:

**Subdivision four, sec. 44, article IV.**—The object of this amendment is, in recognition of military service, to provide employment and rural homes for soldiers, sailors, marines, and others who have served with the armed forces of the United States in the European war or other wars of the United States, including former American citizens who served in allied armies against the central powers and have been repatriated, and who have been honorably discharged, hereafter referred to as "soldiers;" and to accomplish such purposes by co-operation with the agencies of the United States engaged in work of a similar character. To provide the necessary funds for the state of Missouri to co-operate with the agencies of the United States, the contracting of the liability of the state of Missouri by the issuance of its bonds in an aggregate sum, not to exceed one million dollars, is hereby authorized and directed, said bonds to be in the denomination of one thousand or five hundred dollars each, or of both denominations (as the state board of fund commissioners may determine) and be payable thirteen years from the issuance thereof; shall be payable to bearer in lawful money of the United States, and shall bear interest at a rate not to exceed four and one-half per centum a year (as the state board of fund commissioners may determine), payable semi-annually on the first days of January and July of each year, and to that end suitable coupons shall be attached to each bond for the payment of said interest; each coupon shall have a facsimile of the signature of the state treasurer engraved thereon. Said bonds shall be redeemable at the option of the state after eight years from date; shall be signed by the governor, and be countersigned by the secretary of the state, with the great seal of the state attached; and shall be registered by the state auditor to which he shall certify on each bond, and authenticate such registration by his signature and his official seal attached; said bonds, when so prepared and executed, under the supervision of the state board of fund commissioners, shall be sold to the best advantage by said board, but for not less than par. The proceeds of said sales or sale shall constitute a fund to be designated as the

soldiers' settlement fund, and shall be used exclusively as a revolving fund by the soldier settlement board or department for such period of time as it may designate, and for such projects of soldier settlement and at such costs as are approved by the governor, and requisitions upon the soldiers' settlement fund shall bear the governor's approval, after which, this fund with its accrued earnings, shall be returned to the general revenue fund of the state. Contract or contracts for expenditures or loans to carry out the purpose of this act in excess of said one million dollars, with interest collected thereon, shall, to the amount of said excess, be illegal and void and forever non-payable.

**Sec. 2. Levy authorized for interest and sinking fund.**—That the general assembly shall, and does hereby levy an annual tax of one cent on the one hundred dollars valuation of the taxable property of the state for the payment of the accuring interest on the said bonds, and for the creation of a sinking fund for the payment thereof, said taxes, beginning with the year 1920, to be levied and collected annually as in case of other state taxes in this state, until said bonds are fully paid.

---

**Soldiers' Votes; Absent Account of Military Service.**

That section 11, of article 8, Constitution of Missouri is hereby repealed and a new section adopted in lieu thereof:

The legislature shall, by general law, make provision enabling qualified electors of this state, absent from the state on account of military service, to vote at general and special elections.

---

## Prohibition.

The following amendment to the Constitution of the United States, having been ratified by the general assembly as a part of and as an amendment of the Constitution of the United States was ratified by the referendum of the state of Missouri:

"ARTICLE I.

"**Section I.** After one year from the ratification of this article the manufacture, sale, or transportation of intoxicating liquors within, the importation thereof into, or the exportation thereof from the United States and all territories subject to the jurisdiction thereof for beverage purposes is hereby prohibited.

"**Sec. II.** The congress and the several states shall have concurrent power to enforce this article by appropriate legislation.

"**Sec. III.** This article shall be inoperative unless it shall have been ratified as an amendment to the Constitution by the legislature of the several states, as provided in the Constitution, within seven years of the date of the submission hereof to the states by the congress."

*Therefore, be it resolved by the Senate, the House of Representatives concurring therein:*

**Section I.** That the said proposed amendment to the Constitution of the United States of America be, and the same is hereby, ratified by the general assembly of the state of Missouri as a part of and as an amendment to the Constitution of the United States.

**Sec. II.** That certified copies of this preamble and joint and concurrent resolution be forwarded by the governor of this state to the secretary of state at Washington, to the presiding officer of the United States senate, and to the speaker of the house of representatives of the United States.

Approved January 17, 1919.

---

## Providing for Constitutional Convention.

That article XV of the Constitution of the state of Missouri, providing the mode of revising and amending the Contitution, be and the same is hereby repealed and the following new article enacted in lieu thereof, to be known as article XV, providing the mode of revising and amending the Constitution, and for calling a constitutional convention, and which shall read as follows:

### ARTICLE XV.

Providing the mode of revising and amending the Constitution and for calling a constitutional convention.

**Section 1.** This Constitution may be revised and amended only in pursuance of the provisions of this article or as otherwise provided in this Constitution.

**Sec. 2.** The general assembly may, at any time, propose amendments to this Constitution as a majority of the members elected to each house shall deem expedient, and the vote thereon shall be taken by yeas and nays, and entered on the journal. The amendments proposed, either by the general assembly or by initiative petition, shall be submitted to the electors of the state for their approval or rejection, by official ballot title as may be provided by law, on one independent and separate ballot without any emblem or party designation whatever, at the next general election, or at a special election called by the governor in his discretion prior to such general election, at which he may submit any one or more of such proposed amendments. No proposed amendment shall contain more than one amended and revised article of this Constitution or one new article which shall not contain more than one subject and matters properly connected therewith. Each proposed amendment shall be published once a week for four consecutive weeks next preceding such election, in at least one newspaper in each county of the state where a newspaper is published. If a majority of the

electors of the state voting for and against any one of such amendments shall vote for such amendment, the same shall become a part of the Constitution, and shall go into force and effect at the end of thirty days after such election. When more than one amendment shall be submitted at the same time they shall be so submitted as to enable the electors to vote on each amendment separately.

