UNITED STATES DISTRICT COURT
NORTHERN DISCTRICT OF NEW YORK

_____

CARL HIGBIE, JOSEPH HARRIS, and
MICHAEL VOTRUBA,

                       *Plaintiffs*,

        -against-

STEVEN G. JAMES, in his official capacity as
Superintendent of the New York State Police, KYLE
BOURGAULT, in his official capacity as Sheriff of
Rensselaer County, New York, DONALD J. KRAPF,
in his official capacity as Sheriff of Columbia County,
New York, and JOHN DOES 1-10,

                       *Defendants*.

                24-CV-174

                MAD/TWD

_____

## SUPERINTENDENT JAMES' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF HIS CROSS-MOTION FOR SUMMARY JUDGMENT

LETITIA JAMES
New York State Attorney General
*Attorney for Superintendent James*
The Capitol
Albany, New York 12224-0341

Matthew J. Gallagher, Bar Roll No. 701111
James M. Thompson, Bar Roll No. 703513
February 14, 2025

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ..................................................................................................... iii

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ........................................................................................................ 3

STANDARD OF REVIEW ....................................................................................................... 4

ARGUMENT ............................................................................................................................. 5

I.    SUPERINTENDENT JAMES IS NOT A PROPER DEFENDANT IN THIS
      LICENSING CASE AND PLAINTIFFS LACK STANDING TO SUE
      SUPERINTENDENT JAMES ............................................................................... 5

        A.    Superintendent James is Not a Proper Defendant ............................................ 5

        B.    Plaintiffs Lack Standing to Sue the Superintendent Because No Plaintiff Has
             Demonstrated an Injury-In-Fact Traceable to Him or Redressable by Him ..... 7

        C.    Any Claim Based on the PPB-3 Form Is Moot, And The Eleventh
             Amendment Precludes A Damages Action Against The Superintendent ....... 10

        D.    Plaintiff Higbie Lacks Standing Because He Is Employed In New York ...... 11

II.    PLAINTIFFS' SECOND AMENDMENT CLAIM FAILS BECAUSE NEW YORK
      LAW DOES NOT PROHIBIT THEM FROM APPLYING FOR A
      FIREARM LICENSE ........................................................................................ 11

        A.    The Text Of The Licensing Law, Basic Principles of Statutory Interpretation,
             And Controlling Precedent From The New York Court Of Appeals All
             Establish That There Is No In-State Residency or
             Employment Requirement .............................................................. 11

        B.    Settled Canons of Construction Require an Interpretation that Avoids Any
             Constitutional Issue ........................................................................ 18

III.   IN THE EVENT THAT THE COURT FINDS THE STATUTE AMBIGUOUS, IT
      SHOULD ABSTAIN FROM JURISDICTION TO ALLOW NEW YORK COURTS
      TO INTERPRET NEW YORK LAW .................................................................. 19

        A.    Because Any Federal Constitutional Issue Is Predicated on a Question of
             Interpreting New York Law, *Pullman* Abstention is Appropriate ................ 19

        B.    *Burford* Abstention Is Also Appropriate ....................................................... 22

IV.   EVEN IF NEW YORK'S LICENSING STATUTE INCLUDED AN IN-STATE

i

RESIDENCY OR EMPLOYMENT REQUIREMENT, IT WOULD BE CONSISTENT WITH THE NATION'S HISTORICAL TRADITION OF FIREARMS REGULATION ........................................................................................... 23

V.   PLAINTIFFS' FULL FAITH AND CREDIT CLAIM IS WITHOUT MERIT ............ 29

VI.  PLAINTIFFS' PRIVILEGES AND IMMUNITIES CLAIM FAILS BECAUSE NEW YORK'S LICENSING LAW DOES NOT DISCRIMINATE, HAS NO PROTECTIONIST PURPOSE, AND WOULD PASS INTERMEDIATE SCRUTINY ............................................................................................................... 31

CONCLUSION ........................................................................................................................... 35

# TABLE OF AUTHORITIES

CASES                                                                                    PAGE(S)

*1256 Hertel Avenue Assocs., LLC v. Calloway,*
    761 F. 3d 252 (2d Cir. 2014)..................................................................................18

*53rd Street, LLC v. U.S. Bank Nat'l Ass'n,*
    8 F. 4th 74 (2d Cir. 2021) .....................................................................................16

*Adar v. Smith,*
    639 F. 3d 146 (5th Cir. 2011) ................................................................................30

*Am. Freedom Defense Initiative v. MTA,*
    815 F. 3d 105 (2d Cir. 2016)..................................................................................10

*Antonyuk v. Bruen,*
    624 F. Supp. 3d 210 (N.D.N.Y. 2022) ................................................................. 6-7

*Antonyuk v. James,*
    120 F.4th 941 (2d Cir. 2024) ......................................................................... 7, 27-28

*Bach v. Pataki,*
    408 F.3d 75 (2d Cir. 2005)................................................................................16, 35

*Baker ex rel. Thomas v. GM Corp.,*
    522 U.S. 222 (1998)...............................................................................................30

*Baughcum v. Jackson,*
    92 F. 4th 1024 (11th Cir. 2024) ...............................................................................9

*Bethpage Lutheran Serv., Inc. v. Weicker,*
    965 F. 2d 1239 (2d Cir. 1992)................................................................................23

*Borley v. United States,*
    22 F. 4th 75 (2d Cir. 2021) .....................................................................................17

*Brown v. City of Chicago,*
    No. 19 Civ. 2411, 2020 WL 489522 (N.D. Ill. Jan. 30, 2020) ...............................30

*Brown v. Handgun Permit Rev. Bd.,*
    188 Md. App. 455 (Ct. Spec. App. 2009) ..............................................................31

*Carr v. State,*
    34 Ark. 448 (1879).................................................................................................25

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986).................................................................................................5

*Commonwealth v. Harris*,
    481 Mass. 767 (2019) ........................................................................31

*Corbett v. Hochul*,
    No. 22 Civ. 5867, 2024 WL 3553132 (S.D.N.Y. July 26, 2024) .......................................... 8-9

*Corcoran v. Sessions*,
    261 F. Supp. 3d 579 (D. Md. 2017)........................................................................31

*Diamond v. Charles*,
    476 U.S. 54 (1986)........................................................................6

*Doe No. 1 v. Putnam County*,
    No. 16 Civ. 8191, 2020 WL 7027596 (S.D.N.Y. Nov. 30, 2020) .................................... 21-22

*Eslava v. State*,
    49 Ala. 355 (1873) ........................................................................25

*Franchise Tax Bd. of Cal. v. Hyatt*,
    538 U.S. 488 (2003)........................................................................30

*Gazzola v. Hochul*,
    645 F. Supp. 3d 37 (N.D.N.Y. 2022).......................................................................7

*Gazzola v. Hochul*,
    88 F. 4th 186 (2d Cir. 2023) ........................................................................8

*Giambalvo v. Suffolk County*,
    656 F. Supp. 3d 374 (E.D.N.Y. 2023) ........................................................................20

*Golb v. Attorney General of the State of New York*,
    870 F. 3d 89 (2d Cir. 2017)........................................................................19

*Hamilton v. Pallozzi*,
    848 F.3d 614 (4th Cir. 2017) ........................................................................31

*Hawkins v. State*,
    745 S.W.2d 511 (Tex. Ct. App. 1988) ........................................................................31

*J.B. v. Onondaga County*,
    401 F. Supp. 3d 320 (N.D.N.Y. 2019)........................................................................18

*John Wile & Sons, Inc. v. DRK Photo*,
    882 F. 3d 394 (2d Cir. 2018)........................................................................13

*Jones v. Cuomo*,
    542 F. Supp.3d 207 (S.D.N.Y. 2021)........................................................................34

*Justino v. Fed. Of Catholic Teachers, Inc.*,
    54 F. 4th 95 (2d Cir. 2022) ........................................................................18

*Kellogg v. Nichols*,
    703 F. Supp. 3d 367 (N.D.N.Y. 2023) ......................................................21

*Kerzer v. Kingly Mfg.*,
    156 F. 3d 396 (2d Cir. 1998)......................................................................5

*Liberty Mut. Ins. Co. v. Hurlbut*,
    585 F. 3d 639 (2d Cir. 2009)....................................................................23

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)...............................................................................8, 11

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986).....................................................................................5

*Matter of Benedetti*,
    84 Misc. 3d 543 (Sup. Ct. Albany Cty. 2024) ........................................14

*Matter of Winston*,
    438 N.J. Super. 1 (N.J. Super. Ct. App. Div. 2014)................................31

*Meekins v. City of New York*,
    524 F. Supp. 2d 402 (S.D.N.Y. 2007).....................................................34

*Meissner v. City of New York*,
    No. 23 Civ. 1907 (S.D.N.Y.), ECF No. 49 ............................................12

*Miller v. Semple*,
    No. 18 Civ. 1769, 2019 WL 6307535 (D. Conn. Nov. 25, 2019) ...........34

*Moran v. Wisconsin Dep't of Just.*,
    2019 WI App. 38 (Ct. App. 2019) ..........................................................31

*New York State Rifle & Pistol Assoc., Inc. v. Bruen*,
    597 U.S. 1 (2022)............................................................................ passim

*Novak v. Federspiel*,
    646 F. Supp. 3d 878 (E.D. Mich. 2022)..................................................21

*Novak v. Felderspiel*,
    No. 21 Civ. 12008, 2023 WL 1094545 (E.D. Mich. Jan. 27, 2023)........22

*November Team, Inc. v. JCOPE*,
    233 F. Supp. 3d 366 (S.D.N.Y. 2017)................................................ 19-20

*NRA v. Hochul,*
  No. 20-3187, 2021 WL 5313713 (2d Cir. Nov. 16, 2021) ....................................................11

*Osterweil v. Bartlett,*
  21 N.Y.3d 580 (2013) ............................................................................................. passim

*Osterweil v. Bartlett,*
  706 F. 3d 139 (2d Cir. 2013)................................................................. 12, 14, 16-17

*Osterweil v. Bartlett,*
  738 F. 3d 520 (2d Cir. 2013)....................................................................17, 20, 35

*Osterweil v. Bartlett,*
  92 F. Supp. 3d 14 (N.D.N.Y. 2015) ........................................................................21

*People v. Carter,*
  Index No. 74408-24, Slip Op. (Sup. Ct. Kings Cty. Nov. 7, 2024) ........................33

