**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CARL HIGBIE, JOSEPH HARRIS, and<br>MICHAEL VOTRUBA,<br><br>Plaintiffs,<br><br>v.<br><br>STEVEN G. JAMES, in his Official<br>Capacity as Superintendent of the<br>New York State Police, SHERIFF KYLE<br>BOURGAULT, in his Official Capacity as<br>the Sheriff of Rensselaer County, New York,<br>SHERIFF DONALD J. KRAPF, in his<br>Official Capacity as the Sheriff of Columbia<br>County, New York, and JOHN DOES 1-10,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>) Civil Action No. 1:24-cv-00174-MAD-TWD<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM IN OPPOSITION TO DEFENDANT JAMES'**
**CROSS-MOTION FOR SUMMARY JUDGMENT, AND REPLY IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

***Page***

I.    PLAINTIFFS HAVE STANDING. ...................................................................1

   A.    Defendant James Is a Proper Defendant, and Plaintiffs Have Standing. ....................1

   B.    Subsequent Modifications to Form PPB-3 Do Not Moot Plaintiffs' Claims, and the Eleventh Amendment Does Not Preclude Suit Against the Superintendent. ..............................4

   C.    Plaintiff Higbie Has Standing. ........................................................6

II.   DEFENDANT'S ATTEMPT TO AVOID A SECOND AMENDMENT MERITS RULING IS UNAVAILING. ..............................................................6

   A.    All Signs Indicate a Residency or Employment Requirement. ...............................6

   B.    Principles of Constitutional Avoidance Cannot Be Used to Rewrite the Text. ................13

III.  ABSTENTION DOES NOT CURE DEFENDANT'S PROBLEMS. ...................13

IV.   THERE IS NO HISTORICAL TRADITION CONDITIONING THE RIGHT TO BEAR ARMS ON STATE RESIDENCY OR EMPLOYMENT. ................................16

V.    THE FULL FAITH AND CREDIT CLAUSE REQUIRES RECOGNITION OF PLAINTIFFS' LICENSES. ....................................................................21

VI.   NEW YORK'S LAW VIOLATES PRIVILEGES AND IMMUNITIES. ..........................24

## TABLE OF AUTHORITIES

*Page*

**Constitutional Provisions**

Second Amendment ..................................................................................................... passim
Eleventh Amendment ...................................................................................... 1, 4, 5, 6
Fourteenth Amendment ........................................................................................... 19
Full Faith and Credit Clause ............................................................................ 21, 23
Privileges and Immunities Clause ................................................................... 24, 25

**Statutes**

1633 Massachusetts .................................................................................................... 17
1664 New York ........................................................................................................... 17
1664 Pennsylvania .................................................................................................... 17
1665 Connecticut ...................................................................................................... 17
18 U.S.C. § 922(g) ...................................................................................................... 22
18 U.S.C. § 922(g)(5) ................................................................................................. 18
1865 Los Angeles, California ................................................................................. 19
1872 Omaha, Nebraska ............................................................................................ 20
1873 Texas ................................................................................................................... 19
1880 Brooklyn, New York ...................................................................................... 20
1881 New York, New York ..................................................................................... 20
1887 New Mexico ..................................................................................................... 19
1889 Territorial Arizona ......................................................................................... 19
1896 Milwaukee, Wisconsin ................................................................................. 20
1905 Albany, New York .......................................................................................... 20
1905 Troy, New York ............................................................................................... 20
1910 Georgia ............................................................................................................... 20
1913 Oregon ............................................................................................................... 20
1921 Missouri ............................................................................................................ 20
1925 West Virginia ................................................................................................... 20
Conn. Gen. Stat. § 29-28(b) .................................................................................. 22
Mass. Gen. Laws ch. 140, § 121F(k) ................................................................. 22
Mass. Gen. Laws ch. 140, § 131P ....................................................................... 22
Penal Law § 10.00 ...................................................................................................... 7
Penal Law § 265.00(23) .......................................................................................... 22
Penal Law § 265.01-d .............................................................................................. 22
Penal Law § 265.01-e .............................................................................................. 22
Penal Law § 400.00 ....................................................................................... 2, 3, 11
Penal Law § 400.00(1) ................................................................................. 7, 8, 22
Penal Law § 400.00(2)(f) .............................................................................. 7, 8
Penal Law § 400.00(3)(a) ............................................................................ passim
Penal Law § 400.00(3)(b) ...................................................................................... 8
Penal Law § 400.00(4) ............................................................................................ 8

Penal Law § 400.00(7) .................................................................................................. 7, 22
Penal Law § 400.00(19) ......................................................................................................22
Penal Law § 1903 ...............................................................................................................11

## Cases

*Adusumelli v. Steiner*, 740 F. Supp. 2d 582 (S.D.N.Y. 2010) ..........................................25

*Antonyuk v. Bruen*, 624 F. Supp. 3d 210 (N.D.N.Y. 2022) ................................................2

*Antonyuk v. James*, 120 F.4th 941 (2nd Cir. 2024) ............................... 14, 17, 18, 20

*Arizonans for Official English v. Arizona*, 520 U. S. 43 (1997) ......................................14

*Bach v. Pataki*, 408 F.3d 75 (2d Cir. 2005) ............................................................ passim

*Baughcum v. Jackson*, 92 F.4th 1024 (11th Cir. 2024) ................................................. 2, 3

*Carr v. State*, 34 Ark. 448 (1879) ....................................................................................19

*Civil Rts. Corps. v. Pestana*, 2022 U.S. Dist. LEXIS 81969 (S.D.N.Y. May 5, 2022) .................................3

*Commonwealth v. Donnell*, 2023 Mass. Super. LEXIS 666 (Aug. 3, 2023) .....................24

*Commonwealth v. Harris*, 481 Mass. 767 (2019) .......................................................... passim

*Corbett v. Hochul*, 2024 U.S. Dist. LEXIS 132256 (S.D.N.Y. July 26, 2024) ................ 2, 3

*Davis v. Passman*, 442 U.S. 228, 239 (1979) ...................................................................21

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ..........................................16, 18, 23

*Doe v. Putnam County*, 2020 U.S. Dist. LEXIS 222885 (S.D.N.Y. Nov. 30, 2020) .................................15

*Eslava v. State*, 49 Ala. 355 (1873) ..................................................................................19

*Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60 (1991) ..............................................22

*Freeman v. Giuliani*, 2024 U.S. Dist. LEXIS 233459 (S.D.N.Y. Dec. 27, 2024) ...............15

*Friends of the Earth, Inc. v. Laidlaw Env't Servs.*, Inc., 528 U.S. 167 (2000) ..................4

*Fulton v. Goord*, 591 F.3d 37 (2d Cir. 2009) ......................................................................6

*Gazzola v. Hochul*, 88 F.4th 186 (2d Cir. 2023) ................................................................2

*Hamilton v. Pallozzi*, 848 F.3d 614 (4th Cir. 2017) ...................................................... 9, 23

*Hawkins v. State*, 745 S.W.2d 511 (Tex. Ct. App. 1998) ..................................................23

*In re Winston*, 438 N.J. Super. 1 (App. Div. 2014) ..........................................................23

*Jennings v. Rodriguez*, 583 U.S. 281 (2018) ....................................................................13

*Lunding v. N.Y. Tax Appeals Tribunal*, 522 U.S. 287 (1998) ...........................................24

*Mahoney v. Lewis*, 605 N.Y.S.2d 168 (Sup. Ct. App. Div. 1993) .....................................11

*Marbury v. Madison*, 5 U.S. 137 (1803) ...........................................................................15

*McBurney v. Young*, 569 U.S. 221 (2013) .................................................................. 24, 25

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ........................................................25

*Meadors v. Erie Cnty. Bd. of Elections*, 2024 U.S. App. LEXIS 18484 (2d Cir. July 26, 2024) ......5

*Mhany Mgmt. v. County of Nassau*, 819 F.3d 581 (2d Cir. 2016) .....................................4

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) .................................... passim

*N.Y. State Rifle & Pistol Ass'n v. City of New York*, 590 U.S. 336 (2020) ........................5

*Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012) ...........................................12

*Novak v. Federspiel*, 2022 U.S. Dist. LEXIS 236843 (E.D. Mich. Nov. 23, 2022) ..............15

*Osterweil v. Bartlett*, 21 N.Y.3d 580 (2013) ............................................................. 9, 10, 11

*Osterweil v. Bartlett*, 706 F.3d 139 (2d Cir. 2013) ...................................................... 9, 12

