**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**CARL HIGBIE, JOSEPH HARRIS, and**
**MICHAEL VOTRUBA,**

                                        **Plaintiffs,**

    **vs.**                                                    **1:24-CV-174**
                                                                 **(MAD/TWD)**

**STEVEN G. JAMES,** *in his Official Capacity as*
*Superintendent of the New York State Police*,
**SHERIFF KYLE BOURGAULT,** *in his Official*
*Capacity as the Sheriff of Rensselaer County, New*
*York*, **SHERIFF DONALD J. KRAPF,** *in his*
*Official Capacity as the Sheriff of Columbia County,*
*New York*, **and JOHN DOES 1-10,**

                                        **Defendants.**
_____

**APPEARANCES:**                              **OF COUNSEL:**

**WILLIAM J. OLSON, P.C.**                    **ROBERT J. OLSON, ESQ.**
370 Maple Avenue W - Suite 4
Vienna, Virginia 22180
Attorney for Plaintiffs

**STAMBOULIEH LAW, PLLC**                     **STEPHEN D. STAMBOULIEH, ESQ.**
P.O. Box 428
Olive Branch, Mississippi 38654
Attorney for Plaintiffs

**OFFICE OF THE NEW YORK**                    **MATTTHEW GALLAGHER, AAG**
**STATE ATTORNEY GENERAL**                    **JAMES M. THOMPSON, AAG**
The Capitol
Albany, New York 12224
Attorneys for Defendant James

**OFFICE OF THE RENSSELAER**                  **CARL J. KEMPF, III, ESQ.**
**COUNTY ATTORNEY**
99 Troy Road - Fourth Floor
East Greenbush, New York 12061
Attorney for Defendant Bourgault

**ROBERT J. FITZSIMMONS, PLLC**
8 McNary Avenue
Kinderhook, New York 12106
Attorney for Defendant Krapf

**ROBERT J. FITZSIMMONS, ESQ.**

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

On February 5, 2024, Plaintiffs Carl Higbie, Joseph Harris, and Michael Votruba commenced this action pursuant to 42 U.S.C. § 1983, seeking declaratory and injunctive relief, alleging that New York State Penal Law § 400.00(3)(a) (the "firearm statute") violates their Second Amendment right to bear arms, along with the Privileges and Immunities Clause of the United States Constitution. *See* Dkt. No. 1. Plaintiffs also allege that the firearm statute "violates the constitutional requirement that New York grant Full Faith and Credit to the concealed carry permits issued by other states." *Id.* at ¶ 26. Plaintiff Higbie is a resident of Connecticut and Plaintiffs Harris and Votruba are residents of Massachusetts. *See id.* at ¶¶ 11-12. They each have firearms licenses which permit them to bear arms in public in their respective states "and across most of the country." *Id.* at ¶¶ 13-14. Plaintiffs allege that New York does not permit them to "public carry" their firearms while they are in New York solely because they are not residents or employees of the State. *Id.* at ¶ 1.

Plaintiffs name Steven G. James in his official capacity as the Superintendent of the New York State Police ("NYSP") as a Defendant because of his oversight of "the New York Division of State Police, which is responsible for executing and enforcing New York's laws and regulations governing the carrying of firearms in public including, *inter alia*, prescribing the form for Pistol/Revolver License Applications." *Id.* at ¶ 18. Plaintiffs also name Kyle Bourgault, the

Rensselaer County Sheriff, as a Defendant because Rensselaer County is where Plaintiff Votruba typically visits while he is in New York. *See id.* at ¶ 19. Finally, Plaintiffs name Donald Krapf as a Defendant in his capacity as the Columbia County Sheriff because Plaintiffs Votruba and Harris drive through, and Plaintiff Votruba visits, Columbia County. *See id.* at ¶ 20.

Presently before the Court is Plaintiffs' motion for summary judgment, Defendant James' cross-motion for summary judgment, Plaintiffs' response in opposition to Defendant James' motion and their reply in support of their own motion, and Defendant James' reply. *See* Dkt. Nos. 39, 42, 44, 45. Beyond filing their answers and participating in depositions taken by Plaintiffs, Defendants Bourgault and Krapf (the "Sheriff Defendants") have not engaged in this action. They did not respond to Plaintiffs' motion for summary judgment. *See generally* Dkt. Nos. 21, 22, 39-4, 39-5.

For the following reasons, Plaintiffs' motion is granted in part and denied in part and Defendant James' motion is granted in part and denied in part.

## II. BACKGROUND

As set forth in Plaintiffs' complaint, "'New York requires a carry license for the concealed and open carrying of firearms.'" Dkt. No. 1 at ¶ 47 (quoting N.Y. Penal Law §§ 265.01, 265.02, 400.00(2)(d)-(f)). Plaintiffs contend New York's licensing scheme is "an extreme outlier among the states" because "at least 27 states do not even require a permit to carry a concealed firearm in public, while the vast majority that do require permits will issue permits to out-of-state residents, . . . and most states that require a permit for concealed carry still allow open carry without a permit . . . ." *Id.* at ¶ 48. They also allege that New York is different than other states because it does not accept or recognize permits issued by other states, whereas most other states do. *See id.*

3

Plaintiffs' complaint concerns a specific provision of New York's firearm licensing scheme which states as follows:

> "Applications shall be made and renewed, in the case of a license to carry or possess a pistol or revolver … to the licensing officer in the city or county, as the case may be, where the applicant resides, is principally employed or has his or her principal place of business as merchant or storekeeper. . . ."

*Id.* (quoting N.Y. Penal Law § 400.00(3)(a)).  Plaintiffs assert that under section 400.00(3)(a), "for an out-of-state individual who does not 'reside[],' 'is [not] principally employed,' or does not 'ha[ve] his or her principal place of business as merchant or storekeeper' in New York, such individual cannot even apply for a permit to exercise the right to public carry (or, for that matter, to even possess most firearms within New York at all)."  *Id.* at ¶ 50.  The firearm statute also provides that "[i]f such license is issued to a noncitizen, or to a person not a citizen of and usually a resident in the state, the licensing officer shall state in the license the particular reason for the issuance and the names of the persons certifying to the good character of the applicant."  N.Y. Penal Law § 400.00(7).

As to Plaintiff Harris, he is a citizen of Massachusetts.  *See* Dkt. No. 42-4 at ¶ 1.  He has a license to carry a firearm in Massachusetts.  *See id.* at ¶ 2.  Harris has "an 'unrestricted' license to carry" a firearm and "has several other valid 'nonresident' licenses issued by various states," including Maine, Rhode Island, Connecticut, Texas, Florida, Utah, and Pennsylvania.  *Id.* at ¶¶ 2-3.  Harris does not reside or own property in New York, but visits family in New York and wants to carry a firearm while in New York for self-defense.  *See id.* at ¶¶ 4-5.  Plaintiffs aver that "Harris was informed that the only nonresidents who may apply for a New York permit are individuals who either are principally employed in New York or own property in New York."  *Id.* at ¶ 6.

Plaintiff "Harris contacted the Pistol Clerk at the Sheriff's Office of Rensselaer County and was informed he needed to live in the county, possess a New York driver's license, and that New York would not recognize a Massachusetts's firearm license." *Id.* at ¶ 8.  He also "contacted the Sheriff's Office of Columbia County and was informed that New York does not issue permits to nonresidents unless they own property in New York" and "was informed by the Columbia County Sheriff's Office that New York would not recognize his Massachusetts's firearm license." *Id.* at ¶¶ 9-10.  Defendant James agrees that New York does not recognizes a Massachusetts firearm license.  *See id.* at ¶ 7.

As to Plaintiff Votruba, he is a citizen of Massachusetts who maintains an "unrestricted" license to carry a firearm.  *Id.* at ¶¶ 11-12.  He "lives approximately 400 yards from the Massachusetts Pittsfield State Forest, which shares a border with New York." *Id.* at ¶ 13.  He hikes in the Pittsfield State Forest, and he carries his firearm during that time.  *See id.* at ¶ 14. Votruba routinely visits New York in Columbia and Rensselaer Counties.  *See id.* at ¶ 15.  He does not own property or reside in New York but seeks to carry a handgun for self-defense while in New York.  *See id.* at ¶¶ 16-17.  "In December 2023, Votruba called the New York State Police three times to inquire about his eligibility for a New York License to Carry as a nonresident, but he could never get through to a live person." *Id.* at ¶ 18.  On December 18, 2023, Plaintiff Votruba spoke with the Defendant Bourgault "who informed Votruba that New York does not issue licenses to nonresidents unless they work in New York." *Id.* at ¶ 19.

As to Plaintiff Higbie, he is a citizen of Connecticut and has an unrestricted license to carry a firearm in that state.  *See id.* at ¶¶ 20, 22.  Higbie routinely carries a firearm in public for self-defense in Connecticut and wants to do the same in New York.  *See id.* at ¶ 23.  He frequents New York to shop, visits friends, and participate in recreational activities.  *See id.* at ¶ 24.  He

does not reside or own property in New York. *See id.* at ¶ 25. Plaintiffs assert that "Higbie has been unable to apply for a New York Pistol/Revolver License, having been turned away by licensing authorities in Manhattan, in addition to Dutchess, Rensselaer, Putnam, and Westchester Counties." *Id.* at ¶ 26. Plaintiff Higbie testified during his deposition that he could not apply for a license in New York City because he did not have a New York driver's license. *See* Dkt. No. 39-7 at 8.

Defendant James states that Higbie is principally employed in New York City. *See* Dkt. No. 44-6 at ¶ 8. Plaintiffs deny the statement because "'[p]rincipally employed' is not defined, and the deposition citations do not reflect Mr. Higbie testified that he is 'principally employed in New York State.'" *Id.* In his deposition, Higbie testified that he works as a television host for Newsmax whose studios are in Manhattan, New York. *See* Dkt. No. 39-7 at 4. On July 1, 2025, Plaintiff Higbie received a permit for a New York City Concealed Carry Handgun license. *See* Dkt. No. 52.

Plaintiffs assert that Defendant James, as the Superintendent of the NYSP, is responsible for "implementing procedures for the licensing scheme and process." Dkt. No. 42-4 at ¶ 28. Defendant James admits his title, but otherwise denies Plaintiffs' allegation. *See id.* The parties agree that Defendant James is responsible "for enforcing New York firearm laws, including arresting unlicensed residents *and* nonresidents who carry firearms unlawfully within the state." *Id.* at ¶ 29. New York does not have licensing reciprocity with any other state. *See id.* at ¶ 30. Defendant Krapf is the individual tasked with accepting firearm license applications in Columbia County. *See id.* at ¶ 31. He "does not accept applications from nonresidents." *Id.*

As to Rensselaer County, the parties agree that it "does not accept License to Carry applications from out-of-state residents." *Id.* at ¶ 34. Defendant Bourgault confirmed that

"Rensselaer County does not accept nonresident applications, and that a Massachusetts license would not be recognized in New York." *Id.* at ¶ 35.

Defendant James states that he "acts as a licensing officer *only* for the purpose of considering license applications submitted by retired sworn members of NYSP." Dkt. No. 44-6 at ¶ 1. Plaintiffs assert that Defendant James is one "'*possible*' licensing officer for retired members of the state police . . . ." *Id.* However, the parties agree that Defendant James cannot mandate any city or county licensing officer to accept or grant a licensing application. *See id.* at ¶ 2. They also agree that none of the Plaintiffs are retired members of the New York State Police. *See id.* at ¶¶ 4-6. Plaintiffs agree "once a license application has been submitted and is accepted, Defendant [James] has no authority over it being granted or denied." *Id.* at ¶ 7.

The NYSP General Counsel declared that Defendant James "is charged with approving the application form used by individuals seeking to obtain a firearm license in New York State, except in New York City." Dkt. No. 42-1 at ¶ 9. "The application form is designated as the PPB-3 form." *Id.* at ¶ 10. The PPB-3 form as of February 14, 2025, did "not seek New York-specific information from applicants . . . " *Id.* at ¶ 11.