**Sec. 3.** The general assembly may at any time authorize by law that a vote of the electors of the state be taken upon the question, "Shall there be a convention to revise and amend the Constitution?" which shall be submitted to the electors on a separate ballot without party designation of any kind, at either a special or general election, as the general assembly may provide, and if a majority of the electors voting for and against the calling of a convention shall vote for a convention, the governor shall issue writs of election to the sheriffs of the different counties, ordering the election of delegates to the convention, on a day not less than three nor more than six months after that on which said question shall have been voted on. The electors of each senatorial district of the state, as then organized, shall elect two delegates as herein provided at such election, and the electors of the state voting at the same election shall elect fifteen delegates-at-large, such election to be conducted as provided by law; and each delegate shall possess the qualifications of a senator; and no person holding any other office of trust or profit (national guard officers, school directors, justices of the peace and notaries public excepted) shall be eligible to be elected a delegate to the convention nor during the term for which he shall have been elected or appointed. In order to secure representation from different political parties in each senatorial district, each political party as then authorized by law to make nominations for the office of state senator in each senatorial district shall nominate only one candidate for delegate from such senatorial district, and such candidate shall be nominated in such manner as may be prescribed by the senatorial committee of the respective parties, and a certificate of nomination shall be filed in the office of the secretary of state at least thirty days before such election, and such candidate shall be voted for, each on a separate ballot with emblem or party designation, and each elector shall have the right to vote for one of such candidates, and the two candidates receiving the highest number of votes in each senatorial district shall be elected; and all candidates for delegates-at-large shall be nominated by nominating petitions only, which shall be filed in the office of the secretary of state at least thirty days before any such election and shall be verified in the same manner as may be provided by law for initiative petitions, and until otherwise provided by law such petitions shall be signed by electors of the state, equal in number to at least five percentum of the entire vote cast for governor at the last general election

in the senatorial district in which such candidates reside; and all candidates for delegates-at-large shall be voted for upon one independent and separate ballot without any emblem or party designation whatever, and the fifteen candidates for delegates-at-large receiving the highest number of votes shall be elected. Not less than fifteen days before the election, the secretary of state shall certify to the county clerk of the county the name of each person nominated for the office of delegate from the senatorial district in which the county, or any part of it, is included, and the names of all persons nominated for delegates-at-large. The delegates so elected shall be convened by proclamation by the governor within six months after their election at the seat of government. Upon the convening of the convention all delegates shall take an oath or affirmation to support the constitution of the United States and of the state of Missouri, and to faithfully discharge their duties as delegates of the convention, and shall receive for their services the sum of ten dollars per diem and mileage as provided by law for members of the general assembly. A majority of the delegates of the convention shall constitute a quorum for the transaction of business, and no Constitution or amendment to this Constitution shall be submitted for approval or rejection to the electors of the state as herein provided, unless by the assent of a majority of all the delegates elected to the convention, the yeas and nays being entered on the journal to be kept. The convention shall have power to appoint such officers, employes and assistants as it may deem necessary, and fix their compensation, and to provide for the printing of its documents, journals, proceedings and a record of its debates, and to appropriate money to pay for the expenditures incurred. The sessions of the convention shall be held with open doors, it shall determine the rules of its own proceedings, choose its own officers, and be the judge of the election, returns and qualifications of its delegates. In case of a vacancy, by death, resignation or other cause, of any delegate elected to the convention, such vacancy shall be filled by the governor by the appointment of another delegate from the same political party to which the delegate causing the vacancy belonged. Any proposed Constitution or constitutional amendments which shall have been adopted by such convention shall be submitted to a vote of the electors of the state in such manner and containing such separate and alternative propositions and on such official ballot as may be provided by such convention, at a special election, on a day to be therein fixed, not less than sixty days nor more than six months after the adjournment of the convention. Upon the approval of such Constitution or constitutional amendments in the manner provided in the last preceding section such Constitution or constitutional amendments shall go into force and effect at the end of thirty days after such election.

The result of such election shall be made known by proclamation by the governor.

**Sec. 4.** The question "Shall there be a convention to revise and amend the Constitution?" shall be submitted to the electors of the state at a special election to be held on the first Tuesday in August, one thousand nine hundred and twenty-one, and at each general election next ensuing the lapse of twenty successive years since the last previous submission thereof, and in case a majority of the electors voting for and against the calling of a convention shall vote for a convention, the governor shall issue writs of election to the sheriffs of the different counties, ordering the election of delegates, and the assembling of such convention, as is provided in the preceding section.

---

(Note—Last amendment submitted by initiative.)

# MEMORANDA.

The 51st General Assembly which met in Jefferson City Wednesday, January 5, 1921, continued in session up to and including March 21, 1921, at noon, and on the 20th day of April, 1921, Governor Hyde returned the last of the enrolled bills to the Secretary of State. Those approved form this volume. Those objected to by the Governor are here enumerated by number and title, together with a summary of the items eliminated from the several appropriation bills, with the Governor's reasons for such elimination.

## LIST OF BILLS VETOED.

Senate bill No. 28:

AN ACT to amend section 9836 of article 1, chapter 90, relating to private corporations of the Revised Statutes of the state of Missouri for the year 1919 by striking out certain words in said section and inserting certain other words in lieu thereof.

Senate bill No. 29:

AN ACT to amend section 13106 of article 19, chapter 119 of the Revised Statutes of Missouri for 1919 relating to taxation of incomes, by striking out certain words out of said section and inserting certain other word in lieu thereof, and to repeal section 13111 of article 19, chapter 119, of the Revised Statutes of the state of Missouri for the year 1919 and to enact a new section in lieu thereof to be known as section 13111.