*People v. Kent Moo Shand*
  IND-00699-21, Slip Op. (Sup. Ct. Kings Cty. Feb. 6, 2023) ..................................33

*People v. Page,*
  35 N.Y.3d 199 (2020) ............................................................................................13

*People v. Shear,*
  71 Cal. App. 4th 278 (Ct. App. 1999).....................................................................31

*People v. Telfair,*
  41 N.Y. 3d 107 (2023) (Rivera, J., concurring)......................................................20

*People v. Telfair,*
  No. APL-2022-00011 (N.Y) ...................................................................................12

*Qosaj v. Village of Sleepy Hollow,*
  223 A.D. 3d 29 (2d Dep't 2023) .............................................................................12

*Railroad Commission of Texas v. Pullman Co.,*
  312 U.S. 496 (1941) ...............................................................................................19

*Salahuddin v. Goord,*
  467 F. 3d 263 (2d Cir. 2006)....................................................................................5

*Schoenefeld v. Schneiderman,*
  821 F. 3d 273 (2d Cir. 2016)............................................................................. 32-35

*Smith v. State,*
  50 Tenn. 511 (1871)...............................................................................................26

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016)................................................................7

*Srour v. New York City*,
    117 F. 4th 72 (2d Cir. 2024) .............................................10

*Sun Oil Co. v. Wortman*,
    486 U.S. 717 (1988)..............................................................30

*Thompson v. Thompson*,
    484 U.S. 174 (1988)..............................................................30

*Town of Chester, N.Y. v. Laroe Estates, Inc.*,
    581 U.S. 433 (2017)................................................................8

*Trello v. McKeighan*,
    624 F. 3d 150 (N.D.N.Y. 2022) ........................................23

*United States v. Gonzalez*,
    No. 23 Cr. 18, 2024 WL 96517 (S.D.N.Y. Jan. 9, 2024)........................35

*United States v. Homer*,
    No. 23 Cr. 86, 2024 WL 1533919 (E.D.N.Y. Apr. 9, 2024) ..................17

*United States v. Salim*,
    287 F. Supp. 2d 250 (S.D.N.Y. 2003)................................16

*Universal Credit Trust 2000-A v. Mayfield*,
    No. 05 Civ. 5159, 2006 WL 8461786 (S.D.N.Y. Mar. 28, 2006) .........30

*Value Manufactured Homes, LLC v. Key Bank, N.A.*,
    919 F. Supp. 2d 303 (W.D.N.Y. 2013)...............................22

*W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*,
    549 F. 3d 100 (2d Cir. 2008)................................................8

*Yaw v. State of New York*,
    No. 09........................................................................................30

## CONSTITUTIONS

Second Amendment ............................................................ passim

Eleventh Amendment................................................... 3, 10-11

## STATE STATUTES

N.Y. Penal Law
    § 400.00................................................................................................ passim
    § 400.00(2)(f) ..................................................................................13, 18
    § 400.00(3)(a) ................................................................................ passim
    § 400.00(7) ..................................................................................... passim
    § 400.00(11) ..............................................................................................6
    § 400.01 ........................................................................... 3, 8, 9, 12-13
    § 400.01 ....................................................................................................8

1913 Or. Laws 497............................................................................................28

1925 W.Va. Acts 25...........................................................................................28

## RULES

Fed. R. Civ. P. 56(a) ...........................................................................................5

## MISCELLANEOUS AUTHORITIES

38 RNYC 5.03 ....................................................................................................11

II George W. Paschal, *A Digest of the Laws of Texas* 1322 (3d Ed. 1873) ...................................26

VI Orville A. Park, *Park's Annotated Code of the State of Georgia* 234 (1915) .........................28

Charles H. Hamilton, *The General Ordinances of the City of Milwaukee* 693
    (1896)..........................................................................................................28

Edward Rawson, et al., *The General Laws and Liberties of the Massachusetts
    Colony* 74-75................................................................................................24

George Staughton, et al., *Charter to William Penn, and Laws of the Province of
    Pennsylvania, Passed between the Years 1682 & 1700* (1879)...............................24

J. Hammond Trumbull, *The Public Records of the Colony of Connecticut* 79
    (1850)..........................................................................................................24

*Revised Ordinances of the City of Omaha* (1872) ........................................................28

Defendant Steven G. James, sued in his official capacity as Superintendent of the New York State Police (Superintendent), by his attorney Letitia James, New York State Attorney General, respectfully submits this Memorandum of Law in opposition to the Motion for Summary Judgment filed by Plaintiffs Carl Higbie, Joseph Harris, and Michael Votruba (collectively, Plaintiffs), ECF No. 39, and in support of his Cross-Motion for Summary Judgment.

## PRELIMINARY STATEMENT

In this Second Amendment case, Plaintiffs challenge New York State's licensing law by reading into it an in-state residency or employment requirement that does not exist. To the contrary, the law at issue explicitly states that a firearm license may be "issued to a noncitizen, or to a person not a citizen of and usually a resident in the state," language each Plaintiff acknowledged as describing him. The licensing law contains a long and detailed list of the criteria required to be eligible for a permit and neither in-state residency nor in-state employment are included, while elsewhere the statute specifies that such a license can be issued to "any person."

Plaintiffs' position is based on a misreading of subsection (3)(a) of the law, which states that applications should be made "to the licensing officer in the city or county . . . where the applicant resides, is principally employed or has his or her principal place of business." N.Y. Penal Law § 400.00(3)(a). But the New York Court of Appeals has interpreted this specific statutory subsection in *Osterweil v. Bartlett*, 21 N.Y.3d 580 (2013), analyzing its structure and history to conclude that it was designed to discourage "forum-shopping" by New Yorkers, and that the provision does not in any way "exclude certain applicants from qualifying at all." The Second Circuit likewise noted that this provision is "a procedural rule about *where to file* to get a license, not a limitation on *who may get* one." *Osterweil v. Bartlett*, 706 F. 3d 139, 142 (2d Cir. 2013) (emphasis in original). And, in fact, several New York jurisdictions do accept applications from

1

persons without in-state residency or employment. *See* Declaration of Azaria Ferguson (Ferguson Dec.) ¶¶ 2-3. Plaintiffs try to hand-wave away the *Osterweil* case, ignoring it completely in the Complaint and relegating it to a single footnote in their brief, but the interpretation of a State statute by the State's highest court is binding, and it forecloses their attempt to manufacture a constitutional controversy where none exists.

Even if Plaintiffs' interpretation of the statute were not contradicted by Court of Appeals precedent, the canon of constitutional doubt would require the Court to interpret the state law in order to avoid any significant constitutional question. And if the Court were to view the statute as ambiguous, the appropriate step would be to abstain from jurisdiction to allow New York courts— including and especially the Court of Appeals—to authoritatively interpret New York law.

Although the Court need not and should not reach the constitutional issue, an in-state residency or employment requirement would be fully consistent with the Nation's historical traditions of firearm regulation. From colonial times, through the Founding and into the development of licensing laws in the 19th century, jurisdictions have passed laws requiring that persons carrying deadly weapons in a community be *part* of that community. While Plaintiffs gesture at a historical tradition of allowing limited exceptions for "travelers" or persons "on a journey," the statutes they cite actually cut against their position, as they were interpreted only to allow gun carriage by persons passing through a jurisdiction, and the laws could require travelers to disarm if they went off the main road or stopped for as little as fifteen minutes. Plaintiffs' Privileges and Immunities and Full Faith and Credit arguments are similarly without merit, as neither clause inhibits a sovereign State's ability to have its own law apply within its own borders.

Subject-matter jurisdiction is also lacking over any attempt to sue the Superintendent, as he has no control over or involvement with the county licensing officers who review applications.

2

Second Circuit precedent is clear that a licensing challenge is only appropriate against a licensing officer, and the Superintendent is only a licensing officer for retired members of the New York State Police (NYSP). Accordingly, federal courts regularly reject attempts to sue the Superintendent over licensing decisions he plays no part in. Plaintiffs attempt to salvage a claim by pointing to the fact that the PPB-3 licensing form used to include a field for a "New York" driver's license number, but any claim on this theory is moot. Nor can Plaintiffs avoid this conclusion by seeking nominal damages, as any such claim is barred by the Eleventh Amendment. Lastly, Plaintiff Higbie, a talk show host who films his program in Manhattan, must be dismissed because his in-state employment renders him eligible for a license under any possible theory.

## STATEMENT OF FACTS

Plaintiffs initiated this action on February 5, 2024, by filing their Complaint for Declaratory and Injunctive Relieve. *See* Complaint, ECF. No. 1 (Complaint). Plaintiffs allege that New York State infringes upon their Second Amendment rights to keep and bear arms through a firearm licensing scheme that does not allow nonresidents the ability to apply for, or obtain, a New York State firearm license. *Id.* ¶¶ 25, 114-121. Plaintiffs also allege that New York violates the Full Faith and Credit clause of the U.S. Constitution because New York does not honor firearm licenses/permits issued by other states. *Id.* ¶¶ 26, 122-133.

New York firearm licenses are issued and renewed by "licensing officers," as that term is defined in N.Y. Penal Law § 265.00(10). N.Y. Penal Law § 400.00(1). The Superintendent acts as a licensing officer only for the purpose of considering license applications submitted by retired sworn members of the NYSP. N.Y. Penal Law §§ 265.00(10), 400.01; Declaration of Michael Deyo (Deyo Dec.) ¶ 4. The Superintendent cannot mandate that any city or county licensing officer accept or grant any licensing application. *Id.* ¶ 7. Also, the Superintendent does not issue

guidance to licensing officers about whether to accept a license application or whether an applicant is legally entitled to a license. *Id.* ¶ 8.

The Superintendent is charged with approving the application form used by all individuals seeking to obtain a firearm license in New York State, except in New York City. N.Y. Penal Law § 400.00(3)(a). The application form is designated as the PPB-3 form. Deyo Dec. ¶ 10. The current PPB-3 form does not seek any New York-specific information from applicants that would preclude non-New York residents from applying for a license. *Id.* ¶ 11.