*Osterweil v. Bartlett*, 738 F.3d 520 (2d Cir. 2013) ...........................................................11

*Osterweil v. Bartlett*, 92 F. Supp. 3d 14 (N.D.N.Y. 2015) ...............................................12

*People v. Shear*, 71 Cal. App. 4th 278 (1999) ..................................................................23

*People v. Telfair*, 231 N.E.3d 385 (N.Y. 2023)..............................................................13

*Pratt Inst. v. New York*, 183 N.Y. 151 (1905)................................................................11

*Seila Law LLC v. CFPB*, 591 U.S. 197 (2020)..............................................................13

*Smith v. State*, 50 Tenn. 511 (1871) ..............................................................................19

*Thompson v. Thompson*, 484 U.S. 174 (1988) ..............................................................21

*Toomer v. Witsell*, 334 U.S. 385 (1948) ........................................................................25

*Toyota Lease Tr. v. A-1 Grand Autobody, Inc.*, 2019 U.S. Dist. LEXIS 103574 (E.D.N.Y. June 20, 2019)
................................................................................................................................15

*United Fence & Guard Rail Corp. v. Cuomo*, 878 F.2d 588 (2d Cir. 1989).....................14

*United States v. Rahimi*, 602 U.S. 680 (2024) ........................................................ 16, 18

*Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383 (1988)................................................13

**Other Authorities**

Anglo-Dutch Wars, Britannica.........................................................................................18

Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts  (2012) ......... 7, 8

Joshua J. Mark, European Colonization of the Americas, World Hist. Encyc. (Oct. 19, 2020) ..........18

State of New York Pistol/Revolver License Application, Form PPB-3, NYSP..........................passim

**Regulations**

Emergency Rule – Concealed Carry License Rules for Non New York Residents, NYC Rules (Aug. 6, 2024)..............................................................................................................................9

## I.    PLAINTIFFS HAVE STANDING.

In Defendant's Opposition to Plaintiffs' Motion for Summary Judgment and Cross-Motion for Summary Judgment ("XMSJ"), Defendant claims that he is not a proper defendant and that Plaintiffs lack standing to sue him.[1]  XMSJ at 5-6.  Defendant also claims that Plaintiffs' claims against him are moot, that the Eleventh Amendment protects him from Plaintiffs' action, and that Plaintiff Higbie independently lacks standing.  *Id.* at 10-11.  Each argument lacks merit.

### A.  Defendant James Is a Proper Defendant, and Plaintiffs Have Standing.

Defendant demurs that "he cannot provide Plaintiffs with the relief they seek," on the theory that he "has no involvement in" mandating or guiding counties' acceptance of New York firearm license applications, and because he does not "grant" or revoke licenses.  XMSJ at 6.  For the same reasons, Defendant claims Plaintiffs lack standing.  *Id.* at 8-9 (disputing traceability).  But by focusing on what he *does not* do, Defendant dances around what he *does* control.  As Superintendent of the New York State Police ("NYSP"), Defendant is responsible for enforcing New York's firearm laws (including arresting those who break the law) and for promulgating the New York Pistol/Revolver License application form, Form PPB-3.  *See* Memorandum of Authorities in Support of Plaintiffs' Motion for Summary Judgment ("MSJ") at 4, 11-12; N.Y. Penal Law § 400.00(3)(a); XMSJ at 4 (admitting as much).  Indeed, Form PPB-3, up until recently, required the provision of a New York Driver's License number, making it impossible for Plaintiffs to complete.  *See* MSJ at 4, 11-12.  Defendant concedes as much, acknowledging that his prior form demanded "New York-specific information … that would preclude non-New York residents from applying...."  XMSJ at 4.[2]  Thus,

---

[1]  Defendant argues lack of standing only as to himself, taking no position on Plaintiffs' standing to sue the Defendant sheriffs, who did not file responsive pleadings or cross motions.

[2]  Defendant concedes "there is no statutory requirement that a New York driver's license number must be provided as part of the application."  XMSJ at 9.  Yet the prior iterations of Form PPB-3 demanded just that, a "NY Driver's License #," instructing that one must "[c]omplete this form in its entirety."  *State of New York Pistol/Revolver License Application, Form PPB-3*, NYSP (Rev. 8/22),

Defendant all but admits the harm his form caused Plaintiffs. Additionally, persons within the NYSP (Defendant's agents) *told* Plaintiff Harris that he could not apply for a license. Compl. ¶78. Thus, Defendant's claim that he "cannot mandate" counties accept applications or grant licenses, XMSJ at 4, is a finger-pointing *non sequitur*, because Plaintiffs' inability to apply for licenses is directly traceable to Defendant and his office.

Defendant's reliance on *Gazzola v. Hochul*, 88 F.4th 186 (2d Cir. 2023), and *Corbett v. Hochul*, 2024 U.S. Dist. LEXIS 132256 (S.D.N.Y. July 26, 2024), is misplaced. Those cases involved New York *residents*, which Plaintiffs are not. In *Gazzola*, the plaintiff's objection was that a *county* was not providing license applications, an injury traceable directly to the county. *Gazzola*, 88 F.4th at 202. Similarly in *Corbett*, the plaintiff challenged the denial of a license for failing to complete statutory training, but did not challenge "the curriculum" approved by the Superintendent. *Corbett*, 2024 U.S. Dist. LEXIS 132256, at *10. In neither case did Defendant hamper the applicant from seeking a license, as he has done here. In contrast, *Bach v. Pataki*, 408 F.3d 75 (2d Cir. 2005), involved a suit – against Defendant's very office – by a *nonresident* plaintiff who was unable to apply for a license in the first place. *Id.* at 82.[3]

Defendant next claims that any claim against him is improper because "[p]laintiffs do not argue unconstitutionality as to the form itself," and his promulgating a form that thwarts Plaintiffs' application "is insufficient to create a traceable injury...." XMSJ at 9. But Defendant's cases are inapposite. *Baughcum v. Jackson*, 92 F.4th 1024 (11th Cir. 2024), involved a challenge to Georgia's age

_____

https://tinyurl.com/mr2ps83p. Nevertheless, Defendant speculates that a county may accept an "application with or without a New York driver's license number...." XMSJ at 9.

[3] Defendant claims *Antonyuk v. Bruen*, 624 F. Supp. 3d 210 (N.D.N.Y. 2022), is inapposite because, there, he "was expressly charged with promulgating policies and procedures." XMSJ at 6. But Defendant fails to explain how that is any different from being "charged with approving the application form used by all individuals seeking to obtain a firearm license in New York State." *Id.* at 4; *see also* at 8 ("Superintendent is given certain authority under Penal Law § 400.00.").

requirement to carry.  The only challenged act by the Public Safety Commissioner was to include a blank for "age" on the application, which the plaintiffs still could have completed.  *Id.* at 1033-34. Thus, as the Eleventh Circuit explained, the "*claimed injury isn't a bad form*, but rather the restriction of licenses based on age itself." *Id.* at 1034 (emphasis added); *see also Corbett*, 2024 U.S. Dist. LEXIS 132256, at *10 ("While the Superintendent does approve the curriculum for the training courses … [p]laintiff's challenge is aimed solely at the [statutory] hours requirement … and not at the curriculum.").  In contrast, Plaintiffs' harm flows directly from Defendant's promulgation of Form PPB-3 and the instructions issued by his office, which prevented Plaintiffs from applying for a license. *Baughcum* is further distinguishable because the Commissioner is statutorily constrained to highway patrol, *id.* at 1034-35, whereas here, Defendant is specifically tasked with enforcing New York's carry laws.  *See* N.Y. Penal Law § 400.00.