Defendant James asserts he "does not issue guidance to licensing officers about whether an applicant is legally entitled to a license," but Plaintiffs disagree. *Id.* at ¶ 3. Plaintiffs state that they "do not have knowledge of what the Superintendent does or says vis-à-vis any number of third party 'licensing officers,' none of whom is a party to this case." *Id.* Plaintiffs contend that "the referenced citations to Sheriff Bourgault and Sheriff Krapf's deposition transcripts do not reflect either of them being asked or answering any question about 'guidance.' Rather, the record reflects that Defendant's office issues guidance to those who call and ask for it .

. . and the [f]orm PPB-3 guides (if not controls) the application process . . . by mandating the inclusion of certain information." *Id.*

The parties agree that neither Defendant Krapf nor Defendant Bourgault accept nonresident applications in Columbia or Rensselaer Counties, respectively. *See* Dkt. No. 42-4 at ¶¶ 31, 35. In Defendant Krapf's deposition, he testified that his office is not an agent of the state police, and the state police do not have authority over whether his office accepts an application for a pistol permit. *See* Dkt. No. 39-5 at 41. When he was asked whether the state police had authority over the ultimate decision a licensing officer makes, Defendant Krapf responded, "Not that I'm aware of." *Id.* Defendant Bourgault testified the same. *See* Dkt. No. 39-4 at 40-41.

Defendant James relies on the declaration of an Investigative Analyst with Office of the New York State Attorney General who, along with a colleague, contacted the police and sheriff's offices in New York's sixty-two counties. *See* Dkt. No. 42-3. Defendant James attests that based on those phone calls, "[t]here are at least eight (8) counties in New York State that accept firearm licensing applications from out-of-state applicants that do not reside in New York, are not principally employed in New York, and do not have a principal place of business in New York." Dkt. No. 44-5 at ¶ 9. Plaintiffs deny the statement and cite to a declaration from the Franklin County Sheriff. *See id.* Although the Investigative Analyst states that Franklin County accepts nonresident applications, *see* Dkt. No. 42-3 at ¶ 3, the Franklin County sheriff says his office does not. *See* Dkt. No. 44-2.

## III. DISCUSSION

### A. Summary Judgement Standard

"The entry of summary judgment is warranted when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

8

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Doane v. United States*, 369 F. Supp. 3d 422, 438 (N.D.N.Y. 2019) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)); *see also* FED. R. CIV. P. 56(a). "A fact is 'material' if it 'might affect the outcome of the suit under the governing law,' and a dispute is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Jennings v. Decker*, 359 F. Supp. 3d 196, 204 (N.D.N.Y. 2021) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see also Doane*, 369 F. Supp. 3d at 438; *Kenney v. Clay*, 172 F. Supp. 3d 628, 635 (N.D.N.Y. 2016).

"'Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.'" *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (quoting *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996)). However, irrelevant or unnecessary factual disputes do not preclude summary judgment. *See Anderson*, 477 U.S. at 248. Only genuine disputes about a material fact, such that "the evidence is such that a reasonable jury could return a verdict for the nonmoving party" will preclude summary judgment. *Id.*

The party moving for summary judgment "bears the initial burden of demonstrating that there is no genuine issue of material fact to be decided with respect to any essential element of the claim." *Doane*, 369 F. Supp. 3d at 438. If the moving party establishes a prima facie basis for summary judgment and satisfies their burden, the burden then shifts to the nonmoving party, who must then "show, through affidavits or otherwise, that there is a material issue of fact for trial" that a reasonable jury could resolve in its favor. *Id.*; *see also Kenny*, 172 F. Supp. 3d at 635. Evidence that is not significantly probative, or "the mere existence of some alleged factual dispute between the parties[,] will not defeat an otherwise properly supported motion for summary

judgment." *Kenny*, 172 F. Supp. 3d at 635-36 (quoting *Anderson*, 477 U.S. at 247-48); *see also Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993) ("Genuine issues of fact are not created by conclusory allegations").  The nonmoving party must show by more than a "scintilla of evidence" that "a fact-finder could reasonably find for the non-movant." *Heublein*, 996 F.2d at 1461.  In determining the existence of any genuine disputes of material fact, "a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party." *Smith v. N.Y.S. Off. of Temp. & Disability Assistance*, 535 F. Supp. 3d 90, 94 (N.D.N.Y. 2021) (quoting *Ward v. Stewart*, 286 F. Supp. 3d 321, 327 (N.D.N.Y. 2017)); *see also Jeffreys*, 426 F.3d at 553.

"'Where, as here, the parties have cross-moved for summary judgment, a reviewing court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" *Goodall v. New York State Dep't of Corr. & Cmty. Supervision*, No. 9:19-CV-1359, 2024 WL 1288511, *9 (N.D.N.Y. Mar. 26, 2024) (quoting *United States v. Bedi*, 453 F. Supp. 3d 563, 570 (N.D.N.Y. 2020), *rev'd and remanded on other grounds by United States v. Bedi*, 15 F.4th 222 (2d Cir. 2021)).  "'In undertaking this analysis, it bears noting that a district court is not required to grant judgment as a matter of law for one side or the other.'" *Id.* (quotation omitted).

Finally, "Federal Rule of Civil Procedure 56 provides that if a non-moving party fails to oppose a summary judgment motion, then 'summary judgment, *if appropriate*, shall be entered against' him." *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (quoting FED. R. CIV. P. 56(e)).  "Th[e Second Circuit] has made clear, however, that where the non-moving party 'chooses the perilous path of failing to submit a response to a summary judgment motion, the district court may not grant the motion without first examining the moving

party's submission to determine if it has met its burden of demonstrating that no material issue of

fact remains for trial.'" *Id.* (quoting *Amaker v. Foley*, 274 F.3d 677, 681 (2d Cir. 2001)).  "If the

evidence submitted in support of the summary judgment motion does not meet the movant's

burden of production, then 'summary judgment must be denied *even if no opposing evidentiary

matter is presented*.'" *Id.* (quotation omitted).

**B.    Analysis**

　　　　*1. Claims Against Defendant James*

　　　　　　*a. Standing*

　　　　Defendant James argues that "[t]he injuries alleged by Plaintiffs, inability to apply for or

obtain a firearm license in New York due to the licensing regime and New York's failure to give

full faith and credit to their firearm licenses/permits issued by other states, are not traceable to"

him.  Dkt. No. 42-6 at 17.  Plaintiffs contend their alleged injuries are traceable to Defendant

James because he is responsible for "implementing procedures for the licensing scheme and

process" and "enforcing New York's firearm laws."  Dkt. No. 39-12 at 11, 17-18.

　　　　Article III of the United States Constitution limits the "judicial Power of the United

States," to "Cases" and "Controversies[.]"  U.S. CONSTIT. ART. III, §§ 1, 2.  "Standing to sue is a

doctrine rooted in the traditional understanding of a case or controversy."  *Spokeo, Inc. v. Robins*,

578 U.S. 330, 338 (2016).  The doctrine "ensure[s] that federal courts do not exceed their

authority" under Article III, and "limits the category of litigants empowered to maintain a lawsuit

in federal court to seek redress for a legal wrong."  *Id.* (citations omitted).  Therefore, standing is

"the threshold question in every federal case, determining the power of the court to entertain the

suit."  *Kiryas Joel All. v. Village of Kiryas Joel*, 495 Fed. Appx. 183, 188 (2d Cir. 2012).

　　　　"To demonstrate standing, a plaintiff must have 'alleged a personal stake in the outcome of

the controversy as to warrant his invocation of federal-court jurisdiction.'" *Salazar v. Buono*, 559 U.S. 700, 711 (2010) (quoting *Horne v. Flores*, 557 U.S. 433, 445 (2009)) (emphasis omitted). The "constitutional minimum of standing contains three elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) 'actual or imminent, not 'conjectural' or 'hypothetical[.]'" *Id.* (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)) (additional citations omitted). "Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'" *Id.* (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976)). "Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by favorable decision.'" *Id.* at 561 (quoting *Simon*, 426 U.S. at 38).

Plaintiffs contend that Defendant James, in his capacity as the Superintendent of the NYSP, "exercises, delegates, or supervises all powers and duties of the New York Division of State Police, which is responsible for executing and enforcing New York's Laws and regulations governing the carrying of firearms in public, including, *inter alia*, prescribing the form for Pistol/Revolver License Applications." Dkt. No. 39-12 at 17. They further assert that "Defendant James is tasked with enforcing New York firearm laws, including arresting unlicensed residents and nonresidents who carry firearms unlawfully within the state." *Id.* at 18 (emphasis omitted). Plaintiffs argue their "harm flows directly from Defendant's promulgation of [f]orm PPB-3 and the instructions issued by his office, which prevented Plaintiffs from applying for a license." Dkt. No. 44-5 at 8.

Defendant James, on the other hand, argues that he "is not a proper defendant in this

12

action because he cannot provide Plaintiffs with the relief they seek" as he "would have no enforcement authority over [firearms] licenses." Dkt. No. 42-6 at 15. He states that "[t]he Superintendent has no authority or responsibility for any county-issued permits; nor does the Superintendent direct how counties conduct licensing operations." *Id.* at 17 (citing N.Y. Penal Law § 400.00; Dkt. No. 42-1 at ¶¶ 7-8). Specifically, he explains that "[t]he Superintendent would not review Plaintiffs' licensing applications because they are not former members of the NYSP." *Id.* (citing N.Y. Penal Law § 400.01). Defendant James also argues that "[e]ven if the Court were to grant Plaintiffs the relief they seek—declaratory and injunctive relief holding Penal Law § 400.00(3)(a)'s residency, employment, and business prerequisites unconstitutional—the Superintendent would have no role in reviewing Plaintiffs' licensing applications or the procedures utilized by the counties." *Id.* at 18.

As Defendant James points out, "[u]nder binding precedent, a claim against New York's licensing laws can only be brought against a licensing officer." Dkt. No. 45 at 5 (citing *Libertarian Party of Erie Co. v. Cuomo*, 970 F.3d 106, 122 (2d Cir. 2020)) (holding that the proper defendant in a challenge to the licensing law is a licensing officer), *abrogated in part on other grounds by New York State Rifle & Pistol Assoc., Inc. v. Bruen*, 597 U.S. 1 (2022).

Plaintiffs Harris and Votruba contend they contacted Defendants Krapf and Bourgault in Rensselaer and Columbia counties but never interacted with Defendant James. *See* Dkt. No. 42-4 at ¶¶ 8-10. Sergeant Michael Brennan with the NYSP, who speaks "with individuals call[ing] the NYSP about nonresident pistol licensure[,]" and Defendant Bourgault, allegedly informed Plaintiffs that they are unable to apply for a license as nonresidents and their respective out-of-state firearm licenses cannot be recognized in New York. Dkt. No. 39-12 at 18-19; *see* Dkt. No. 42-4 at ¶¶ 19, 35. Defendant James' role in the current matter is limited to the creation and

enforcement of form PPB-3 which is utilized to apply for a firearm license. *See* Dkt. No. 39-12 at 17-18; *see also* Dkt. No. 42-4 at ¶ 29. Although Plaintiffs argue that form PPB-3 prohibits them from applying for a license, neither Plaintiff Harris nor Votruba allege that they attempted to complete form PPB-3. *See* Dkt. No. 39-12 at 12-15. Plaintiff Higbie testified in his deposition that the online application "requires a New York State driver's license which [did] not allow [him] to proceed." Dkt. No. 39-7 at 6.

First, Defendant James "is 'designated as a possible licensing officer for retired members of the state police.'" Dkt. No. 44-6 at ¶ 1 (emphasis omitted). A separate section of New York Penal Law § 400 governs a "[l]icense to carry and possess firearms for retired sworn members of the division of state police." N.Y. Penal Law § 400.01. That statute states that such a license "shall be granted in the same manner and upon the same terms and conditions as licenses issued under section 400.00 of this article provided, however, that applications for such license may be made to, and the licensing officer may be, the superintendent of state police." *Id.* § 400.01(1). None of the Plaintiffs in this case are retired members of the NYSP. *See id.* at ¶¶ 4-6.