Senate bill No. 69:

AN ACT to amend section 6782 of the Revised Statutes of Missouri for the year 1919, relating to state industrial inspectors.

Senate bill No. 95:

AN ACT to amend section 370 of article 16 of chapter 1 of the Revised Statutes of Missouri of 1919, by inserting in line one, after the word "males" and before the word "of," the words "and females" and by striking out in line two the words "and females of the age of eighteen years."

Senate bill No. 171:

AN ACT defining and regulating the practice of chiropractic; providing for a state board of examiners; prescribing qualifications of applicants and fees to be charged for examination; providing for the granting of license to persons practicing in this state for one year, prior to the time this act shall go into effect; providing for the examination of applicants who have been practicing chiropractic for less than one year in this state prior to the passage of this act; providing for examination of students who are in attendance in a chiropractic school or college prior to the passage of this act; providing for registration of applicants from other states; providing for revocation of license granted by the board and providing penalties for violation hereof, with an emergency.

Senate bill No. 228:

AN ACT to amend section 13071 of the Revised Statutes of 1919, by inserting the words "and manufacturers" between the word "merchants" and the word "statements" in the 28th line thereof, by striking out the word "statements" between the word "merchants" and the word "and" in the 77th line thereof, and inserting in lieu thereof the words "and manufacturers' statements provided for by law," and adding thereto a provision concerning the payment of all costs and expenses of the collection of state and city licenses and taxes and the costs and expenses of the board of merchants' and manufacturers' tax equalization.

Senate bill No. 230:

AN ACT to amend section 12816, Revised Statutes of 1919, by inserting the words "except in the city of St. Louis" between the word "assessor" and the word "shall" in the second line thereof and striking out the following words: "provided further, that in the city of St. Louis, the assessor shall perform the duties now performed by county clerks in extending taxes on the assessment books and such other services pertaining thereto, and shall be allowed the same compensation as is allowed county clerks for such service by law" in the tenth, eleventh, twelfth, thirteenth and fourteenth lines thereof.

Senate bill No. 324:

AN ACT to amend article 1 of chapter 21 of the Revised Statutes of Missouri for the year 1919, entitled "courts of record—general powers and duties," by adding two new sections thereto relating to the same subject, said new sections to be numbered and designated as sections 2348a and 2354a, respectively, and therein providing for the holding of special terms of court, and that trials not finished at the end of any term may be concluded or continued, as the court may direct.

Senate bill No. 342:

AN ACT relating to the employment of special physicians in the eleemosynary institutions of this state, and subdivisions thereof.

Senate bill No. 383:

AN ACT to regulate and control the location, maintenance, and operation of burial grounds, cemeteries and graveyards.

Senate bill No. 403:

AN ACT to repeal sections 8256, 8260 and 8261, article 4, chapter 72, Revised Statutes of Missouri 1919, relating to municipal corporations, cities of the third class, and enacting new sections in lieu thereof.

Senate bill No. 408:

AN ACT to amend chapter 1, article 5, of the Revised Statutes of Missouri 1919, entitled administration, sales of personal property, by adding thereto a new section to be known as and numbered section 119a, concerning the sale of personal property, and providing for such sale by the sheriff in certain cases; providing that administrator or executor may purchase at such sale; providing compensation of sheriff in making sale; repealing inconsistent and conflicting acts, with an emergency clause.

Senate bill No. 409:

AN ACT to amend chapter 1, article 6, of the Revised Statutes of Missouri, 1919, entitled "Administration, leasing, repairing, redemption and sale of real estate," by adding thereto a new section to be known as and numbered section 164a, concerning the sale of real estate, and providing for such sale by the sheriff in certain cases; providing that administrator or executor may purchase at such sale; and providing for compensation of sheriff in making sale; repealing inconsistent and conflicting acts, with an emergency clause.

Senate bill No. 450:

AN ACT to amend article XV, Revised Statutes of 1919, by repealing section 12403 of said article and insert in lieu thereof a new section to be known as section 12403.

Senate bill No. 504:

AN ACT relating to railroads, amending article 2, chapter 90, Revised Statutes of Missouri, 1919, by adding a new section to said article to be known as section 9903a, requiring common carriers in certain instances to operate through passenger trains through county seats upon main lines of common carrier and to secure and discharge passengers at said county seats, providing penalty for violation thereof, with an emergency clause.

House bill No. 53:

AN ACT fixing the salary of recorders of deeds in counties in this state having 300,000 inhabitants or more, with an emergency clause.

House bill No. 91:

AN ACT to repeal sections, 8373, 8374, 8376, 8377, 8378, 8379 and 8381 article 5, chapter 72, of the Revised Statutes of Missouri, 1919, and enacting in lieu thereof seven new sections to be known as sections 8373, 8374, 8376, 8377, 8378, 8379 and 8381, relating to alternative form of government for cities of the third class, with an emergency clause.

House bill No. 111:

AN ACT requiring clerks of courts having criminal jurisdiction in all counties and cities, not within the limits of a county having a population of 300,000 inhabitants or more or such as may hereafter have 500,000 inhabitants or more, to keep an accurate and complete record of all bail bonds and recognizances given in criminal cases, containing the name of the principal in the bail bond, the surety or sureties on each bail bond or recognizance, and the amount thereof, and to furnish, whenever requested by the judges of the circuit court exercising criminal jurisdiction, a list of the same, and requiring such clerk to furnish monthly to the police department of such city or county the name of each and every person convicted in said court and the offense for which such person may have been convicted, the date of such conviction, and the term of imprisonment for such conviction, and providing compensation for such services.

House bill No. 210, Com. Sub. for:

AN ACT establishing a state athletic commission and regulating boxing and sparring in the state of Missouri.