Plaintiffs Harris and Votruba are citizens of the Commonwealth of Massachusetts, are not principally employed in New York, and do not have a principal place of business in New York. Deposition of Joseph Harris, ECF No. 39-2 (Harris Depo.) 15:18-21, 17:12-16; Deposition of Michael Votruba, ECF No. 39-6 (Votruba Depo.) 15:4-11, 16:17-23. Plaintiff Higbie is a citizen of the State of Connecticut. Deposition of Carl Higbie, ECF No. 39-7 (Higbie Depo.) 14:4-11. Plaintiff Higbie is employed in New York and works in New York City. *Id.* at 14:12-20. No Plaintiff is a retired member of NYSP. Harris Depo. 55:24-56-3; Votruba Depo. 45:18-21; Higbie Depo. 31:20-22.

There are at least eight New York counties (Broome County, Franklin County, Hamilton County, and the five counties that make up New York City—Bronx, Kings, New York, Queens, and Richmond Counties) that accept firearm applications from out-of-state applicants that are not principally employed in New York and do not have a principal place of business in New York. Ferguson Dec. ¶¶ 2-3.

## <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322 (1986).  The movant bears the initial burden of showing that there is no genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  If this initial burden is met, the opposing party must show that there is a material dispute of fact for trial.  *Id.* at 324.

Although the evidence and reasonable inferences should be construed in favor of the non-movant, the non-movant must nonetheless "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).  To defeat a motion for summary judgment, the non-movant must point to specific evidence showing a genuine issue for trial.  *See Salahuddin v. Goord*, 467 F. 3d 263, 273 (2d Cir. 2006).  "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact."  *Kerzer v. Kingly Mfg.*, 156 F. 3d 396, 400 (2d Cir. 1998) (internal citation omitted).

## **ARGUMENT**

### I.    **SUPERINTENDENT JAMES IS NOT A PROPER DEFENDANT IN THIS LICENSING CASE AND PLAINTIFFS LACK STANDING TO SUE SUPERINTENDENT JAMES**

As a threshold matter, the Court should deny Plaintiffs' motion for summary judgment as to the Superintendent, because the Superintendent is not a proper defendant and Plaintiffs lack standing to sue him.  The Superintendent is not a proper party because he has no involvement in the acceptance, review, or granting of Plaintiffs' licensing applications, and he cannot provide Plaintiffs with the relief they seek, as he has no ability to accept an application or grant a license to anyone who is not a retired State trooper.  Likewise, Plaintiffs lack standing because no Plaintiff has demonstrated an injury-in-fact traceable to the Superintendent or redressable by him.

#### A.    **Superintendent James is Not a Proper Defendant**

In deciding whether a party is a proper defendant, the Court must consider "whether (and, if so, the extent to which), if ordered to do so by the Court, [the defendant] could provide Plaintiffs

5

with the relief they seek." *Antonyuk v. Bruen*, 624 F. Supp. 3d 210, 228 (N.D.N.Y. 2022). "When a plaintiff mounts a constitutional challenge against a particular state statute, the proper defendant is typically the state official charged with enforcing the statute." *Diamond v. Charles*, 476 U.S. 54, 64 (1986).

The Superintendent is not a proper defendant in this action because he cannot provide Plaintiffs with the relief they seek. The Superintendent cannot mandate that counties accept or grant Plaintiffs' licensing applications. Deyo Dec. ¶ 7. The Superintendent also does not issue guidance to licensing officers about whether an application should be accepted for review or whether an applicant is legally entitled to a license. *Id.* ¶ 8. Also, the Superintendent does not possess the power to revoke a license. *See* N.Y. Penal Law § 400.00(11). Thus, to the extent that Penal Law § 400.00 is interpreted to not permit Plaintiffs to apply for a New York firearms license, and a licensing officer or officers granted Plaintiffs licenses, the Superintendent would have no enforcement authority over said licenses. *See id.*

Plaintiffs' claims in this matter are different than those in *Antonyuk v. Bruen*, 624 F. Supp. 3d 210 (N.D.N.Y. 2022), where this Court held that former NYSP Superintendent Bruen was a proper defendant to certain claims challenging the enforcement of the Concealed Carry Improvement Act ("CCIA"). *Antonyuk*, 624 F. Supp. 3d at 234. In *Antonyuk*, the plaintiff directly challenged specific provisions of the CCIA and its enforcement. *Id.* at 216-17. The Court determined that Superintendent Bruen was a proper defendant as to the claims challenging (1) the new 18-hour firearm training requirement under the CCIA for newly issued or renewed licenses because the Superintendent was expressly charged with promulgating policies and procedures, as well as approving the curriculum, of the 18-hour firearm trainings; and (2) the enforcement of the CCIA by NYSP because NYSP enforced certain provisions of the CCIA throughout New York

State. *Id.* at 229-34.

This matter is distinguishable, as the Superintendent has neither the authority nor enforcement obligations over the licensing procedures used by counties with regard to accepting applications or the granting of licenses. To the extent that NYSP could enforce New York State laws prohibiting unlicensed ownership of certain firearms, that is not the basis for the constitutional challenge asserted by the Plaintiffs with regard to the licensing process. *See* Complaint ¶¶ 111-133 (asserting claims arising out of the licensing process). Thus, the Superintendent is not a proper defendant because if the Court determines that the licensing scheme is unconstitutional, the Superintendent cannot enforce that holding on the counties or their licensing officers. The general enforcement of laws by NYSP does not bestow proper-defendant status upon the Superintendent in this matter. *See Gazzola v. Hochul*, 645 F. Supp. 3d 37, 58 (N.D.N.Y. 2022).

### B. Plaintiffs Lack Standing to Sue the Superintendent Because No Plaintiff Has Demonstrated an Injury-In-Fact Traceable to Him or Redressable by Him

"To establish Article III standing, a plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Antonyuk v. James*, 120 F.4th 941, 976 (2d Cir. 2024) (quoting *Silva v. Farrish*, 47 F.4th 78, 86 (2d Cir. 2022)). "To establish an injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). The traceability prong for standing requires "a causal connection between the injury and the conduct complained of—the injury has to be 'fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560. To satisfy the redressability requirement, there must be "a non-speculative likelihood that

the injury can be remedied by the requested relief." *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F. 3d 100, 106-07 (2d Cir. 2008) (quoting *Lujan*, 504 U.S. at 560-61). "[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017) (quoting *Davis v. Federal Election Comm'n*, 554 U.S. 724, 734 (2008)).

The injuries alleged by Plaintiffs, inability to apply for or obtain a firearm license in New York due to the licensing regime and New York's failure to give full faith and credit to their firearm licenses/permits issued by other states, are not traceable to the Superintendent. The Superintendent has no authority or responsibility for any county-issued permits; nor does the Superintendent direct how counties conduct licensing operations. *See* N.Y. Penal Law § 400.00; Deyo Dec. ¶¶ 7-8. Accordingly, the Superintendent does not direct counties whether to accept Plaintiffs' licensing applications or grant Plaintiffs licenses. *See Gazzola v. Hochul*, 88 F. 4th 186, 202-03 (2d Cir. 2023) (finding plaintiff lacked standing because a "county's failure to provide license applications" is not "fairly traceable to the challenged action of the . . . Superintendent"); *Corbett v. Hochul*, No. 22 Civ. 5867, 2024 WL 3553132, at *4 (S.D.N.Y. July 26, 2024) (holding no standing to bring licensing claim against Superintendent because "[t]he NYPD decides Plaintiff's application, not the [Superintendent]"). The Superintendent would not review Plaintiffs' licensing applications because they are not former members of the NYSP. *See* N.Y. Penal Law § 400.01. While the Superintendent is given certain authority under Penal Law § 400.00, such authority is not associated with Plaintiff's purported inability to apply for a license throughout the state or to any counties. *See id.* §§ 400.00(3)(a) (approving application forms), 4-a (creating appeals board and promulgating rules and regulations for the appeals process), 5 (filing applications and record keeping), 7 (approving licensing form), 9 (filing amended licenses), 10 (recertifying licensees).

While the Superintendent approves the PPB-3 form, Plaintiffs do not argue unconstitutionally as to the form itself. To the extent Plaintiffs make allegations concerning the PPB-3's former request for a New York driver's license number or non-driver identification number, that is insufficient to create a traceable injury back to the Superintendent. *See Baughcum v. Jackson*, 92 F. 4th 1024, 1033 (11th Cir. 2024) (affirming standing-based dismissal of licensing claim against Georgia Commissioner of Public Safety because "the injuries at issue here (not being given licenses) are not traceable to the Commissioner's decisions about how to design the form, but rather the [local officials]' decisions regarding licensure applications."); *Corbett v. Hochul*, 2024 WL 3553132, at *4 (dismissing challenge to gun training requirement as against Superintendent for lack of traceability, despite Superintendent approving the curriculum). There is no statutory requirement that a New York driver's license number must be provided as part of the application. *See* N.Y. Penal Law § 400.00(3)(a) (providing application requirements that do not include any driver's license information). As to whether a county accepts, or grants, a licensing application with or without a New York driver's license number is completely within the purview of the county. *See id.* § 400.00(1). Indeed, the issuance of a license "to a noncitizen, or to a person not a citizen of and usually a resident in the state," is expressly contemplated by Penal Law § 400.00(7).

To that end, the conduct challenged by Plaintiffs is not redressable by the Superintendent. Even if the Court were to grant Plaintiffs the relief they seek—declaratory and injunctive relief holding Penal Law § 400.00(3)(a)'s residency, employment, and business prerequisites unconstitutional—the Superintendent would have no role in reviewing Plaintiffs' licensing application or the procedures utilized by the counties. Such a ruling would not necessitate the Superintendent to remove the request for New York driver's license number or non-driver

identification number from the PPB-3. Even if the PPB-3 form still required a New York driver's license number, the Superintendent would have no involvement with whether the application was accepted for review or granted.