Just because Defendant cannot alone provide the full spectrum of relief Plaintiffs seek (*see* XMSJ at 6) does not mean that he is improper.  *See Civil Rts. Corps. v. Pestana*, 2022 U.S. Dist. LEXIS 81969, at *27 (S.D.N.Y. May 5, 2022) (citations omitted, cleaned up) (Plaintiff need not prove that a favorable decision will relieve … *every* injury" for defendant to be a "proper defendant").  To be sure, while Defendant does not control license grants at the county level, Plaintiffs also sued the Defendant sheriffs.  Meanwhile, the sheriffs are not responsible for the promulgation of Form PPB-3, or the guidance issued by Defendant's office, which is why Plaintiffs sued Defendant James.  Indeed, both sheriffs testified that each would accept applications from out-of-state applicants if allowed to do so. MSJ at 13-14.  Meanwhile, both Defendant and the Sheriffs are tasked with arresting those who violate New York's carry ban.  Compl. ¶¶18, 21.  Defendant glosses over his part of the story – and to the extent that he is responsible for the harm Plaintiffs allege *against him*, he is answerable for the offense.[4]

---

[4] Defendant's argument that, "if the Court determines that the licensing scheme is unconstitutional, [he] cannot enforce that holding on the counties or their licensing officers," XMSJ

Defendant volunteers another reason he is a proper defendant – because he would arrest Plaintiffs were they to carry a firearm without a license[5] (XSMJ at 7) – but demurs "that is not the basis for" Plaintiffs' constitutional challenge. *Id.* (citing Compl. ¶¶111-33). Not so. Plaintiffs alleged that "Defendant James is tasked with enforcing New York firearm laws, including arresting unlicensed residents and nonresidents who carry firearms unlawfully within the state," and that, "[w]hen traveling to and *through New York*, Mr. Votruba … reasonably fears being arrested and/or prosecuted for carrying a firearm without a New York permit." Compl. ¶¶18, 95 (emphasis added).

## B. Subsequent Modifications to Form PPB-3 Do Not Moot Plaintiffs' Claims, and the Eleventh Amendment Does Not Preclude Suit Against the Superintendent.

Defendant claims that, because his office has amended Form PPB-3 subsequent to being sued, Plaintiffs' claims are moot. XMSJ at 10. Of course, "voluntary cessation," and those harms "capable of repetition but evading review," do not render a case moot. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 174 (2000). In this Circuit, "voluntary cessation" requires the defendant [to] demonstrate that (1) there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Mhany Mgmt. v. County of Nassau*, 819 F.3d 581, 603 (2d Cir. 2016). Neither is satisfied. Here, the ease with which Defendant can amend the form is demonstrated by him amending it *twice* since Plaintiffs sued, in November 2024 and again in December 2024.[6] Defendant therefore is wrong that there "is no basis in the record to believe" another amendment would occur, as he can (and does) amend the form at will. XMSJ at 10 n.1. Defendant's actions here are entirely unlike *N.Y.*

---

at 7, is a misdirection. The Court – not Defendant – enforces its judgments, and Defendant would bear responsibility only for compliance with the Court's judgment directed at him.

[5] Not only *would* Defendant arrest out-of-staters for unlicensed carry, but also he *has* done so – repeatedly, and has also refused to recognize valid out of state permits. *See* Exhibit 2. Due to the numerous redactions involved, Plaintiffs only include one example, but there are many more.

[6] *See State of New York Pistol/Revolver License Application, Form PPB-3*, NYSP (Rev. 11/24), https://tinyurl.com/r2y8s2pk (Nov. 2024); ECF #42-1 (Dec. 2024).

*State Rifle & Pistol Ass'n v. City of New York*, 590 U.S. 336, 338 (2020), where New York amended its firearm licensing *statut*e, "making the old New York City ordinance illegal," and leaving no way for New York City to return to its old ways. *See id.* at 341 (Alito, J., dissenting). Indeed, New York's back-and-forth history with its residency requirement makes Defendant's burden insurmountable. Just a few years ago, New York enthusiastically represented to the Second Circuit that the statute *does indeed* have a residency requirement. Section II(A), *infra*. But then, New York flipflopped to claim *no* residency requirement in other cases. *See* XMSJ at 12 n.3. But even then, Defendant *maintained* the residency requirement by demanding a New York license number on his Form PPB-3 and advising nonresidents of their ineligibility. *See* Harris Deposition at 54:19-55:16, ECF #39-2. And now, having been sued, Defendant amended his Form twice and changed his guidance for call-center staff. *See* Deyo Deposition at 35-36, ECF #39-9 (guidance changed "this month"). In other words, there is no reason to believe Defendant will not change his mind yet again.

Likewise, Defendant's actions are capable of repetition, yet evading review because "(1) the challenged action [is] in its duration too short to be fully litigated prior to cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subject to the same action again." *Meadors v. Erie Cnty. Bd. of Elections*, 2024 U.S. App. LEXIS 18484, at *3-4 (2d Cir. July 26, 2024). And by "evading review," "the Supreme Court has meant evading Supreme Court review." *Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 322 (D.C. Cir. 2009). Given that Defendant has amended Form PPB-3 twice in the span of two months, and provided conflicting information regarding the ability for out-of-state residents to apply for a license (after New York previously changed its mind more than once on the issue), there is no reason to believe Defendant will not flip flop again. And because Defendant can amend Form PPB-3 and call center guidance at will and without any formal process, any further action will be "too short to be fully litigated prior to cessation." Defendant also claims that any claim for nominal damages is prohibited by the Eleventh

Amendment. XMSJ at 10-11. "Under the Eleventh Amendment, State officials can be sued in their official capacities for injunctive relief, but not for money damages." *Fulton v. Goord*, 591 F.3d 37, 45 (2d Cir. 2009). But Plaintiffs predominantly request declaratory and injunctive relief, and the Eleventh Amendment is no bar to *that*. *See* MSJ at 25; Compl. Prayer for Relief.

### C. Plaintiff Higbie Has Standing.

Finally, Defendant claims Higbie lacks standing because he "would be eligible for a license because he is 'principally employed' in New York." XMSJ at 11. But Defendant miscasts the record. At his deposition, Higbie was never asked where he was "principally employed," but instead "where do you work?" Higbie Deposition at 14:17, ECF #39-7; *see also* at 64:5-6 ("you would view New York City as the place where you're employed, correct?"). Neither of these imprecise questions, or Higbie's answers, demonstrates that he is "principally employed" in New York. Moreover, as Higbie explained, he attempted to seek licensure from New York City (among several jurisdictions), but was rebuffed. *Id.* at 29:13-30:3 (making clear he "worked in New York City."). But regardless of whether Higbie has standing, Plaintiffs Votruba and Harris clearly do.

## II. DEFENDANT'S ATTEMPT TO AVOID A SECOND AMENDMENT MERITS RULING IS UNAVAILING.

### A. All Signs Indicate a Residency or Employment Requirement.

New York Penal Law § 400.00 lends itself to one reasonable interpretation – that nonresidents without a statutory nexus may not apply for or be issued a handgun carry license. But even if adopting Defendants' atextual view that § 400.00(3)(a) allows out-of-state residents to apply in any county (XMSJ at 15 n.5), then Defendant's own forms and instructions conflict with his representation of the statute, meaning he violated Plaintiffs' rights without any statutory backing. Either scenario would require this Court to declare that Plaintiffs' right to bear arms in New York has been infringed, and to enjoin all Defendants from continuing their infringement.

But Defendant's statutory arguments are unconvincing. First, he posits that "'any person' is eligible to apply for a New York State handgun license," regardless of residency or employment, because § 400.00(7) "contemplates that a license may be 'issued to a noncitizen, or to a person not a citizen of and usually a resident in the state'...." XMSJ at 11-12. This, Defendant maintains, "indicates that the Legislature intended to allow licenses for non-New Yorkers." *Id.* at 12. Defendant finds further support for this reading in § 400.00(1), which sets general eligibility requirements. *Id.* at 12-13. Finally, Defendant claims that, under § 400.00(2)(f), licenses "can be issued to 'any person.'" *Id.* at 13. But that these provisions support Defendant's interpretation is hardly clear. Indeed, Defendant's interpretation would require reading new words *into* the statute.

First, § 400.00(7)'s contemplation of licenses "issued to a noncitizen, or to a person not a citizen of and usually a resident in the state'" is entirely compatible with § 400.00(3)(a)'s extension of license eligibility to one who "is principally employed or has his or her principal place of business as merchant or storekeeper...." *Id.* § 400.00(3)(a). These are precisely the "noncitizens" § 400.00(7) contemplates. *See* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 180 (2012) ("The provisions of a text should be interpreted in a way that renders them compatible, not contradictory.").