Second, Defendant James is charged with approving form PPB-3. *See* Dkt. No. 42-1 at ¶ 9. Plaintiffs contend this establishes standing against Defendant James because the form prevented them from applying for a license when the form required a New York driver's license. *See* Dkt. No. 39-12 at 16-18. The Court disagrees. Even if the form did not contain that requirement, and Plaintiffs completed and submitted the form, Defendant James "has no authority over it being granted or denied." Dkt. No. 44-6 at ¶ 7; *see also* New York Penal Law § 400.00(4-b) ("In acting upon an application, the licensing officer shall either deny the application for reasons specifically and concisely stated in writing or grant the application and issue the license applied for"). The parties agree in Plaintiffs' response to Defendant James' statement of material

14

facts that "[t]he Superintendent cannot mandate that any city or county licensing officer accept or grant any licensing application." *Id.* at ¶ 2. As explained, Defendants Krapf and Bourgault testified in their depositions that their offices are not agents of the state police, and the NYSP do not have authority over whether their offices accept an application for a pistol permit. *See* Dkt. No. 39-5 at 41; Dkt. No. 39-4 at 40-41. The Sheriff Defendants testified that they do not accept applications from out-of-state residents. *See id.* Therefore, any injury in being unable to obtain a license cannot be traced to Defendant James' approval of form PPB-3. *See Gazzola v. Hochul*, 88 F.4th 186, 202-03 (2d Cir. 2023) (holding that the plaintiffs lacked standing to bring their individual Second Amendment claims against the Superintendent because a "county's failure to provide license applications" is not "fairly traceable to the challenged actions"); *see also Corbett v. Hochul*, No. 22-CV-5867, 2024 WL 3553132, *4 (S.D.N.Y. July 26, 2024) (holding that the plaintiffs lacked standing against the state defendants, including the Superintendent, because "[t]he NYPD decides [the p]laintiff's application").

This conclusion is supported by a recent decision from this Court wherein the Court held that the plaintiffs failed to allege any injury traceable to Defendant James with respect to a licensing process and, therefore, lacked standing to pursue their claims against him. *See New York State Rifle & Pistol Ass'n, Inc. v. James*, No. 1:22-CV-907, 2025 WL 553423, *2 (N.D.N.Y. Feb. 18, 2025). Specifically, in that case, the New York State Rifle & Pistol Association ("NYSRPA") lacked standing to sue because it did not suffer an injury concerning New York's sensitive places firearm restrictions as a direct result of Defendant James' actions. *See id.* at *4. Similarly, in the present case, the Court agrees with Defendant James that "Plaintiffs lack standing to sue the Superintendent because their purported inability to apply for a New York firearms license is due to the counties not accepting their applications, not any actions of the

Superintendent." Dkt. No. 45 at 7.  As such, Plaintiffs alleged injuries are fairly traceable to the

licensing officers, but not Defendant James.

Finally, Plaintiffs assert Plaintiff Votruba has standing to sue Defendant James because

Plaintiff Votruba cannot carry a firearm in New York because of the likelihood he will have

contact with New York law enforcement.  *See* Dkt. No. 1 at ¶ 95.  Plaintiffs note that in

November of 2023, Plaintiff Votruba was stopped by law enforcement in Rensselaer County and

given a warning for speeding, which they contend makes the likelihood of police interaction

probable.  *See id.*  A plaintiff "cannot manufacture standing merely by inflicting harm on

themselves based on their fears of hypothetical future harm that is not certainly impending."

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) (citing *Pennsylvania v. New Jersey*, 426

U.S. 660, 664 (1976)).  Alleging a fear of future interaction with NYSP is not sufficient to

establish standing against Defendant James.  Accordingly, Plaintiffs lack standing to sue

Defendant James.

### b. Eleventh Amendment Immunity

Defendant James next asserts that Plaintiffs' "argument is barred by the Eleventh

Amendment." Dkt. No. 42-6 at 19.  In their response, Plaintiffs contend that because they

"predominantly request declaratory and injunctive relief, . . . the Eleventh Amendment is no bar to

that." Dkt. No. 44-5 at 11 (emphasis omitted).  "An action against a state official in his official

capacity is deemed an action against the state itself, . . . which possesses sovereign immunity

under the Eleventh Amendment[.]" *Libertarian Party of Erie Cnty.*, 970 F.3d at 122 (citing *Hafer

v. Melo*, 502 U.S. 21, 25 (1991)).  "While the immunity conferred by that Amendment 'is not

coextensive with the limitations on judicial power in Article III,' it places a 'limitation on the

federal court's judicial power.'"  *Id.* (quoting *Calderon v. Ashmus*, 523 U.S. 740, 745 n.2 (1998)).

"Although the Eleventh Amendment does not bar a federal court, in adjudicating federal claims against state officials in any capacity, from granting prospective injunctive relief, . . . a state official sued in his official capacity is entitled to invoke Eleventh Amendment immunity from a claim for damages[.]" *Id.* at 122-23 (citations omitted).

In *Ex parte Young*, the Supreme Court carved out the following "limited exception," *CSX Transp., Inc. v. N.Y.S. Off. of Real Prop. Servs.*, 306 F.3d 87, 98 (2d Cir. 2002), to Eleventh Amendment state immunity: "[I]ndividuals who, as officers of the state, [have] some duty in regard to the enforcement of the laws of the state, and who threaten and are about to commence proceedings . . . to enforce against parties affected . . . may be enjoined . . . from such action." *Ex parte Young*, 209 U.S. 123, 155-56 (1908); *see also In re Dairy Mart Convenience Stores, Inc.*, 411 F.3d 367, 371 (2d Cir. 2005) ("*Ex parte Young* . . . held that sovereign immunity did not bar actions seeking only prospective injunctive relief against state officials to prevent a continuing violation of federal law because a state does not have the power to shield its officials by granting them immunity from responsibility to the supreme authority of the United States").

Through the *Ex parte Young* doctrine, a party may bring "'a suit [for injunctive or declaratory] relief challenging the constitutionality of a state official's actions in enforcing state law[.]'" *CSX Transp., Inc.*, 306 F.3d at 98 (quotation omitted). "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon Md., Inc. v. Public Service Comm'n of Maryland*, 535 U.S. 635, 645 (2002) (quotation omitted). When a plaintiff seeks prospective relief against a state official in his or her official capacity based on an allegedly unconstitutional statute, "the state officer . . . 'must have some connection with the enforcement of

17

the act'" that includes "both a particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty[.]"  *Kelly v. New York State Civil Serv. Comm'n*, No. 14-CV-716, 2015 WL 861744, *3 (S.D.N.Y. Jan. 26, 2015), *aff'd sub nom.*, *Kelly v. New York Civil Serv. Comm'n*, 632 Fed. Appx. 17 (2d Cir. 2016) (quotation omitted); *see also Ex parte Young*, 209 U.S. at 158-59 (holding that proper suit requires a "special relation" between the defendant and enforcement of the challenged statute); *see also HealthNow New York, Inc. v. New York*, 739 F. Supp. 2d 286, 295 (W.D.N.Y. 2010), *aff'd*, 448 Fed. Appx. 79 (2d Cir. 2011) ("The *Ex parte Young* 'special relation' requirement of a defendant's 'proximity to and responsibility for the challenged state action' is not met where . . . an official merely possesses '[g]eneral authority to enforce the laws of the state'") (quoting *S.C. Wildlife Fed'n v. Limehouse*, 549 F.3d 324, 331, 333 (4th Cir. 2008)).

As explained, this Court recently decided a case that was brought against Defendant James for similar reasons.  Much like the standing issue, this Court concluded that "Defendant James is not involved in the licensing of civilian applicants, since, under New York Law, he is only responsible for the licensing of retired members of the Division of State Police," and that "Defendant James does not have the 'special relation' required under *Ex parte Young.*"  *NYSRPA*, 2025 WL 553423, at *3 (citing N.Y. Penal Law §§ 265.00(10), 400.01(1)).  Thus, this Court found *Ex parte Young* inapplicable "[s]ince none of the . . . [p]laintiffs [were] alleged to be retired members of the [NYSP]" and dismissed Defendant James "insofar as th[e] claims relate[d] to [the p]laintiffs' challenge to the CCIA's firearms safety course and training requirements."  *Id.* at *3. Likewise, in this case, Defendant James lacks a specific "connection with the enforcement of the act" in individual counties.  *Kelly*, 2015 WL 861744, at *3.  As Defendant James explains, "[t]he Superintendent has no authority or responsibility for any county-issued permits; nor does the

Superintendent direct how counties conduct licensing operations." Dkt. No. 42-6 at 17 (citing N.Y. Penal Law § 400.00). Thus, Plaintiffs lack standing to bring their claims against Defendant James in this case and he must be dismissed from the action.

### 2. Mootness

#### a. Claims by Plaintiff Higbie

In the complaint, Plaintiff Higbie, along with the other Plaintiffs, requests that the Court order New York to permit nonresidents to apply for a firearm license. *See* Dkt. No. 1 at 29. The counties located in New York City—Bronx, Kings, New York, Queens, and Richmond counties—issued an Emergency Rule in August 2024 which allowed nonresidents to apply for firearm licenses. *See* Dkt. No. 52 at 1. As of July 2025, Plaintiff Higbie received a concealed carry license in New York City. *See id.*

"Article III, Section 2 of the United States Constitution limits the subject matter of the federal courts to those cases which present a 'case or controversy.'" *Islam v. New York State Bd. of Parole*, No. 9:13-CV-0854, 2016 WL 3943668, *2 (N.D.N.Y. June 2, 2016) (citing *Spencer v. Kemna*, 523 U.S. 1, 7 (1998)). "The hallmark of a moot case or controversy is that the relief sought can no longer be given or is no longer needed." *Martin-Trigona v. Shiff*, 702 F.2d 380, 386 (2d Cir. 1983). "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969).

Plaintiff Higbie will no longer benefit from New York recognizing his out-of-state firearm license as he holds a New York firearm license; therefore, his as-applied Second Amendment challenge is moot. As this Court previously stated, "[w]here a plaintiff challenges a licensing law, their claims become moot if they receive a license." *James*, 2025 WL 553423, at *5 n.5 (citing

*Libertarian Party of Erie Cnty.*, 970 F.3d at 121-22). Because "the relief sought . . . is no longer needed" and he "lack[s] a legally cognizable interest in the outcome," the case is moot as it relates to Plaintiff Higbie's as-applied challenge. *Martin-Trigona*, 702 F.2d at 386; *Powell*, 395 U.S. at 496.

However, "'facial' challenges to regulation[s] are generally ripe the moment the challenged regulation or ordinance is passed[.]" *Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 736 n.10 (1997); *see also Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 915 F. Supp. 2d 574, 595 (S.D.N.Y. 2013) (citing cases holding that a plaintiff need not be denied or even apply for a permit prior to filing a facial challenge); *Ecogen, LLC v. Town of Italy*, 438 F. Supp. 2d 149, 155 (W.D.N.Y. 2006) ("[F]acial challenges to legislative acts are ripe by their very nature") (internal quotation marks omitted). Accordingly, Plaintiff Higbie's facial challenge to the New York firearm statute is not moot.

### b. Voluntary Cessation Doctrine

Defendant James avers "even if Plaintiffs could tie any constitutional injury to [form PPB-3], . . . any such claim would be moot, as . . . the form has been changed to remove the field for a 'New York' driver's license." Dkt. No. 42-6 at 19.[1] Plaintiffs argue the changes to form PPB-3

---

[1] The Court has held that Plaintiffs lack standing to bring their claims against Defendant James; therefore, the Court is not obligated to consider Defendant James' remaining arguments in his cross-motion as they are moot. *See In re Merrill Lynch & Co., Inc. Rsch. Reps. Sec. Litig.*, 375 B.R. 719, 724 (S.D.N.Y. 2007) ("Under Article III's standing requirement, 'if the plaintiff loses standing at any time during the pendency of the proceedings in the district court or in the appellate courts, the matter becomes moot, and the court loses jurisdiction'") (quoting *Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49, 69 (2d Cir. 2001)). However, because the Court has not received a response from the Sheriff Defendants, the Court will reiterate Defendant James' arguments herein because "[t]he non-moving party need not respond to the motion . . . [and a] non-response does not risk a default judgment. . . . Rule 56 does not allow district courts to automatically grant summary judgment on a claim simply because the summary judgment motion, or relevant part, is unopposed." *Jackson v. Fed. Exp.*, 766 F.3d 189, 194 (2d Cir. 2014). The

after the commencement of this litigation do not moot their claims because of the voluntary

cessation doctrine.  *See* Dkt. No. 39-12 at 20-21.  Defendant James contends that the voluntary

cessation doctrine does not apply because "there is no basis in the record to believe that the

Superintendent intends to re-revise the PPB-3 licensing form to add the words 'New York' in front

of "Driver's License # (or Non-Driver ID).'"  Dkt. No. 42-6 at 19 n.1.