House bill No. 233:

AN ACT to amend chapter 72, article 7 of the Revised Statutes of the state of Missouri for 1919, in relation to municipal corporation, by adding thereto a new section to be known as section 8541a, relating to changing the names of streets, with an emergency clause.

House bill No. 401, Com. Sub.:

AN ACT to repeal section 10444, article 2, chapter 95, Revised Statutes of Missouri, 1919, entitled "Provisions relating to railroads, street railroads and common carriers," and to enact in lieu thereof a new section to be known as section 10444.

House bill No. 436:

AN ACT to amend section 12279, of article 7, chapter 111, Revised Statutes of the state of Missouri, 1919, relating to state hospitals, by striking out certain word and figures, and inserting in lieu thereof a certain other word and figures.

House bill No. 451:

AN ACT to amend section 13379, article 2, chapter 123, Revised Statutes of Missouri, 1919, by striking out certain words and inserting other words in lieu thereof, with an emergency clause.

House bill No. 524:

AN ACT providing for the establishment and maintenance of branch board of health laboratories in certain counties, the appointment of superintendents of such laboratories, the expense of equipping and maintaining such laboratories, giving the county court, subject to the approval of the state board of health, the right to fix fees for the services rendered by such laboratories, the disposition to be made of such fees, and with an emergency clause.

House bill No. 691:

AN ACT to repeal section 8962, chapter 72, article 22, Revised Statutes of Missouri, 1919.

House bill No. 693:

AN ACT to amend section 8961, chapter 72, article 22 of the Revised Statutes of Missouri, 1919, relating to the making of estimates of expense of conducting the police department, certifying the same to the council and authorizing the board of police commissioners to pass upon claims, by adding thereto a provision requiring the board of police commissioners to meet with the board of estimate and apportionment in the preparation of the annual budget for the police department.

House bill No. 696:

AN ACT establishing a commission to actively co-operate with the United States Government in the production of a horse fit for army use and prescribing its powers and duties

House bill No. 704:

AN ACT repealing sections 9697, 9698 and 9714, Revised Statutes of Missouri, 1919, relating to public printing and enacting three new sections in lieu thereof.

House bill No. 737:

AN ACT to amend section 11750 of article 2, chapter 108, Revised Statutes of Missouri, 1919, relating to banks.

House bill No. 747:

AN ACT to appropriate money to the public buildings commission for the use and benefit of the eleemosynary and penal institutions of this state for new buildings, equipment, furnishings, improvements and repairs, during the years 1921 and 1922, with an emergency clause.

House bill No. 754:

AN ACT to appropriate money to the public buildings commission for the use and benefit of the state university, and other educational institutions of this state for new building equipment, furnishings, improvements, and repairs during the years 1921 and 1922, with an emergency clause.

## ITEMS VETOED IN APPROVED BILLS.

Under date of April 20, 1921, the Governor returned to the Secretary of State two appropriation bills approved except as to certain items enumerated as follows:

Under the provisions of section 13, article 5, of the Constitution of Missouri, I herewith return you House bill 745 and appended to the same the following statement of items objected to by me, which items are objected to by me and returned without my approval for the reasons hereinafter stated.

I hereby veto, object to and return without my approval items enumerated as follows:

### HOUSE BILL 745.

Section 14d. Appropriating fifty thousand dollars for the payment of percentages of cash premiums to county and district fairs, for the reason that the revenue, considering large appropriations already made for agriculture and for State Fairs, will not permit.

Sec. 19a. Appropriating for the payment of Confederate Pensions the sum of two hundred thousand dollars.

Sec. 24a. Appropriating eight thousand dollars for the salary of the St. Louis Circuit Judges, disapproved because the appropriation for Circuit Judges contained in the judicial bill covers sixty-five Circuit Judges. The last Legislature cut that number down materially so that there will be sufficient funds in that appropriation to cover the two additional Circuit Judges in St. Louis.

Sec. 32. Appropriating to the Fruit Experiment Station at Mountain Grove the item of "twelve thousand dollars for maintenance."

Sec. 34. Appropriating to the Historical Society the two items "cataloging," twenty-five hundred dollars, and the "genealogical" department, forty-five hundred dollars, because of lack of funds.

Sec. 40. Appropriating to the Poultry Experiment Station at Mountain Grove the item, "premium in County shows," ten-thousand dollars, and the item for "improvements and maintenance," eighty-five hundred dollars, for lack of funds.

Sec. 49. Appropriating to the department of land reclamation the sum of $2,475.00 for the reason that the activities of this office have ceased.

Sec. 57. Appropriating to the Public Service Commission for the preparation and publication of a state map, four thousand dollars.

Sec. 72a. Appropriating thirty-five thousand dollars for the establishment of a Negro Demonstration farm for the reason that the act authorizing said farm failed of passage.

Sec. 78. Appropriating $3,750.00 for the relief of H. H. Hohenchild and H. G. Clymer for lack of funds and for the further reason that the same item was vetoed two years ago because "the state holds the receipt of said parties accepting payment in full of said claim against the state."

Sec. 90a. Appropriating $6,791.37 for the relief of A. J. Watkins for lack of funds and for the further reason that said item was vetoed two years ago. "Because the said Watkins accepted the sum of $4,500.00 in full payment of said claim, see session acts of 1909, section 77, at page 24."

Sec. 108a. Appropriating the sum of thirty thousand dollars for the bureau of neglected children, for the reason that this item is covered by a bill of the last session of the legislature creating a home for neglected children, which bill carries an appropriation for this purpose in the sum of fifty thousand dollars.

Sec. 113. Appropriating the sum of thirty-five hundred dollars to pay salaries of the Printing Commission for lack of funds.