### C.    Any Claim Based on the PPB-3 Form Is Moot, And the Eleventh Amendment Precludes A Damages Action Against The Superintendent

To the extent that Plaintiffs attempt to salvage a claim against the Superintendent by claiming entitlement to an award of nominal damages, their argument is barred by the Eleventh Amendment. As discussed above, the Superintendent's involvement in the licensing process (at least for persons like Plaintiffs who are not retired members of NYSP) is limited to drafting the form that applicants must fill out when beginning the process. *See* N.Y. Penal Law § 400.00(3)(a) ("Blank applications shall . . . be approved as to form by the superintendent of state police."). And even if Plaintiffs could tie any constitutional injury to the fields included on the form, rather than the decisions of local licensing officials, any such claim would be moot, as Plaintiffs acknowledge, the form has been changed to remove the field for a "New York" driver's license.[1] Plaintiffs' Memorandum of Law, ECF No. 39-12 (Plf. Memo) 14-15; *see Srour v. New York City*, 117 F. 4th 72, 81 (2d Cir. 2024) (dismissing for mootness is "not an optional responsibility" because "under Article III of the U.S. Constitution, when a case becomes moot, the federal courts lack subject matter jurisdiction over the action."). Plaintiffs argue that even this lack of subject matter jurisdiction does not apply to them because they seek nominal damages, Plf. Memo 15, but any such claim is barred by the Eleventh Amendment, which prohibits lawsuits against a state officer

---

[1] Plaintiffs argue that the Court should retain jurisdiction under the "voluntary cessation" doctrine, Plf. Memo 14-15, but there is no basis in the record to believe that the Superintendent intends to re-revise the PPB-3 licensing form to add the words "New York" in front of "Driver's License # (or Non-Driver ID)." *Cf. Am. Freedom Defense Initiative v. MTA*, 815 F. 3d 105, 110 (2d Cir. 2016) (holding that case moot where there is "no reasonable expectation that the [agency] would return to its past practice.").

in his official capacity for money damages. *See NRA v. Hochul*, No. 20-3187, 2021 WL 5313713, at *2 (2d Cir. Nov. 16, 2021) (summary order) (affirming dismissal of claim for nominal damages "on the ground that it is barred by the Eleventh Amendment").

### D.    Plaintiff Higbie Lacks Standing Because He Is Employed In New York

Although the Complaint represented that all plaintiffs "do not live, are not principally employed, and do not own property in New York," Complaint ¶ 15, Plaintiff Higbie acknowledged at his deposition that he films his television show in Manhattan and views New York as his place of employment. *See* Higbie Tr. 14:12-15:2. Accordingly, even under the most restrictive possible interpretation of N.Y. Penal Law § 400.00(3)(a), Plaintiff Higbie would be eligible for a license because he is "principally employed" in New York. *See* Higbie Tr. 64:5-7. Similarly, Plaintiff Higbie's relief, if any, would be against New York City, a nonparty to this case.[2] *See Lujan*, 504 U.S. at 560 (for standing to be proper, injury must not be "the result of the independent action of some third party not before the court."). No matter how the Court ultimately interprets the statute at issue, summary judgment must be granted against Plaintiff Higbie in any event.

## II.    PLAINTIFFS' SECOND AMENDMENT CLAIM FAILS BECAUSE NEW YORK LAW DOES NOT PROHIBIT THEM FROM APPLYING FOR A FIREARM LICENSE

### A.    The Text Of The Licensing Law, Basic Principles of Statutory Interpretation, And Controlling Precedent From The New York Court Of Appeals All Establish That There Is No In-State Residency or Employment Requirement

Both Court of Appeals caselaw and fundamental principles of statutory interpretation support the Superintendent's position that "any person" is eligible to apply for a New York State

---

[2] New York City used to have a residency requirement for firearm licensing applications, but that requirement has since been removed, and it currently states, "[a] person who resides outside of New York State and is not principally employed within New York City may apply for a carry handgun license pursuant to this section." *See* 38 RNYC 5.03.

handgun license, so long as they meet the eligibility requirements in N.Y. Penal Law § 400.00(1).[3] The clearest indication that in-state residence or employment are not required elements of a licensing application comes from the licensing statute itself, N.Y. Penal Law § 400.00, which explicitly contemplates that a license may be "issued to a noncitizen, or to a person not a citizen of and usually a resident in the state," and requires such a license to contain additional language. *See* N.Y. Penal Law § 400.00(7). The plain meaning of the clause indicates that the Legislature intended to allow licenses for non-New Yorkers. While the term "noncitizen" could perhaps be interpreted to mean someone who is not a citizen of the United States, the rest of the sentence, which discusses someone who is "not a citizen of . . . the state," forecloses such an interpretation. *See id.* § 400.00(7); *see Qosaj v. Village of Sleepy Hollow*, 223 A.D. 3d 29, 33 (2d Dep't 2023) (interpreting New York statutory law: "[w]hen an identical phrase is used in different parts of the same statute, it will be presumed to be used in the same sense throughout, absent any indication of a contrary intent" (quotation omitted)). Moreover, as the Court of Appeals found, "the legislative history of the statutes that underlay Penal Law § 400.00" is not consistent with "an intent to limit licenses to applicants to make their domicile in New York." *Osterweil v. Bartlett*, 21 N.Y. 3d 580, 585 (2013); *see also Osterweil v. Bartlett*, 706 F. 3d 139, 142 (2d Cir. 2013) (noting that the Court of Appeals "has never held that this statute imposes even a residence requirement.").

The conclusion is also substantiated in subsection (1) of the law, which lays out the eligibility requirements to obtain a New York firearms license in great detail, without including either a requirement of in-state residency or employment. Contents of a successful license

---

[3] This straightforward interpretation is not a new development and has been New York's position in several other cases, including before the State's highest court well before this suit was filed. *See* Br. for Intervenor Attorney General, *People v. Telfair*, No. APL-2022-00011 (N.Y), at 52-55; *see also* Brief for the Attorney General as Intervenor, *Meissner v. City of New York*, No. 23 Civ. 1907 (S.D.N.Y.), ECF No. 49 at 16-18.

application, *i.e.*, what a licensing officer must find to be true in his or her investigation of a carry

permit application, are laid out in an extensive list in N.Y. Penal Law § 400.00(1), but neither New

York residency nor New York employment are included in the list. *See* N.Y. Penal Law

§ 400.00(1). This demonstrates that there is not an unwritten in-state residency or employment

requirement, since "the interpretive canon of *expressio unius est exclusio alterius* instructs that

[the State Legislature]'s expression of one or several items in an enumerated list typically reflects

an intent to 'exclude another left unmentioned.'" *John Wile & Sons, Inc. v. DRK Photo*, 882 F. 3d

394, 405 (2d Cir. 2018) (quoting *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 302 (2017)) (brackets

omitted); *accord People v. Page*, 35 N.Y.3d 199, 206-07 (2020) (recognizing that New York courts

"have consistently interpreted statutes" in the same manner under state law).  Additionally, the

subsection that authorizes the issuance of concealed carry permits, Penal Law § 400.00(2)(f), says

that licenses shall be to "have and carry concealed, without regard to employment or place of

possession subject to the restrictions of state and federal law," and that they can be issued to "any

person."

The conclusion is further substantiated by the fact that at least eight New York counties

(Broome County, Franklin County, Hamilton County, and the five counties that make up New

York City—Bronx, Kings, New York, Queens, and Richmond Counties) accept firearm

applications from out-of-state applicants that are not principally employed in New York and do

not have a principal place of business in New York.  Ferguson Dec. ¶¶ 2-3.

None of the statutory provisions governing an applicant's eligibility for a firearm license

contain a requirement that he or she must live or work in New York State.  Plaintiffs seize on

subsection (3)(a) of the law, which states that "[a]pplications shall be made and renewed, in the

case of a license to carry or possess a pistol or revolver or to purchase or take possession of a

semiautomatic rifle, to the licensing officer in the city or county, as the case may be, where the applicant resides, is principally employed or has his or her principal place of business as merchant or storekeeper." *See* Plf. Memo 2, 15-16. But this statutory subsection simply does not bar anyone from eligibility for a license. As the Second Circuit noted, "§ 400.00(3)(a) is phrased in the form of a procedural rule about *where to file* to get a license, not a limitation on *who may get* one." *Osterweil v. Bartlett*, 706 F. 3d at 142 (emphasis in original). Indeed, the subsection states that persons who have a New York State residence or place of business must apply in the county where the residence or business is located; it says nothing at all about persons located outside of New York, let alone anything to exclude them from eligibility.[4]

Ultimately, though, Plaintiffs' interpretation of the statute is definitively foreclosed by *Osterweil v. Bartlett*, 21 N.Y. 3d 580 (2013), the most recent pronouncement on the statute issued by New York's highest court. In *Osterweil*, the Court of Appeals accepted a question certified to it by the Second Circuit (in an opinion by former Supreme Court Justice Sandra Day O'Connor) regarding whether an applicant who owns only "a part-time residence in New York but makes his permanent domicile elsewhere" was "eligible for a New York handgun license." *Osterweil*, 21 N.Y. 3d at 584 (quoting *Osterweil v. Bartlett*, 706 F. 3d at 145). The parties in *Osterweil*, like the

---

[4] For this reason, Plaintiffs misinterpret *Matter of Benedetti*, 84 Misc. 3d 543 (Sup. Ct. Albany Cty. 2024), when they cite it in a footnote for the proposition that an out-of-state applicant "fail[s] the statutory mandate." The plaintiff in *Benedetti* was a New Yorker who "lives in Erie County and performs (carries out) his work in Erie County." *Benedetti*, 84 Misc. 3d at 544. The application, therefore, presented the same issue that Governor Roosevelt and the New York State Legislature of 1931 enacted the forum provision to prevent: persons located in one part of the State filing licensing applications in other locations where they are less well-known, or where the process involves less scrutiny. *See Osterweil*, 21 N.Y. 3d at 585-86 (summarizing the legislative history and concluding that the law "evinces an intent to ensure that an applicant for a handgun license applies in his place of residence, rather than an intent to limit licenses to applicants who make their domicile in New York."). The Court in *Benedetti* cited extensively to *Osterweil* as identifying the statutory purpose of preventing forum-shopping. *See Benedetti*, 84 Misc. 3d at 545-47.

Plaintiffs here, were focused on the language from N.Y. Penal Law § 400.00(3)(a) stating that "[a]pplications shall be made and renewed, . . . to the licensing officer in the city or county, as the case may be, where the applicant resides, is principally employed or has his or her principal place of business . . ." *See id.* at 584-85. The Court of Appeals had no such indecision, finding that "[t]his is not a case in which we are faced with an ambiguous statute" and that "[t]he plain language of the statute is not consistent with the theory that the law requires an applicant to establish domicile as an eligibility requirement." *Id.* at 584, 585.