Second, Defendant's suggestion that N.Y. Penal Law § 400.00(1) exclusively "lays out the eligibility requirements" (XMSJ at 12) ignores its introductory mandate that "[n]o license shall be issued ... except by the licensing officer," a term undefined in the Penal Law (*see id.* § 10.00). Thus, § 400.00(3)(a) defines just who the "licensing officer" is – an official "in the city or county ... where *the applicant* resides, is principally employed or has his or her principal place of business...." *Id.* (emphasis added). Without meeting those criteria, there is no "licensing officer" for such person under the statute. To accept Defendant's contrary reading would edit N.Y. Penal Law § 400.00(3)(a) to read "the *in-state* applicant" rather than just "the applicant." Similarly, to accept Defendant's

atextual and self-serving proffer that Plaintiffs may apply "in any county in the State" (XMSJ at 15 n.5) would require blue-penciling the statute to make it say what Defendant wants. But "[n]othing is to be added to what the text states or reasonably implies ... a matter not covered is … not covered." Scalia & Garner, *supra*, at 93.[7]

Finally, Defendant claims that N.Y. Penal Law § 400.00(2)(f) authorizes the licensure of "any person." XMSJ at 13. But § 400.00(2)(f) appears within a list of seven types (a-g) of licenses, and subsection (f) allows a so-called "unrestricted" license to be issued to "any person." N.Y. Penal Law § 400.00(2)(f). But rather than covering literally "any person" (indeed, including felons, as Defendant's logic would permit), statutory context reveals a narrower meaning. *See* Scalia & Garner, *supra*, at 195 ("words are given meaning by their context"). Indeed, the six other license types each authorize *narrow* categories of persons to carry firearms in *limited* contexts, while section (f)'s "unrestricted" license is available to "any person" *without limitation to their job duties or particular location*. The statute does not expand eligibility for licensure itself to "any person" irrespective of the eligibility criteria, in-state residency and employment included.

Defendant next claims "that at least eight New York counties … accept firearm applications from out-of-state applicants...." XMSJ at 13 (citing Ferguson Dec. ¶¶2-3).[8] But, as Defendant admits, five of those counties make up New York City, which only recently changed its rules to allow out-of-

---

[7] The context surrounding a number of other provisions confirm Defendant's misreading. For example, § 400.00(1)(o) requires that "the applicant shall meet *in person* with the licensing officer...." *Id.* (emphasis added). This would make sense if one is applying in their local county, but makes little sense if the applicant is from Arizona. Similarly, §§ 400.00(3)(b) and (4) require a background investigation and fingerprinting by *local* authorities. Again, this makes sense for a *local* applicant, but not one from Alaska. At bottom, the statute clearly contemplates licensing being a local affair for those either residing in or having statutory ties with a given county.

[8] Defendant offers characterizations of hearsay statements in support of this position. *See* Ferguson Dec. ¶3 ("Eight counties … said that they do accept such applications."). But Plaintiffs have no way of knowing what was *actually* communicated, since Defendant does not offer the name or title of the persons who responded, or their specific statements. Nor did Defendant inform Plaintiffs of his declarants or the information they provided prior to the filing of his cross-motion.

state applications *after* Plaintiffs filed this litigation.[9]  And as for the three remaining counties, the Franklin County Sheriff provided a declaration stating that his office does not accept (and never has) the applications Defendant claims, and that Franklin County's licensing official does not issue (and never has) such licenses.  Exhibit 1.  Moreover, Plaintiffs have reason to believe that the same is true for Broome and Hamilton Counties.  Of course, even if Defendants were correct that these counties *accepted* applications, Defendant's declarant concedes that "the ultimate decision as to whether a permit is *issued* is up to the judge or licensing officer."  Ferguson Dec. ¶4 (emphasis added).  And Defendant's 30(b)(6) deponent admitted that, although Defendant receives copies of all license applications "approved by [a] licensing officer," "none that occur to [him]" were ever for an out-of-state resident.  Deyo Deposition at 30:16-31:5.  Plaintiffs seek more than an exercise in futility, where they "apply" in spirit, only for their applications immediately to find their way into a paper shredder.

Defendant then cites a number of cases involving New York's licensing scheme, including *Osterweil v. Bartlett*, 21 N.Y.3d 580 (2013), which he claims "definitively foreclose[s]" Plaintiffs' Second Amendment claim.  XMSJ at 14.  But *Osterweil* does not say what Defendant claims, and in fact other case law seems to "foreclose" Defendant's reading.  Claiming that § 400.00(3)(a) imposes no residency requirement, Defendant quotes *Osterweil v. Bartlett*, 706 F.3d 139, 142 (2d Cir. 2013) for the notion that § 400.00(3)(a) "is phrased in the form of a procedural rule about *where to file* to get a license, not a limitation on *who may get* one."  XMSJ at 14.  But Defendant omits the preceding language: "*As the State noted at oral argument....*"  *Id*, 706 F.3d at 142  (emphasis added).  In other words, the Court was recounting *New York's litigation position* to determine the parameters of the question to certify – whether *domicile* is required for licensure.  *See id.* at 141.  If the Second Circuit had in fact determined there was

---

*See* Defendant's Responses to First Set of Interrogatories, Interrogatory Nos. 2, 3, Exhibit 3.  *See also* Fed. R. Civ. P. 26 (ongoing discovery obligations).

[9] *See Emergency Rule – Concealed Carry License Rules for Non New York Residents*, <u>NYC Rules</u> (Aug. 6, 2024, <u>https://tinyurl.com/mr45xzej</u>.

no *residency* requirement, there would have been no need to certify the *domicile* question in the first place. *Id.* If this Court is to equate New York's litigation positions with Second Circuit holdings, then it is worth mentioning that New York claimed "the text speaks only of residence," and "the New York Court of Appeals would likely apply only a residence *requirement*...." *Id.* (emphasis added).

Next, Defendant claims *Osterweil*, 21 N.Y.3d 580, "definitively foreclose[s]" Plaintiffs' reading. XMSJ at 14. But at no point does Defendant cite relevant language, or explain how it "forecloses" a residency requirement. Indeed, because Osterweil already was "a *resident* of Summit, New York," the issue was whether the statute required domicile *in addition to* residency. *Osterweil*, 21 N.Y.3d at 582 (emphasis added). *See also* MSJ at 16 n.13. It was in this context that *Osterweil* observed that "[t]he plain language of the statute is not consistent with … *domicile* as an eligibility requirement." *Id.* at 585. *Osterweil* simply did not reach the question of residency.

Nor is Defendant's reliance on legislative history persuasive. *See* XMSJ at 15 (recounting problems of licenses freely issued by distant counties and then used in New York City by "persons of unsavory reputation, or with criminal records"). Defendant hangs his hat on *Osterweil*'s discussion of "discourage[ing] 'forum-shopping,'" *Osterweil*, 21 N.Y.3d at 586, but Defendant never acknowledges that this forum-shopping concern would apply equally to out-of-state applicants, who Defendant now promises can apply "in any county in the State," XMSJ at 15 n.5. Indeed, if an applicant hailing from one New York county was unknown in another, a nonresident could not have been any *less* unknown.

Next, Defendant posits that New York "once had an explicit residency requirement but abandoned it." XMSJ at 16. But the older language Defendant quotes (at 16) is no different than current requirements. The legislature simply moved the residency-or-employment requirement into a new subsection defining *who* the "licensing officer" is. N.Y. Penal Law § 400.00(3)(a). Indeed, Defendant's recognition that New York *once had* such a requirement is further evidence that New York has *always* had it. *Osterweil* acknowledged as much. 21 N.Y.3d at 586 ("corresponding residence

language in today's … § 400.00(3)(a) is derived from former Penal Law § 1903, which was added in 1963," and finding "no legislative history from the 1960s suggesting that the relevant intent of the legislature was different then from … 1931.").

Defendant's attempt to minimize *In re Benedetti*, 212 N.Y.S.3d 806 (Sup. Ct. Albany Cnty. 2024), also fails. Defendant notes that *Benedetti* involved a New Yorker who had applied in the wrong county. XMSJ at 14 n.4. But Defendant fails to acknowledge *Benedetti*'s clear statement that "Penal Law § 400.00(3)(a) … must be jurisdictional in nature," and "cannot be waived." *Benedetti*, 212 N.Y.S.3d at 810. Accordingly, "a licensing officer has the ability to grant a license … *only if* the applicant lives or performs his work in the county *where the officer is venued.*" *Id.* at 811 (emphases added). This holding is nothing new as, pre-*Osterweil*, another court concluded that, "[w]hile Penal Law § 400.00 does not contain a residency requirement per se, it follows a fortiori from the Penal Law § 400.00(3) mandate that applications for the type of permit sought here be filed in the city or county of residence that residency *is indeed a prerequisite to its issuance.*" *Mahoney v. Lewis*, 605 N.Y.S.2d 168, 168 (Sup. Ct. App. Div. 1993) (emphasis added). *Osterweil* later repudiated *Mahoney* only as to domicile, not residency.