> "[A] defendant's 'voluntary cessation of a challenged practice' will moot a case only if the

defendant can show that the practice cannot 'reasonably be expected to recur.'"  *Fed. Bureau of*

*Investigation v. Fikre*, 601 U.S. 234, 241 (2024) (quoting *Friends of the Earth, Inc. v. Laidlaw*

*Environmental Services (TOC), Inc.*, 528 U.S. 167, 189 (2000)) (additional citation and quotation

marks omitted).  "'The Constitution deals with substance,' not strategies."  *Id.* (quotation omitted).

"Were the rule more forgiving, a defendant might suspend its challenged conduct after being

sued, win dismissal, and later pick up where it left off; it might even repeat 'this cycle' as

necessary until it achieves all of its allegedly 'unlawful ends.'"  *Id.* (quoting *Already, LLC v. Nike,*

*Inc.*, 568 U.S. 85, 91 (2013)).  "A live case or controversy cannot be so easily disguised, and a

federal court's constitutional authority cannot be so readily manipulated.  To show that a case is

truly moot, a defendant must prove 'no reasonable expectation' remains that it will 'return to [its]

old ways."  *Id.* (quoting *United States v. W. T. Grant Co.*, 345 U.S. 629, 632-33 (1953)).

(additional quotation marks omitted).  "'The voluntary cessation of allegedly illegal activities will

usually render a case moot if the defendant can demonstrate that (1) there is no reasonable

expectation that the alleged violation will recur and (2) interim relief or events have completely

and irrevocably eradicated the effects of the alleged violation.'"  *Mhany Mgmt., Inc. v. Cnty. of*

---

Court must still "determine whether the legal theory of the motion is sound" and will refer to
Defendant James' briefing insofar as it presents counter arguments to Plaintiffs' legal theories.  *Id.*

*Nassau*, 819 F.3d 581, 603 (2d Cir. 2016) (quoting *Granite State Outdoor Advert., Inc. v. Town of Orange*, 303 F.3d 450, 451 (2d Cir. 2002)).

"At bottom, the 'rule traces to the principle that a party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior.'" *Id.* (quoting *City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 284 n.1 (2001)). "'[A] defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.'" *Id.* at 603-04 (quoting *Laidlaw*, 528 U.S. at 190) (emphasis omitted).

Prior to Plaintiffs filing their complaint, form PPB-3 required an applicant to provide a New York driver's license number. *See* Dkt. No. 39-12 at 10, 15 n.12. However, in late 2024, the application was updated to exclude the language requiring a New York driver's license. *See id.* at 15 n.12. Plaintiffs contend Defendant James has the authority to change the application and call center guidance at any time. *See id.* at 21. Defendant James argues that Plaintiffs provide "no basis . . . to believe that the Superintendent intends to revise the PPB-3 licensing form to add the words 'New York' in front of 'Driver's License # (or Non-Driver ID).'" Dkt. No. 42-6 at 19 n.1. Plaintiffs note, however, that since filing the lawsuit, form PPB-3 has been revised twice and "there is no reason to believe Defendant will not change his mind yet again." Dkt. No. 44-5 at 10.

Although "'a live controversy is not maintained by speculation' that a party might in the future be prevented from conducting an activity that it 'currently asserts no plan to [conduct,]'" *Connecticut Citizens Def. League, Inc. v. Lamont*, 6 F.4th 439, 445 (2d Cir. 2021) (quoting *City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 285 (2001)), Defendant James fails to establish that there is "no reasonable expectation" that he will again change form PPB-3 or call center instructions regarding nonresident applicants, *Fikre*, 601 U.S. at 241. Plaintiffs'

contentions are beyond mere speculation as they state that the residency requirement on the application has been revised twice in the past.  *See* Dkt. No. 44-5 at 10; *see also* Dkt. No. 39-9 at 35-36.  Given this history and Defendant James' failure to sufficiently assure the Court that the "alleged violation" will not recur if the case is dismissed as moot, the intervening changes do not moot Plaintiffs' claims.  *Mhany*, 819 F.3d at 603.[2]

### 3. Merits of Second Amendment Challenge

In New York, applications for a firearm license "shall be made and renewed . . . to the licensing officer in the city or county . . . where the applicant *resides [or] is principally employed or has his or her principal place of business* as merchant or storekeeper[.]"  N.Y. Penal Law § 400.00(3)(a) (emphasis added).  The statute also provides that "[i]f such license is issued to *a noncitizen, or to a person not a citizen of and usually a resident in the state*, the licensing officer shall state in the license the particular reason for the issuance and the names of the persons certifying to the good character of the applicant."  *Id.* § 400.00(7) (emphasis added).  The statute does not define "licensing officer."

Here, Plaintiffs allege violations of their Second Amendment rights "both facially and as applied to Plaintiffs."  Dkt. No. 1 at ¶ 121.  Defendant James contends "there is no Second Amendment issue presented, since Plaintiffs may apply for firearms licenses on the same basis as New Yorkers, and firearm licensing laws are facially constitutional."  Dkt. No. 42-6 at 29

---

[2] Plaintiffs also argue in their response to Defendant James' cross-motion that his actions are capable of repetition yet evade review.  *See* Dkt. No. 44-5 at 10.  The law in the Second Circuit is clear that arguments raised for the first time in a counseled reply brief need not be considered. *See ABN Amro Verzekeringen BV v. Geologistics Americas, Inc.*, 485 F.3d 85, 100 n.16 (2d Cir. 2007) ("[W]e decline to consider an argument raised for the first time in a reply brief"); *Sacchi v. Verizon Online LLC*, No. 14-CV-423, 2015 WL 1729796, *1 n.1 (S.D.N.Y. Apr. 14, 2015) ("Generally, a court does not consider issues raised in a reply brief for the first time because if a party raises a new argument in a reply brief the opposing party may not have an adequate opportunity to respond to it") (citations omitted).  Therefore, the Court declines to address whether Defendant James' action are capable of repetition, yet evade review.

(citations omitted).  Plaintiffs claim that "even if the statute did *not* operate to bar nonresident

Plaintiffs from applying for licenses, *Defendants have*[;]" therefore, the firearm statute is

unconstitutional as applied to them.  Dkt. No. 39-12 at 22.

As an initial matter, Defendant James notes eight counties—Broome, Franklin, Hamilton,

Bronx, Kings, New York, Queens, and Richmond—accept firearm applications from out-of-state

applicants who are not principally employed in New York.  *See id.*; *see also* Dkt. No. 42-3 at ¶ 3.

He suggests Plaintiffs should "simply apply in one of the several . . . counties."  Dkt. No. 42-6 at

31 n.8.  However, the Supreme Court has noted that

> Americans are always free to invoke the Second Amendment, as a
> defense against unconstitutional firearms-licensing schemes. . . .
> [T]his issue is an important and recurring one. . . . [*C*]*f. Baughcum
> v. Jackson*, 92 F.4th 1024, 1035 ([11th Cir.] 2024) (recognizing, for
> Article III standing purposes, that litigants did not need to make the
> "futile gesture" of first applying for a carry license, where "they do
> not meet the state's requirements for license holders").

*Wilson v. Hawaii*, 145 S. Ct. 18, 21-22 (2024) (Mem).  Regardless of whether Plaintiffs were able

to apply for a firearm license, they have standing to challenge the firearm statute and its

application under the Second Amendment.  The Supreme Court has stated that to hold otherwise

"contravenes the settled principle that Americans need not engage in empty formalities before

they can invoke their constitutional rights, and it wrongly reduces the Second Amendment to a

'second-class right.'"  *Id.* at 18 (quoting *McDonald v. Chicago*, 561 U.S. 742, 780 (2010)

(plurality opinion)); *see also United States v. Wilson*, No. 23-30777, 2025 WL 1982767, *7 (5th

Cir. July 17, 2025) ("[R]egardless of how States' permitting schemes are set up, keeping and

bearing arms is *presumptively lawful* nationwide").

Defendant James also argues that this case is not the appropriate means by which

Plaintiffs should seek relief.  *See* Dkt. No. 42-6 at 28-32.  Defendant James argues that "if a

licensing officer denies a Plaintiff's handgun permit application (or if a Sheriff or County Clerk refuses to take one), he can utilize the 'well-established appellate recourse under Article 78[.]'" Dkt. No. 42-6 at 31 (quoting *Kellogg v. Nichols*, 703 F. Supp. 3d 367, 374 n.5 (N.D.N.Y. 2023)). Likewise, Defendant James argues the Court should abstain from reviewing Plaintiffs' claims under the *Pullman* and *Burford* abstention doctrines.[3,4]  *See id.* at 28-32.  As explained, the Supreme Court and Second Circuit have noted that plaintiffs should not be required to engage in futile acts before bringing a constitutional challenge.  The parties agree that Rensselaer and Columbia Counties do not accept nonresident applications.  *See* Dkt. No. 42-4 at ¶¶ 31, 34.  This is sufficient to support Plaintiffs' standing and the Court rejects Defendant James' argument that Plaintiffs are required to litigate this issue in state court through an Article 78 proceeding.  *See Doe No. 1 v. Putnam Cnty.*, 344 F. Supp. 3d 518, 530-31 (S.D.N.Y. 2018) ("While a plaintiff typically lacks standing to challenge New York State's licensing laws if he fails to apply for a

---

[3] As for the *Pullman* abstention doctrine, courts "have abstained under *Pullman* 'when three conditions are met: (1) an unclear state statute is at issue; (2) resolution of the federal constitutional issue depends on the interpretation of the state law; and (3) the law is susceptible to an interpretation by a state court that would avoid or modify the federal constitutional issue.'" *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 100 (2d Cir. 2004) (quoting *Vt. Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376, 385 (2d Cir. 2000)) (additional citation and quotation marks omitted).  "Even when these conditions are fulfilled, we are not required to abstain, and, to the contrary, 'important federal rights can outweigh the interests underlying the *Pullman* doctrine.'" *Id.* (quotation omitted).

[4] "'*Burford* abstention[]' . . . instructs a federal court to abstain, as follows: '[w]here timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar; or (2) where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.'" *Allstate Ins. Co. v. Elzanaty*, 916 F. Supp. 2d 273, 289 (E.D.N.Y. 2013) (quoting *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 361 (1989)).  There is no state administrative agency decision at issue in this case; therefore, the Court declines to apply the *Burford* abstention doctrine.  *See State Farm Mut. Auto. Ins. Co. v. Schepp*, 616 F. Supp. 2d 340, 346 (E.D.N.Y. 2008).

firearms license in New York, there is an exception to this rule: a plaintiff who fails to apply for a firearms license in New York has standing if he makes a 'substantial showing' that his application 'would have been futile'") (quoting *United States v. Decastro*, 682 F.3d 160, 164 (2d Cir. 2012)).

Likewise, Plaintiffs' "claims present 'a direct challenge to the constitutionality of a state statute, a controversy federal courts are particularly suited to adjudicate.'" *Kachalsky v. Cacace*, 817 F. Supp. 2d 235, 253 (S.D.N.Y. 2011), *aff'd sub nom. Kachalsky v. Cnty. of Westchester*, 701 F.3d 81 (2d Cir. 2012) (quoting *Alliance of Am. Insurers v. Cuomo*, 854 F.2d 591, 600-01 (2d Cir. 1988)). Based on the foregoing, the Court declines to abstain from addressing the merits of Plaintiffs' constitutional challenges.