Sec. 117. Appropriating the sum of fifty thousand dollars to the Immigration Bureau for the reason that this is covered by an appropriation to the consolidated Agriculture Department to which the duties of the Bureau of Immigration have been related.

## HOUSE BILL 746.

Sec. 49. Appropriating to R. C. Mosby, $192.50; Marvin Crutcher $192.50; Clarence Inglish, $17.50; F. W. Armstrong $121.50; F. W. Armstrong $22.50; F. W. Armstrong $22.50; Frank Armstrong, $35.00; for the reason that I am advised by the State Auditor that no service was rendered to the state in return for these amounts.

Sec. 52a. Appropriating to E. S. Lewis, former Excise Commissioner of the City of St. Louis, the sum of $7,833.33, for the reason that the amount of this item is disproportionate to the service rendered.

## DATE ON WHICH LAWS BECOME EFFECTIVE.

Constitution of Missouri, Article 4, Sec. 36.—"No law passed by the General Assembly, except the general appropriation act, shall take effect or go into force until ninety days after the adjournment of the session at which it was enacted, unless in case of emergency (which emergency must be expressed in the preamble or in the body of the act), the General Assembly shall, by a vote of two-thirds of all the members elected to each house, otherwise direct."

The Legislature having adjourned Monday, March 21, 1921, the laws passed by the Fifty-first General Assembly and not vetoed by the Governor go into effect June 20, 1921.

CHARLES U. BECKER,
Secretary of State.

## ATTESTATION.

STATE OF MISSOURI, }
City of Jefferson. } ss.

I, Charles U. Becker, Secretary of State of the State of Missouri, hereby certify that I have carefully collated the laws and resolutions passed by the Fifty-first General Assembly of the State of Missouri, as contained in the foregoing pages and compared them with the original manuscripts, correcting them thereby. Errors are noted by the use of brackets [inclosing interpolated words, points and figures necessary to the meaning] and black side headings are used for the convenience of the reader but are no part of the laws they precede.

In testimony whereof, I have hereunto set my hand and affixed the Great Seal of the State of Missouri. Done at my office in the City of Jefferson this 20th day of June, A. D. nineteen hundred and twenty-one.

CHARLES U. BECKER,
(Seal) Secretary of State.

# Senatorial Districts.

STATEMENT OF APPORTIONMENT OF SENATORIAL DISTRICTS, APRIL 16, 1921.

This is to certify that, on Saturday, April 16th, 1921, under the provisions of section 7, article 4 of the Constitution of the state of Missouri (the legislature of said state, in its session next after the decennial census of the United States has been taken and the result thereof as to this state ascertained, being the regular session of the 51st General Assembly, having failed to apportion the state into senatorial districts), the undersigned, Arthur M. Hyde, governor of the state of Missouri, Charles U. Becker, secretary of state, and Jesse W. Barrett, attorney-general, having for several days had the matter under consideration, did divide the state of Missouri into thirty-four senatorial districts, as follows:

First district—The counties of Andrew, Atchison, DeKalb, Gentry, Holt, Nodaway and Worth.

Second district—The county of Buchanan.

Third district—The counties of Clay, Clinton, Lafayette, Platte and Ray.

Fourth district—The counties of Caldwell, Daviess, Grundy, Harrison, Livingston and Mercer.

Fifth district—The counties of Adair, Linn, Macon, Putnam and Sullivan.

Sixth district—The counties of Carroll, Chariton, Howard, Randolph and Saline.

Seventh district—The counties of Audrain, Boone, Callaway, Monroe and Ralls.

Eighth district—The counties of Clark, Knox, Lewis, Marion, Scotland, Shelby and Schuyler.

Ninth district—The counties of Franklin, Lincoln, Montgomery, Pike, St. Charles and Warren,

Tenth, eleventh, twelfth and thirteenth districts—The county of Jackson.

Fourteenth district—The counties of Barton and Jasper.

Fifteenth district—The counties of Bates, Cass, Henry and Johnson.

Sixteenth district—The counties of Cedar, Dade, Hickory, Polk, St. Clair and Vernon.

Seventeenth district—The counties of Benton, Camden, Cooper, Moniteau, Morgan and Pettis.

Eighteenth district—The counties of Barry, Lawrence, McDonald, Newton and Stone.

Nineteenth district—The counties of Dallas, Greene, Laclede and Webster.

Twentieth district—The counties of Christian, Douglas, Howell, Ozark, Taney, Texas and Wright.

Twenty-first district—The counties of Cole, Gasconade, Maries, Miller, Osage, Phelps and Pulaski.

Twenty-second district—The counties of Carter, Crawford, Dent, Iron, Oregon, Reynolds, Ripley, Shannon and Washington.

Twenty-third district—The counties of Butler, Bollinger, Cape Girardeau, Stoddard and Wayne.

Twenty-fourth district—The counties of Jefferson, Madison, Perry, St. Francois and Ste. Genevieve.

Twenty-fifth district—The counties of Dunklin, Mississippi, New Madrid, Pemiscot and Scott.

Twenty-seventh district—The county of St. Louis.

Twenty-sixth, Twenty-eighth, Twenty-ninth, Thirtieth, Thirty-first, Thirty-second, Thirty-third and Thirty-fourth districts—The city of St. Louis.

Done at the City of Jefferson, state of Missouri, the sixteenth day of April, in the year of our Lord, one thousand nine hundred and twenty-one.

ARTHUR M. HYDE, Governor.

(Seal) CHARLES U. BECKER, Sec'y of State.

JESSE W. BARRETT, Attorney-General.

Attest: CHARLES U. BECKER, Secretary of State.