The state high court also delved into the statute's history, finding that the Legislature had "an intent to ensure that an applicant for a handgun license applies in his place of residence, rather than an intent to limit licenses to applicants who make their domicile in New York." *Id.* at 585. The statutory language in question came from 1931, when Governor Franklin Roosevelt wrote to the legislature, noting that "[m]any persons of unsavory reputation, or with criminal records, are apprehended in [New York City] and are found in the possession of pistol permits issued by a judge or justice of a court of record in other counties of the State," particularly counties where "permits are issued with little or no investigation." *Id.* at 586 (quoting Message to the Legislature, Sept. 1, 1931, reprinted in Public Papers of Governor Franklin D. Roosevelt, 1931 at 183). "It is therefore evident that the law was originally designed to ensure that licenses were obtained where applicants resided, and to discourage 'forum-shopping,' rather than to exclude certain applicants from qualifying at all."[5] *Id.*

The statutory history discussed in *Osterweil* also shows how New York's licensing law

---

[5] To the extent that there is ambiguity about where a non-New Yorker should direct his or her application, this legislative history and the Court of Appeals analysis in *Osterweil* indicates that such an application could be filed in any county in the State, just as New Yorkers could do prior to Governor Roosevelt's legislation amending the statute.

once had an explicit residency requirement but abandoned it. The law enacted by Governor Roosevelt and the 1931 legislature read:

> No license shall be issued by the police commissioner of the city of New York except to a resident of that city. Outside of the city of New York, no license shall be issued by a judge or justice of a court of record except to a resident of the county in which the office of such judge or justice is located. A license may be issued, however, to a qualified person principally employed in such city or county and to a merchant or storekeeper having his principal place of business in such city or county.

*Osterweil*, 21 N.Y. 3d at 585 (quoting 1931 N.Y. Laws ch. 792 § 4). This language, unlike the current text of N.Y. Penal Law § 400.00, explicitly states that "no license shall be issued . . . except to a resident" or "to a qualified person principally employed in such city or county." *Id.* It would be extraordinary to interpret New York's licensing law as implicitly containing an in-state residency or employment requirement when it had one before but abandoned it. *Cf. United States v. Salim*, 287 F. Supp. 2d 250, 340 (S.D.N.Y. 2003) ("In interpreting statutory language, a court may consider the history of the language as it finally evolved, with particular reference to the language used in earlier statutes, and may also search for the policy intended to be enacted." (quoting *Israel-British Bank Ltd. v. FDIC*, 536 F. 2d 509, 512 (2d Cir. 1976))).

Plaintiffs try to minimize *Osterweil*, discussing it only in a single footnote in their brief. Plf. Memo 15 n.13. They do not appear to have been aware of it before filing this case, as their Complaint makes no mention of *Osterweil*, instead repeatedly portraying the Second Circuit's earlier holding in *Bach v. Pataki*, 408 F.3d 75, 79 (2d Cir. 2005), as the state of the law.[6] *See*

---

[6] To the extent that *Bach* interpreted New York law twenty years ago as including a residency (and domicile) requirement for licensing, *see* 408 F. 3d at 81 & n.13, the case cannot be squared with the Court of Appeals' later holding in *Osterweil*, which controls on issues of state statutory interpretation, and is therefore no longer good law. *See 53rd Street, LLC v. U.S. Bank Nat'l Ass'n*, 8 F. 4th 74, 76, 77 (2d Cir. 2021) (federal court decision regarding state law is abrogated when it conflicts with subsequent decision of the New York Court of Appeals). It also cannot be squared

*generally* Complaint.  Plaintiffs' pre-motion letter likewise did not mention *Osterweil* at all.  *See* ECF No. 37.  But *Osterweil* controls this case: when federal courts engage in "'state law adjudication,' our 'ultimate source' must be the 'law as established by the constitution, statutes, or authoritative court decisions of the state'—and not federal courts' guesses as to what that law might be."  *Borley v. United States*, 22 F. 4th 75, 82 (2d Cir. 2021) (quoting *Desiano v. Warner-Lambert & Co.*, 467 F. 3d 85, 90 (2d Cir. 2006)); *accord United States v. Homer*, No. 23 Cr. 86, 2024 WL 1533919, at *5 (E.D.N.Y. Apr. 9, 2024) (emphasizing in firearms licensing case that "in considering state decisional law, the court must afford the fullest weight to the pronouncements of the New York Court of Appeals" (quotation and brackets omitted)).  The Court of Appeals' statements are binding precedent on this issue of state statutory interpretation, and the state high court has declared that N.Y. Penal Law § 400.00(3)(a), the statutory subsection that undergirds Plaintiffs' claim, simply does not "exclude certain applicants from qualifying at all."  *Osterweil*, 21 N.Y.3d at 586; *cf. Osterweil*, 706 F. 3d at 142 (noting prior to certification that the Court of Appeals "has never held that this statute imposes even a residence requirement," and that "§ 400.00(3)(a) is phrased in the form of a procedural rule about *where to file* to get a license, not a limitation on *who may get* one." (emphasis in the original)).

Resolving the state statutory question in line with the plain text of the law and the Court of Appeals' holding in *Osterweil* is sufficient to resolve the case.  This Court, like the Second Circuit after receiving the Court of Appeals' opinion in *Osterweil* itself, can and should "decline to reach the constitutional question" because it "is based on a flawed reading of the licensing statute."  *Osterweil v. Bartlett*, 738 F. 3d 520, 521 (2d Cir. 2013). The Court should grant summary judgment

---

with the Second Circuit's own recognition eight years later in *Osterweil* that the Court of Appeals "has never held that this statute imposes even a residence requirement."  *See Osterweil*, 706 F. 3d at 142.

in favor of the Defendants and dismiss the case in its entirety.

**B.**    **Settled Canons of Construction Require an Interpretation that Avoids Any Constitutional Issue**

Even if the text, structure, and history of N.Y. Penal Law § 400.00 left room for doubt— which they do not—the statute should be interpreted to permit (and require) "any person" to apply for a New York handgun license pursuant to Penal Law § 400.00(2)(f), under the principle that statutes should be construed so as to avoid serious constitutional questions.  "Under the federal and New York State[7] canons of constitutional doubt, 'a statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional, but also grave doubts upon that score.'"  *1256 Hertel Ave. Assocs., LLC v. Calloway*, 761 F. 3d 252, 260-61 (2d Cir. 2014) (quoting *Tauza v. Susquehanna Coal Co.*, 220 N.Y. 259, 267 (1917) (Cardozo, J.)); *see also Justino v. Fed. Of Catholic Teachers, Inc.*, 54 F. 4th 95, 101 (2d Cir. 2022) (recognizing "the longstanding principle that acts of [the legislature] ought not be construed to violate the Constitution if any other possible construction remains available." (quotation omitted)); *J.B. v. Onondaga County*, 401 F. Supp. 3d 320, 342 (N.D.N.Y. 2019) ("the long-established 'presumption of constitutionality . . . holds that courts should, if possible, interpret ambiguous statutes to avoid rendering them unconstitutional" (quotation omitted)).

Here, although the Superintendent contends that an in-state residency or employment requirement would survive constitutional scrutiny due to America's longstanding tradition of distinguishing between persons inside and outside the community when enacting firearms laws, *see* Section IV, *infra*, there is no question that adopting Plaintiffs' interpretation of the statute would present a significant constitutional issue.  But the statute is also perfectly consistent with

---

[7] "[B]oth New York and the federal courts recognize the constitutional avoidance canon."  *1256 Hertel Avenue Assocs., LLC v. Calloway*, 761 F. 3d 252, 260 n.5 (2d Cir. 2014).

New York's reading: where the law says that "[a]pplications shall be made . . . to the licensing officer in the city or county, as the case may be, where the applicant resides, is principally employed or his or her principal place of business," N.Y. Penal Law § 400.00(3)(a), it applies by its terms only to persons (like Plaintiff Higbie) who *have a New York State place of residence, employment, or business*.  It says nothing at all, one way or another, about persons who do not. *Cf. Osterweil*, 21 N.Y. 3d at 686 ("the law was originally designed to ensure that licenses were obtained where applicants resided, and to discourage 'forum-shopping,' rather than to exclude certain applicants from qualifying at all"); *see also* N.Y. Penal Law § 400.00(7) (expressly stating that license may be "issued to a noncitizen, or to a person not a citizen of and usually a resident in the state").  Because "an alternative interpretation of the statute is fairly possible," the Court is "obligated to construe the statute to avoid such problems."  *See Golb v. Attorney General of the State of New York*, 870 F. 3d 89, 103 (2d Cir. 2017).

## III.    IN THE EVENT THAT THE COURT FINDS THE STATUTE AMBIGUOUS, IT SHOULD ABSTAIN FROM JURISDICTION TO ALLOW NEW YORK COURTS TO INTERPRET NEW YORK LAW

### A.    Because Any Federal Constitutional Issue Is Predicated on a Question of Interpreting New York Law, *Pullman* Abstention is Appropriate

Plaintiffs' claim necessarily turns on an interpretation of New York law, and on convincing the Court to interpret it in a way contrary to New York's position and the language of the most recent opinion of New York's highest court.  Rather than step into the thicket of interpreting state law, if the Court concludes that N.Y. Penal Law § 400.00 is ambiguous as to whether it contains an in-state residency or employment requirement, the appropriate course is to abstain under *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496 (1941).  *Pullman* abstention is proper where "(1) an unclear state statute is at issue; (2) resolution of the federal constitutional issue depends on the interpretation of the state law; and (3) the law is susceptible to an interpretation by

a state court that would avoid or modify the federal constitutional issue." *November Team, Inc. v. JCOPE*, 233 F. Supp. 3d 366, 370 (S.D.N.Y. 2017) (quoting *Vt. Right to Life Comm., Inc. v. Sorrell*, 221 F. 3d 376, 385 (2d Cir. 2000)). "*Pullman* abstention allows federal courts to avoid both (a) premature decisions on questions of federal constitutional law, and (b) erroneous rulings with respect to state law." *Id.*

All three elements for *Pullman* abstention are present in this case. First, although the Superintendent contends that Penal Law § 400.00 unambiguously contains no residency or employment requirement for the reasons laid out in Section II, *supra*, the interpretation of the statute is at most "an open question." *People v. Telfair*, 41 N.Y. 3d 107, 119 (2023) (Rivera, J., concurring). Second, resolution of the state statutory interpretation question is a necessary prerequisite for any constitutional issue to arise. Plaintiffs argue "that the statute's mandatory language controls: 'Applications *shall* be made . . . where the applicant resides . . .,'" Plf. Memo 16 (emphasis in original), while the Court of Appeals has stated that this language does not "exclude certain applicants from qualifying at all," *Osterweil*, 21 N.Y.at 586, and the statute separately establishes that a license can be "issued to a noncitizen, or to a person not a citizen of and usually a resident in the state." N.Y. Penal Law § 400.00(7). And third, the statute is fully susceptible to an interpretation that avoids any constitutional issue. Interpreting the statute as containing no residency requirement (as New York advocates) is entirely consistent with the Court of Appeals' controlling opinion in *Osterweil*. *Cf. Osterweil*, 738 F. 3d at 521 ("we decline to reach the constitutional question raised by Osterweil's appeal, which is based on a flawed reading of the licensing statute."). Such an interpretation also means that there is no Second Amendment issue presented, since Plaintiffs may apply for firearms licenses on the same basis as New Yorkers, and firearms licensing laws are facially constitutional. *See Giambalvo v. Suffolk County*, 656 F. Supp.