Finally, Defendant seeks to minimize *Bach v. Pataki*, 408 F.3d 75 (2d Cir. 2005), claiming that *Bach* was decided "twenty years ago" and so it is "no longer good law" in light of *Osterweil*. XMSJ at 16 n.6. But again, *Osterweil* did not undermine the residency-or-employment requirement. Indeed, if *Osterweil* means what Defendant claims, it would seem odd that the Court of Appeals would repudiate *Bach* without even referencing it. *See generally Osterweil*, 21 N.Y.3d 580. Indeed, *Bach* clearly stated that "a nonresident … is not eligible for a New York firearms license." *Bach*, 408 F.3d at 77. *See Pratt Inst. v. New York*, 183 N.Y. 151, 161 (1905) (Court of Appeals does "not overrule important authorities *sub silentio....*"). Nor did the Second Circuit understand *Osterweil* to undermine *Bach*. Rather, two months later, the Second Circuit explained that Osterweil's "status as a part-time *resident is sufficient.*" *Osterweil v. Bartlett*, 738 F.3d 520, 521 (2d Cir. 2013) (emphasis added). The Second Circuit then "*agree*[*d*]" with

11

New York's "represent[ation] that, if the verb 'resides' in § 400.00(3)(a) refers only to residence and does not require domicile, then Osterweil would satisfy *this requirement*...." *Id.* (emphases added). The Second Circuit therefore did not just presuppose a residency requirement; it *agreed* to its existence.

Finally, after remand from the Second Circuit, this Court summarized the case's procedural posture in a subsequent decision on attorney's fees, describing the statute's eligibility criteria to include "§ 400.00(3)(a)'s *apparent residence requirement*...." *Osterweil v. Bartlett*, 92 F. Supp. 3d 14, 21 (N.D.N.Y. 2015). If the New York Court of Appeals had denied the existence of such a requirement, it seems unlikely this Court would continue to discuss its existence. At bottom, Defendant proffers an entirely novel interpretation of the Court of Appeals' *Osterweil* decision which neither this Court nor the Second Circuit recognized in subsequent litigation.

And if Defendant truly believed that out-of-state applications can be filed in any county in the State, then his own actions tell a different story, having promulgated licensing forms demanding New York driver's license numbers, and instructing NYSP officials to inform nonresident callers that they are ineligible for licenses.[10] Indeed, New York's prior positions contradict Defendant's newfound belief where, briefing *Osterweil* before the Second Circuit, New York advanced a position *completely contrary* to Defendant's position now. *See, e.g.*, *Osterweil*, 706 F.3d at 143 ("State itself urges that § 400.00(3)(a) imposes only a residence requirement...."); *id.* at 141 ("State's primary response … is that … the text speaks only of residence" and "that the New York Court of Appeals would likely apply only a residence requirement...."). In fact, New York urged the Second Circuit in briefing to "reach its own conclusion that New York's firearm licensing law *requires residence* rather than domicile

---

[10] It was entirely within Defendant's control "to amend the … Form PPB-3 to remove the requirement of a 'New York driver's license,'" as it was to "update[] … guidelines for call-center staff...." MSJ at 12, 14 (citing Deyo Deposition at 28:17-29:2, 35:20-23). But Defendant did so only after Plaintiffs sued him. *Id.* at 14. And Defendant's "self-serving litigating positions are entitled to no weight." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 665-66 (2012).

in New York,"[11] devoting an entire brief section to "New York's Residency Requirement…." *Id.* at 8; *see also* at 28 ("it is reasonable to construe the phrase 'where the applicant resides' as effectively imposing a state residency requirement…."). But New York's repudiation of Defendant's newfound position did not end there. New York then proceeded to *defend* the Second Circuit's *Bach* decision, arguing that, "[i]n *Bach v. Pataki*, this Court specifically discussed the *important interests* served by the residency provision in Penal Law § 400.00(3)(a)." *Id.* at 38 (emphasis added); *see also* at 39 (calling *Bach*'s "analysis … regarding … New York's residency requirement … accurate and persuasive.").[12]

### B. Principles of Constitutional Avoidance Cannot Be Used to Rewrite the Text.

Lastly, Defendant urges invocation of the canon of constitutional avoidance to avoid what he calls "a significant constitutional issue." XMSJ at 18. But as discussed, the statute does not appear susceptible to Defendant's alternative reading. *Jennings v. Rodriguez*, 583 U.S. 281, 298 (2018) (canon permits a court to "choos[e] between competing *plausible* interpretations of a statutory text"). Rather, construing it to contain *no* residency or employment requirement would require rewriting its text. *See* Section II(A), *supra*. And "we will not rewrite a state law to conform it to constitutional requirements." *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 397 (1988); *see also Seila Law LLC v. CFPB*, 591 U.S. 197, 230 (2020) ("Constitutional avoidance is not a license to rewrite Congress's work to say whatever the Constitution needs it to say…."). Defendant offers this Court no reason to blue-pencil the statute.

## III.   ABSTENTION DOES NOT CURE DEFENDANT'S PROBLEMS.

Defendant next argues that, "rather than step[ping] into the thicket of interpreting state law … the appropriate course is to abstain…." XMSJ at 19 (arguing for "*Pullman* abstention"). But while

---

[11] Brief for Appellee at 5 n.2, *Osterweil v. Bartlett*, No. 11-2420 (2d Cir. June 26, 2012), ECF #83, https://tinyurl.com/28hhxhvv (emphasis added).

[12] Defendant insists his reading "is not a new development and has been New York's position in several other cases," but it has not been adopted by any court. XMSJ at 12 n.3. *See People v. Telfair*, 231 N.E.3d 385, 393 (N.Y. 2023) (nonresident eligibility "an open question….").

abstention applies to "novel or unsettled questions of state law," *Arizonans for Official English v. Arizona*, 520 U. S. 43, 77 (1997), the issue of § 400.00(3)'s "residency requirement" is hardly novel or unsettled, having percolated for more than three decades.  Nor is it unsettled, with several courts finding it to contain a residency requirement.  *See* Section II(A), *supra* (collecting cases).  *Osterweil*, for its part, contains no language to the contrary.  Nor is abstention proper when the Second Circuit already has squarely considered and addressed the question two decades ago.  *See Bach*, 408 F.3d at 77 ("a nonresident without New York State employment … is not eligible for a New York firearms license"). Defendant does not explain why it was appropriate for the Second Circuit to answer the question in *Bach*, but inappropriate for this Court to rely on *Bach* now.  Rather, Defendant claims that the New York "Court of Appeals already interpreted the statutory provision...."  XMSJ at 21; *see also* at 14 (arguing that *Osterweil* "foreclose[s]" Plaintiffs' reading of the statute).  But again, if it is true that New York courts have resolved this question *against* Plaintiffs, then this Court should simply apply that holding here.[13]

Defendant then argues that "prudential considerations weigh in favor of abstention," claiming Plaintiffs should try to apply for licenses, be denied, and then "appeal."  XMSJ at 21-22.  But again, both state courts and the Second Circuit have explained that Plaintiffs are ineligible for licenses, and both *Bach*, 408 F.3d at 83, and *Antonyuk v. James*, 120 F.4th 941, 978 (2nd Cir. 2024), hold that Plaintiffs need not engage in exercises of futility before vindicating their Second Amendment rights.

Arguing alternatively for *Burford* abstention, Defendant claims that, because of "inconsistent application of [the] statute among New York's 62 counties," this Court "must decline to interfere with

_____

[13] As the Second Circuit stated, "*Pullman* abstention requires … state law be unclear."  *United Fence & Guard Rail Corp. v. Cuomo*, 878 F.2d 588, 595 (2d Cir. 1989).  A question purportedly "foreclosed" cannot also be "unclear."

the proceedings...." XMSJ at 22.[14]  But as noted above, Defendant has not shown that any New York

County accepts out-of-state applications, other than New York City only recently.  *See* Section II(A),

*supra*.  Moreover, *Burford* abstention applies "only in rare cases" to "protect[] complex state

administrative processes....'"  *Freeman v. Giuliani*, 2024 U.S. Dist. LEXIS 233459, at *16-17 (S.D.N.Y.