Finally, both parties have filed a supplemental letter pointing the Court's attention to a recent case out of the Southern District of New York. *See* Dkt. Nos. 46, 47 (citing *Meissner v. City of New York*, No. 23-CV-1907, 2025 WL 712744 (S.D.N.Y. Mar. 5, 2025)). In *Meissner*, "the plaintiffs contend[ed] that New York City [] unduly delay[ed] the approval process to obtain a firearm license." *Meissner*, 2025 WL 712744, at *1. The court held that "'"shall-issue" licensing regimes, so long as they allow persons contemplated by the Second Amendment to keep and bear arms and are not applied in practice to frustrate that right, do not even trigger a *Bruen* inquiry into whether they are consistent with this nation's tradition of firearm regulation.'" *Id.* at *4 (additional citation omitted). It dismissed the plaintiff's Second Amendment claim "to the extent it challenges New York State's right to impose its own firearm licensing laws within its own borders." *Id.* Here, Plaintiffs have alleged that the firearm statute frustrates their right to keep and bear arms when traveling in, to, and through the state because they are unable to obtain a license. *See* Dkt. No. 1 at ¶ 121. They do not argue that their ability to obtain a license is simply delayed. As such, the *Meissner* holding is inapposite.

### a. Facial Challenge

"A facial challenge to a legislative Act is . . . the most difficult challenge to mount successfully, since the [plaintiff] must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987); *see also United States v. Rahimi*, 602 U.S. 680, 693 (2024).  To prevail, a defendant need only demonstrate that the law at issue is constitutional in some of its applications.  *See Rahimi*, 602 U.S. at 693; *see also Nat'l Shooting Sports Found., Inc. v. James*, No. 22-1374-CV, 2025 WL 1901082, *5 (2d Cir. July 10, 2025); *Copeland v. Vance*, 893 F.3d 101, 110 (2d Cir. 2018); *Salerno*, 481 U.S. at 745 (1987).  The Second Circuit has recently explained that, even after the Supreme Court's ruling in *Bruen*, the rule remains the same: "[t]o mount a successful facial challenge' to [a firearm regulation], a litigant 'must establish that no set of circumstances exists under which the law would be valid, or show that the law lacks a plainly legitimate sweep.'" *Zherka v. Bondi*, 140 F.4th 68, 74-75 (2d Cir. 2025) (quoting *Antonyuk v. James*, 120 F.4th 941, 983 (2d Cir. 2024)); *see also Bucklew v. Precythe*, 587 U.S. 119, 138 (2019).  "'Facial challenges are disfavored' because they 'often rest on speculation,' 'raise the risk of "premature interpretation of statutes on the basis of factually barebones records,"' and 'threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution.'" *Antonyuk*, 120 F.4th at 987 (quoting *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450-51 (2008)) (additional quotation omitted).

Plaintiffs allege that "[a]s nonresidents of New York without property or principal employment in the State, [they] are ineligible to apply for New York permits, and thus under state law, there is no officer 'with[] authority to review' their applications.'"  Dkt. No. 1 at ¶ 22.  Defendant James argues that Plaintiffs misunderstand the statute because "it says nothing at all

about persons located outside of New York, let alone anything to exclude them from eligibility." Dkt. No. 42-6 at 23. As Defendant James contends, the firearm statute is valid in its application to certain individuals, specifically as to those who reside or are principally employed in New York. *See Antonyuk*, 120 F.4th at 983 ("'[T]o prevail, the Government need only demonstrate that [the challenged statute] is constitutional in *some* of its applications'") (citing *Rahimi*, 602 U.S. at 693). Plaintiffs are not challenging the statute in regard to residents, but rather its effect on nonresidents. The firearm statute does not expressly forbid nonresidents from applying for a firearm license and it specifically references noncitizens applying for a license. *See* N.Y. Penal Law § 400.00(3)(a), (7). Because there are a "set of circumstances" in which the statue is valid, the New York firearm licensing scheme is facially valid. *Salerno*, 481 U.S. at 745. Therefore, the Court must turn to Plaintiffs' as-applied challenge to the statute.

### b. As-applied Challenge

"[A] plaintiff generally cannot prevail . . . without showing that the law has in fact been (or is sufficiently likely to be) unconstitutionally applied to him." *McCullen v. Coakley*, 573 U.S. 464, 485 n.4 (2014). "'[A]n as-applied challenge . . . requires an analysis of the facts of a particular case to determine whether the application of a statute, even one constitutional on its face, deprived the individual to whom it was applied of a protected right.'" *United States v. Karper*, 847 F. Supp. 2d 350, 356 (N.D.N.Y. 2011) (quoting *Field Day, LLC v. County of Suffolk*, 463 F.3d 167, 174-75 (2d Cir. 2006)) (collecting cases).

The Second Amendment provides as follows: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. AMEND. II. In *Bruen*, the Supreme Court rejected a two-step approach commonly used for Second Amendment claims by abandoning the second step which "appli[ed]

means-end scrutiny in the Second Amendment context." *Bruen*, 597 U.S. at 19.  The Supreme Court clarified that "the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  The Government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition." *Id.* at 24.

The Court must first ask "whether the plain text of the Second Amendment protects the [plaintiff's] proposed course of conduct[.]" *Mintz v. Chiumento*, 724 F. Supp. 3d 40, 55 (N.D.N.Y. 2024) (citing *Bruen*, 597 U.S. at 31).  This "requires a textual analysis" of the Second Amendment which "confer[s] an individual right to keep and bear arms." *Id.*; *see also District of Columbia v. Heller*, 554 U.S. 570, 595 (2008).  "[T]he right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626-27 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)).  The right to bear arms has been limited to those that were "in common use at the time." *Id.* (quotation omitted).  This right is also limited to "the sorts of weapons" that are "typically possessed by law-abiding citizens for lawful purposes." *Id.* at 625.

While "there is no defined analytical standard for answering [whether possession of a weapon constitutes typical possession] . . . , the Second Circuit has instructed courts to 'look into both broad patterns of use and the subjective motives of owners.'" *Avitabile v. Beach*, 368 F. Supp. 3d 404, 412 (N.D.N.Y. 2019) (citing *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 256 (2d Cir. 2015)) (additional citation and quotation marks omitted).  "[A] court should consider more broadly whether the weapon is dangerous and unusual in the hands of law-abiding citizens." *Id.* (quotation marks omitted).

This issue is undisputed.  The parties agree Plaintiffs are "ordinary, law-abiding, adult citizens," and are, therefore, "part of the 'people' whom the Second Amendment protects." *Bruen*,

597 U.S. at 31-32; *see also* Dkt. No. 42-4 at ¶¶ 1-2, 11-12, 20-22.  Plaintiffs already obtained

firearm licenses in their respective states and Defendant James does not introduce any reason to

dispute that Plaintiffs are responsible "law-abiding citizens." *Bruen*, 597 U.S. at 31-32.  As such,

the Constitution presumptively protects their right to bear arms in New York.

     *Bruen* then requires the Court to ask "whether the challenged law is consistent with this

Nation's historical tradition of firearms regulation, as 'that delimits the outer bounds of the right to

keep and bear arms.'" *Mintz*, 724 F. Supp. 3d at 56 (citing *Antonyuk v. Chiumento*, 89 F.4th 271,

300 (2d Cir. 2023)).  "The *Bruen* Court was clear in its instruction to the district courts when

undertaking a constitutional analysis of a state's gun control legislation." *Id.* at 53.  "This Court

must rely on history to inform the meaning of constitutional text rather than make empirical

judgments about the costs and benefits of firearms restrictions." *Id.*  As examined by the Supreme

Court in both *Heller* and *Bruen*, "[f]rom the earliest days of the common law, firearm regulations

have included provisions barring people from misusing weapons to harm or menace others."

*Rahimi*, 602 U.S. at 693.  "Even when a law regulates arms-bearing for a permissible reason,

though, it may not be compatible with the right if it does so to an extent beyond what was done at

the founding." *Id.* at 692.  "And when a challenged regulation does not precisely match its

historical precursors, 'it still may be analogous enough to pass constitutional muster.'" *Id.*

(quoting *Bruen*, 597 U.S. at 30).  "The law must comport with the principles underlying the

Second Amendment, but it need not be a 'dead ringer' or a 'historical twin.'" *Id.*

     Defendant James argues that the residency or employment requirement—assuming there is

such a requirement—is supported by historical tradition. *See* Dkt. No. 42-6 at 32.  Defendant

James cites to legislation in New York, Pennsylvania, Connecticut, and Massachusetts dating back

to 1664 which prohibited the sale of weapons to anyone outside the state. *See id.* at 33.

Defendant James also cites to an 1880 law in the City of Brooklyn that had an explicit local residency or employment requirement for obtaining a license for self-defense. *See id.* at 36. Defendant James notes that when state licensing laws began to emerge in the early 20th century, "jurisdictions across the country regularly included in-state residency or employment requirements." Dkt. No. 42-6 at 37.

Plaintiffs, on the other hand, suggest that "[f]rom the 1600s to the modern day, laws proliferated that *exempted* nonresident visitors – or 'travelers' – from local carry restrictions." Dkt. No. 39-12 at 27. Plaintiffs cite to *Bruen* which "explained [that] territorial restrictions often were legislative improvisations[] which conflict with the Nation's earlier approach to firearm regulation and were irrelevant to more than 99% of the American population." Dkt. No. 44-5 at 24 (quoting *Bruen*, 597 U.S. at 67) (quotation marks omitted). Plaintiffs assert that "there [is] no historical tradition (Founding era or otherwise) to support New York's refusal to allow nonresidents to carry firearms in New York," Dkt. No. 39-12 at 27.

In *Bruen*, the Supreme Court categorized historical "periods as follows: (1) medieval to early modern England; (2) the American Colonies and the early Republic; (3) antebellum America; (4) Reconstruction; and (5) the late-19th and early-20th centuries." *Bruen*, 597 U.S. at 34. The Supreme Court explained that it "categorize[d] these historical sources because, when it comes to interpreting the Constitution, not all history is created equal." *Id.* "'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*.'" *Id.* (quoting *Heller*, 554 U.S. at 634-35). The Supreme Court noted that "[t]he Second Amendment was adopted in 1791; the Fourteenth in 1868." *Id.* "Thus, historical practices that long predate or postdate codification of the relevant constitutional provision may not have much bearing on the provision's scope if the practices were obsolete or anomalous." *Antonyuk*, 120 F.4th at 969

(citation omitted).  "For example, a one-off and short-lived territorial law, military decree, or local law, while no doubt relevant, will not carry the day if it contradicts the overwhelming weight of other evidence." *Id.* (citation omitted).  "What matters is 'our whole experience as a Nation.'" *Id.* (quoting *Chiafalo v. Washington*, 591 U.S. 578, 593 (2020)) (additional quotation omitted).

"*Bruen* instructs [courts] to determine whether a given modern law is *part* of the Nation's tradition of firearm regulation, not the sum of it." *Antonyuk*, 120 F.4th at 990.  The Court "must ascertain whether the . . . law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" *Rahimi*, 602 U.S. at 691 (quoting *Bruen*, 597 U.S. at 29).

*Bruen* held that "confining the right to 'bear' arms to the home would make little sense given that self-defense is 'the *central component* of the [Second Amendment] right itself.'" *Bruen*, 597 U.S. at 32 (quoting *Heller*, 554 U.S. at 599).  "After all, the Second Amendment guarantees an 'individual right to possess and carry weapons in case of confrontation,' . . . and confrontation can surely take place outside the home." *Id.* at 33 (quoting *Heller*, 554 U.S. at 592).  The Supreme Court further stated that "[a]lthough [the Supreme Court] remarked in *Heller* that the need for armed self-defense is perhaps 'most acute' in the home, . . . [they] did not suggest that the need was insignificant elsewhere." *Id.*  "Many Americans hazard greater danger outside the home than in it." *Id.*  For example, the Supreme Court has commented that "'a Chicagoan is a good deal more likely to be attacked on a sidewalk in a rough neighborhood than in his apartment on the 35th floor of the Park Tower'[].  The text of the Second Amendment reflects that reality." *Id.* (citing *Moore v. Madigan*, 702 F.3d 933, 937 (7th Cir. 2012)).