# EXHIBIT 18

# ACTS

*of the*

# LEGISLATURE

*of*

# WEST VIRGINIA

REGULAR AND FIRST EXTRAORDINARY
SESSIONS

1925




TRIBUNE PRINTING CO., CHARLESTON, W. VA.

## NOTE BY CLERK OF THE HOUSE OF DELEGATES.

The acts of the first extraordinary session follow immediately after the acts of the regular session and are separated therefrom by a colored insert.

Municipal charters are published in a separate volume.

# CHAPTER 3

(House Bill No. 7—By Mr. Robinson from the Select Committee)

AN ACT to amend and re-enact section seven of chapter one hundred and forty-eight of the code of West Virginia, as amended and re-enacted by chapter fifty-one of the acts of the legislature of West Virginia, one thousand nine hundred and nine, regular session, and as further amended and re-enacted by an act of the legislature of West Virginia, regular session, one thousand nine hundred and twenty-five, relating to offenses against the peace; providing for the granting and revoking of licenses and permits respecting the use, transportation and possession of weapons and fire arms; restricting the manner of the sale and display of weapons and fire arms; imposing liability upon certain persons for the accidental or improper, negligent or illegal discharges of weapons and fire arms; defining the powers and duties of certain officers in the granting and revocation of said licenses and permits, and providing penalties for the violation of this act and any part thereof.

[Passed June 5, 1925; in effect 90 days from passage. Approved by the Governor.]

Sec.

7. (*a*) Penalty for carrying dangerous or deadly weapon without license; second offense; duties of prosecuting attorneys; application for license; what to show; publication; issuance; fee; bond; term of license; territory covered; deputy sheriffs and railway police licenses co-extensive with state; accounting for fees; forms by tax commissioner; certified copy of license to superintendent of department of public safety; list of all licenses to the same; lawful to carry arms on own premises, or from place of purchase and repair, not applicable to employee; permits to express company employees and railway police; bonds; emergency permits; reports of violations, and penalty for failure so to do; certain officers permitted to carry arms; bond; unlawful to carry or use weapon in a manner likely to cause breach of peace; penalty; revocation of license; notice; reinstatement.

7. (*b*) Permits for possession of machine gun and high-powered rifle; regulations; exception of rifle club members and licensed hunters; granting of permit; fee; revocation; confiscation of arms; alien prohibited from owning or possessing arms; display of arms for sale or rent prohibited; report of sales by dealers to superintendent of department of public safety; unlawful to arm alien; penalty for violations of this sub-section; inconsistent acts repealed.

*Be it enacted by the Legislature of West Virginia:*

That section seven of chapter one hundred and forty-eight of the code of West Virginia, as amended and re-enacted by chapter fifty-one of the acts of the legislature of West Virginia of one thousand nine hundred and nine, regular session, and as further amended and re-enacted by the legislature of West Virginia, one thousand nine hundred and twenty-five, regular session, in House Bill number four hundred six, be amended and re-enacted so as to read as follows:

Section 7 (*a*). If any person, without a state license therefor, carry about his person any revolver or other pistol, dirk, bowie-knife, slung shot, razor, billy, metallic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor and upon conviction thereof be confined in the county jail for a period of not less than six nor more than twelve months for the first offense; but upon conviction of the same person for the second offense in this state, he shall be guilty of a felony and be confined in the penitentiary not less than one or more than five years, and in either case fined not less than fifty nor more than two hundred dollars, in the discretion of the court; and it shall be the duty of the prosecuting attorney in all cases to ascertain whether or not the charge made by the grand jury is the first or second offense, and if it shall be the second offense, it shall be so stated in the indictment returned, and the prosecuting attorney shall introduce the record evidence before the trial court of said second offense, and shall not be permitted to use his discretion in charging said second offense nor in introducing evidence to prove the same on the trial; *provided,* that boys or girls under the age of eighteen years, upon the second conviction, may, at the discretion of the court, be sent to the industrial homes for boys and girls, respectively, of the state. Any person desiring to obtain a state license to carry any such weapon within one or more counties in this state shall first publish a notice in some newspaper, published in the county in which he resides, setting forth his name, residence and occupation, and that on a certain day he will apply to the circuit court of his county for such state license; and after the publication of such notice for at least ten days before said application is made and at the time stated in said notice upon application to said court, it may grant such person a license in the following manner, to-wit:

The applicant shall file with said court his application in writing, duly verified, which said application shall show:

*First:* That said applicant is a citizen of the United States of America.

*Second:* That such applicant has been a *bona fide* resident of this state for at least one year next prior to the date of such application, and of the county sixty days next prior thereto.

*Third:* That such applicant is over twenty-one years of age; that he is a person of good moral character, of temperate habits, not addicted to intoxication, and has not been convicted of a felony nor of any offense involving the use on his part of such weapon in an unlawful manner.

*Fourth:* The purpose or purposes for which the applicant desires to carry such weapon and the necessity therefor and the county or counties in which said license is desired to be effective.

Upon the hearing of such application the court shall hear evidence upon all matters stated in such application and upon any other matter deemed pertinent by the court, and if such court be satisfied from the proof that there is good reason and cause for such person to carry such weapon, and all of the other conditions of this act be complied with, said circuit court or the judge thereof in vacation, may grant said license for such purposes, and no other, as said circuit court may set out in the said license (and the word "court" as used in this act shall include the circuit judge thereof, acting in vacation); but before the said license shall be effective such person shall pay to the sheriff, and the court shall so certify in its order granting the license, the sum of twenty dollars, and shall also file a bond with the clerk of said court, in the penalty of three thousand five hundred dollars, with good security, signed by a responsible person or persons, or by some surety company, authorized to do business in this state, conditioned that such applicant will not carry such weapon except in accordance with his said application and as authorized by the court, and that he will pay all costs and damages accruing to any person by the accidental discharge or improper, negligent or illegal use of said weapon or weapons. Any such license granted after this act becomes effective shall be good for one year, unless sooner revoked, as hereinafter provided, and be co-extensive with the county in which granted, and such other county or counties as the court shall designate in the order granting such license; except that regularly appointed deputy sheriffs having license shall be permitted to carry such revolver or other weapons at any place, within the state, while in the performance of their duties as such deputy sheriffs and except that any such license granted to regularly appointed railway police

shall be co-extensive with the state, and all license fees collected hereunder shall be paid by the sheriff and accounted for to the auditor as other license taxes are collected and paid, and the state tax commissioner shall prepare all suitable forms for licenses and bonds and certificates showing that such license has been granted and to do anything else in the premises to protect the state and see to the enforcement of this act.