3d 374, 381 (E.D.N.Y. 2023) ("While the precise parameters of a state's ability to regulate handgun ownership remains the subject of developing law, some things are beyond dispute" including that "certain state handgun licensing regimes are constitutionally permissible."); *cf. New York State Rifle & Pistol Assoc., Inc. v. Bruen*, 597 U.S. 1, 80 (2022) (hereinafter *Bruen*) (Kavanaugh, J., joined by Roberts, C.J., concurring) ("New York . . . may continue to require licenses for carrying handguns for self-defense").

Federal courts can and do abstain under *Pullman* in appropriate Second Amendment cases, *see, e.g., Doe No. 1 v. Putnam County*, No. 16 Civ. 8191, 2020 WL 7027596, at *8 (S.D.N.Y. Nov. 30, 2020); *Novak v. Federspiel*, 646 F. Supp. 3d 878, 893 (E.D. Mich. 2022), and the Court should do so here if it finds the statute to be ambiguous. "The present case is typical of cases warranting *Pullman* abstention in that it 'concerns the applicability of [a] challenged statute to a certain person or a defined course of conduct, whose resolution in a particular manner would eliminate the constitutional issue and terminate the litigation." *Doe No. 1*, 2020 WL 7027596 at *8 (quoting *Baggett v. Bullitt*, 377 U.S. 360, 376-77 (1964)).

Prudential considerations also weigh in favor of abstention. If this Federal Court were to take on the constitutional issue, this case is likely to progress similarly to the *Osterweil* matter itself, which resulted in seven different decisions from three different federal and state courts over nearly six years between the May 20, 2009 denial of Mr. Osterweil's license application and the March 11, 2015 final opinion in the case. *See generally Osterweil v. Bartlett*, 92 F. Supp. 3d 14, 21-22 (N.D.N.Y. 2015) (recounting the procedural history). There is no reason for the federal courts to go through the lengthy process a second time—particularly when the Court of Appeals already interpreted the statutory provision at issue in *Osterweil*. Instead, if a licensing officer denies a Plaintiff's handgun permit application (or if a Sheriff or County Clerk refuses to take

21

one), he can utilize the "well-established appellate recourse under Article 78,"[8] *Kellogg v. Nichols*, 703 F. Supp. 3d 367, 374 n.5 (N.D.N.Y. 2023), providing a quick and effective summary proceeding for review in state court, with appeal to the Court of Appeals, where issues of state statutory interpretation belong. Accordingly, "the interests of comity and federalism favor a decision to await a state court interpretation which may well obviate the present action." *Doe No. 1*, 2020 WL 7027596 at *8.

      **B.**    ***Burford* Abstention Is Also Appropriate**

      If the Court were to find a potential constitutional issue stemming not from an ambiguous statute, but from inconsistent application of that statute among New York's 62 counties, the proper result would be abstention under the *Burford* line of cases rather than under *Pullman*. Under the *Burford* doctrine, "[w]here timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are 'difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar'; or (2) where the 'exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *Value Manufactured Homes, LLC v. Key Bank, N.A.,* 919 F. Supp. 2d 303, 307-08 (W.D.N.Y. 2013) (quoting *New Orleans Public Serv., Inc. v. Council of City of New Orleans*, 591 U.S. 350, 361 (1989)); *cf. Novak v. Felderspiel*, No. 21 Civ. 12008, 2023 WL 1094545, at *18-20 & n.4 (E.D. Mich. Jan. 27, 2023) (abstaining under *Burford* in post-*Bruen* Second Amendment case).

---

[8] Or alternatively, he could simply apply in one of the several New York counties that accept applications from out-of-state residents. *See* Harris Depo 82:3-7 ("Q: And so if you applied and got that license, wouldn't that essentially give you everything you want here?  A: In this case technically it would, yes.").

The Second Circuit "identified three factors to consider in connection with the determination of whether federal court review would work a disruption of a state's purpose to establish a coherent public policy in a matter involving substantial concern to the public. These factors are as follows: (1) the degree of specificity of the state regulatory scheme; (2) the need to give one or the other debatable construction to a state statute; and (3) whether the subject matter of the litigation is traditionally one of state concern." *Liberty Mut. Ins. Co. v. Hurlbut*, 585 F. 3d 639, 650 (2d Cir. 2009). Each of the three *Hurlbut* factors is present when considering firearms licensing. Firearm licensing is (1) subject to an intricate regulatory framework under state law, (2) a process that presents a substantial constitutional issue only if a Court adopts a construction contrary to the one taken by the State and the State's highest court, and (3) a core state function. The Second Circuit also recognized in *dicta* the existence of a fourth factor, namely whether a state "ha[s] created a centralized system of judicial review" for the topic at issue. *Bethpage Lutheran Serv., Inc. v. Weicker*, 965 F. 2d 1239, 1245 (2d Cir. 1992). The fourth factor also weighs in favor of abstention because if one or more counties disagree with the Superintendent on the interpretation of New York law and refuse to accept applications from out-of-state residents, such incidents can and should be adjudicated in state court. *See Trello v. McKeighan*, 624 F. 3d 150, 157 (N.D.N.Y. 2022) ("Courts have held that a proceeding under Article 78 . . . is an adequate remedy to challenge decisions with respect to firearms licenses.").

## IV.    EVEN IF NEW YORK'S LICENSING STATUTE INCLUDED AN IN-STATE RESIDENCY OR EMPLOYMENT REQUIREMENT, IT WOULD BE CONSISTENT WITH THE NATION'S HISTORICAL TRADITION OF FIREARMS REGULATION

Although New York law does not contain such a provision, in-state residency or employment requirements for carrying deadly weapons are entirely "consistent with this Nation's historical tradition," and would pass the governing test under *Bruen*, 597 U.S. 1 (2022). Despite

Plaintiffs' rhetoric, there is a longstanding American tradition of states and localities protecting public safety by preventing strangers outside the jurisdiction from carrying deadly weapons within.

From the early days of Anglo-American settlement on this continent, colonial Americans enacted laws prohibiting the sale of weapons, gunpowder, or bullets not only to Native American tribes, but to anyone outside the state. Here in New York, a law enacted in 1664 established that "[n]o person shall sell, give or Barter directly or indirectly any Gun or Guns, Powder, Bullett, shott, [or] Lead . . . Without Licence first had and obtained under the Governours hand and Seal, to any Indian whatsoever, nor to any person Inhabiting out of this Government."[9]  1 Commissioners of Statutory Revision, *Colonial Laws of New York from the Year 1664 to the Revolution* 40-41 (1894), Declaration of James M. Thompson (Thompson Dec.) Exhibit (Ex.) 1. Pennsylvania adopted a nearly-identical law the same year, also covering any "Gun or Guns[,] Powder, Bullet, shott [or] Lead," and also prohibiting sales to "any person Inhabitting out of this Government," without the Governor's direct authorization. George Staughton, et al., *Charter to William Penn, and Laws of the Province of Pennsylvania, Passed between the Years 1682 & 1700* at 32 (1879), Thompson Dec. Ex. 2; *see also* J. Hammond Trumbull, *The Public Records of the Colony of Connecticut* 79 (1850), Thompson Dec. Ex. 3 (similar Connecticut law requiring "that noe man w[i]thin this Jurisdiction shall directly or indirectly . . . sell nor barter any guns, powder, bullitts or lead" to any Native American or outsider, "without lycence of this or the prticuler Court, or som two Magistrats"). These laws were patterned after an earlier Massachusetts statute that prohibited ammunition sales to natives or outsiders (but did not allow for any exceptions). *See* Edward Rawson, et al., *The General Laws and Liberties of the Massachusetts Colony* 74-75 (1679), Thompson Dec. Ex. 4.

---

[9] Spelling in the quotations is taken from the original source.

Plaintiffs' brief has little in the way of historical analysis and bases its historical arguments entirely on a handful of laws prohibiting concealed weapons that contained exceptions for "travelers" or people on a "journey." *See* Plf. Memo 21. But these laws actually cut against Plaintiffs' position. Case law from the period shows that these exceptions were understood narrowly to allow only for travelers to protect themselves on the road, and not to cover everyday weapons carriage in a foreign jurisdiction in the way Plaintiffs here seek to do. For instance, Plaintiffs cite to an Arkansas concealed weapon prohibition law with an exception for persons "upon a journey," Plf. Memo 21, but their portrayal of the law as "*exempt*[ing] nonresident visitors . . . from local carry restrictions," *id.* at 21 (emphasis Plaintiffs'), is simply wrong.