Dec. 27, 2024).  Here, there are no administrative proceedings at issue.  *See id.* at *4 ("the existence of

an administrative scheme is necessary to apply *Burford*"); *Doe v. Putnam County,* 2020 U.S. Dist. LEXIS

222885, at *22 n.7 (S.D.N.Y. Nov. 30, 2020) ("deference is required only to the adjudicative

proceedings of state regulatory bodies").  *Toyota Lease Tr. v. A-1 Grand Autobody, Inc.*, 2019 U.S. Dist.

LEXIS 103574, at *8-9 (E.D.N.Y. June 20, 2019).  *Burford* is inapplicable here.

And despite Defendant's attempts to avoid having this Court "say what the law is" (*Marbury

v. Madison*, 5 U.S. 137, 177 (1803)), abstention does not get Defendant what he wants – dismissal of

this case.  Rather, regardless of whether § 400.00(3) contains a "residency requirement," Defendant's

actions independently have prevented Plaintiffs from applying for carry licenses.  *See* Section II(A),

*supra*.  Thus, regardless of whether the statute violates Plaintiffs' rights, Defendant has.  So too have

Defendant sheriffs, who refused to accept Plaintiffs' license applications.  Bourgault Deposition at 20-

21, ECF #39-4; Krapf Deposition at 16:4-7, ECF #39-5.  Defendant also overlooks that Plaintiffs did

not bring *only* a challenge predicated on New York State's refusal to issue them licenses.  Rather,

Plaintiffs' Second Amendment claim is *also* predicated on Defendant's refusal (as communicated by

his agents) to recognize their *out-of-state* carry licenses.  This distinct aspect of Plaintiffs' claim has

---

[14] Defendant claims that *Novak v. Federspiel*, 2022 U.S. Dist. LEXIS 236843 (E.D. Mich. Nov. 23, 2022), involved "abst[ention] under *Burford* in a post-*Bruen* Second Amendment case."  XMSJ at 22.  Not so.  Rather, that case involved forfeiture issues "effectuate[d]" by "administrative agencies" and numerous "claim-and-delivery" actions in state court.  That court stayed the case prior to resolving the plaintiffs' request to "add a Second Amendment claim...."  *Id.* at *9 n.4.

nothing to do with issuance of a *New York* carry license. Thus, even if this Court abstained from the "residency requirement" question, that would not resolve this case in Defendant's favor.

## IV.    THERE IS NO HISTORICAL TRADITION CONDITIONING THE RIGHT TO BEAR ARMS ON STATE RESIDENCY OR EMPLOYMENT.

Attempting to concoct a historical tradition to justify New York's flat ban on 94 percent of Americans bearing arms, Defendant first postulates that "persons carrying deadly weapons in a community [must] be *part* of that community." XMSJ at 29; *see also* at 24 (likening Plaintiffs to "strangers" or "outsiders"); at 28. But Defendant's tone-deaf claim is foreclosed by *Heller*, which explained that "the people" means "all members of the political community," that being " a *national* community" and those "who have otherwise developed sufficient connection with this *country*." *District of Columbia v. Heller*, 554 U.S. 570, 580 (2008) (emphases added); *see also N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 70 (2022) ("The Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public...."). Just how it is that Plaintiffs, who live over the border in neighboring states, are not part of the "community" and therefore "the people" protected by the Second Amendment, Defendant does not begin to explain.

Rather, Defendant nakedly claims "a longstanding American tradition of ... protecting public safety by preventing strangers outside the jurisdiction from carrying deadly weapons within." XMSJ at 24. But at no point does Defendant *even begin* to prove such a tradition ever existed. That is no hyperbole. Indeed, *not one* of the historical laws Defendant proffers operated remotely similarly to the statute Plaintiffs challenge here – an absolute deprivation of the right to public carry. Nor did *any* of Defendant's historical laws impose a punishment remotely as severe as New York's felony penalties. Nor did Defendant proffer a single historical law from the Founding era – a fatal failure under *Bruen*, especially so after *United States v. Rahimi*, 602 U.S. 680 (2024). But even under the Second Circuit's divergent temporal holding that "evidence from the Reconstruction Era … is at least as relevant as

evidence from the Founding Era," *Antonyuk,* 120 F.4th at 988 n.36., Defendant's historical showing still fails, as he cites territories and scattered cities whose representativeness *Bruen* already dismissed. And Defendant concludes with just *four* temporally irrelevant 20th-century laws, two of which did not even reach the conduct at issue here.

Permeating Defendant's failures are three glaring omissions. First, Defendant never disputes that the Second Amendment's plain text covers Plaintiffs' conduct, and therefore that *Bruen*'s analytical framework applies. XMSJ at 23; *Bruen*, 597 U.S. at 31-33; U.S. Const. amend. II. Second, at no point does Defendant wrestle with the growing judicial consensus that bans on nonresident carry violate the Second Amendment. *See* MSJ at 20-21 (collecting cases). And third, Defendant never cites a single historical authority supporting New York's refusal to honor *other* states' carry licenses. Thus, even if a historical law limited license issuance by *that* jurisdiction, Defendant failed to show that the jurisdiction would not have recognized the licenses of *other* jurisdictions. Indeed, the relevant historical question is broader than just issuance of carry licenses, but instead whether New York can *entirely prevent* Americans from carrying within its borders altogether. Defendant failed to evince such a tradition.

Defendant begins his historical foray in the early colonial era, a time period *Bruen* warned "cannot be indiscriminately attributed to the Framers of our own Constitution." *Bruen*, 597 U.S. at 35. Indeed, absent evidence that such practices "survived to become our Founders' law" and constituted a "long, unbroken line of common-law precedent," they cannot shed light on the meaning of the Second Amendment. *Id.* Even so, Defendant insists on the relevance of 1633 Massachusetts, 1664 New York, 1664 Pennsylvania, and 1665 Connecticut laws which "prohibit[ed] *the sale* of weapons, gunpowder, or bullets not only to Native American tribes, but to anyone outside the state."

XMSJ at 24 (emphasis added).[15]   But on their face, these laws did not prohibit *public carry* by anyone,

therefore failing *Bruen*'s test for relevant similarity, as they did not "impose a comparable burden on

the right...."  *Bruen*, 597 U.S. at 29; *see also Antonyuk*, 120 F.4th at 1046 ("*none* of the State's proffered

analogues burdened Second Amendment rights in the same way").   Moreover, none of these colonial

laws imposed a comparable penalty, "another relevant aspect of the burden" which also must "fit[]

within the regulatory tradition."  *Rahimi*, 602 U.S. at 699.  These historical penalties all were monetary

in nature, a far cry from New York's threat of felony imprisonment today.  *See* Thompson Dec. at 10,

19, 24, 30, ECF #42-2; *Heller*, 554 U.S. at 633-34 (5-shilling fine would not have precluded self-

defense).  And if *Bruen* "doubt[ed] that *three* colonial regulations could … show a tradition of public-

carry regulation," *id.* at 46, it is difficult to imagine how *one* more could make the difference.

Unsurprisingly, Defendant then skips the Founding era entirely, despite *Bruen*'s "general[]

assum[ption] that the scope of the protection applicable to the Federal Government and States is

pegged to the public understanding of the right when the Bill of Rights was adopted in 1791."  *Id.* at

37.  Detouring to cases purportedly undermining Plaintiffs' discussion (MSJ at 21) of historical

traveler's protections, Defendant claims "these exceptions were understood narrowly to allow only

for travelers to protect themselves on the road," XMSJ at 25, Defendant cites *Carr v. State*, 34 Ark.

---

[15] For starters, even as late as the 1660s, the number of inhabitants of the colonies numbered in the *thousands*.  During that time, the colonies were not only British, but also French, Dutch, and Swedish.  Joshua J. Mark, *European Colonization of the Americas*, World Hist. Encyc. (Oct. 19, 2020), https://tinyurl.com/5fcjmnb5.  War between these great powers often permeated the colonies.  *Anglo-Dutch Wars*, Britannica, https://tinyurl.com/3pmksa3m (last visited Feb. 19, 2025).   Thus, the "political community" (*Heller*, 554 U.S. at 580) that developed far later in the colonies simply did not exist in the 1660s.  Rather, the refusal to sell firearms to Indians and "outsiders" reflected nothing more than a refusal to arm foreigners, who were often the enemy.  *See, e.g.*, 18 U.S.C. § 922(g)(5).  Defendant thus impliedly claims that Plaintiffs, fellow Americans who live just across the border in other states, and not citizens of the same country protected by the same Bill of Rights.  *Bruen*, 597 U.S. at 29 (analyzing "why the regulations burden a law-abiding citizen's right to armed self-defense").  Indeed, "some pre-ratification history can be probative of what the Constitution *does not* mean." *Rahimi*, 602 U.S. at 720 (Kavanaugh, J., concurring).  A tradition of the English refusing to arm the French does not justify New York refusing to let Connecticuters bear arms.