Here, the Court is tasked with answering whether the right for armed self-defense can be carried across state lines.  "[T]he prevailing understanding of the right to bear arms in 1868 and

1791 are both focal points of [the] analysis." *Antonyuk*, 120 F.4th at 972 (citations and footnote omitted). Plaintiffs present the Court will laws from 1686, 1813, 1820, 1831, 1837, 1840, 1878, and 1986. *See* Dkt. No. 39-10. In those laws, states prohibited a "person or persons" from "privately [] wear[ing]" a weapon or having an item "concealed as a weapon." *Id.* a 5, 8, 14, 16, 20-21. They did not discuss openly carrying a firearm. *See id.* Some of the laws also did not differentiate between a person residing within the state and a person residing elsewhere. *See id.* at 5, 8, 14, 16.

The 1831 law from Indiana, however, applied only to those "not being a traveller [sic]," meaning that travelers could conceal their weapons. *Id.* at 18. Likewise, the 1840 and 1878 Alabama and Mississippi laws prohibited concealed carrying of weapons "unless such person shall . . . be travelling, or setting out on a journey[.]" *Id.* at 21, 23. Plaintiffs also provide the Court with a federal law dated 1986 which stated that, "[n]otwithstanding any other provision of any law or any rule or regulation of a State or any political subdivision thereof, any person who is not otherwise prohibited by this chapter . . . shall be entitled to transport a firearm for any lawful purpose from any place where he may lawfully possess and carry such firearm to any other place where me may lawfully possess and carry such firearm . . . ." *Id.* at 25. This is still good law and requires only that "during such transportation the firearm is unloaded, and neither the firearm nor any ammunition being transported is readily accessible or is directly accessible from the passenger compartment of such transporting vehicle." 18 U.S.C. § 926A.

Defendant James admits that "[s]tate licensing laws such as the one Plaintiffs are challenging did not emerge until the early 20th Century[.]" Dkt. No. 42-6 a 37. His argument that "when [similar laws did emerge], jurisdictions across the country regularly included in-state residency or employment requirements" is unavailing. *Id.* The *Bruen* court rejected state

officials' reliance on laws from "a handful of late-19th-century jurisdictions" because "the historical record compiled by [those officials did] not demonstrate a tradition of broadly prohibiting the public carry of commonly used firearms for self-defense." *Bruen*, 597 U.S. at 38.

Defendant James attempts to rely on even more modern laws from 1905, 1910, 1913, 1914, 1921, and 1985. *See* Dkt. No. 42-2 at 3-5, ¶¶ 14-15, 18-21. Defendant James does provide the Court with a statute dating back to 1672. *See id.* at 2, ¶ 7. However, that law concerned selling firearms to Native Americans or "to any person inhabiting outside of this jurisdiction." *Id.* at 30. The firearm statute challenged by Plaintiffs in this case does not concern the selling of firearms. Defendant James relies on laws from cities in New York which differentiated between residents and non-residents but still permitted "[a]ny nonresident who does business in the city of Albany, and has occasion to carry a loaded pistol, revolver, or firearm while in the said city" to apply for a firearm license. *Id.* at 3-4, ¶¶ 14-15.

Defendant James has not presented any legislative history which supports restricting non-residents from applying for a firearm license in New York. Contrary to Defendant James' argument, an "in-state residency or employment requirement for firearms licensing," is not "entirely 'consistent with this Nation's historical tradition of firearm regulation.'" Dkt. No. 42-6 at 38 (quoting *Bruen*, 597 U.S. at 17). Defendant James contends that for the Court to reach this conclusion, it "would need to adopt an interpretation of Penal Law § 400.00(3)(a) that is contrary to both New York's position and controlling precedent from the New York Court of Appeals" because "New York's licensing law does not contain such a[n in-state residency or employment] requirement." *Id.*

The Court agrees that the firearm statute does not, on its face, contain such a requirement and it does not expressly exclude non-residents from applying for a firearm license. *See* N.Y.

Penal Law § 400.00(3)(a). However, as that law is applied to Plaintiffs Votruba and Harris, who are indisputably not residents or employees of New York, they have been unable to apply for a license. As Plaintiffs argue, based on the language of the statute directing a person to apply "to the licensing officer in the city or county, as the case may be, where the applicant resides, is principally employed or has his or her principal place of business . . . ." N.Y. Penal Law § 400.00(3)(a), Plaintiffs Votruba and Harris have nowhere they can apply. *See* Dkt. No. 44-5 at 12. Defendant James argues that there are "at least eight New York counties . . . [that] accept firearm applications from out-of-state applicants that are not principally employed in New York and do not have a principal place of business in New York," and that there is nothing in § 400.00(3)(a) which expressly forbids nonresidents from applying. Dkt. No. 42-6 at 22-23. As stated, Defendant James is correct that the statue does not expressly "exclude [Plaintiffs] from eligibility," *id.* at 23, but he does not explain which county Plaintiffs are supposed to apply for a license in when they do not have a New York "city or county . . . where the[y] reside[], [are] principally employed or ha[ve a] principal place of business . . ."  N.Y. Penal Law § 400.00(3)(a).

The Court's conclusion is not contrary to "controlling precedent from the New York Court of Appeals" because *Osterweil* concluded "that Penal Law § 400.00(3)(a) does not preclude an individual who owns a part-time residence in New York but makes his permanent domicile in another state from applying for a New York handgun license[.]" *Osterweil*, 21 N.Y.3d at 587; *see also* Dkt. No. 42-6 at 38. There, the court "ha[d] no occasion to decide whether a contrary law would be unconstitutional." *Id.*  The court was not addressing a situation where it is undisputed that the individuals do not reside, even part time, in New York. *See id.*

As of 2022, New York has adopted a "shall issue" licensing regime "where authorities must issue concealed-carry licenses whenever applicants satisfy certain threshold requirements,

without granting licensing officials discretion to deny licenses based on a perceived lack of need or suitability." *Bruen*, 597 U.S. at 13.  Nevertheless, the Second Circuit and the Supreme Court have recognized various exceptions to the right to bear arms.  *See Bruen*, 597 U.S. at 24; *Zherka*, 140 F.4th at 90.

One well established exception concerns the dangerousness of (1) the weapon or (2) the individual wielding the weapon.  For instance, the Second Circuit recently held that Congress has "a legislative power, consistent with the Second Amendment, to disarm categories of persons presumed to be dangerous." *Zherka*, 140 F.4th at 90.  In *Zherka*, the Second Circuit determined that because "the tradition of status-based, categorical restrictions on firearms possession is indicative of an understanding, before, during, and after the period of the Founding and continuing to the present day, of a legislative power, consistent with the Second Amendment, to disarm categories of persons presumed to be dangerous[,]" such exception to the right to bear arms was constitutional.  *Id.*; *see also United States v. Johnson*, No. 24-1629, 2025 WL 1872847, *1 (2d Cir. July 8, 2025); *United States v. Sabree*, No. 23-7218, 2025 WL 2202955, *1 (2d Cir. Aug. 4, 2025).  If "the underlying facts of th[e] case easily support that [the plaintiff] belongs to the 'categories of persons perceived to be dangerous,' as to which firearm regulations have deep historical roots," then the plaintiff cannot prevail on an as-applied challenge.  *Jackson v. United States*, No. 21-CR-386, 2025 WL 1928029, *3 (S.D.N.Y. July 14, 2025) (quoting *Zherka*, 140 F.4th at 88).

Likewise, the Supreme Court recently held that "[w]hen a restraining order contains a finding that an individual poses a credible threat to the physical safety of an intimate partner, that individual may—consistent with the Second Amendment—be banned from possessing firearms while the order is in effect." *Rahimi*, 602 U.S. at 690.  It explained that "[s]ince the founding, our

Nation's firearm laws have included provisions preventing individuals who threaten physical harm to others from misusing firearms." *Id.* In addition to persons perceived as dangerous, "the scope of the Second Amendment does not extend to weapons that are not 'in common use at the time.'" *United States v. Dabidah*, No. 24-CR-00514, 2025 WL 1094657, *3 (S.D.N.Y. Apr. 11, 2025) (quoting *Heller*, 554 U.S. at 627) (collecting cases). This can include short-barreled shotguns and machine guns. *See id.* Additionally, historical tradition supports restrictions at "sensitive places" including "where children congregate," like schools. summer camps, and places of worship. *Mintz*, 724 F. Supp. 3d at 47, 65.

The Second Circuit has recently held that historical tradition supports certain character requirements for obtaining a firearm license. In *Antonyuk*, the plaintiffs argued that the discretionary nature of the "good moral character" condition and the requirement to provide all social media accounts for the application was unconstitutional. *Antonyuk*, 120 F.4th at 998. The Second Circuit stated that "[t]he New York statute mandates the issuance of a license to anyone except those found to present a danger to the community." *Id.* It concluded that if "licensing has been used to regulate privately-owned firearms, issuance has been based on discretionary judgments by local officials. Licensing that includes discretion that is bounded by defined standards . . . is part of this Nation's history and tradition of firearm regulation and . . . in compliance with the Second Amendment." *Id.* at 981.

In this case, there is a lack of historical tradition to support the notion that states can exclude out-of-state applicants and none of the Plaintiffs fall into any of the aforementioned exceptions. There is no dispute that Plaintiffs are not dangerous felons, nor are they subject to restraining orders. *See Zherka*, 140 F.4th at 90; *see also Rahimi*, 602 U.S. at 690. It is also uncontested that Plaintiffs do not seek to carry an uncommon, dangerous firearm, nor do they

seek to carry a firearm in an established "sensitive place." *Dabidah*, 2025 WL 1094657, at *3; *Mintz*, 724 F. Supp. 3d at 65. Finally, it is undisputed that Plaintiffs have good moral character. *Antonyuk*, 120 F.4th at 998. Given the lack of supportive historical tradition for restricting firearm licenses to out-of-state residents and the fact that Plaintiffs are not otherwise exempt from carrying a firearm, the statute is unconstitutional as applied to Plaintiffs, who were denied and prohibited from getting a license in New York.[5]

Plaintiffs filed a letter of supplemental authority on July 2, 2025, directing the Court's attention to a case from the U.S. District Court for the Southern District of California. *See* Dkt. No. 50 (citing *Hoffman v. Bonta*, No. 3:24-CV-664, 2025 WL 1811853 (S.D. Cal. July 1, 2025)). The California law in *Hoffman* "impose[d] a residency requirement" for a standard two-year license. *Hoffman*, 2025 WL 1811853, at *1 (citing Cal. Penal Code § 26155(a)(3)). In California, "[a]n applicant who ha[d] his or her principal place of business or employment within the local permitting jurisdiction may receive a 90-day license." *Id.* (citing Cal. Penal Code §§ 26150(a)(3), 26220(b)). In that case, the plaintiffs were nonresidents of California who held valid firearm licenses issued by their respective states and were unable to carry their firearms for self-

---

[5] The Court notes that "[a]mong the powers reserved to the States under the Tenth Amendment is the State's police power, which includes the power and authority 'reasonably necessary to "guard and protect" public health and public safety[.]'" *Bill & Ted's Riviera, Inc. v. Cuomo*, 494 F. Supp. 3d 238, 244 (N.D.N.Y. 2020) (quoting *Luke's Catering Serv., LLC v. Cuomo*, 485 F. Supp. 3d 369, 379 (W.D.N.Y. 2020)) (additional citations omitted). "In *Jacobson v. Massachusetts*, 197 U.S. 11, 25 (1905), the Supreme Court defined the police powers of the State very broadly, holding that 'the rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand.'" *Id.* (quoting *Jacobson*, 197 U.S. 11 at 29). States are generally afforded significant discretion regarding the legislation of activities concerning public health and safety within their own borders. Firearm regulation is one of those areas. However, in light of the "questions *Bruen* both created and left unresolved[,]" the Court finds that the New York firearm statute is too "oppressive" against nonresident applicants. *Mintz*, 724 F. Supp. 3d at 66.