The clerk of the court shall immediately after license is granted as aforesaid, furnish the superintendent of the department of public safety a certified copy of the order of the court granting such license, for which service the clerk shall be paid a fee of two dollars which shall be taxed as cost in the proceeding; within thirty days after this act becomes effective it shall be the duty of the clerks of each court in this state having jurisdiction to issue pistol licenses to certify to the superintendent of the department of public safety a list of all such licenses issued in his county.

*Provided,* that nothing herein shall prevent any person from carrying any such weapon, in good faith and not for a felonious purpose, upon his own premises, nor shall anything herein prevent a person from carrying any such weapon (unloaded) from the place of purchase to his home or place of residence, or to a place of repair and back to his home or residence; but nothing herein shall be construed to authorize any employee of any person, firm or corporation doing business in this state to carry on or about the premises of such employer any such pistol, or other weapon mentioned in this act for which a license is herein required, without having first obtained the license and given the bond as herein provided; and, *provided, further,* that nothing herein shall prevent agents, messengers and other employees of express companies doing business as common carriers, whose duties require such agents, messengers and other employees to have the care, custody or protection of money, valuables and other property for such express companies, from carrying any such weapon while actually engaged in such duties, or in doing anything reasonably incident to such duties; *provided,* such express company shall execute a continuing bond in the penalty of thirty thousand dollars, payable unto the state of West Virginia, and with security to be approved by the secretary of state of the state

of West Virginia, conditioned that said express company will pay all damages, accruing to anyone by the accidental discharge or improper, negligent or illegal discharge or use of such weapon or weapons by such agent, messenger or other employee while actually engaged in such duties for such express company, in doing anything that is reasonably incident to such duties; but the amount which may be recovered for breach of such condition shall not exceed the sum of three thousand five hundred dollars in any one case, and such bond shall be filed with and held by the said secretary of state, for the purpose aforesaid, but upon the trial of any cause for the recovery of damages upon said bond, the burden of proof shall be upon such express company to establish that such agent, messenger or other employee was not actually employed in such duties for such express company nor in doing anything that was reasonably incident to such duties at the time such damages were sustained; and, *provided further*, that nothing herein shall prevent railroad police officers duly appointed and qualified under authority of section thirty-one of chapter one hundred forty-five of Barnes' code or duly qualified under the laws of any other state, from carrying any such weapon while actually engaged in their duties or in doing anything reasonably incident to such duties; *provided*, such railroad company shall execute a continuing bond in the penalty of ten thousand dollars payable unto the state of West Virginia and with security to be approved by the secretary of state of the state of West Virginia conditioned that said railroad company will pay all damages accruing to anyone by the accidental discharge or improper, negligent or illegal discharge or use of such weapon or weapons by such railroad special police officer whether appointed in this or some other state while actually engaged in such duties for such railroad company, in doing anything that is reasonably incident to such duties, but the amount which may be recovered for breach of such condition shall not exceed the sum of three thousand five hundred dollars in any one case, and such bond shall be filed with and held by the said secretary of state for the purpose aforesaid but upon the trial of any cause for the recovery of damages upon said bond, the burden of proof shall be upon such railroad company to establish that such railroad police officer was not actually em-

ployed in such duties for such railroad company nor in doing anything that was reasonably incident to such duties at the time such damages were sustained; and *provided, further,* that in case of riot, public danger and emergency, a justice of the peace, or other person issuing a warrant, may authorize a special constable and his posse whose names shall be set forth in said warrant, to carry weapons for the purpose of executing a process, and a sheriff in such cases may authorize a deputy or posse to carry weapons, but the justice shall write in his docket the cause and reasons for such authority and the name of the person, or persons, so authorized, and index the same, and the sheriff or other officer shall write out and file with the clerk of the county court the reasons and causes for such authority and the name, or names of the persons so authorized, and the same shall always be open to public inspection, and such authority shall authorize such special constable, deputies and posses to carry weapons in good faith only for the specific purposes and times named in such authority, and upon the trial of every indictment the jury shall inquire into the good faith of the person attempting to defend such indictment under the authority granted by any such justice, sheriff or other officer, and any such person or persons so authorized shall be personally liable for the injury caused to any person by the negligent or unlawful use of any such weapon or weapons. It shall be the duty of all ministerial officers, consisting of the justices of the peace, notaries public and other conservators of the peace of this state, to report to the prosecuting attorney of the county the names of all persons guilty of violating this section, and any person wilfully failing so to do, shall be guilty of a misdemeanor and shall be fined not exceeding two hundred dollars, and shall, moreover, be liable to removal from office for such wilful failure; and it shall likewise be the duty of every person having knowledge of the violation of this act, to report the same to the prosecuting attorney, and to freely and fully give evidence concerning the same, and any one failing so to do, shall be guilty of a misdemeanor and upon conviction thereof shall be fined not exceeding one hundred dollars; *provided, further,* that nothing herein contained shall be so construed as to prohibit sheriffs, their regularly appointed deputies, who actually collect

taxes in each county, and all constables in their respective counties and districts, and all regularly appointed police officers of their respective cities, towns or villages, all jailors and game protectors who have been duly appointed as such, and members of the department of public safety of this state, from carrying such weapons as they are now authorized by law to carry, who shall have given bond in the penalty of not less than three thousand five hundred dollars, conditioned for the faithful performance of their respective duties, which said officers shall be liable upon their said official bond, for the damages done by the unlawful or careless use of any such weapon or weapons, whether such bond is so conditioned or not.