In *Carr v. State*, 34 Ark. 448, 449 (1879), the Arkansas Supreme Court considered a case where a defendant "had been on a visit to Memphis; and, on his way back to his father's stopped a few hours in Marriana (Arkansas)." The Supreme Court held the exception did not apply to even a quick stop of a few hours, declaring that "Defendant, whilst stopping over at Marianna, could not be said to be on a journey," and should have disarmed himself "and not carried [firearms] on his person." *Id.* The state high court explained that "[t]he exception in the statute is to enable travelers to protect themselves on the highways, or in transit through populous places—not to allow them the privilege of mixing with the people in ordinary intercourse, about the streets, armed in a manner which, upon a sudden fit of passion, might endanger the lives of others." *Id.*

Other laws Plaintiffs rely on similarly did not "*exempt*[] nonresident visitors . . . from local carry restrictions." Plaintiffs cite to an Alabama law with an exception for travelers, Plf. Memo 21, but, in *Eslava v. State*, 49 Ala. 355 (1873), the State Supreme Court held that "the 'travelling or setting out on a journey,' which under the statute excuses the act, must be a travel to a distance from home, and not within the ordinary line of the person's duties, habits, or pleasure." *Eslava*,

25

49 Ala. 357. Tennessee likewise emphasized that the travel exception in its statute should not cover typical travel of five or six miles or "across the lines of contiguous counties"—in the way Plaintiffs wish to carry in New York on a regular basis—because the travel exception was designed to protect against "such possible perils of the highways as are not supposed to exist among one's own neighbors," while the law prohibited the "carrying of deadly weapons on the streets, in society, in the community, or among the people with whom we are in the habit of associating." *Smith v. State*, 50 Tenn. 511, 513-14 (1871). The extraordinarily limited scope of the "traveler" exemption is further demonstrated by an 1889 law from Arizona, which stated that, "Persons traveling may be permitted to carry arms within settlements or towns of the Territory for one-half hour after arriving in such settlements or town, and while going out of such towns or settlements." 1889 AZ. Acts 31. If they were doing anything other than immediately entering or leaving, they were required to "divest themselves of their weapons." 1889 AZ. Acts 31, Thompson Dec. Ex. 5; *see also* II George W. Paschal, *A Digest of the Laws of Texas* 1322 (3d Ed. 1873), Thompson Dec. Ex. 6 (permitting "persons traveling in the state" only to "keep[] or carry[] arms with their baggage"). New Mexico had a similar law: "Persons traveling may carry arms for their own protection while actually prosecuting their journey and may pass through settlements on their road without disarming; but if such travelers shall stop at any settlement for a longer time than fifteen minutes they shall remove all arms from their person or persons, and not resume the same until upon eve of departure." 1887 N.M. Acts 57, Thompson Dec. Ex. 7. Likewise, the city of Los Angeles issued a blanket prohibition on carrying concealed weapons, with a narrow exception for "person actually traveling, and immediately passing through Los Angeles city." 1865 Los Angeles Ordinance, Thompson Dec. Ex. 8. Whenever a police officer encountered "any stranger," the

26

officer was required to inform him of the law and compel the person to "deposit[] their weapons in a place of safety." *Id.*

With the growth of urban life over the course of the 19th century, along with the increasing proliferation of concealable pistols and revolvers, localities began to enact pistol licensing requirements that were the precursors of the laws in place today. As the Second Circuit has noted, over the course of the Nineteenth Century, "[c]ities across the country, from San Francisco and Eureka to New York and Elmira" adopted firearm licensing laws, and "[t]hat widespread adoption by diverse and distant localities under varying circumstances suggests that these policies enjoyed broad popular support and were understood at the time to be consistent with the Second and Fourteenth Amendments." *Antonyuk*, 120 F.4th at 990 (citing Saul Cornell, *The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America,* 33 U.C. Davis L. Rev. Online 65, 85 (2021)). And many of these laws, including here in New York State, had explicit *local* residency or employment requirements.

For instance, the independent City of Brooklyn enacted an 1880 law stating that "[a]ny person twenty one years of ager and over . . . who has occasion to carry a pistol for his protection, may apply to the officer in command of the station house of the precinct *where* he resides, and such officer, if satisfied that the applicant is a proper and law abiding person" shall recommend that the Commissioner of Police issue him a permit. Ordinance to Regulate the Carrying of Pistols, printed in the *Brooklyn Daily Eagle* (Oct. 26, 1880) (emphasis in original), Thompson Dec. Ex. 9. As to nonresidents, the law established that "[a]ny non-resident who does business in the City of Brooklyn" could "make application for permission to do so to the officer in command of the station house of the precinct in which he does business, in the same manner as is required for the residents of said city." *Id.* There was no provision made for the carrying of deadly weapons by persons

27

without a significant connection to the community.  Similar laws limiting permits to city residents or persons doing business within the jurisdiction were passed in New York City, Thompson Dec. Ex. 10, Albany, *id.* Ex. 11, and Troy, *id.* Ex. 12.  Nor does New York State appear to be unique, as jurisdictions elsewhere adopted similar requirements.  *See, e.g.,* Charles H. Hamilton, *The General Ordinances of the City of Milwaukee* 693 (1896), Thompson Dec. Ex. 13 (prohibiting the carrying of pistols or other deadly weapons, but allowing that the chief of police may "issue and give a written permit to any person residing within the city of Milwaukee . . . when it is made to appear to said chief of police that it is necessary for the personal safety of such person . . . to carry such weapon"); *see also Revised Ordinances of the City of Omaha* (1872), Thompson Dec. Ex. 14 (prohibiting concealed weapons except for "well known and worthy citizens, or persons of good repute, who may carry arms for their own protection in going to or from their place of business"). "[T]hese laws and ordinances did not merely exist—they appear to have existed without constitutional qualms or challenges." *Antonyuk*, 120 F. 4th at 990.

State licensing laws such as the one Plaintiffs are challenging did not emerge until the early 20th Century, but when they did, jurisdictions across the country regularly included in-state residency or employment requirements.  For instance, when Georgia enacted its licensing law in 1910, it made it "unlawful for any person to have or carry about his person, in any county in the State of Georgia, any pistol or revolver without first taking out a license from the ordinary of the respective counties in which the party resides."  VI Orville A. Park, *Park's Annotated Code of the State of Georgia* 234 (1915), Thompson Dec. Ex. 15; *see also* 1913 Or. Laws 497, Thompson Dec. Ex. 16 (forbidding in Oregon the sale of a pistol or revolver to someone without a permit signed by a judicial official "of the county wherein such person resides."); 1921 Mo. Laws 692, Thompson Dec. Ex. 17 (no person may buy or sell a concealable firearm without a permit "issued by the

circuit clerk of the county in which the applicant for a permit resides in this state"). West Virginia's licensing law required that an applicant "has been a *bona fide* resident of this state for at least one year next" before even applying. 1925 W.Va. Acts 25, Thompson Dec. Ex. 18.

To be clear, the Court need not and should not reach the issue of the constitutionality of a hypothetical in-state residency or employment requirement for firearms licensing. New York's licensing law does not contain such a requirement, and to reach the issue the Court would need to adopt an interpretation of Penal Law § 400.00(3)(a) that is contrary to both New York's position and controlling precedent from the New York Court of Appeals. But even if such a law were on the books, it would be entirely "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. Throughout American history, the people's elected representatives have enacted laws "designed to ensure only that those baring arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens,'" *id.* at 38 n.9 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008)), and one way in which they repeatedly did so is by passing laws requiring that persons carrying deadly weapons in a community be *part* of that community. There are no grounds whatsoever to believe that our forebears would have viewed such laws as unconstitutional.

## V.    PLAINTIFFS' FULL FAITH AND CREDIT CLAIM IS WITHOUT MERIT

Plaintiffs argue in passing—and without any citation to case law on point—that the Full Faith and Credit Clause of the U.S. Constitution bars New York from having its own firearm licensing law apply to out-of-state residents seeking to carry guns within New York State, *see* Plf. Memo 22-23, but that argument is meritless for two reasons. First, the Full Faith and Credit Clause does not give rise to a private right of action. And second, Plaintiffs fundamentally misunderstand the Full Faith and Credit Clause's meaning, as decades of precedent demonstrate that the Clause ensures the recognition of judgments across state lines, but it also leaves each state free to maintain

its own laws within its borders.  That includes state-specific licensing and registration laws like those pertaining to firearms.

Plaintiffs cannot establish such a claim because "the Full Faith and Credit Clause, in either its constitutional or statutory incarnations, does not give rise to an implied federal cause of action." *Thompson v. Thompson*, 484 U.S. 174, 182-83 (1988); *accord Yaw v. State of New York*, No. 09 Cit. 499A, 2009 WL 3817674, at *2 (W.D.N.Y. Nov. 13, 2009); *Universal Credit Trust 2000-A v. Mayfield*, No. 05 Civ. 5159, 2006 WL 8461786, at *5 (S.D.N.Y. Mar. 28, 2006).  "Rather, the Clause 'only prescribes a rule by which courts, Federal and State, are to be guided when a question arises in the progress of a pending suit as to the full faith and credit to be given to the public acts, records, and judicial proceedings of a State other than that in which the court is sitting.'" *Thompson*, 484 U.S. at 182-83 (quoting *Minnesota v. N. Sec. Co.*, 194 U.S. 48, 72 (1904)).  Nor does the Full Faith and Credit Clause "give[] rise to a right vindicable in a § 1983 action." *Adar v. Smith*, 639 F. 3d 146, 153 (5th Cir. 2011) (*en banc*); *accord Brown v. City of Chicago*, No. 19 Civ. 2411, 2020 WL 489522, at *2-3 (N.D. Ill. Jan. 30, 2020).

But more broadly, Plaintiffs' argument misunderstands the way the Full Faith and Credit Clause functions; the provision "differentiates the credit owed to laws (legislative measures and common law) and to judgments."  *Baker ex rel. Thomas v. GM Corp.*, 522 U.S. 222, 232 (1998). While the Clause requires states to give preclusive effect to the judgment of a sister state, the Supreme Court has repeatedly emphasized that "[t]he Full Faith and Credit Clause does not compel a state to substitute statutes of other states for its own statutes dealing with a subject matter concerning which it is competent to legislate." *Franchise Tax Bd. of Cal. v. Hyatt*, 538 U.S. 488, 494 (2003); *accord Sun Oil Co. v. Wortman*, 486 U.S. 717, 722 (1988); *Baker*, 522 U.S. at 232. There is no doubt that the people of New York remain competent and empowered to make their

own choices about the firearm licensing procedures that keep them safe.  *See Bruen*, 597 U.S. at 80 (Kavanaugh, J., joined by Roberts, C.J., concurring) ("New York . . . may continue to require licenses for carrying handguns for self-defense").