448 (1879), *Eslava v. State*, 49 Ala. 355 (1873), and *Smith v. State*, 50 Tenn. 511 (1871). But the statutes at issue reached *concealed carry only*, meaning nonresidents still could carry *openly*. And as for *Smith*, the Tennessee Supreme Court later "read this language to permit the public carry of larger, military-style pistols because any categorical prohibition on their carry would 'violat[e] the constitutional right to keep arms.'" *Bruen*, 597 U.S. at 54. Defendant's singular focus on traveler's exceptions misses the broader point. Those exceptions, even if "extraordinarily limited," XMSJ at 26, only concerned *concealed* carry, and none supports New York's ban on *all* nonresident carry.

Moreover, focusing his historical survey on *traveler's exceptions*, Defendant skips over even the ratification of the Fourteenth Amendment, citing an 1889 law from territorial Arizona "permitting 'persons traveling in the state'" to carry arms only "with their baggage." XMSJ at 26. But as *Bruen* explained, territorial restrictions often were "'legislative improvisations[]' which conflict with the Nation's earlier approach to firearm regulation" and "were irrelevant to more than 99% of the American population." *Bruen*, 597 U.S. at 67. And in any case, this "transitory" law fails *Bruen*'s "how," *id.* at 69, 29, extending only to public carry within a "settlement, town, village or city," not the entire jurisdiction. Thompson Dec. at 33. Thus, under this law, Plaintiffs would not become criminals for walking in the woods. *See* MSJ at 8. And if Plaintiffs had violated this territorial law, they would be subject only a fine and firearm forfeiture, not a *felony*. *See* Thompson Dec. at 33.

Defendant's other traveler's exceptions similarly do not advance his cause. Defendant cites 1873 Texas, 1887 New Mexico, and 1865 Los Angeles, California laws. XMSJ at 26. But the Texas law contained a "reasonable grounds" self-defense exception from its carry regulation, and it punished violations as a misdemeanor via fine and forfeiture. Thompson Dec. at 37. The New Mexico law – another territorial restriction entitled to no weight – applied only to settlements, not the whole jurisdiction, and punished violations with a comparative slap on the wrist. *See id.* at 42 (providing for a fine and a maximum of six months' imprisonment). The Los Angeles ordinance applied only to

19

"carrying concealed weapons," XMSJ at 26, leaving nonresidents free to carry openly. *See* Thompson Dec. at 49 (providing for a fine and a maximum of ten days' imprisonment). None of these is on par with New York's flat ban on bearing arms by 94 percent of Americans.

Left without a remotely comparable tradition of entirely prohibiting nonresident carry, Defendant cites *Antonyuk* for the broadest of propositions – that "[c]ities across the country' … adopted firearm licensing laws," and that "many of these laws … had explicit *local* residency or employment requirements." XMSJ at 27. But Defendant never explains how scattered cities' regulations "demonstrate a broad tradition of States doing so." *Bruen*, 597 U.S. at 70. Nor does he claim that these jurisdictions ever refused to honor other jurisdictions' licenses. Without this crucial detail, Defendant cannot prove that these cities – to the extent they even evince a national tradition[16] – *actually* ever prohibited nonresident carry. Moreover, *every single* example Defendant cites – 1880 Brooklyn, New York; 1881 New York, New York; 1905 Albany, New York; 1905 Troy, New York; 1896 Milwaukee, Wisconsin; and 1872 Omaha, Nebraska – all licensed *concealed carry only*, not regulating carrying firearms openly. *See* Thompson Dec. at 52, 56, 60, 64, 69-70, 74-75. And again, all violations appear to have been misdemeanors, at worst. *See id.*

Ultimately, Defendant is forced to concede that "State licensing laws such as the one Plaintiffs are challenging did not emerge until the early 20th Century...." XMSJ at 28. That admission alone should end this Court's inquiry. Indeed, "20th-century evidence … does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Bruen*, 597 U.S. at 66 n.28; *see also Antonyuk*, 120 F.4th at 989 n.41 ("Twentieth-century evidence is not as probative…."). Defendant's final appeals to 1910 Georgia, 1913 Oregon, 1921 Missouri, and 1925 West Virginia

---

[16] They do not. *See Bruen*, 597 U.S. at 69-70 (engaging in population analysis to discount cities as accounting for only small percentages of state populations); *see also id.* at 66 n.28 ("As with their late-19th-century evidence, the 20th-century evidence presented … does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence.'").

licensing laws therefore fall flat. XMSJ at 28-29. Moreover, aside from being temporally irrelevant, the Oregon and Missouri laws licensed only firearm *transfer*, not public carry generally. *See* Thompson Dec. at 80, 83, 87, 120.

Altogether, Defendant's historical analogues are not analogues at all. They are disparate, anachronistic, and irrelevant regulations which never came close to prohibiting nonresidents from exercising their rights to public carry. Indeed, at no point in the American tradition did a state entirely ban the bearing of arms for 94 percent of the country. *Bruen* explained as much, holding that the Second Amendment protects "all Americans." *Bruen*, 597 U.S. at 70. No number of analogues can contradict this history or that explicit holding, and the challenged statute is unconstitutional.

## V.  THE FULL FAITH AND CREDIT CLAUSE REQUIRES RECOGNITION OF PLAINTIFFS' LICENSES.

Defendant notes that the Full Faith and Credit Clause neither creates an "'implied federal cause of action'" nor "'gives rise to a right vindicable in a § 1983 action.'" XMSJ at 30. But Plaintiffs' Complaint clearly does not plead the Full Faith and Credit Clause as either a freestanding or Section 1983 claim. Rather, Plaintiffs have challenged New York's refusal to recognize their carry licenses *under the Second Amendment*. Compl. ¶¶9, 114; *see also* MSJ at 22. Of course, "[i]f a litigant is an appropriate party to invoke the power of the courts, it is said that he has a 'cause of action,'" which "is analytically distinct and to the question of … relief...." *Davis v. Passman*, 442 U.S. 228, 239 (1979). Defendant confuses Plaintiffs' request for relief, requiring application of Full Faith and Credit, with their cause of action, violation of their right to bear arms. New York's infringement is its failure to let Plaintiffs carry firearms within the state, while Full Faith and Credit is the "rule" to "guide[]" this Court "when a question arises in the progress of a pending suit...." *Thompson v. Thompson*, 484 U.S. 174, 182-83 (1988). And "if a right of action exists to enforce a federal right and Congress is silent on the question of remedies, a federal court may order any appropriate relief." *Franklin v. Gwinnett Cnty.*

*Pub. Sch.*, 503 U.S. 60, 69 (1991). Application of the Full Faith and Credit Clause here will remedy Defendant's Second Amendment infringement.

Defendant next theorizes that New York need not recognize Massachusetts and Connecticut licenses because a state need not "'substitute statutes of other states for its own statutes....'" XMSJ at 30. But Defendant misses the point. For starters, New York must allow Plaintiffs to bear arms within the state. *Bruen*, 597 U.S. at 70. Second, Plaintiffs have not demanded that New York allow them to carry handguns *in the same manner* as Connecticut and Massachusetts. Indeed, Plaintiffs have not challenged New York's registration requirement (N.Y. Penal Law § 400.00(7)), magazine capacity restriction (*id.* § 265.00(23)), any "sensitive" or "restricted" locations (*id.* §§ 265.01-d, 265.01-e), or any other New York-specific rules of carry. Third, with respect to *who* may carry, Plaintiffs have not sought to force New York to allow ineligible persons to carry within the state. Rather, other than their status as out-of-state residents, Plaintiffs are eligible to carry firearms within New York, and *would be issued* New York licenses were they permitted to apply. Compl. ¶¶15, 17, 84, 99, 111. Indeed, both Connecticut and Massachusetts (where Plaintiffs hold licenses, Compl. ¶¶ 13, 75, 87) have among the most stringent carry-licensing criteria in the nation. *Id.* ¶¶104-05, 107-09.[17] In other words, Plaintiffs' possessing those states' licenses *evidences their eligibility* to carry firearms in New York. In fact, Defendant's *own lawyers* spent a significant amount of time deposing each Plaintiff as to his *bona fides* to carry a firearm within New York, going point-by-point down the list of eligibility requirements contained in both § 400.00(1) and 18 U.S.C. § 922(g). Higbie Deposition at 33:20-40:25; Harris Deposition at 47:16-52:24; Votruba Deposition at 41:23-45:17. So detailed were Defendant's questions, that Plaintiff Higbie was even asked to supply his *character references*. Higbie Deposition at

---

[17] *Cf.* N.Y. Penal Law § 400.00(19); Conn. Gen. Stat. § 29-28(b); Mass. Gen. Laws ch. 140, § 131P (training requirements). *Cf.* N.Y. Penal Law § 400.00(1)(b); Conn. Gen. Stat. § 29-28(b); Mass. Gen. Laws ch. 140, § 121F(k) (suitability or morality standards).