defense purposes when travelling to and through California.  *See id.*  After analyzing historical precedent and engaging in the *Bruen* analysis, the court held that "[t]he provisions barring nonresidents from applying for licenses violate the Constitution."  *Id.* at *5.  The court in *Hoffman* held that "the challenged statutory framework's exclusion of nonresidents violates the Second Amendment."  *Id.*  By "[o]pening the application process to nonresidents[, they] . . . are simply afford[ing] the same chance guaranteed to residents to exercise their Second Amendment rights."  *Id.*

Defendant James argues that the language of the New York statute differs from the California statutory language because "New York law [does] not have an explicit residency requirement like California's."  Dkt. No. 51 at 1.  He also contends the historical tradition relied on by the California court is not dispositive in the Second Circuit.  *See id.* at 2.  Although the historical tradition relied on by the California court in *Hoffman* is not binding on this Court, the historical tradition discussed in *Hoffman*, which came from the *Bruen* court, supports this Court's conclusion.  As in *Hoffman*, here, the statutory framework as applied to Plaintiffs prohibits them, as nonresidents, from applying for a firearm license.  This is unsupported by historical tradition and is therefore unconstitutional.  *Hoffman*, 2025 WL 1811853, at *5 ("The provisions barring nonresidents from applying for [carry] licenses violate the Constitution"); *Rahimi*, 602 U.S. at 691-92 ("[T]he Second Amendment permits more than just those regulations identical to ones that could be found in 1791"); *see also United States v. Wilson*, 2025 WL 1982767, at *7 ("[R]egardless of how States' permitting schemes are set up, keeping and bearing arms is *presumptively lawful* nationwide").

Last year, in *Christian v. James*, a case out of the Western District of New York held that a New York law, which criminalized possessing a firearm on private property open to the public

by license holders, was unconstitutional as "dictated by the teaching of the Supreme Court's recent cases addressing individual Americans' right to keep and bear arms." 753 F. Supp. 3d 273, 275 (W.D.N.Y. 2024). In that case, the plaintiff claimed the law prevented him "from carry[ing] for self-defense in local parks or when hiking on trails, and while using public transportation[.]" *Id.* (additional citation and quotation marks omitted). The plaintiff further alleged he was prevented "from going about his daily life while lawfully carrying his firearm for purposes of self-defense." *Id.* at 275-76 (quotation and quotation marks omitted). The court applied the reasoning from *Bruen* and concluded as follows:

> In sum, much of the land in New York is held privately and much of that is open to the public. It encompasses various businesses, hotels, parking lots and garages, grocery stores, pharmacies, medical offices, hospitals, cemeteries, malls, sports and entertainment venues, and so on. These are places that people, exercising their rights, frequent every day when they move around outside their homes. Confrontation for self-defense is certainly possible in these places. The State's restriction "'functionally creates a universal default presumption against carrying firearms in public places, seriously burdening lawful gun owners' Second Amendment rights." *Antonyuk*, 89 F.4th at 386. And that "burden is entirely out of step with that imposed by the proffered analogues[.]" *Id.*
>
> The Constitution requires that individuals be permitted to use handguns for the core lawful purpose of self-defense. *McDonald*, 561 U.S. at 767. And it protects that right outside the home. *Bruen*, 597 U.S. at 33. Nothing in the Nation's history or traditions closes the door on that right across all private property open to the public. New York's exclusion, therefore, violates "the general right to publicly carry arms for self-defense." *Id.* at 31. This is one of the policy choices taken "off the table" by the Second Amendment. *Heller*, 554 U.S. at 636.

*Id.* at 293.

In this case, Plaintiffs similarly contend that the New York law, which prevents them from applying for a New York firearm license and fails to recognize their out-of-state firearm licenses,

effectively keeps them from "going about [their] daily life while lawfully carrying [their] firearm for purposes of self-defense." *Id.* at 275-76 (quotation omitted). For example, Plaintiff Votruba contends that the law prevents him from carrying a firearm for self-defense purposes in the woods near his home. *See* Dkt. No. 42-4 at ¶¶ 13-15; *see also* Dkt. No. 1 at ¶ 89. Plaintiffs assert they frequent New York, whether to visit family, travel through, or purchase gasoline for their vehicles. *See* Dkt. No. 39-11. Plaintiffs also explain that they live so close to New York, they may not realize they have crossed the state line at a given moment. *See id.* Here, Plaintiffs have the "general right to publicly carry arms for self-defense" outside the home which, during an individual's daily life, can include crossing state lines. *Christian*, 753 F. Supp. 3d at 275-76. Defendant James has not presented any reason why Plaintiffs' constitutional right to keep and bear arms should stop at the State line. Because "[c]onfrontation for self-defense is certainly possible" when traveling into another state for any reason, New York cannot exclude nonresidents from exercising their constitutional right to bear arms. *Id.* at 293.

Guided by the Supreme Court's holding in *Bruen*, the Court grants Plaintiffs' motion for summary judgment and concludes that the New York firearm statute is unconstitutional under the Second Amendment as applied to Plaintiffs Votruba and Harris. As noted by the district court in California, "the State cannot point to a single law from the Founding or framing tradition that wholesale blocked nonresidents from participating in a general firearms licensing scheme." *Hoffman*, 2025 WL 1811853, at *5. The Court agrees that "[o]pening the application process to nonresidents does not limit [New York's] ability to regulate who receives a [] license based on other measured parameters. Nonresidents are simply afforded the same chance guaranteed to residents to exercise their Second Amendment rights." *Id.*

### *4. Full Faith and Credit Clause*

Plaintiffs argue that "New York must give [their] out-of-state license full faith and credit as a record of a public act certifying Plaintiffs' eligibility to carry a firearm" under the Constitution's Full Faith and Credit Clause. Dkt. No. 39-12 at 28-29. In his cross-motion, Defendant James contends "the Full Faith and Credit Clause does not give rise to a private right of action" and a state can "maintain its own laws within its borders." Dkt. No. 42-6 at 38-39.

The Full Faith and Credit Clause of the U.S. Constitution provides that "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof." U.S. CONST. ART. IV, § 1. "The constitutional requirement that full faith and credit shall be given in each state to the public acts, records, and judicial proceedings of every other state is necessarily to be interpreted in connection with other provisions of the Constitution[.]" *Old Wayne Mut. Life Ass'n v. McDonough*, 204 U.S. 8, 15 (1907).

"First, 'the Full Faith and Credit Clause, in either its constitution or statutory incarnations, does not give rise to an implied federal cause of action.'" *Meissner*, 2025 WL 712744, at *4 (quoting *Thompson v. Thompson*, 484 U.S. 174, 182 (1988)). "Nor does it give 'rise to a right vindicable in a § 1983 action.'" *Id.* (quoting *Adar v. Smith*, 639 F.3d 146, 153 (5th Cir. 2011)). Second, even if Plaintiffs had a vindicable right, "in the case of statutes, . . . the full faith and credit clause does not require one state to substitute for its own statute, applicable to persons and events within it, the conflicting statute of another state, even though that statute is of controlling force in the courts of the state of its enactment with respect to the same persons and events." *Pac. Emps. Ins. Co. v. Indus. Accident Comm'n of State of California*, 306 U.S. 493, 502 (1939).

Defendant James correctly argues that "the grant of a Connecticut or Massachusetts firearm license is not a 'judgment,' and even if it were, those states are not empowered to determine who may carry deadly weapons within New York's borders any more than New York could grant or forbid the right to carry weapons there."  Dkt. No. 45 at 14; *see also Commonwealth v. Harris*, 481 Mass. 767, 775-76 (2019) ("Ultimately, th[e] matter concerns different jurisdictions making differing determinations about firearm licensing and regulation. . . . The Commonwealth is not required to substitute its statutes for those of New Hampshire") (citing *Hamilton v. Pallozzi*, 848 F.3d 614, 628, n.15 (4th Cir. 2017); *Pac. Emps. Ins.*, 306 U.S. at 50 ("[T]he conclusion is unavoidable that the full faith and credit clause does not require one state to substitute for its own statute, applicable to persons and events within it, the conflicting statute of another state")); *see also Hawkins v. State*, 745 S.W.2d 511, 514 (Tex. App. 1988) ("In light of a legitimate state interest in regulating the carrying of handguns, [the court held] that Texas is not required to give full faith and credit to appellant's California [] license and California laws regulating the same").  Plaintiffs have not presented any persuasive authority which negates the conclusion that the firearm statutes of one state cannot be substituted for the requirements of another.  *See Pac. Emps. Ins.*, 306 U.S. at 502.  Additionally, "[m]atters of public record ordinarily include 'documents from prior state court adjudications.'"  *Boateng v. InterAmerican Univ., Inc.*, 210 F.3d 56, 60 (1st Cir. 2000) (quotation omitted).  Plaintiffs' claims in this case do not involve matters of public record or judicial proceedings.  Therefore, Plaintiffs' Full Faith and Credit claim is meritless, and their motion is denied on this ground.

### 5. Privileges and Immunities Clause

Finally, Plaintiffs move for summary judgment on the grounds that the New York licensing scheme at issue violates the Privileges and Immunities Clause because it discriminates

against nonresidents. *See* Dkt. No. 39-12 at 29. They argue that "New York cannot discriminate against nonresidents seeking to exercise their enumerated right to bear arms." *Id.* Defendant James argues that (1) the Privileges and Immunities claim fails because New York's licensing law does not discriminate against nonresidents; (2) Plaintiffs fail to establish a "protectionist purpose"; and (3) assuming there is a residency requirement, there is "sufficient justification" for it. Dkt. No. 42-6 at 31-34. The Court agrees with Defendant James that Plaintiffs have failed to establish the statute's "protectionist purpose" and it is thus not susceptible to a Privileges and Immunities challenge. *See Jones v. Cuomo*, 542 F. Supp. 3d 207, 225 (S.D.N.Y. 2021).

"In order to prevail on a Privileges and Immunities challenge, a plaintiff must demonstrate that the 'State has, in fact, discriminated against out-of-staters with regard to the privileges and immunities it accords its own citizens.'" *Bach v. Pataki*, 408 F.3d 75, 88 (2d Cir. 2005) (quoting *Connecticut ex rel. Blumenthal v. Crotty*, 346 F.3d 84, 94 (2d Cir. 2003)). The constitutional right to travel from one state to another is a fundamental one. *See United States v. Guest*, 383 U.S. 745, 757 (1966). "One component of the right to travel is the right of a nonresident of a state 'to be treated as a welcome visitor rather than an unfriendly alien when temporarily present' in that state.'" *Bach*, 408 F.3d at 88 (quoting *Saenz v. Roe*, 526 U.S. 489, 500 (1999)). "This right does not, however, guarantee to the temporary visitor of a state the enjoyment of all the rights enjoyed by bona fide residents of that state." *Bach v. Pataki*, 289 F. Supp. 2d 217, 226 (N.D.N.Y. 2003), *aff'd*, 408 F.3d 75 (2d Cir. 2005).

If a state treats nonresidents differently, it "may defend its position by demonstrating: '(a) a substantial reason for the discrimination, and (b) a reasonable relationship between the degree of discrimination exacted and the danger sought to be averted by enactment of the discriminatory statute.'" *Bach*, 408 F.3d at 88 (quoting *Crotty*, 346 F.3d at 94). "[A] law 'implicates the right to

travel when it actually deters such travel, when impeding travel is its primary objective, or when it uses any classification which serves to penalize the exercise of that right.'" *Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 53 (2d Cir. 2007) (quoting *Att'y Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 903 (1986)).  "[A] plaintiff asserting a Privileges and Immunities Clause challenge must demonstrate that the state has burdened nonresident activity that is sufficiently basic to the livelihood of the Nation as to fall within the purview of the Privileges and Immunities Clause." *Jones*, 542 F. Supp. 3d at 225 (citing *Schoenefeld v. Schneiderman*, 821 F.3d 273, 279 (2d Cir. 2016)) (additional quotation and quotation marks omitted).  "If a plaintiff makes such a showing, the state may defend its position by demonstrating that 'substantial reasons exist for the discrimination and the degree of discrimination bears a sufficiently close relation to such reasons.'" *Id.* (quoting *Schoenefeld*, 821 F.3d at 279) (additional quotation omitted).