It shall be unlawful for any person armed with a pistol, gun, or other dangerous or deadly weapon, whether licensed to carry same or not, to carry, expose, brandish, or use, such weapon in a way or manner to cause, or threaten, a breach of the peace. Any person violating this provision of this act shall be guilty of a misdemeanor, and upon conviction, shall be fined not less than fifty nor more than three hundred dollars or imprisoned in the county jail not less than thirty nor more than ninety days, or be punished by both fine and imprisonment in the discretion of the court.

Any circuit court granting any such license to carry any of the weapons mentioned in this act, the governor, or the superintendent of the department of public safety, with the consent of the governor, may, for any cause deemed sufficient by said court, or by the governor or by the superintendent of the department of public safety with the approval of the governor aforesaid, as the case may be, revoke any such license to carry a pistol or other weapon mentioned in this act for which a license is required, and immediate notice of such revocation shall be given such licensee in person, by registered mail or in the same manner as provided by law for the service of other notices, and no person whose license has been so revoked shall be re-licensed within one year thereafter; *provided,* that the authority so revoking such license may, after a hearing, sooner reinstate such licensee.

(*b*) It shall be unlawful for any person to carry, transport, or to have in his possession any machine gun, sub-machine gun, and what is commonly known as a high powered rifle, or any

gun of similar kind or character, or any ammunition therefor, except on his own premises or premises leased to him for a fixed term, until such person shall have first obtained a permit from the superintendent of the department of public safety of this state, and approved by the governor, or until a license therefor shall have been obtained from the circuit court as in the case of pistols and all such licenses together with the numbers identifying such rifle shall be certified to the superintendent of the department of public safety. *Provided, further,* that nothing herein shall prevent the use of rifles by *bona fide* rifle club members who are freeholders or tenants for a fixed term in this state at their usual or customary place of practice, or licensed hunters in the actual hunting of game animals. No such permit shall be granted by such superintendent except in cases of riot, public danger, and emergency, until such applicant shall have filed his written application with said superintendent of the department of public safety, in accordance with such rules and regulations as may from time to time be prescribed by said department of public safety relative thereto, which application shall be accompanied by a fee of two dollars to be used in defraying the expense of issuing such permit, and said application shall contain the same provisions as are required to be shown under the provisions of this act by applicants for pistol license, and shall be duly verified by such applicant, and at least one other reputable citizen of this state. Any such permit as granted under the provisions of this act may be revoked by the governor at his pleasure and upon the revocation of any such permit the department of public safety shall immediately seize and take possession of any such machine gun, sub-machine gun, high powered rifle, or gun of similar kind and character, held by reason of said permit, and any and all ammunition therefor, and the said department of public safety shall also confiscate any such machine gun, sub-machine gun, and what is commonly known as a high powered rifle, or any gun of similar kind and character and any and all ammunition therefor so owned, carried, transported or possessed contrary to the provisions of this act, and shall safely store and keep the same, subject to the order of the governor. No alien shall own, keep or possess any firearm of any kind or character. It shall be unlawful for any person, firm or corporation to place or keep

on public display to passersby on the streets, for rent or sale, any revolver, pistol, dirk, bowie knife, slung shot or other dangerous weapon of like kind or character or any machine gun, sub-machine gun or high powered rifle or any gun of similar kind or character, or any ammunition for the same.

All dealers licensed to sell any of the foregoing arms or weapons shall take the name, address, age and general appearance of the purchaser, as well as the maker of the gun, manufacturer's serial number and caliber, and report the same at once in writing to the superintendent of the department of public safety.

It shall be unlawful for any person to sell, rent, give or lend any of the above mentioned arms to an unnaturalized person.

Any person violating the provisions of sub-section (*b*) of this act shall be guilty of a misdemeanor and upon conviction thereof shall be fined not less than fifty dollars, nor more than three hundred dollars, or confined in the county jail not less than thirty days nor more than six months, or both such fine and imprisonment, in the discretion of the court.

All acts and parts of acts inconsistent herewith are hereby repealed.

---

# CHAPTER 4

(Senate Bill No. 4—By Joint Special Committee)

AN ACT making appropriations of public moneys to pay general charges upon the treasury.

[Passed June 6, 1925; in effect from passage. Approved by the Governor.]


Sec.

1. Appropriations made from the treasury.
2. Fiscal years of 1926 and 1927.
3. Appropriations under sub-sections "A," "B" and "C" payable out of the general revenue of the state.

*Sub-Section "A"*

4. Construction and equipment of second unit of office building of new capitol; Governor to sell all state property on Capitol and Summers streets in Charleston; proceeds to be paid into the treasury as a special capitol building fund; Governor may continue capitol building commission, by re-appointment; limit of total cost of new capitol; authorizing construction and limiting cost of second office building.
5. Appropriations for maintenance and repair of roads; in "state fund general revenue" not otherwise appropriated to be used for road maintenance.

5-*a*. Recodification commission; salary and expenses of the commission, assistants and stenographers; expenses of the legislative committee; this an additional appropriation.

*Sub-Section "B"*

6. Appropriations appearing under sub-section "B" payable only on requisition and approval of the state board of control.