Plaintiffs cite no case holding that the Full Faith and Credit clause requires states to defer to firearm licenses granted under the law of a different state.  In fact, court after court has rejected that argument, including the Fourth Circuit in a case where the organization that brought the action, represented by Plaintiffs' counsel, sought to compel Maryland to license a prohibited person based on Virginia's law.  *Hamilton v. Pallozzi*, 848 F.3d 614, 628 & n.15 (4th Cir. 2017) ("Virginia may have opted to restore [felon]'s gun ownership rights within its borders, but Maryland need not do so within its own borders."); *overruled in part on other grounds*, *Bruen*, 597 U.S. at 19; *see also, e.g., Commonwealth v. Harris*, 481 Mass. 767, 776 (2019) (under Full Faith and Credit Clause, "[t]he Commonwealth is not required to substitute its statutes for those of New Hampshire."); *Matter of Winston*, 438 N.J. Super. 1, 8-9 (N.J. Super. Ct. App. Div. 2014); *Corcoran v. Sessions*, 261 F. Supp. 3d 579, 588 n.18 (D. Md. 2017); *Moran v. Wisconsin Dep't of Just.*, 2019 WI App. 38, ¶¶ 43-45 (Ct. App. 2019); *Brown v. Handgun Permit Rev. Bd.*, 188 Md. App. 455, 485 (Ct. Spec. App. 2009); *People v. Shear*, 71 Cal. App. 4th 278, 288-89 (Ct. App. 1999); *Hawkins v. State*, 745 S.W.2d 511, 514 (Tex. Ct. App. 1988).

## VI.    PLAINTIFFS' PRIVILEGES AND IMMUNITIES CLAIM FAILS BECAUSE NEW YORK'S LICENSING LAW DOES NOT DISCRIMINATE, HAS NO PROTECTIONIST PURPOSE, AND WOULD PASS INTERMEDIATE SCRUTINY

Plaintiffs also contend that New York's firearm licensing laws violate the Constitution's Privileges and Immunities Clause, Plf. Memo 23-25, though their brief discusses the claim almost exclusively by citing Second Amendment cases.  This is likely because the law of the Privileges and Immunities clause is solidly against them, since "the Clause does not demand that a citizen of

one State be allowed to carry with him into another state the privileges and immunities which come

with citizenship in his state." *Schoenefeld v. Schneiderman*, 821 F. 3d 273, 279 (2d Cir. 2016).

Moreover, "[t]he Privileges and Immunities clause . . . is 'not an absolute' that precludes states

from ever distinguishing between citizens and noncitizens." *Id.* (quoting *Supreme Court of

Virginia v. Friedman*, 487 U.S. 59, 67 (1988)).  Instead, such challenges are evaluated under the

familiar intermediate scrutiny standard, under which multiple federal courts, including this one,

have found residency requirements for firearms licenses to be constitutional.  *See Osterweil* v.

Bartlett, 819 F. Supp. 2d 72, 86 (N.D.N.Y. 2011).  Even if New York's licensing law contained an

in-state residency or employment requirement—which it does not—Plaintiffs' Privileges and

Immunities argument fails.

### A.     New York's Licensing Statute Does Not Discriminate Against Nonresidents

As an initial matter, any Privileges and Immunities claim fails because New York simply

does not discriminate against residents of other states in firearm licensing.  The Privileges and

Immunities clause "guarantees 'that in any state every citizen of any other state is to have the same

privileges and immunities which the citizens of that State enjoy.'" *Schoenefeld*, 821 F. 3d at 279.[10]

That is the case under New York law, which on its face allows out-of-state applicants to apply for

firearm licenses on the same basis and under the same standards as applicants from New York.

*See* N.Y. Penal Law §§ 400.00(7) (license may be "issued to a noncitizen, or to a person not a

---

[10] To the extent that Plaintiffs claim that the Privileges and Immunities Clause entitles them to carry guns in New York because they are licensed in other states, they are mistaken: "the Clause does not demand that a citizen of one State be allowed to carry with him into another state the privileges and immunities which come with citizenship in his state." *Schoenefeld*, 821 F. 3d at 279.  Indeed, it is Plaintiffs, in asking to carry guns in New York without fulfilling the requirements New Yorkers must meet, who are "looking to be treated differently from, not the same as, New York resident[s]." *Id.* at 276.

citizen of and usually a resident in the state"); (1)(a) (containing no state citizenship requirement in "eligibility" criteria); (2)(f) (concealed carry license "shall be issued . . . without regard to employment or place of possession . . . by any person"); *Osterweil*, 21 N.Y.3d at 586 (application provision exists "to discourage 'forum-shopping,' rather than to exclude certain applicants from qualifying at all."); *see generally* Section II, *supra*.

**B.     Plaintiffs Do Not Carry Their Burden to Demonstrate a "Protectionist Purpose"**

Plaintiffs' Privileges and Immunities claim also fails because Plaintiffs do not allege (let alone adduce evidence) that the laws at issue were enacted for the purpose of economic protectionism.  "Consistent with" Supreme Court and Second Circuit case law, "a plaintiff challenging a law under the Privileges and Immunities Clause must allege or offer some proof of a protectionist purpose to maintain the claim.  In the absence of such a showing, a Privileges and Immunities claim fails, obviating the need for a tailoring inquiry." *Schoenefeld*, 821 F. 3d at 280-81 (citing *McBurney v. Young*, 569 U.S. 221, 229 (2013)); *see also id.* at 282 ("A statute enacted for [] a nonprotectionist purpose is not vulnerable to a Privileges and Immunities challenge.").

Even if the Court were to interpret New York's licensing statute as containing an in-state residency or employment requirement (which it does not), the purpose of the relevant portion of the statute was already declared by the Court of Appeals: "the residence language was introduced to prevent New York City residents from obtaining handgun permits in counties where, at the time, investigations of applicants were much less thorough than in the city.  It is therefore evident that the law was originally designed to ensure that licenses were obtained where [New York-based] applicants resided, and to discourage 'forum-shopping.'" *Osterweil*, 21 N.Y. 3d at 586.  Plaintiffs nowhere dispute this purpose for the statute, nor do they contend anywhere that protectionism plays any role in the law's enactment or function.  Accordingly, "[i]n light of the [statute]'s

33

undisputed nonprotectionist purpose, and given that Plaintiffs have not put forth any allegations of a 'protectionist intent,' the Court [should] find[] that Plaintiffs have failed to establish a violation of the Privileges and Immunities Clause." *Jones v. Cuomo*, 542 F. Supp.3d 207, 226 (S.D.N.Y. 2021) (singular changed to plural) (quoting *Schoenfeld*, 821 F. 3d at 282-83); *see also Miller v. Semple*, No. 18 Civ. 1769, 2019 WL 6307535, at \*5 (D. Conn. Nov. 25, 2019) (rejecting Privileges and Immunities claim where plaintiff "'has offered no proof' that any of defendants' actions were done 'in order to provide a competitive economic advantage for Connecticut citizens.'" (cleaned up) (quoting *Schoenefeld*, 821 F. 3d at 280)).

## C. Even if New York Law were Interpreted to Prevent Gun Carriage by Out-of-Staters with no New York Employment or Residency, "Sufficient Justification" Supports Any Such Measure

Even if New York's firearms licensing law did discriminate against noncitizens—which it does not—and even if it was enacted with a protectionist purpose—which it was not—the law would still be constitutional on the merits under the intermediate scrutiny test governing a Privileges and Immunities challenge. "The Privileges and Immunities Clause [] is 'not an absolute' that precludes states from ever distinguishing between citizens and noncitizens." *Schoenefeld*, 821 F. 3d at 279 (quoting *Friedman*, 487 U.S at 67). Instead, even where a plaintiff can demonstrate that a state law is found to discriminate against out-of-state residents, the law still satisfies the Privileges and Immunities Clause so long as the government "'has a substantial reason for the difference in treatment' and 'the discrimination practiced against nonresidents bears a substantial relationship to the State's objective.'" *Meekins v. City of New York*, 524 F. Supp. 2d 402, 412 (S.D.N.Y. 2007) (quoting *Barnard v. Thorstenn*, 489 U.S. 546, 552 (1989)); *accord Schoenefeld*, 821 F. 3d at 279. Even if the Court were to impute a residency requirement into the law, it would still pass muster under the intermediate scrutiny standard, as the Second Circuit and this Court have held before. *Osterweil*, 819 F. Supp. 2d at 89 (rejecting Privileges and Immunities argument

because "New York has a substantial interest in limiting firearm possession to those with the most significant contacts with the State and [] section 400.00 of New York's Penal Law is substantially related to that purpose."); vacated on other grounds by *Osterweil v. Bartlett*, 738 F.3d 520 (2d Cir. 2013) (*per curiam*).[11]

## **CONCLUSION**

Pursuant to all the reasons set forth above, Superintendent James respectfully requests that this Honorable Court deny Plaintiffs' Motion for Summary Judgment, grant his Cross-Motion for Summary Judgment, dismiss the Complaint in its entirety and with prejudice, and grant such other and further relief as the Court deems just and proper.


Dated:  Albany, New York
         February 14, 2025

                                    LETITIA JAMES
                                    New York State Attorney General
                                    Attorney for the Superintendent


                          By: _____

                                    Matthew J. Gallagher
                                    Assistant Attorney General
                                    Bar Roll No. 701111
                                    The Capitol
                                    Albany, NY 12224
                                    Tel: (518) 776-2284

---

[11] To the extent that the Second Circuit's 2005 decision in *Bach* still has any force, it is here at the last step of the Privileges and Immunities analysis.  While *Bach's* Second Amendment reasoning is undermined by *Bruen* and its state statutory interpretation is contrary to the New York Court of Appeals' subsequent decision in *Osterweil*, *Bachs's* application of intermediate scrutiny to the Privileges and Immunities question, 408 F. 3d at 89-95, has not been directly overruled.  Where the Second Circuit "has spoken directly to the issue presented by [a] case," a district court is "required to follow that decision unless and until it is overruled in a precedential opinion by the Second Circuit itself, or unless a subsequent decision of the Supreme Court so undermines it that it will almost inevitably be overruled by the Second Circuit." *United States v. Gonzalez*, No. 23 Cr. 18, 2024 WL 96517, at *3 (S.D.N.Y. Jan. 9, 2024).

Matthew.Gallagher@ag.ny.gov

James M. Thompson
Special Counsel
Bar Roll No. 703513
28 Liberty Street
New York, NY 10005
Tel.: (212) 416-6556
James.Thompson@ag.ny.gov

CC:  All Counsel of Record
     (via ECF)

36