36:14-25. Thus, Defendant himself has *proved the truth of* Plaintiffs' claims of eligibility to carry firearms in New York.[18] There simply is no Connecticut or Massachusetts law that New York must "substitute … for its own." Rather, Plaintiffs are eligible to carry firearms *under New York's own scheme*, evidenced by their Connecticut and Massachusetts licenses, which New York must honor.

Finally, Defendant claims that the weight of case law is against Plaintiffs on this issue. XMSJ at 31. But *Hamilton v. Pallozzi*, 848 F.3d 614 (4th Cir. 2017), was not an "action … brought" by an "organization … represented by Plaintiffs' counsel...." XMSJ at 31. Rather, it was a criminal appeal where the Fourth Circuit (in a single sentence footnote) addressed an argument made by *amici. See* 848 F.3d at 629 n.15. *Hamilton* is also distinguishable, because application of Full Faith and Credit there would have required Maryland to accept a Virginia restoration of rights *for which Maryland law did not provide. Id.* at 617; *see also In re Winston*, 438 N.J. Super. 1 (App. Div. 2014) (same); *People v. Shear*, 71 Cal. App. 4th 278 (1999) (Arizona restoration of felon's rights could not be forced upon California). Other than allowing out-of-state persons to bear arms, New York is not required to bend *any* of its laws to those of Connecticut or Massachusetts.

Next, *Hawkins v. State*, 745 S.W.2d 511 (Tex. Ct. App. 1998), is no longer good law, as it predates both *Heller* (Second Amendment protects an individual right) (554 U.S. at 592) and *Bruen* (broad right to public carry applies to "all Americans") (597 U.S. at 70), and instead upheld "Texas['s] … policy determination that carrying a handgun is illegal." 745 S.W.2d at 513-14. In other words, following *Hawkins* is not an option here. *See also Commonwealth v. Harris*, 481 Mass. 767 (2019) (a pre-*Bruen* case labeling the "right to … bear arms" a "privilege" (at 775), and rejecting a request to use a New Hampshire license (permissively granted) in Massachusetts (a restrictive state)). Indeed, as a Massachusetts court subsequently held, "at the time of the *Harris* decision, carrying a firearm outside

---

[18] At a minimum, this Court should find that, *as applied to these Plaintiffs*, the Full Faith and Credit Clause mandates that New York recognize Plaintiffs' Massachusetts and Connecticut licenses.

23

of the home was a privilege." *Commonwealth v. Donnell*, 2023 Mass. Super. LEXIS 666, *4 (Aug. 3, 2023). Defendant's cases either facially conflict with *Bruen* or *Heller*, or they involve attempts to force one state to allow carry by an otherwise-prohibited person.[19] That is not what Plaintiffs seek here.

## VI.    NEW YORK'S LAW VIOLATES PRIVILEGES AND IMMUNITIES.

Defendant claims that "New York simply does not discriminate against residents of other states in firearm licensing." XMSJ at 32. But as the Second Circuit already observed, "[t]here is *no question* that New York discriminates against nonresidents in providing handgun licenses...." *Bach*, 408 F.3d at 91 (emphasis added). Ignoring this, Defendant doubles down, asserting that "New York law … on its face allows out-of-state applicants to apply...." XMSJ at 32. But as already discussed, this cannot be true, and historically it has not been true. *See* Section II(A), *supra*. Next, Defendant asserts – without citation – that Plaintiffs' claim cannot succeed unless "the laws at issue were enacted for the purpose of economic protectionism." XMSJ at 33. But while economic protectionism is *one form* of discrimination the Clause prohibits, it is not the *only* one. Indeed, no such limitation exists in the Clause's text. And "[t]he object of the Privileges and Immunities Clause is to 'strongly … constitute the citizens of the United States one people,' by 'placing the citizens of each State upon the same footing with the citizens of other States, so far as the advantages resulting from citizenship in those States are concerned.'" *Lunding v. N.Y. Tax Appeals Tribunal*, 522 U.S. 287, 296 (1998). *Cf.* XMSJ at 24 (likening Plaintiffs to "strangers" or "outsiders"). Here, citizens of New York have the "advantage[]" of being able to apply for a license to carry a firearm in public, while Plaintiffs have been deprived of that "advantage[]" and treated as if they are not "citizens of the United States" at all. *Id.*; *see also McBurney v. Young*, 569 U.S. 221, 226 (2013) ("Clause protects only those privileges and

---

[19] To the extent that decisions of other state courts contain any discussion or analysis that applies here, Plaintiffs submit that those cases were wrongly decided, unpersuasive, and are non-binding. There is "no other constitutional right which a person loses simply by traveling beyond his home state's border into another state...." *Donnell*, 2023 Mass. Super. LEXIS 666, at *8-9.

immunities that are 'fundamental'"); *McDonald v. City of Chicago*, 561 U.S. 742, 778 (2010) (majority opinion) ("count[ing] the right to keep and bear arms among those fundamental rights").

And although comparisons to cases of economic protectionism are unnecessary, one analogous case bears emphasis. In *McBurney*, *Toomer v. Witsell*, 334 U.S. 385 (1948), the Court struck a statute imposing 100x the fee on out-of-state shrimping boats, where the "'purpose and effect of this statute … [was] not to conserve shrimp, but to exclude non-residents....'" *McBurney*, 569 U.S. at 227 (alteration in original). Of course, an expensive licensing fee is far less prohibitive than a flat *prohibition against applying*, like here. And no matter what the "purpose" of New York's law is on paper (indeed, a law can have many purposes), its "effect" is to discriminate against out-of-state residents. Defendant's overreliance on stated "purpose" is therefore misplaced. XMSJ at 33. Indeed, if a legislature could inoculate its enactments from future claims simply by keeping nefarious legislative purposes secret, then the Privileges and Immunities Clause would be utterly unenforceable.

Finally, Defendant claims New York's nonresident carry ban passes "intermediate scrutiny." XMSJ at 34. But under this test, the "government bears the burden" of justifying its law. *Adusumelli v. Steiner*, 740 F. Supp. 2d 582, 598 (S.D.N.Y. 2010). Here, Defendant only cites the pre-*Bruen Osterweil* line of cases, relying on *Bach*, to claim the law simply "pass[es] muster...." XMSJ at 34. But *Bach* claimed an "interest" in licensing-official discretion, 408 F.3d at 91, an "interest" that is no longer tenable under *Bruen*, which rejected the "discretion to deny licenses based on a perceived lack of need or suitability." 597 U.S. at 13. Defendant makes no attempt to address this change in law and, without any legitimate proffered justification, the challenged law fails "intermediate scrutiny."

## CONCLUSION

For the reasons stated, this Court should deny Defendant's Cross-Motion for Summary Judgment, and grant Plaintiffs' Motion for Summary Judgment.

Respectfully submitted,

Dated: February 21, 2025

_/s/ Stephen D. Stamboulieh_
Stephen D. Stamboulieh                    Robert J. Olson
Stamboulieh Law, PLLC                     William J. Olson, PC
P.O. Box 428                              370 Maple Avenue West, Suite 4
Olive Branch, MS 38654                    Vienna, VA 22180
(601) 852-3440 (T)                        (703) 356-5070 (T)
stephen@sdslaw.us                         (703) 356-5085 (F)
NDNY Bar Roll# 520383                     rob@wjopc.com
_Counsel for Plaintiffs_                  NDNY Bar Roll# 703779

**CERTIFICATE OF SERVICE**

I, Stephen D. Stamboulieh, hereby certify that I have caused to be filed a true and correct copy of the foregoing document or pleading with the Court's ECF system, which generated a notice and delivered a copy of the same to all counsel of record.

Dated: February 21, 2025.

/s/ *Stephen D. Stamboulieh*
Counsel for Plaintiffs