However, the Second Circuit has explained that "it is protectionist purpose, and not disparate effects alone, that identifies the sort of discrimination prohibited by the Privileges and Immunities Clause, by contrast, for example, to the Commerce Clause." *Schoenefeld*, 821 F.3d at 280.  The Supreme Court "has struck laws down as violating the [P]rivilege[s] [and Immunities Clause if] enacted for the protectionist purpose of burdening out-of-state citizens." *McBurney v. Young*, 569 U.S. 221, 227-28 (2013) (collecting cases).

"[A] plaintiff challenging a law under the Privileges and Immunities Clause must allege or offer some proof of a protectionist purpose to maintain the claim.  In the absence of such a showing, a Privileges and Immunities claim fails, obviating the need for a tailoring inquiry." *Schoenefeld*, 821 F.3d at 281.  There is no protectionist purpose if "[n]o local economic factor is favored[.]" *Brown-Forman Corp. v. Tennessee Alcoholic Beverage Comm'n*, 860 F.2d 1354, 1363 (6th Cir. 1988), *judgment vacated on other grounds*, 492 U.S. 902 (1989); *see also Black*

*Star Farms LLC v. Oliver*, 600 F.3d 1225, 1230 n.4 (9th Cir. 2010) (noting a plaintiff must

provide "'evidence' of a legislative economic protectionist purpose"). "'A statute enacted for . . . a

nonprotectionist purpose is not vulnerable to a Privileges and Immunities challenge.'" *Id.*

(quoting *Schoenefeld*, 821 F.3d at 282).

Defendant James asserts that any residency language in the statute has an "undisputed

nonprotectionist purpose" which is "to prevent New York City residents from obtaining handgun

permits in counties where . . . investigations of applicants were much less thorough . . . . [T]he

law was originally designed to ensure that licenses were obtained where [New York-based]

applicants resided, and to discourage 'forum-shopping.'" Dkt. No. 42-6 at 42 (quoting *Osterweil*,

21 N.Y. 3d at 586). Plaintiffs address the issue of a protectionist purpose in their response to

Defendant James' motion. *See* Dkt. No. 44-5. They argue, with no support from case law, that

the protectionist purpose requirement does not "exist[] in the Clause's text" and "while economic

protectionism is one form of discrimination the Clause prohibits, it is not the only one." Dkt. No.

44-5 at 29 (emphasis omitted). Plaintiffs cite to *Toomer v. Witsell*, 334 U.S. 385 (1948), in which

the statute at issue "require[d] non-residents of South Carolina to pay license fees one hundred

times as great as those which residents must pay" for owning a shrimp boat. *Id.* at 395. Plaintiffs

cite a portion of the *Toomer* decision which stated that the "purpose and effect of th[e] statute . . .

[was] not to conserve [the] shrimp [supply], but to exclude non-residents . . ." thus implicating the

Privileges and Immunities Clause. Dkt. No. 44-5 at 30. However, their citation to *Toomer* omits

the latter half of the sentence which notes that the statute was meant "to exclude non-residents and

thereby create a *commercial monopoly* for South Carolina residents[,]" which is a protectionist

purpose. *Toomer*, 334 U.S. at 395 (emphasis added). Because Plaintiffs fail to establish that the

purpose and effect of the New York firearm statute necessarily involves the economy or

protectionism, the statute is "not vulnerable to a Privileges and Immunities challenge." *Jones*,

542 F. Supp. 3d at 225 (quoting *Schoenefeld*, 821 F.3d at 281).  Thus, the Court denies Plaintiffs'

motion for summary judgment as it pertains to the Privileges and Immunities Clause.

**C.    Declaratory and Injunctive Relief**

Finally, "Plaintiffs request entry of declaratory and injunctive relief holding N.Y. Penal

Law § 400.00(3)(a)'s residency, employment, and business prerequisites unconstitutional."  Dkt.

No. 39-12 at 31.  In their complaint, Plaintiffs requested the Court to enter judgment in their favor

declaring and enjoining Defendants' conduct as follows:

> 1. An order declaring that the challenged sections of N.Y.
> Penal Law § 400.00 are unenforceable, unconstitutional, and
> violate the Second and Fourteenth Amendments to the
> United States Constitution;
>
> 2. An order declaring that New York's failure to accept
> applications or issue firearm permits to out of state residents
> violates the Privileges and Immunities Clause;
>
> 3. An order declaring that New York must honor permits to
> carry firearms issued by other states, regardless of whether
> the permit holder is a resident of New York;
>
> 4. An order declaring that New York must permit residents
> of other states to apply for and be issued permits to carry
> firearms in New York;
>
> 5. An order permanently enjoining all Defendants and all
> other officers, agents, servants, employees, and persons
> under the authority of the State, from enforcing all laws
> prohibiting concealed carry if the person accused of that
> crime has an otherwise-valid permit to carry issued by any
> state, and is not otherwise prohibited from possessing or
> carrying firearms; [and]
>
> 6. An order permanently enjoining all Defendants and all
> other officers, agents, servants, employees, and persons
> under the authority of the State, from refusing to accept
> applications from, and refusing to issue permits, to

> otherwise eligible persons who are not residents of the State
> of New York[.]

Dkt. No. 1 at 29.  In light of the Court's conclusions throughout this Memorandum-Decision and

Order, and for the following reasons, the relief requested in paragraphs 1, 4, and 6 is granted in

part, and all requests are otherwise denied.

"A Plaintiff must satisfy the following four-factor test for injunctive relief: (1) the plaintiff

must suffer irreparable injury; (2) legal remedies are inadequate; (3) an equitable remedy is

warranted in light of the balance of hardships between the parties; and (4) a permanent injunction

would not disserve the public interest." *Hoffman*, 2025 WL 1811853, at \*6 (citing *Monsanto Co.*

*v. Geertson Seed Farms*, 561 U.S. 139, 156-57 (2010)) (additional citation omitted); *see also*

*Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024).

"'A showing of irreparable harm is the single most important prerequisite for the issuance

of a preliminary injunction.'" *Bisnews AFE (Thailand) Ltd. v. Aspen Research Group Ltd.*, 437

Fed. Appx. 57, 58 (2d Cir. 2011) (quoting *Faiveley Transport Malmo AB v. Wabtec Corp.*, 559

F.3d 110, 118 (2d Cir. 2009)).  However, speculative, remote, or future injury is not the province

of injunctive relief. *Los Angeles v. Lyons*, 461 U.S. 95, 111-12 (1983); *Garcia v. Arevalo*, No.

93-CV-8147, 1994 WL 383238, \*2 (S.D.N.Y. June 27, 1994) ("It is well settled that an allegation

of the mere possibility of irreparable harm is insufficient to justify the drastic remedy of

preliminary injunction. . . .  A party who seeks the extraordinary remedy of a preliminary

injunction must show the alleged irreparable harm to be imminent, not remote or speculative, and

the alleged injury to constitute one that is incapable of being fully remedied by monetary

damages") (citations omitted).  Moreover, a finding of irreparable harm cannot be based solely on

past conduct. *See Haden v. Hellinger*, No. 9:14-CV-0318, 2016 WL 589703, \*1 (N.D.N.Y. Feb.

11, 2016).

"In the Second Circuit, it is well-settled that an alleged constitutional violation constitutes irreparable harm." *Basank v. Decker*, 449 F. Supp. 3d 205, 213 (S.D.N.Y. 2020) (citing *Connecticut Dep't of Envtl. Prot. v. O.S.H.A.*, 356 F.3d 226, 231 (2d Cir. 2004)) ("[W]e have held that the alleged violation of a constitutional right triggers a finding of irreparable injury") (internal quotation marks and citations omitted) (collecting cases); *see also Glidedowan, LLC v. New York State Dep't of Health*, 768 F. Supp. 3d 503, 516 (W.D.N.Y. 2025). "And it is generally recognized that there is no adequate remedy at law to rectify a constitutional injury." *Hoffman*, 2025 WL 1811853, at *6 ("[A] plaintiff who can show a statute violates the Constitution will also usually show that both public interest and balance of equities favor an injunction") (citing *Baird v. Bonta*, 81 F.4th 1036, 1044 (9th Cir. 2023)); *see also Pennington v. Rosado*, No. 21-CV-7322, 2022 WL 3127062, *9 (S.D.N.Y. May 31, 2022) ("'[I]t is always in the public interest to prevent the violation of a party's constitutional rights.' A preliminary injunction would prevent an ongoing violation of [a p]laintiff's substantive liberty rights and would remedy ongoing harm to him") (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (additional citation omitted)).

The Court has concluded that Defendants violated Plaintiffs Harris and Votruba's Second Amendment rights insofar as New York Penal Law § 400.00(3)(a)'s residency, employment, and business prerequisites are applied to them. Therefore, the Court finds that they are entitled to declaratory and injunctive relief for the same and New York must permit residents of other states to apply for permits to carry firearms in New York. However, Plaintiffs also request that the Court order Defendants "to issue" firearm licenses. Dkt. No. 1 at 29. As explained in this decision, New York is a "shall issue" state "where authorities must issue concealed-carry licenses

whenever applicants satisfy certain threshold requirements, without granting licensing officials discretion to deny licenses based on a perceived lack of need or suitability." *Bruen*, 597 U.S. at 13. Whether Plaintiffs "satisfy certain threshold requirements," such as the "good character" requirement, which permits "licensing officers across New York [to] consider whether an applicant for a firearm license can be trusted to use that gun in a responsible, safe way," *Antonyuk*, 120 F.4th at 998-99, is not an issue before this Court. The Court was tasked with answering only whether individuals who do not reside or work in New York should be permitted to apply for a firearm license in New York State. The Court has answered that question in the affirmative and will not go beyond that conclusion to determine whether New York shall issue a license to the named Plaintiffs.

Plaintiffs are not, likewise, entitled to the same on the Full Faith and Credit and Privileges and Immunities claims. Plaintiffs request that the Court order New York and law enforcement personnel to recognize out-of-state firearm licenses. As explained, no constitutional provision requires one state to adopt the license issued in another state without any additional inquiry. Therefore, Plaintiffs are not entitled to the relief they seek concerning firearm license reciprocity.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the reasons set forth above, the Court hereby

**ORDERS** that Plaintiffs' motion for summary judgment (Dkt. No. 39) is **GRANTED IN PART and DENIED IN PART** as follows:

**GRANTED** as to Plaintiffs' Second Amendment claims regarding the constitutionality of N.Y. Penal Law § 400.00(3)(a) as applied to Plaintiffs Harris and Votruba;

**DENIED** as to Plaintiffs' Full Faith and Credit claim; and

**DENIED** as to Plaintiffs' Privileges and Immunities claim; and the Court further

**ORDERS** that N.Y. Penal Law § 400.00(3)(a) has been unconstitutionally applied to Plaintiffs Harris and Votruba; and the Court further

**ORDERS** that Defendants must permit residents of other states to apply for permits to carry firearms in New York; and the Court further

**ORDERS** that Defendants and all other officers, agents, servants, employees, and persons under the authority of the State shall not refuse to accept applications from otherwise eligible persons who are not residents or employees of the State of New York; and the Court further

**ORDERS** that Defendant James' cross-motion for summary judgment (Dkt. No. 42) is **GRANTED as to standing** and otherwise **DENIED as moot**; and the Court further

**ORDERS** that Plaintiffs' claims, to the extent they seek relief from Defendant James, are **DISMISSED for lack of standing**; and the Court further

**ORDERS** that Plaintiff Higbie's as-applied Second Amendment claim is **DISMISSED as moot**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in accordance with this Memorandum-Decision and Order and close the case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: August 20, 2025
      Albany, New York

Mae A. D'Agostino
U.S. District Judge